No. 24-6063

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

STATE OF OKLAHOMA,
*Plaintiff-Appellant,*

*v.*

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER BECERRA, IN HIS OFFICIAL CAPACITY AS THE SECRETARY OF THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; JESSICA S. MARCELLA, IN HER OFFICIAL CAPACITY AS DEPUTY ASSISTANT SECRETARY FOR POPULATION AFFAIRS;
OFFICE OF POPULATION AFFAIRS,
*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Oklahoma
No. 5:23-CV-01052-HE, The Hon. Joe Heaton

**BRIEF OF MISSISSIPPI, ALABAMA, ALASKA, ARKANSAS, FLORIDA, GEORGIA, IDAHO, INDIANA, IOWA, KANSAS, KENTUCKY, LOUISIANA, MISSOURI, MONTANA, NEBRASKA, NORTH DAKOTA, OHIO, SOUTH CAROLINA, SOUTH DAKOTA, TENNESSEE, TEXAS, UTAH, WEST VIRGINIA, AND WYOMING AS AMICI CURIAE SUPPORTING PLAINTIFF-APPELLANT AND REVERSAL**

LYNN FITCH
 *Attorney General*
SCOTT G. STEWART
 *Solicitor General*
MISSISSIPPI ATTORNEY
 GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
E-mail: scott.stewart@ago.ms.gov
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iii

INTRODUCTION AND INTEREST OF AMICI CURIAE ....................... 1

SUMMARY OF ARGUMENT .................................................... 5

ARGUMENT .................................................... 5

I.    When Agency Action Pushes Constitutional Boundaries, Judicial Review Of That Action Is Searching—Not Deferential.................. 5

    A.    The Constitution Establishes A Limited Federal Government And Leaves Power With—And Accountable To—The People ................................................................ 5

    B.    Federal Agencies Present Special Dangers To The Constitutional Design ........................................... 8

    C.    Because Agencies Present Special Dangers, Courts Must Be Searching—Not Deferential—In Reviewing Agency Action That Pushes Constitutional Boundaries ............................. 11

II.    HHS's Decision Pushes Constitutional Boundaries And Thus Warrants Searching Judicial Review ........................................... 14

    A.    HHS's Decision Undercuts The Separation Of Powers........ 15

    B.    HHS's Decision Erodes Federalism ..................................... 17

    C.    HHS's Decision Robs From The People Decisions Of Great Importance .......................................................... 19

CONCLUSION ........................................................... 21

CERTIFICATE OF COMPLIANCE ........................................... 23

CERTIFICATE OF DIGITAL SUBMISSION ....................................... 23

i

CERTIFICATE OF SERVICE................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Ass'n of Realtors v. HHS*,
141 S. Ct. 2485 (2021) (per curiam)................................ 8, 10, 12, 13, 19

*Bond v. United States*,
564 U.S. 211 (2011)................................................................................7

*Bowsher v. Synar*,
478 U.S. 714 (1986)..................................................................... 5, 6, 10

*Dobbs v. Jackson Women's Health Organization*,
142 S. Ct. 2228 (2022)................................................. 15, 17, 18, 19, 20

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)............................................................................. 12

*Free Enterprise Fund v. PCAOB*,
537 F.3d 667 (D.C. Cir. 2008) ...............................................................9

*Free Enterprise Fund v. PCAOB*,
561 U.S. 477 (2010)......................................................... 7, 8, 9, 10, 20

*Freytag v. Commissioner*,
501 U.S. 868 (1991)..........................................................................7-8

*Gonzales v. Oregon*,
546 U.S. 243 (2006).............................................. 10, 13, 14, 17, 19, 20

*Gregory v. Ashcroft*,
501 U.S. 452 (1991)........................................................ 7, 9, 10, 13, 19

*Hillsborough County v. Automated Medical Laboratories, Inc.*,
471 U.S. 707 (1985).............................................................................. 17

iii

*INS v. Chadha,*
    462 U.S. 919 (1983) ................................................................ 6, 8, 9, 17

*New York v. United States,*
    505 U.S. 144 (1992) ............................................................ 7, 8, 10, 11

*NFIB v. OSHA,*
    142 S. Ct. 661 (2022) (per curiam) .................................. 11, 12, 14, 17

*NFIB v. Sebelius,*
    567 U.S. 519 (2012) ...................................................................... 7

*Planned Parenthood of Southeastern Pennsylvania v. Casey,*
    505 U.S. 833 (1992) ..................................................................... 15

*Rust v. Sullivan,*
    500 U.S. 173 (1991) ..................................................................... 16

*Solid Waste Agency of Northern Cook County v.*
    *U.S. Army Corps of Engineers,*
    531 U.S. 159 (2001) ..................................................................... 13

*Utility Air Regulatory Group v. EPA,*
    573 U.S. 302 (2014) ..................................................................... 12

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ....................................................... 11, 12, 14, 17

*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ...................................................................... 6

## Constitutional Provisions

U.S. Const. art. I, § 7 ......................................................................... 8

U.S. Const. amend. X ......................................................................... 7

## Statutes

18 U.S.C. § 1461 ............................................................................... 16

18 U.S.C. § 1462 ................................................................ 16

18 U.S.C. § 1531 ................................................................ 16

42 U.S.C. § 300 ............................................................. 1, 15

42 U.S.C. § 300a-6 ................................................. 1, 15, 16

136 Stat. 4459 (2022) ...................................................... 16

Miss. Code Ann. § 41-41-45 ............................................ 17

Okla. Stat. Ann. tit. 21, § 861 .................................. 17, 18, 19

Okla. Stat. Ann. tit. 63, § 1-741 ....................................... 20

## Regulation

42 C.F.R. § 59.5 ................................................................. 1

## Rule

Fed. R. App. P. 29 .............................................................. 4

## Other Authorities

John Hart Ely,
    Democracy and Distrust (1980) .......................................... 10

Jonathan H. Adler & Christopher J. Walker,
    Delegation and Time,
    105 Iowa L. Rev. 1931 (2020) ............................................. 9

Ronald A. Cass,
    Rulemaking Then and Now: From Management to Lawmaking,
    28 Geo. Mason L. Rev. 683 (2021) ....................................... 9

The Federalist No. 47
    (James Madison) ................................................................ 6

Women's Health Protection Act of 2023,
S. 701, 118th Cong. (2023)...................................................... 16

Women's Public Health and Safety Act,
S. 471, 118th Cong. (2023)......................................................... 15-16

**INTRODUCTION AND INTEREST OF AMICI CURIAE**

This case challenges the U.S. Department of Health and Human Services' decision to block federal funds to Oklahoma based on the State's approach to abortion. That decision bristles against constitutional boundaries and warrants searching—not deferential—judicial scrutiny.

This case concerns Title X of the Public Health Service Act, which authorizes HHS to send federal money to States to operate "voluntary family planning projects." 42 U.S.C. § 300(a). States may use that money to offer a wide range of "effective family planning methods and services," *ibid.*, but Congress directed that "[n]one of the funds appropriated under" Title X "shall be used in programs where abortion is a method of family planning," *id.* § 300a-6. Despite that command, current HHS regulations require Title X grantees to provide abortion counseling and referrals upon request. 42 C.F.R. § 59.5(a)(5)(i), (ii). As HHS sees things, that regulation requires States to refer for abortions despite a State's laws on the matter. HHS therefore halted Oklahoma's Title X family-planning funding because that State generally will not refer patients for abortions. In this lawsuit seeking to regain that funding, HHS urged the district court to exercise "narrow," "deferential" review over HHS's decision blocking that funding. HHS Opp., App. Vol. 3 at 436. The district court sided with HHS. PI Hearing Tr., App. Vol. 3 at 597-613; *see id.* at 604, 610, 611-12.

1

HHS is not entitled to deference. Courts give agencies deference on matters of special agency competence, on granular questions requiring technical expertise, and on issues over which an agency enjoys clear authority. But courts do not defer when agency actions (like HHS's decision here) test constitutional boundaries.

This is because federal agencies present special risks to the constitutional design. Our Constitution establishes a limited federal government and leaves power over important issues with the people. Agencies imperil that design. Where the Constitution separates the national government's powers, agencies seek to concentrate power. The Constitution vests lawmaking authority—the power to make national policy—in a vigorous Congress. But federal agencies routinely exert broad lawmaking power and impose major national policies. The Constitution also divides power between the national government and state governments. Federalism prevents the national government from wielding so much power that it can trample liberty and keeps most power with state governments that the people can better hold accountable. Federal agencies undercut this framework. They regularly adopt policies that thwart state laws—without the accountability that comes with state lawmaking—causing federal power to swell and liberty to shrink. And agencies imperil what may be the Constitution's core feature: that the people decide the hardest, most important issues. As agencies engulf more of American life, the people lose control over those issues.

HHS's decision to halt Oklahoma's Title X funding presents these risks to the constitutional design. Start with the separation of powers. HHS seeks to force Oklahoma, with the threat of losing millions of dollars, to refer patients for abortions that defy Oklahoma state law. But in the very statute that HHS wields to make this threat, Congress barred States from using federal funds for abortion. At the least, Title X does not override state abortion restrictions. Yet that is the power that HHS now claims under Title X. And it demands deference to that view. This claim of authority tests the separation of powers.

Now take federalism. Under the Constitution, States have the primary authority to protect life and health. Using that authority, some States have taken a permissive approach to abortion. Other States—like Oklahoma—have restricted abortion. Either way, those decisions are for each State to make. Yet HHS has upended that framework by seeking to force Oklahoma to subvert its own laws or lose out on money that helps the State provide services that it deems critical. This intrusion on state authority exerts serious pressure on the federal-state balance of power.

Last, consider how this all affects the American people. Few issues are as important and controversial as abortion. Federal lawmaking on abortion has thus long proceeded incrementally: sweeping action has not gained the consensus needed to become federal law. And when Congress has legislated on abortion, it has adopted targeted laws that restrict or discourage abortion or—like Title X—block federal dollars from funding

it. Because questions on abortion are so important, it is critical that the people decide them. Yet HHS seeks to rob the people of power to decide these questions for themselves by demanding, on pain of massive financial loss, that Oklahoma refer for abortions that defy the will of its people. That state of affairs departs from our constitutional order, which leaves the most important matters to the people.

These tests to the constitutional design—and what they mean for resolving this case—are of great importance to amici curiae, the States of Mississippi, Alabama, Alaska, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Missouri, Montana, Nebraska, North Dakota, Ohio, South Carolina, South Dakota, Tennessee, Texas, Utah, West Virginia, and Wyoming.* In adopting the Constitution, the people reserved most power to themselves and to States that would protect liberty. Because of their duty to protect liberty, amici have a strong interest in rigorous enforcement of constitutional limits— including searching judicial review of federal agency actions that press constitutional boundaries. Amici also have a strong interest in the enforcement of duly enacted state laws on abortion and in the interests that those laws serve. HHS's decision presses constitutional boundaries and undercuts state abortion laws. This Court should subject HHS's decision to searching review.

_____

* The States may file this brief without the parties' consent or leave of the Court. Fed. R. App. P. 29(a)(2).

## SUMMARY OF ARGUMENT

Our Constitution establishes a limited federal government that leaves most power with—and accountable to—the people. Federal agencies present special risks to that design. So when agency action pushes constitutional bounds, judicial review of that action is searching—not deferential. The HHS decision challenged here pushes constitutional bounds. The decision tests the separation of powers, saps federalism, and undermines decisions made by the people of Oklahoma. This Court should therefore exercise searching review of that decision and reject HHS's plea for deference.

## ARGUMENT

### I.  When Agency Action Pushes Constitutional Boundaries, Judicial Review Of That Action Is Searching—Not Deferential.

Federal courts often decide challenges to agency action. At times courts review such action deferentially. But that is not so when agency action bristles against the constitutional design. When that happens, judicial review is searching.

### A.  The Constitution Establishes A Limited Federal Government And Leaves Power With—And Accountable To—The People.

The Constitution protects liberty by limiting government power. It does this mainly through "structural protections." *Bowsher v. Synar*, 478 U.S. 714, 730 (1986). It divides power at the national level, further

divides power between the national and state governments, and otherwise reinforces that power remains with and is accountable to the people—particularly on what is most important.

Start at the national level, with the separation of powers. The Constitution "divide[s] the ... powers of the ... Federal Government into three defined categories, Legislative, Executive, and Judicial." *INS v. Chadha*, 462 U.S. 919, 951 (1983). The Framers understood that "unit[ing]" different powers in the "same person or body" destroys "liberty." The Federalist No. 47 (James Madison) (quoting Montesquieu). By "diffus[ing] power," then, the Constitution aims to "better ... secure liberty." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). All the Constitution's divisions of national power are critical. But the division most important to national policymaking is the one between the legislative and executive branches. The Constitution establishes "a vigorous Legislative Branch and a separate and wholly independent Executive Branch, with each branch responsible ultimately to the people." *Bowsher*, 478 U.S. at 722. Each of those branches must "confine itself to its assigned responsibility" and not "exceed" constitutional limits by exercising power assigned to the other branch. *Chadha*, 462 U.S. at 951.

Next, take the division between the national and state governments: federalism. The Constitution embraces a system of "dual sovereignty," in which "States possess sovereignty concurrent with that

of the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). By striking a proper "balance of power between the States and the Federal Government," federalism complements the separation of powers by "secur[ing] to citizens the liberties that derive from the diffusion of sovereign power." *New York v. United States*, 505 U.S. 144, 181 (1992). And instead of forcing the people "to rely solely upon the political processes that control a remote central power," the federal structure lets States take different approaches that respond "to the diverse needs of a heterogeneous society." *Bond v. United States*, 564 U.S. 211, 221 (2011). By leaving most power with the States, the Constitution makes those who most wield power over everyday life accountable to the people as a distant national government can never be. *See Gregory*, 501 U.S. at 458; *cf. NFIB v. Sebelius*, 567 U.S. 519, 578 (2012) (opinion of Roberts, C.J.) ("Permitting the Federal Government to force the States to implement a federal program would threaten the political accountability key to our federal system.").

Last, take the core aim of the Constitution: protecting liberty by leaving power with—and making power accountable to—the people. *See* U.S. Const. amend. X. "Our Constitution was adopted to enable the people to govern themselves, through their elected leaders." *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 499 (2010). The constitutional design ensures that the officials who wield government power remain "accountable to political force and the will of the people," *Freytag v.*

*Commissioner*, 501 U.S. 868, 884 (1991), and face "electoral ramifications" when they use power poorly, *New York*, 505 U.S. at 169. The separation of powers and federalism of course serve this aim. And the Constitution reinforces those protections by limiting federal power—particularly national lawmaking power. The Constitution makes that power hard to exercise. A policy can become federal law only by majority vote of two differently composed houses of Congress and approval by the President. U.S. Const. art. I, § 7. This process is deliberately challenging. *See Chadha*, 462 U.S. at 944, 949, 959. Requiring hard work and buy-in from a wide cross-section of the people's elected representatives ensures that "dependence on the people" remains the "primary contro[l] on the government." *Free Enterprise Fund*, 561 U.S. at 501.

## B. Federal Agencies Present Special Dangers To The Constitutional Design.

Against the constitutional design stand federal agencies. Agencies pose many risks to that design, but three are especially acute.

First, agencies erode the separation of powers. Agencies are housed in the executive branch yet often assert legislative power over matters of "vast economic and political significance." *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (per curiam) (internal quotation marks omitted). Agencies have adopted many national policies—on heated, important issues—that operate as federal law even though those policies would never have been enacted by Congress. *See infra* Part I-C (giving

examples). That is especially so in the modern day, when "the vast majority" of federal "lawmaking" no longer "take[s] place in Congress, but within the hundreds of federal agencies spread across the modern regulatory state." Jonathan H. Adler & Christopher J. Walker, Delegation and Time, 105 Iowa L. Rev. 1931, 1975 (2020); *see* Ronald A. Cass, Rulemaking Then and Now: From Management to Lawmaking, 28 Geo. Mason L. Rev. 683, 694 (2021) (Congress passes 200-400 laws each year; federal agencies adopt some 3000-5000 final rules each year). Agencies have thus overtaken much of Congress's "assigned responsibility." *Chadha*, 462 U.S. at 951.

Second, federal agencies imperil federalism. Just as there is "hydraulic pressure inherent within each of the separate [federal] Branches to exceed the outer limits of its power," *Chadha*, 462 U.S. at 951, there is inherent pressure for the federal government to exceed its authority by invading the domain of States. *Cf. Free Enterprise Fund v. PCAOB*, 537 F.3d 667, 694 n.4 (D.C. Cir. 2008) (Kavanaugh, J., dissenting) ("Power abhors a vacuum."), *aff'd in part*, *rev'd in part*, *and remanded*, 561 U.S. 477 (2010). As federal power expands, it does so at the expense of state power. That expense is costly indeed: the people can far better channel power and hold officials accountable at the state level. The ability to disrupt the traditional federal-state balance is thus an "extraordinary power" that Congress "does not exercise lightly." *Gregory*, 501 U.S. at 460. Yet federal agencies now routinely "intrude[ ] into" the

"domain of state law." *Alabama Ass'n*, 141 S. Ct. at 2489. And they often do so using stale, vague, or inapt delegations of power that do not reflect Congress's "clear and manifest" "intent to intrude on state governmental functions." *Gregory*, 501 U.S. at 461, 470. "[T]he background principles of our federal system ... belie the notion that Congress would use" "obscure grant[s] of authority to regulate areas traditionally supervised by the States' police power." *Gonzales v. Oregon*, 546 U.S. 243, 274 (2006). Yet agencies plow ahead, claiming more for themselves—and less for States.

Third, agencies seize power from the people. Only a "vigorous" Congress—"responsible ultimately to the people" through elections— enjoys national lawmaking authority. *Bowsher*, 478 U.S. at 722. When elected representatives in Congress "make[ ] ... decision[s] in full view of the public," those officials "suffer the consequences if" a decision "turns out to be detrimental or unpopular." *New York*, 505 U.S. at 168. And the challenges of the federal-lawmaking process ensure that "the people" retain ultimate policymaking control. *Free Enterprise Fund*, 561 U.S. at 501. But agencies operate outside these constraints. They are staffed by faceless functionaries who are "neither elected nor reelected" and are "controlled only spasmodically by officials who are." John Hart Ely, Democracy and Distrust 131 (1980); *see Free Enterprise Fund*, 561 U.S. at 499 ("The growth of the Executive Branch, which now wields vast power and touches almost every aspect of daily life, heightens the concern that it may slip from the Executive's control, and thus from that of the

10

people."). This "insulat[ion]" from "electoral ramifications" "diminishe[s]" the "[a]ccountability" the Constitution envisions. *New York*, 505 U.S. at 169. As a result, agencies often adopt policies, on major issues, that the people as a whole do not want. *Cf. West Virginia v. EPA*, 142 S. Ct. 2587, 2608-09 (2022) (describing cases where agencies adopted policies that would likely have failed legislatively).

### C. Because Agencies Present Special Dangers, Courts Must Be Searching—Not Deferential—In Reviewing Agency Action That Pushes Constitutional Boundaries.

Given the risks that agencies pose to the constitutional design, courts must be vigilant in policing agency actions that test constitutional limits. The Supreme Court has demonstrated this in many cases.

First, the Supreme Court has safeguarded the separation of powers by blocking agency actions that arrogate legislative power from Congress. In *West Virginia v. EPA*, for example, the Court rejected the EPA's claim of authority to "restructure the American energy market" by "forc[ing] a nationwide transition" to renewable energy sources. 142 S. Ct. at 2610, 2616. "A decision of such magnitude and consequence," the Court ruled, "rests with Congress itself"—or at least with "an agency acting pursuant to a clear delegation from that representative body." *Id.* at 2616. Similarly, in *NFIB v. OSHA*, 142 S. Ct. 661 (2022) (per curiam), the Court rejected the Occupational Safety and Health Administration's attempt to impose a nationwide vaccine mandate on "roughly 84 million workers."

*Id.* at 662. The "responsibility" for "weigh[ing] [the] tradeoffs" of such "a significant encroachment" on the American public, the Court stressed, belongs to "those chosen by the people through democratic processes." *Id.* at 665, 666.

The Supreme Court has rejected many other agency actions that intruded on Congress's legislative authority. *E.g.*, *Alabama Ass'n*, 141 S. Ct. at 2486, 2490 ("Congress, not the CDC," is responsible for deciding "whether the public interest merits" a "nationwide moratorium on evictions" during a pandemic); *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) (rejecting view of Clean Air Act that would have "br[ought] about an enormous and transformative expansion in EPA's regulatory authority without clear congressional authorization"); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125-26 (2000) (rejecting FDA's claim that its power over "drugs" and "devices" includes power to regulate or ban tobacco products). In doing so, the Supreme Court has applied a "presum[ption]" that "Congress intends to make major policy decisions itself"—through legislation—and "not leave those decisions to agencies." *West Virginia*, 142 S. Ct. at 2609. Courts should thus look skeptically—not deferentially—when agencies make broad uses of legislative power.

Second, the Supreme Court has halted agency actions that erode federalism. The Court has been especially wary of actions that "intrude[ ] into an area that is the particular domain of state law." *Alabama Ass'n*,

12

141 S. Ct. at 2489. Thus in *Alabama Association of Realtors*, the Court rejected the CDC's claimed authority to impose a nationwide eviction moratorium in part because that action "intrude[d]" on "landlord-tenant relationship[s]" traditionally regulated by States. *Ibid.* And in *Gonzales v. Oregon*, the Court refused to read the federal Controlled Substances Act to give the Attorney General power "to prohibit doctors from prescribing regulated drugs for use in physician-assisted suicide." 546 U.S. at 248-49. The Court rejected the claimed power of "a single executive officer" "to effect a radical shift of authority from the States to the Federal Government to define general standards of medical practice in every locality." *Id.* at 275. Similarly, in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001), the Court refused to read the Clean Water Act to give a federal agency control over certain lands traditionally regulated by States. *Id.* at 162. A contrary view would have "result[ed] in a significant impingement of the States' traditional and primary power over land and water use." *Id.* at 174. In all these cases the Supreme Court scrutinized agency action not deferentially but vigilantly—in a way that honored federalism and preserved the "proper balance between the States and the Federal Government." *Gregory*, 501 U.S. at 459.

Third, the Supreme Court has closely examined agency actions that take major issues away from the people. A prominent recent example is the Court's rejection of a workplace-safety agency's effort to mandate

vaccination for much of the U.S. workforce. *See OSHA*, 142 S. Ct. at 664-66. Such a consequential, debated issue was for the people's elected representatives, not unelected federal functionaries. The Court's careful scrutiny was particularly apt because the agency's actions set a national policy that cut off an "earnest and profound debate" "across the country" on a matter of great importance. *Gonzales*, 546 U.S. at 267. The Constitution largely leaves such "political and moral debate[s]," *id.* at 249, to the people, to resolve through persuasion and voting. This respect for the people "is vital because" (as "the framers believed") "a republic—a thing of the people—[is] more likely to enact just laws than a regime administered by a ruling class of largely unaccountable 'ministers.'" *West Virginia*, 142 S. Ct. at 2617 (Gorsuch, J., concurring). So when unaccountable ministers test our constitutional design, courts must subject their work to searching review.

## II.    HHS's Decision Pushes Constitutional Boundaries And Thus Warrants Searching Judicial Review.

This case challenges HHS's decision to block Title X funding to Oklahoma because the State does not refer patients for certain abortions. HHS's decision tests constitutional bounds. This Court should therefore reject HHS's plea for "narrow," "deferential" review (HHS Opp., App. Vol. 3 at 436) and should subject HHS's actions to searching review.

14

**A.    HHS's Decision Undercuts The Separation Of Powers.**

HHS's decision blocks Title X funds based on Oklahoma's approach to abortion. This raises serious separation-of-powers problems.

First consider the landscape under HHS's actions. Title X authorizes HHS to send federal money to States to operate "voluntary family planning projects." 42 U.S.C. § 300(a). States may use that money to offer many services, including "natural family planning methods, infertility services, and services for adolescents." *Ibid.* But Title X does not allow spending for abortion. It does the opposite: it prohibits sending money to "programs where abortion is a method of family planning." *Id.* § 300a-6. Abortion policy has always been an issue that is in the first instance for legislatures—a feature made even clearer by *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). Yet HHS now claims that it has power to revoke all of a State's family-planning funding if that State generally will not refer patients for abortions.

Allowing a federal agency to override state abortion laws in this way would require a breathtaking feat of federal legislation. Abortion is "unique" and "fraught with consequences," *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 852 (1992)—after all, it "presents an irreconcilable conflict between the interests of a pregnant woman who seeks an abortion and the interests in protecting fetal life," *Dobbs*, 142 S. Ct. at 2304 (Kavanaugh, J., concurring). Many federal legislative proposals have sought to address abortion. *E.g.*, Women's

15

Public Health and Safety Act, S. 471, 118th Cong. (2023); Women's Health Protection Act of 2023, S. 701, 118th Cong. (2023). Yet few have gained the consensus needed to become federal law. The rare successes have been targeted laws that, far from endorsing abortion, restrict or discourage it. *E.g.*, 136 Stat. 4459, 4908 (2022) (Hyde Amendment, restricting use of federal funds for certain abortions); 18 U.S.C. § 1531 (Partial-Birth Abortion Ban Act); *id.* §§ 1461, 1462 (criminal laws making abortion drugs nonmailable and nonshippable by common carrier).

Title X is just this type of targeted law. Far from conferring on HHS the power to override state abortion laws, Title X establishes that "[n]one of the funds appropriated" to HHS under the statute may be used "in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. Congress thus decided "to subsidize family planning services which will lead to conception and childbirth" rather than to "promote or encourage abortion." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). Title X is part of a long tradition of restricting the use of federal funds for abortions. *See*, *e.g.*, 136 Stat. at 4908; Compl. ¶ 51, App. Vol. 1 at 22; PI Mot., App. Vol. 2 at 184-86, 195-98.

This all points up the obvious: Congress has never enacted a nationwide regime—in Title X or otherwise—that authorizes federal agencies like HHS to subvert state abortion laws. Yet HHS here claims the power to itself take such actions—and demands that this Court defer to its choice. But by claiming the power to make a "decision of such

magnitude and consequence," *West Virginia*, 142 S. Ct. at 2616, HHS has invaded Congress's "assigned responsibility" and weakened the Constitution's checkpoints for democratic accountability. *INS v. Chadha*, 462 U.S. 919, 951 (1983); *see id.* at 946-51. Under our constitutional design, the "responsibility" for "weigh[ing] [the] tradeoffs" of abortion policy is with elected officials "chosen by the people through democratic processes." *OSHA*, 142 S. Ct. at 666. HHS's decision undermines this design and thus warrants this Court's close scrutiny.

### B.     HHS's Decision Erodes Federalism.

HHS's decision is also hostile to federalism.

Under the Constitution, States have "primar[y]" authority over health and safety. *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 719 (1985). "[T]he structure and limitations of federalism" "allow the States great latitude under their police powers" to enact laws protecting "the lives, limbs, health, comfort, and quiet of all persons." *Gonzales*, 546 U.S. at 270 (internal quotation marks omitted). This authority includes regulating or restricting abortion to protect life and health. *See Dobbs*, 142 S. Ct. at 2284.

Using their retained constitutional authority, States take varying approaches to abortion. Some States have adopted permissive regimes. Other States (like Oklahoma) impose tighter regulations or restrictions. Abortion laws in those latter States ubiquitously protect a woman's life. *E.g.*, Okla. Stat. Ann. tit. 21, § 861; Miss. Code Ann. § 41-41-45(2). These

laws reflect the approach the Constitution envisions for addressing hard issues that require "legislative bodies" to "draw lines that accommodate competing interests." *Dobbs*, 142 S. Ct. at 2268.

For over 40 years, Oklahoma has used Title X funds to provide critical public-health services. Compl. ¶ 15, App. Vol. 1 at 11. Each year, the State's Title X program offers family-planning services and counseling, preventive women's-health screenings, infectious-disease testing, immunizations, pre-conception and post-partum care, and more to tens of thousands of Oklahomans—many of whom cannot access such care elsewhere. Compl. ¶¶ 16-17, App. Vol. 1 at 11-12; PI Mot. Ex. 1 ¶¶ 12, 17-19, App. Vol. 2 at 211, 212-13. The State has decided that these services are essential—indeed, so important to its citizens' welfare that the State has decided to provide these services itself. But the State has also decided that elective abortions are generally unlawful in Oklahoma, as is "advis[ing] or procur[ing] any woman" to obtain such an abortion. Okla. Stat. Ann. tit. 21, § 861. That decision is for the State and is a reasonable one for a State to make.

Rather than respect the State's measured decision, HHS rescinded millions of dollars in funding from Oklahoma because the State wants to provide family-planning services while respecting its own abortion laws. The agency cut off all that funding based on the possibility that someone, in a State where abortion is generally unlawful, *might* ask a Title X provider to refer her for an abortion that is illegal under state law. The

18

agency's decision undermines the choices that Oklahoma has made to protect health and safety and thus "intrude[s] on state governmental functions." *Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991). Without any federal law expressing Congress's "exceedingly clear" wish "to significantly alter the balance between federal and state power," *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (per curiam), HHS has sought to "shift ... authority from the States to the Federal Government" on abortion. *Gonzales*, 546 U.S. at 275; *see Dobbs*, 142 S. Ct. at 2284 (the "authority" to "regulat[e] or prohibit[ ] abortion" belongs to "the citizens of each State"). Given these harms to federalism, this Court should view HHS's actions with skepticism.

### C.    HHS's Decision Robs From The People Decisions Of Great Importance.

Finally, HHS's decision departs from the central tenet of our Constitution: that power—particularly over important, hard, controversial issues—resides with and must be accountable to the people.

Few issues are as important, hard, and controversial as abortion. *Supra* pp. 15-16. The Constitution thus leaves the task of regulating and restricting abortion to "the people and their elected representatives." *Dobbs*, 142 S. Ct. at 2284. In keeping with that design, the people of Oklahoma have decided generally to restrict elective abortions. *See* Okla. Stat. Ann. tit. 21, § 861. They have also decided that no person in the State may be required to perform or participate in such abortions. *E.g.*,

*id.* tit. 63, § 1-741. Acting through their elected representatives, Oklahomans have decided that this approach appropriately balances the "legitimate interests" in "prenatal life," "maternal health and safety," the "integrity of the medical profession," and more. *Dobbs*, 142 S. Ct. at 2284. Not all States balance (or view) the competing interests this way, but that is how the people of Oklahoma see them. And in our constitutional system, the decision on this hard issue is theirs.

But HHS has refused to accept the choices made by the people of Oklahoma, "through their elected leaders," on fraught and consequential questions of policy. *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 499 (2010). HHS is not content to respect the result of Oklahoma's "earnest and profound debate" on the "morality, legality, and practicality" of abortion—including whether to allow it and how to regulate it. *Gonzales*, 546 U.S. at 249. In the decision challenged here, HHS has instead done all it can to override those considered choices. But the Constitution does not give HHS that say over the people's decisions in this fraught area. Far from meriting "narrow" and "deferential" scrutiny for its decision challenged here, HHS Opp., App. Vol. 3 at 436, HHS's decision should for these reasons—and those given above—face this Court's searching review.

## CONCLUSION

The Court should exercise searching—not deferential—review over HHS's decision to halt Oklahoma's funding, hold that that decision is unlawful, and reverse the judgment below.

Respectfully submitted,

LYNN FITCH
  *Attorney General*

*s/ Scott G. Stewart*
SCOTT G. STEWART
  *Solicitor General*
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
E-mail: scott.stewart@ago.ms.gov

*Counsel for Amici Curiae*

April 26, 2024

21

*Counsel for Additional Amici States*

STEVE MARSHALL
Attorney General
State of Alabama

TREG TAYLOR
Attorney General
State of Alaska

TIM GRIFFIN
Attorney General
State of Arkansas

ASHLEY MOODY
Attorney General
State of Florida

CHRISTOPHER M. CARR
Attorney General
State of Georgia

RAÚL R. LABRADOR
Attorney General
State of Idaho

THEODORE E. ROKITA
Attorney General
State of Indiana

BRENNA BIRD
Attorney General
State of Iowa

KRIS W. KOBACH
Attorney General
State of Kansas

RUSSELL COLEMAN
Attorney General
Commonwealth of
Kentucky

LIZ MURRILL
Attorney General
State of Louisiana

ANDREW BAILEY
Attorney General
State of Missouri

AUSTIN KNUDSEN
Attorney General
State of Montana

MICHAEL T. HILGERS
Attorney General
State of Nebraska

DREW H. WRIGLEY
Attorney General
State of North Dakota

DAVE YOST
Attorney General
State of Ohio

ALAN WILSON
Attorney General
State of South Carolina

MARTY J. JACKLEY
Attorney General
State of South Dakota

JONATHAN SKRMETTI
Attorney General
State of Tennessee

KEN PAXTON
Attorney General
State of Texas

SEAN D. REYES
Attorney General
State of Utah

PATRICK MORRISEY
Attorney General
State of West Virginia

BRIDGET HILL
Attorney General
State of Wyoming

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limitations of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32, it contains 4,751 words. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface, including serifs, using Microsoft Word 2016, in Century Schoolbook 14-point font.

Dated: April 26, 2024

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Amici Curiae*

## CERTIFICATE OF DIGITAL SUBMISSION

I, Scott G. Stewart, hereby certify that with respect to the foregoing: (1) all required privacy redactions have been made per 10th Cir. R. 25.5; (2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents; (3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Carbon Black software, and according to the program are free of viruses.

Dated: April 26, 2024

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I, Scott G. Stewart, hereby certify that the foregoing brief has been filed with the Clerk of Court using the Court's electronic filing system, which sent notification of such filing to all counsel of record.

Dated: April 26, 2024

*s/ Scott G. Stewart*
Scott G. Stewart
*Counsel for Amici Curiae*
