No. 24-6063

---

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

STATE OF OKLAHOMA,

*Plaintiff-Appellant,*

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER BECERRA, in his official capacity as the Secretary of the U.S. Department of Health and Human Services; OFFICE OF POPULATION AFFAIRS; and JESSICA S. MARCELLA, in her official capacity as Deputy Assistant Secretary for Population Affairs,

*Defendants-Appellees.*

---

On Appeal from the United States District Court
for the Western District of Oklahoma
Case No. 5:23-cv-01052

---

## BRIEF OF AMICI CURIAE THE AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS & GYNECOLOGISTS, THE CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS, THE CATHOLIC MEDICAL ASSOCIATION, AND THE NATIONAL ASSOCIATION OF CATHOLIC NURSES, USA, IN SUPPORT OF APPELLANT STATE OF OKLAHOMA

---

John J. Bursch
Erin M. Hawley
ALLIANCE DEFENDING FREEDOM
440 First Street, N.W., Suite 600
Washington, D.C. 20001
(202) 393-8690
jbursch@ADFlegal.org
ehawley@ADFlegal.org

Christopher P. Schandevel
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
cschandevel@ADFlegal.org

*Attorneys for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Under Fed. R. App. P. 26.1 and 10th Cir. R. 26.1, Amici Curiae, the American Association of Pro-Life Obstetricians & Gynecologists (AAPLOG), the Christian Medical & Dental Associations (CMDA), the Catholic Medical Association (CMA), and the National Association of Catholic Nurses, USA (NACN-USA), state that they have no parent corporation and do not issue stock.

# TABLE OF CONTENTS

Corporate Disclosure Statement ............................................................. i

Table of Authorities .................................................................... iii

Interest of Amici Curiae ............................................................... 1

Introduction ........................................................................ 4

Argument ......................................................................... 6

I.    Oklahoma is likely to prevail because the 2021 Rule violates federal conscience protections, and HHS's termination decision increases the risk of conscience violations. ..................... 6

    A.    The referral requirement violates the Weldon Amendment. ....................................................... 10

    B.    The referral requirement violates the Coats-Snowe Amendment. ............................................. 12

    C.    The referral requirement violates the Church Amendments. .................................................... 13

    D.    The referral requirement violates RFRA. ............................ 14

II.    An injunction would serve the public good by protecting conscientious healthcare professionals and entities from being driven out of the practice of medicine. ................................ 16

Conclusion ....................................................................... 19

Rule 32(g)(1) Certificate of Compliance .................................................. 20

Certificate of Digital Submission .......................................................... 21

Certificate of Service ................................................................. 22

# TABLE OF AUTHORITIES

## Cases

*California by & through Becerra v. Azar,*
    950 F.3d 1067 (9th Cir. 2020) ............................................................. 6

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) ............................................................. 16

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) ............................................................. 14, 15

*Motor Vehicle Manufacturers Association v. State Farm Mutual*
    *Automobile Insurance Company,*
    463 U.S. 29 (1983) ............................................................. 11, 14

*National Family Planning & Reproductive Health Association,*
    *Inc. v. Gonzales,*
    468 F.3d 826 (D.C. Cir. 2006) ............................................................. 6

*National Institute of Family & Life Advocates v. Becerra,*
    585 U.S. 755 (2018) ............................................................. 15

*New Concepts for Living, Inc. v. National Labor Relations Board,*
    94 F.4th 272 (3d Cir. 2024) ............................................................. 7

*Ohio v. Becerra,*
    87 F.4th 759 (6th Cir. 2023) ............................................................. 7, 10

*Roe v. Wade,*
    410 U.S. 113 (1973) ............................................................. 13

*Rust v. Sullivan,*
    500 U.S. 173 (1991) ............................................................. 6, 15, 17

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    582 U.S. 449 (2017) ............................................................. 14, 15

## Statutes

42 U.S.C. § 2000bb-1 ............................................................. 14

42 U.S.C. § 238n ............................................................... 12

42 U.S.C. § 300a-6 ....................................................... 4, 6, 7

42 U.S.C. § 300a-7 ....................................................... 13, 14

5 U.S.C. § 706 ..................................................................... 6

Consolidated Appropriations Act, 2005, Pub. L. No. 108–447, title
    V, § 508(d)(1), 118 Stat. 2809 ........................................ 10

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div.
    H, title V, § 507(d)(1), 136 Stat. 4459 (2022) ................................. 10

OKLA. STAT. TIT. 21, § 861 ............................................... 5

## Other Authorities

Brittni Fredericksen et al., *A National Survey of OBGYNs'
    Experiences After Dobbs*, Kaiser Family Foundation (June
    21, 2023) ............................................................... 17

H.R. Conf. Rep. No. 91–1667 (1970) ....................................... 18

Ludwig Edelstein, *The Hippocratic Oath: Text, Translation, and
    Interpretation* (1943) ............................................ 9

*The Growing Demand for Healthcare Workers in Oklahoma*,
    American Immigration Council ..................................... 16

Thomas A. Moore & Matthew Gaier, *Liability of Referring
    Physicians*, NEW YORK LAW JOURNAL (Oct. 5, 2020) ........................ 9

*Thomas Jefferson to Richard Douglas, 4 February 1809*,
    Founders Online, National Archives ............................... 4

## Regulations

Ensuring Access to Equitable, Affordable, Client-Centered,
    Quality Family Planning Services, 86 Fed. Reg. 56144–01
    (Oct. 7, 2021) ............................... 4, 6, 7, 8, 11, 14, 15, 18

## INTEREST OF AMICI CURIAE[1]

The American Association of Pro-Life Obstetricians & Gynecologists (AAPLOG) is a nonprofit organization with over 7,000 medical-professional members and associates who are experts in reproductive healthcare. AAPLOG strives to ensure pregnant women receive quality care and are informed of abortion's potential long-term consequences on a woman's health. AAPLOG offers medical professionals and the public a better understanding of abortion-related health risks, including depression, substance abuse, suicide, and subsequent preterm birth.

The Christian Medical & Dental Associations (CMDA) is a professional association of physicians, dentists, and other healthcare professionals that educates, encourages, and equips Christian healthcare professionals to glorify God by following Christ, serving with excellence and compassion, caring for all people, and advancing biblical principles of healthcare within the Church and throughout the world.

CMDA has close to 13,000 members and 357 chapters at medical, dental, optometry, physician-assistant, and undergraduate schools across the country. CMDA also has 871 members in the state of Oklahoma.

---

[1] Counsel for both parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part or financially supported this brief, and no one other than amici curiae or their counsel contributed money intended to fund preparing or submitting this brief. Fed. R. App. P. 29(c)(5).

1

The Catholic Medical Association (CMA) is the largest association of Catholic individuals in healthcare. Its membership includes more than 2,400 physicians, nurses, and physician assistants nationwide, including two member guilds and 23 active members in Oklahoma. CMA's mission is to inform, organize, and inspire its members to uphold the Catholic faith in the science and practice of medicine. CMA opposes direct abortion because it violates the teaching and tradition of the Catholic Church, respect for the sanctity of human life, Judeo-Christian medical ethics, and the best interest of patients. CMA's members are committed to the sanctity of human life, and it would violate their consciences to participate in or refer for direct abortions.[2]

CMA has actively sought conscience protections for its members and other healthcare professionals who might be forced by laws, regulations, or their employers to provide, counsel, or refer for abortions. Many CMA members work at healthcare facilities that receive Title X funds. These CMA members face a substantial risk of harm caused by strict enforcement of the 2021 Rule. And they face further risk of harm caused by the Department of Health and Human Services' decision to terminate Oklahoma's Title X funding.

---

[2] CMA uses the phrase "direct abortions" to exclude medically necessary procedures—like removing the fallopian tube for an ectopic pregnancy—that, while they may unintentionally cause the death of the embryo, are not direct attacks on the unborn child but are aimed instead at treating a serious condition that would otherwise be fatal for the woman.

The National Association of Catholic Nurses, USA (NACN-USA), is the national professional organization for Catholic nurses in the United States. A nonprofit association of hundreds of nurses of different clinical expertise, NACN-USA focuses on promoting patient advocacy, human dignity, and professional and spiritual development in the integration of faith and health within the Catholic context in nursing. NACN-USA supports the protection of human life from conception to natural death.

Like the other organizations who have joined this brief, NACN-USA opposes any involvement in direct abortion of any kind. Any such involvement would contradict Roman Catholic teaching and values, including respect for the sanctity of human life and the well-being of members' patients.

AAPLOG, CMDA, CMA, and NACN-USA have a strong interest in ensuring that the states and federal government respect Congress's refusal to use taxpayer dollars to support abortions, and in opposing HHS's recent efforts to force Title X recipients to counsel and refer for abortions, thereby threatening to strip funding from pro-life healthcare entities and professionals.

## INTRODUCTION

Rights of conscience are at the core of our constitutional freedoms. Indeed, "[n]o provision in our constitution ought to be dearer to man, than that which protects the rights of conscience against the enterprises of the civil authority."[3] These protections are precious for a reason: the conscience not only serves as a moral compass but as a constant source of inspiration to serve others. So it is no surprise that many healthcare professionals put matters of faith and conscience at the heart of their Hippocratic mission to heal and do no harm.

Section 1008 of the Public Health Service Act prohibits "funds appropriated under" Title X from being "used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. Despite this prohibition—and multiple federal and state laws protecting constitutional rights of conscience—the Department of Health and Human Services issued a final rule in 2021 imposing a universal requirement that each Title X grantee *must* provide information, counseling, and referrals for abortion. Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services, 86 Fed. Reg. 56144–01, 56178–79 (Oct. 7, 2021) ("2021 Rule"). The Rule ignores the reality that referring for an abortion means formally cooperating with the taking of a human life, violating the conscience of many healthcare professionals.

---

[3] *Thomas Jefferson to Richard Douglas, 4 February 1809,* Founders Online, National Archives, perma.cc/G8R2-58RM.

The 2021 Rule violates Title X, disregards rights of conscience, and forces many healthcare professionals to make an impossible choice between violating their consciences and forgoing public benefits that enable them to serve their patients. That makes the Rule illegal *and* bad policy: it denies the public valuable services from healthcare professionals who cannot in good conscience counsel or refer for abortion.

By contrast, Oklahoma's decision to stop requiring Title X recipients to counsel and refer for abortion is both legally correct *and* good policy. In Oklahoma, a person who performs an abortion "or advises or procures any woman" to have an abortion commits a felony unless the abortion is "necessary to preserve [the woman's] life." OKLA. STAT. TIT. 21, § 861. By removing the requirement to counsel and refer for abortion now that state law prohibits it, Oklahoma has chosen not to force medical professionals to choose between their consciences and their funding.[4] As a result, it has brought its policy into compliance with the conscience protections provided by the Weldon Amendment, the Coats-Snowe Amendment, the Church Amendments, and the Religious Freedom Restoration Act. HHS's failure to consider that result before cutting Oklahoma's funding violates federal and state law and exacerbates the arbitrary and capricious nature of that termination decision.

---

[4] Even assuming Oklahoma still requires counseling and referral for abortion in the rare case when it is necessary to save a woman's life, such procedures typically do not qualify as "direct abortions" as amici understand that term. *See supra* note 2 and accompanying text.

# ARGUMENT

## I.   Oklahoma is likely to prevail because the 2021 Rule violates federal conscience protections, and HHS's termination decision increases the risk of conscience violations.

Under the APA, a court must "hold unlawful and set aside" any agency action that is "not in accordance with [the] law" or is "contrary to [a] constitutional right." 5 U.S.C. § 706(2)(A)–(B). Indeed, the 2021 Rule recognizes that "a valid statute always prevails over a conflicting regulation." 86 Fed. Reg. at 56153 (quoting *Nat'l Fam. Plan. & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 829 (D.C. Cir. 2006)). Here, the Rule states that Title X grantees "must" provide "information," "counseling," and "referral upon request" for abortions. 86 Fed. Reg. at 56178–79. And the Rule enshrines these obligations as "requirements [that] must be met" by "[e]ach project" supported by Title X funding. *Id.*

At a threshold level, these requirements must be set aside because they violate Section 1008, which prohibits Title X funds from being "used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. By forcing recipients to counsel and refer for abortions, the Rule illegally requires them to treat abortion as a viable "method of family planning," in violation Section 1008's plain text. *See Rust v. Sullivan*, 500 U.S. 173, 184 (1991) (explaining that the "broad language of Title X plainly allows [for this] construction of the statute"); *Cal. by & through Becerra v. Azar*, 950 F.3d 1067, 1084–85 (9th Cir. 2020) (affirming that this is still true 30 years later).

That remains true even though the Sixth Circuit recently applied *Rust*'s reasoning—especially its *Chevron* analysis—to hold that HHS's current, contrary position *requiring* abortion counseling and referrals also is not an "impermissible" reading of Section 1008. *Ohio v. Becerra*, 87 F.4th 759, 772 (6th Cir. 2023). "In HHS's present judgment, a program that provides a referral for abortion upon request is *not* one 'where abortion is a method of family planning.'" *Id.* (quoting 86 Fed. Reg. at 56,149–50) (emphasis added). The Sixth Circuit conceded that might not be "the best interpretation of § 1008." *Id.* But so long as *Chevron* remained good law, the court's hands were tied. *Id.* at 770–71.

*Chevron* may not remain good law for long given that the Supreme Court is currently considering whether to overrule it in two cases: *Loper Bright Enterprises v. Raimondo*, No. 22-451 (argued Jan. 17, 2024), and *Relentless, Inc. v. Department of Commerce*, No. 22-1219 (argued Jan. 17, 2024). "*Chevron* deference itself may not survive" those cases. *New Concepts for Living, Inc. v. Nat'l Lab. Rels. Bd.*, 94 F.4th 272, 290 n.1 (3d Cir. 2024) (Krause, J., concurring). If it doesn't, this Court should employ traditional tools of statutory interpretation and hold that the referral requirement violates Title X's prohibition on using funds "in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. Regardless, Oklahoma is likely to prevail for an independent reason: the referral requirement violates multiple laws protecting the conscience rights of healthcare professionals.

In issuing the 2021 Rule, HHS conceded that "Congress has passed several laws protecting the conscience rights of providers, particularly in the area of abortion," and that "[u]nder these statutes, objecting providers or Title X grantees are *not* required to counsel or refer for abortions." 86 Fed. Reg. at 56153 (emphasis added). The preamble reaffirms these protections, stating that "objecting individuals and grantees will not be required to counsel or refer for abortions." *Id.*

Yet both the preamble and the legally operative text of the Rule fail to safeguard federal conscience rights on the front end. The preamble simply explains that while federal conscience protections "may at times interact with the requirements of Title X," interpreting them is "beyond the scope" of the Rule. *Id.* It then concludes weakly that "providers may avail themselves of existing conscience protections and file complaints with OCR, which will be evaluated on a case-by-case basis as is done with other complaints." 86 Fed. Reg. at 56156.

Meanwhile, the legally operative text of the Rule states in a footnote that "[p]roviders *may* separately be covered by federal statutes protecting conscience and/or civil rights." 86 Fed. Reg. at 56178 n.2 (emphasis added). So the Rule recognizes only that healthcare professionals *may* be able to obtain some relief *after* their rights have been violated. Nothing more. And that's not enough under any of the federal statutes discussed below.

The Rule gives short shrift to the reality that counseling and referring for abortion makes healthcare professionals complicit in what many of them view as an immoral procedure. It suggests the healthcare professional endorses the procedure and potentially takes some responsibility for its outcome. *See* Thomas A. Moore & Matthew Gaier, *Liability of Referring Physicians*, NEW YORK LAW JOURNAL (Oct. 5, 2020), www.law.com/newyorklawjournal/2020/10/05/liability-of-referring-physicians/ (describing "circumstances under which referring physicians may be held liable"). And it forces physicians to participate by referral in the ending of a human life in violation of their Hippocratic Oath, which explicitly states that a doctor will not deliberately end a life by abortion or euthanasia and will never even "make a suggestion to this effect." Ludwig Edelstein, *The Hippocratic Oath: Text, Translation, and Interpretation* 3 (1943).

By requiring abortion referrals, the 2021 Rule forces healthcare professionals to counsel and refer for ending the lives of their unborn patients. Forcing performance, counseling, or referral for a procedure that ends a human life is an egregious violation of the conscience of a medical professional. Four different federal laws prohibit it. And Oklahoma is right to do everything it can to avoid it.

## A. The referral requirement violates the Weldon Amendment.

A bipartisan Congress first passed the Weldon Amendment in 2004 as an appropriations rider prohibiting funds from the Departments of Health, Labor, and Education from flowing to any federal, state, or local government or program that discriminates against "any institutional or individual health care entity" based on the entity's refusal to "provide, pay for, provide coverage of, or refer for abortions." Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, title V, § 508(d)(1), 118 Stat. 2809. Congress has included the rider in every such act since. *See, e.g.*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. H, title V, § 507(d)(1), 136 Stat. 4459, 4908 (2022).

HHS violated the Weldon Amendment by issuing and enforcing the 2021 Rule. Indeed, the Sixth Circuit strongly suggested as much in *Ohio v. Becerra*, explaining that it was "somewhat puzzled about the interaction between the Rule's referral requirement and…the Weldon Amendment, as applied to State grantees." 87 F.4th at 774 n.8. That's because the Rule "would seem to forbid States from subgranting to 'health care entities' who will not refer for abortion," and "that, in turn, seems to force the States to 'discriminat[e] on the basis that the health care entity does not…refer for abortions,' the very thing the Weldon Amendment forbids." *Id.* (quoting § 507(d)(1), 136 Stat. at 496).

Exactly right. Because the 2021 Rule makes "referral upon request" for abortions a universal "requirement" that "each" Title X grantee must meet, 86 Fed. Reg. at 56178–79, the Rule violates the Weldon Amendment by forcing states to exclude and discriminate against healthcare entities that refuse to refer for abortions.

Because the 2021 Rule violates the Weldon Amendment—and because it tries to force states like Oklahoma to violate the Amendment themselves by forcing them to deny funding to healthcare entities that cannot in good conscience counsel or refer for abortions—Oklahoma is right to take steps to avoid violating the Amendment. And that is exactly what Oklahoma has done by removing the requirement that Title X recipients counsel and refer for abortions that are now illegal under Oklahoma law.

HHS does not appear to have considered any of this when it cut off Oklahoma's Title X funding based on that decision. Doing so exceeded HHS's authority and was arbitrary and capricious for all the reasons Oklahoma lists in its brief. Oklahoma's Opening Br. at 47–50. But that's not all. HHS's termination decision was arbitrary and capricious for the added reason that it "entirely failed to consider an important aspect of the problem," namely Oklahoma's obligation to comply with the Weldon Amendment—not to mention HHS's own obligation to comply with that Amendment. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Oklahoma is thus likely to succeed on its APA claim, and this Court should enjoin HHS's enforcement of the 2021 Rule's referral requirement and HHS's termination decision.

### B.    The referral requirement violates the Coats-Snowe Amendment.

The same result follows from HHS's failure to consider Oklahoma's—and HHS's own—obligations under the Coats-Snowe Amendment. In 1996, Congress enacted that Amendment to the Public Health Service Act to protect the conscience rights of "health care entit[ies]," including physicians, postgraduate physician-training programs, and participants in health-training programs. 42 U.S.C. § 238n(c)(2). The Amendment prohibits the "Federal government, and any State or local government that receives Federal financial assistance" from discriminating against hospitals or physicians based on their refusal "to undergo training in the performance of induced abortions, to require or provide such training, to perform such abortions, or to provide referrals for such training or such abortions." *Id*. § 238n(a)(1).

Going further, a separate provision prohibits the government from discriminating against healthcare entities for refusing to "make arrangements" for any of those activities. *Id.* § 238n(a)(2). Read together, these provisions prohibit the government from discriminating against entities and physicians because they refuse to provide abortion referrals or choose not to even make arrangements for such referrals. *Id.*

12

The 2021 Rule's referral requirement squarely violates these prohibitions. Rather than safeguard entities and physicians who decline to refer for or make arrangements for referrals for abortions, the Rule *excludes* them from receiving any Title X funding. That is precisely the type of discrimination the Coats-Snowe Amendment prohibits.

HHS does not appear to have considered any of this when it ended Oklahoma's Title X funding. For this reason, too, Oklahoma is likely to succeed on its APA claim, and this Court should enjoin HHS's referral requirement and its termination decision.

### C. The referral requirement violates the Church Amendments.

Years before the Weldon and Coats-Snowe Amendments, *Roe v. Wade*, 410 U.S. 113 (1973), prompted Congress to pass laws protecting healthcare professionals and institutions that object to participating in abortion. Those provisions—collectively referred to as the Church Amendments—remain in force today.

One provision prohibits the government from conditioning grants on whether an individual will "perform or assist in the performance" of abortion-related activities. 42 U.S.C. § 300a-7(b)(1). Another protects against being forced "to perform or assist in the performance of *any part* of a [federally funded] health service program" if such participation "would be contrary to [the healthcare professional's] religious beliefs or moral convictions." 42 U.S.C. § 300a-7(d) (emphasis added).

Again, the 2021 Rule violates these federal protections. The Rule requires that abortion counseling and referral "must" be part of "each" Title X program. 86 Fed. Reg. at 56178–79. But the Church Amendments guarantee that no individual can be forced to perform "any part" of a program contrary to their religious or moral convictions. 42 U.S.C. § 300a-7(d). So the Rule violates the Church Amendments, and HHS's apparent failure to consider this "important aspect of the problem" when it ended Oklahoma's funding further proves the decision was arbitrary and capricious. *Motor Vehicle Mfrs.*, 463 U.S. at 43.

### D.    The referral requirement violates RFRA.

The Religious Freedom Restoration Act (RFRA) provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless "it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)–(b). Funding conditions can substantially burden religious exercise when they put recipients to the choice of violating their religious convictions or forgoing funding. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 532 (2021); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017).

By requiring "each" grantee to provide abortion counseling and referrals or fail to meet a "requirement" for Title X funding, 86 Fed. Reg. at 56178–79, the Rule forces grantees to choose between violating their religious convictions and forgoing Title X funds. As a result, the Rule substantially burdens the religious exercise of Title X funding recipients who oppose abortion counseling and referral for religious reasons. *Fulton*, 593 U.S. at 532; *Trinity Lutheran*, 582 U.S. at 462.

There is also no government interest—much less a compelling government interest—in requiring abortion referrals in the Title X program. Because the "Government has no affirmative duty to commit any resources to facilitating abortions," the Supreme Court has upheld previous Title X regulations *prohibiting* abortion counseling or referral. *Rust*, 500 U.S. at 184–87, 201 (cleaned up).

Nor is the abortion-referral requirement the least restrictive means of advancing any conceivable government interest. There are many other ways the government could provide information about abortion providers without forcing all Title X grantees to provide abortion counseling and referrals. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 775 (2018) (agreeing that the government could "inform the women itself with a public-information campaign" rather than force private speakers to provide information about abortion). Thus, the referral requirement also violates RFRA, and HHS should have considered that before it terminated Oklahoma's Title X funding.

## II. An injunction would serve the public good by protecting conscientious healthcare professionals and entities from being driven out of the practice of medicine.

"Protecting religious liberty and conscience is obviously in the public interest." *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018). An injunction restoring Oklahoma's Title X funding would help protect the religious liberty and conscience rights of many healthcare entities and healthcare professionals across the state—and it would help secure healthcare access for Oklahomans, especially for those living in rural communities already facing healthcare shortages.

Due to "the COVID-19 pandemic, labor shortages, and a growing number of baby boomers who are reaching retirement age each year, Oklahoma has seen an increase in demand for healthcare workers." *The Growing Demand for Healthcare Workers in Oklahoma* 1, American Immigration Council, perma.cc/G8D3-C4JM. Even before the pandemic, Oklahoma already "faced severe physician shortages, with some counties across the state registering eight physicians per 100,000 residents." *Id.* at 3. Post-COVID, "[p]rojections remain dire." *Id.* The state is "expected to need an additional 451 primary care physicians by 2030, significantly impacting the accessibility of healthcare, particularly in rural communities." *Id.* Absent an injunction restoring Oklahoma's Title X funding, the barriers to care Oklahomans are experiencing already will likely only be made worse. Oklahoma's Opening Br. at 5–6.

Meanwhile, if Oklahoma capitulates to HHS's illegal demands to regain access to its Title X funding, healthcare professionals who conscientiously object to counseling or referring for abortion may be forced out of providing Title X services like fertility education and treatment. A recent survey found that 30 percent of OBGYNs practicing in states like Oklahoma that protect life from conception do not provide counseling or referrals for abortions. Brittni Fredericksen et al., *A National Survey of OBGYNs' Experiences After Dobbs* (Figure 3), Kaiser Family Foundation (June 21, 2023), perma.cc/BV8Q-JG6R. Among the OBGYNs surveyed in these states, 35 percent cited their personal beliefs as one reason they do not participate in abortion. *Id.* (Figure 4).

Depending on their specialty, experience, and geographic location, some of these healthcare professionals could be driven out of the practice of medicine entirely. The result would deprive Oklahomans of vital healthcare services from conscientious healthcare professionals who are dedicated to doing no harm to their patients or their patients' children—medical professionals who share many of their patients' religious and moral beliefs about abortion.

Congress intended for Title X grants to fund a diverse array of healthcare professionals and entities engaged in a wide range of activities, including "preventive family planning services, population research, infertility services, and other related medical, informational, and educational activities." *Rust*, 500 U.S. at 178–79 (quoting H. R.

Conf. Rep. No. 91–1667, p. 8 (1970)). The Department claims to promote diversity among Title X grantees, 86 Fed. Reg. at 56168, but in light of HHS's recent demands and termination decisions, that claim rings hollow. Far from granting religious and conscientious exemptions, the 2021 Rule threatens to force religious and conscientious healthcare professionals out of the practice of medicine altogether.

As a result, the Rule threatens to reduce the resources available to members of the public who seek fertility services, family-planning information, and other medical services from healthcare professionals who share their beliefs about abortion and the sanctity of human life. Diminishing healthcare services in this way harms the public interest. As a result, the public interest favors an injunction restoring Oklahoma's Title X funding *without* requiring strict compliance with HHS's illegal abortion-counseling-and-referral mandate.

## CONCLUSION

For these reasons, and for the reasons submitted by Oklahoma in this appeal, this Court should reverse the district court's order denying Oklahoma's motion for a preliminary injunction and for a stay under 5 U.S.C. § 705, and the Court should do so in time to preserve Oklahoma's ability to benefit from a favorable decision prior to HHS's disbursement of Title X funds for 2024.

Dated: April 26, 2024          Respectfully submitted,

                              */s/ Christopher P. Schandevel*

John J. Bursch                Christopher P. Schandevel
Erin M. Hawley                ALLIANCE DEFENDING FREEDOM
ALLIANCE DEFENDING FREEDOM    44180 Riverside Pkwy
440 First Street, N.W.        Lansdowne, VA 20176
Suite 600                     (571) 707-4655
Washington, D.C. 20001        cschandevel@ADFlegal.org
(202) 393-8690
jbursch@ADFlegal.org
ehawley@ADFlegal.org

*Attorneys for Amici Curiae*

## RULE 32(G)(1) CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) and 29(a)(5) because it contains 4,033 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook font.

Dated: April 26, 2024

*/s/ Christopher P. Schandevel*
Christopher P. Schandevel
*Attorney for Amici Curiae*

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to this brief:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, the ECF submission is an exact copy of those documents; and

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Cortex XDR, Agent version 7.8.1, and according to the program are free of viruses.

Dated: April 26, 2024

/s/ Christopher P. Schandevel
Christopher P. Schandevel
*Attorney for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2024, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Christopher P. Schandevel*
Christopher P. Schandevel
*Attorney for Amici Curiae*