**[ORAL ARGUMENT REQUESTED]**

**No. 24-6063**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

———————————

STATE OF OKLAHOMA,

Plaintiff-Appellant,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,
et al.,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the Western District of Oklahoma
District Court Case No. 23-cv-01052 (Judge Heaton)

———————————

**BRIEF FOR APPELLEES**

———————————

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*

MICHAEL S. RAAB
COURTNEY L. DIXON
BRIAN J. SPRINGER
  *Attorneys, Appellate Staff
  Civil Division, Room 7537
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 616-5446*

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED APPEALS

GLOSSARY

INTRODUCTION .................................................................................................1

STATEMENT OF JURISDICTION ...................................................................2

STATEMENT OF THE ISSUE .........................................................................2

STATEMENT OF THE CASE ..........................................................................3

    A.    Title X .....................................................................................3

    B.    Regulatory History .................................................................4

    C.    HHS's Decision to Terminate Oklahoma's Title X Grant.........7

    D.    District Court Proceedings.....................................................11

SUMMARY OF ARGUMENT.......................................................................... 14

STANDARD OF REVIEW .............................................................................. 16

ARGUMENT ....................................................................................................... 17

I.    Oklahoma Has Not Demonstrated Likelihood of Success on the Merits......... 17

    A.    Oklahoma Is Unlikely to Succeed on Its APA Claims..............................17

        1.    HHS Acted Well Within Its Statutory Authority in Terminating Oklahoma's Title X Grant ...........................................17

        2.    HHS's Decision Is Consistent with Its Regulations ......................24

        3.    HHS's Decision Is Neither Arbitrary Nor Capricious...................28

    B.    Oklahoma Is Unlikely to Succeed on Its Spending Clause Arguments...................................................................................32

II.     The Remaining Preliminary Injunction Factors Counsel Against Relief ........... 38

CONCLUSION ................................................................................................................. 41

REQUEST FOR ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** <span style="float:right">**Page(s)**</span>

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
570 U.S. 205 (2013) ........................................................................... 31, 40

*Alabama Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) (per curiam) ...............................................................38

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006) ...................................................................................34

*Auer v. Robbins*,
519 U.S. 452 (1997) ......................................................................15, 29, 30

*Becerra v. Mayor of Baltimore*,
141 S. Ct. 2170 (2021) ...............................................................................5

*Bennett v. Kentucky Dep't of Educ.*,
470 U.S. 656 (1985) ...................................................................................33

*Biden v. Missouri*,
595 U.S. 87 (2022) ......................................................................16, 36, 37

*California ex rel. Becerra v. Azar*,
950 F.3d 1067 (9th Cir. 2020) (en banc) ....................................................5

*Colorado v. U.S. Envtl. Prot. Agency*,
989 F.3d 874 (10th Cir. 2021) ...................................................................17

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022) ..............................................................................32, 34

*Diné Citizens Against Ruining Our Env't v. Jewell*,
839 F.3d 1276 (10th Cir. 2016)..............................................................16, 38

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) ....................................................................................8

*Fullilove v. Klutznick*,
　448 U.S. 448 (1980) .................................................................................32

*Kentucky v. Yellen*,
　54 F.4th 325 (6th Cir. 2022).............................................................. 37, 38

*Kisor v. Wilkie*,
　139 S. Ct. 2400 (2019)............................................................................25

*Mayor of Baltimore v. Azar*,
　973 F.3d 258 (4th Cir. 2020) (en banc) ...................................................5

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
　463 U.S. 29 (1983) .................................................................................29

*Ohio v. Becerra*,
　87 F.4th 759 (6th Cir. 2023)........................................... 1, 7, 12, 14, 15, 16, 19,
　　　　　　　　　　　　　　　　　　　　　　　　　　　20, 21, 22, 23, 29, 37

*Pennhurst State Sch. & Hosp. v. Halderman*,
　451 U.S. 1 (1981) .........................................................................33, 34, 35

*Port City Props. v. Union Pac. R.R. Co.*,
　518 F.3d 1186 (10th Cir. 2008).............................................................39

*Rust v. Sullivan*,
　500 U.S. 173 (1991) .........................................................5, 18, 31, 33, 38

*Sabri v. United States*,
　541 U.S. 600 ...........................................................................................37

*Sebelius v. Auburn Reg'l Med. Ctr.*,
　568 U.S. 145 (2013) ...............................................................................24

*South Dakota v. Dole*,
　483 U.S. 203 (1987) ...............................................................................32

*Tennessee v. HHS*,
　No. 23-cv-384, 2024 WL 1053247 (E.D. Tenn. Mar. 11, 2024) .................11

*West Virginia ex rel. Morrisey v. U.S. Dep't of the Treasury*,
   59 F.4th 1124 (11th Cir. 2023) ................................................................ 37, 38

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................. 17, 39

**Constitution:**

U.S. Const. art. I, § 8, cl. 1 ...................................................................32

**Statutes:**

Family Planning Services and Population Research Act of 1970,
   Pub. L. No. 91-572, 84 Stat. 1504 ...........................................................3
     42 U.S.C. § 300(a) .......................................................... 3, 17, 23, 32
     42 U.S.C. § 300a-4(a) ..................................................3, 15, 17, 32, 35
     42 U.S.C. § 300a-4(b) ......................................................... 3, 15, 32, 35
     42 U.S.C. § 300a-6 ................................................................. 3, 18, 35

Further Consolidated Appropriations Act, 2024,
   Pub. L. No. 118-47, 138 Stat. 460:
     div. D, tit. II, 138 Stat. at 652 .......................................................32
     div. D, tit. V, § 507(d)(1), 138 Stat. at 703 ................................. 3, 20, 21, 24
     div. D, tit. V, § 507(d)(2), 138 Stat. at 703 .............................. 21, 22

5 U.S.C. § 705 ...........................................................................................17

28 U.S.C. § 1292(a)(1) ................................................................................2

28 U.S.C. § 1331 ........................................................................................2

42 U.S.C. § 238n(a) .................................................................................20

42 U.S.C. § 254b(k)(3)(N) .......................................................................33

42 U.S.C. § 300a-7(c) ...............................................................................20

42 U.S.C. § 300z-10(a) .............................................................................19

42 U.S.C. § 1395x(e)(9) .................................................................. 36

42 U.S.C. § 1793(f)(2) .................................................................... 33

49 U.S.C. § 5309(c)(4) .................................................................... 33

Okla. Stat. Ann. tit. 21, § 861 ..................................................... 9, 26

Okla. Stat. Ann. tit. 63:
  § 1-728e(B)(1) .......................................................................... 27
  § 1-738.3(A)(2)(d) ..................................................................... 27
  § 1-741.1(B) ............................................................................. 26
  § 1-753(2) ................................................................................ 27

**Regulations:**

42 C.F.R. § 59.5(a)(1) .................................................................... 23

42 C.F.R. § 59.5(a)(5) ................................................................ 4, 18

42 C.F.R. § 59.5(a)(5)(ii) ............................................................... 23

42 C.F.R. § 59.5(b)(6) .................................................................... 25

42 C.F.R. § 59.5(b)(8) .................................................................... 27

42 C.F.R. § 59.7 ............................................................................. 7

42 C.F.R. § 59.8(a) .................................................................... 7, 39

42 C.F.R. § 59.8(b) .................................................................... 7, 39

42 C.F.R. § 59.8(c) .................................................................... 7, 39

42 C.F.R. § 59.9 ............................................................................. 7

45 C.F.R. § 75.371(c) ...................................................................... 7

45 C.F.R. § 75.372(a)(1) .................................................................. 7

45 C.F.R. § 88.2 (2019) ...................................................................................22

**Other Authorities:**

*Advise*, Merriam-Webster Dictionary,
    https://perma.cc/Y8ZJ-5347........................................................................26

All-Options, *All-Options Talkline*,
    https://perma.cc/GTS3-A37M..........................................................................9

53 Fed. Reg. 2922 (Feb. 2, 1988) ......................................................................4

58 Fed. Reg. 7462 (Feb. 5, 1993) ......................................................................5

65 Fed. Reg. 41,270 (July 3, 2000) .................................................. 5, 19, 23, 28

65 Fed. Reg. 41,281 (July 3, 2000) ........................................................4, 9, 18, 24

84 Fed. Reg. 7714 (Mar. 4, 2019) ......................................................................5

86 Fed. Reg. 19,812 (Apr. 15, 2021) ...................................................................4

86 Fed. Reg. 56,144 (Oct. 7, 2021) .................................................. 5, 6, 16, 18, 19, 21, 25,
                                                                                      26, 28, 29, 30, 40

89 Fed. Reg. 2078 (Jan. 11, 2024) ...................................................................22

Office of Population Affairs, HHS, *Fiscal Year 2023 Title X
    Service Grant Awards*, https://perma.cc/H2QK-P5ZX........................................... 11, 31

## STATEMENT OF RELATED APPEALS
## PURSUANT TO TENTH CIRCUIT RULE 28.2(C)(3)

Counsel for appellees is aware of the following prior or related appeals:

*Ohio v. Becerra*, 87 F.4th 759 (6th Cir. 2023)

*Tennessee v. Becerra*, No. 24-5220 (6th Cir.)

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| HHS | U.S. Department of Health and Human Services |

**INTRODUCTION**

Title X of the Public Health Service Act authorizes the U.S. Department of Health and Human Services (HHS) to award discretionary grants to fund family-planning services.  In 2021, HHS promulgated a rule restoring regulatory requirements that had been in effect for most of the program's history.  The rule requires that Title X projects offer pregnant patients the opportunity to receive information and nondirective counseling on all options, including abortion, followed by factual information about where a service can be obtained if the patient wishes.  Recently, in *Ohio v. Becerra*, 87 F.4th 759 (6th Cir. 2023), the Sixth Circuit rejected a request by Oklahoma and other States for a preliminary injunction to prevent enforcement of the referral requirement, concluding that HHS acted reasonably and within the bounds of its statutory authority in restoring that requirement.

Oklahoma now rehashes arguments in this Court that were considered and rejected in *Ohio*.  The Oklahoma State Department of Health, a longstanding Title X grantee, accepted a Title X grant award in 2023—at which time it was well aware of the counseling and referral requirements.  Like all Title X grants, Oklahoma's grant was made expressly contingent on its project's compliance with applicable statutory and regulatory requirements.  When Oklahoma later refused to comply with those requirements, HHS suspended and subsequently terminated Oklahoma's grant.  The district court correctly denied Oklahoma's request for a preliminary injunction to compel HHS to award continued grant funds to Oklahoma despite its stated refusal to

comply with program requirements that were upheld in *Ohio*. Neither the law nor the equities support Oklahoma's extraordinary request.

## STATEMENT OF JURISDICTION

In this Administrative Procedure Act (APA) action, Oklahoma invoked the district court's jurisdiction under 28 U.S.C. § 1331. App. Vol. 1 at 10.[1] The district court denied Oklahoma's motion for a preliminary injunction on March 26, 2024. App. Vol. 3 at 538. Oklahoma filed a timely notice of appeal on April 1, 2024. App. Vol. 3 at 615. This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

Whether the district court correctly denied a preliminary injunction where Oklahoma has no likelihood of success on the merits of its claims that HHS violated the APA or the Constitution in deciding to terminate Oklahoma's grant of discretionary Title X funds after Oklahoma refused to comply with the regulatory requirements governing the program, and where the balance of the equities and the public interest do not favor an injunction that would shift grant funds away from projects that continue to comply with program requirements.

---

[1] References to the appendix follow the citation convention in Tenth Circuit Rule 28.1(a)(1).

## STATEMENT OF THE CASE

### A.    Title X

In 1970, Congress enacted Title X of the Public Health Service Act to make "comprehensive voluntary family planning services readily available to all persons desiring such services."  Family Planning Services and Population Research Act of 1970, Pub. L. No. 91-572, § 2(1), 84 Stat. 1504, 1504.  The Act authorizes HHS to "make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services."  42 U.S.C. § 300(a).

Title X grants "shall be made in accordance with such regulations as the [HHS] Secretary may promulgate," 42 U.S.C. § 300a-4(a), and "shall be payable . . . subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made," *id.* § 300a-4(b).  Section 1008 of the Act provides that "[n]one of the funds appropriated . . . shall be used in programs where abortion is a method of family planning."  *Id.* § 300a-6.  Since 2004, Congress has included federal conscience protections specifying that annually appropriated Title X funds may not be made available to government entities that discriminate "on the basis that [a] health care entity does not provide, pay for, provide coverage of, or refer for abortions."  Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. V, § 507(d)(1), 138 Stat. 460, 703.

3

### B.    Regulatory History

For much of the Title X program's history, HHS has required—as it does now—that Title X projects offer pregnant patients the choice to be provided information and "nondirective 'options counseling'" about "prenatal care," "adoption and foster care," and "pregnancy termination (abortion)," "followed by referral for [any of] these services if [the patient] so requests."  53 Fed. Reg. 2922, 2923 (Feb. 2, 1988) (describing regulatory history); *see* 42 C.F.R. § 59.5(a)(5) (current regulation).  In other words, patients can receive "complete factual information about all medical options and the accompanying risks and benefits."  65 Fed. Reg. 41,281, 41,281 (July 3, 2000).  Consistent with Section 1008, HHS has explained that a Title X project may not "promote[] abortion or encourage[] persons to obtain abortion."  *Id.*  Any referral for an abortion may consist of "relevant factual information" such as a provider's "name, address, [and] telephone number," but Title X projects may not take "further affirmative action (such as negotiating a fee reduction, making an appointment, providing transportation) to secure abortion services for the patient."  *Id.*

On two occasions over the course of the program, HHS has placed further restrictions on the type of counseling and referrals that Title X grantees may provide. First, in 1988, the agency issued a rule that "prohibited" grantees from discussing or referring for abortions.  *See* 86 Fed. Reg. 19,812, 19,813 (Apr. 15, 2021) (describing 1988 rule).  Although the Supreme Court upheld the 1988 rule as a "permissible construction" of the statute in light of the "broad directives provided by Congress in

4

Title X," *Rust v. Sullivan*, 500 U.S. 173, 184-90 (1991), the rule was "never implemented on a nationwide basis," 65 Fed. Reg. 41,270, 41,271 (July 3, 2000). The agency issued an interim rule in 1993 that suspended the 1988 rule and reverted back to the pre-1988 compliance standards. 58 Fed. Reg. 7462, 7462 (Feb. 5, 1993). The agency issued a final rule in 2000, whose regulatory requirements—including the requirement for nondirective options counseling and a referral for any options the patient requested—remained in effect until 2019. *See* 65 Fed. Reg. at 41,271.

Second, in 2019, HHS "essentially revive[d]" the 1988 rule through a new final rule that significantly constrained the ability of Title X projects to provide pregnancy options counseling and prohibited Title X projects from referring for abortion. *See Mayor of Baltimore v. Azar*, 973 F.3d 258, 271 (4th Cir. 2020) (en banc); 84 Fed. Reg. 7714 (Mar. 4, 2019). The Ninth Circuit upheld the rule's restrictions, *California ex rel. Becerra v. Azar*, 950 F.3d 1067, 1101-04 (9th Cir. 2020) (en banc), while the Fourth Circuit enjoined their operation in the State of Maryland, *see Mayor of Baltimore*, 973 F.3d at 276-81, 283-90, 296. The Supreme Court granted certiorari but dismissed the case in light of HHS's intent to engage in new rulemaking. *See Becerra v. Mayor of Baltimore*, 141 S. Ct. 2170 (2021).

In October 2021, HHS promulgated a final rule—which remains in effect today—restoring the counseling and referral requirements that have governed grantees "for much of the program's history." *See* 86 Fed. Reg. 56,144, 56,150 (Oct. 7, 2021). HHS determined that the 2019 rule's restrictions on counseling and referrals

had "interfered with the patient-provider relationship," *id.* at 56,146; had "compromised [grantees'] ability to provide quality healthcare to all clients," *id.*; and had "shifted the Title X program away from its history of providing client-centered quality family-planning services," *id.* at 56,148. HHS explained that it is "critical for the delivery of quality, client-centered care" to provide "pregnant clients the opportunity to receive neutral, factual information and nondirective counseling on all pregnancy options" plus "referral upon request for option(s) the client wishes to receive" and to allow "healthcare providers to offer complete and medically accurate information and counseling to their clients." *Id.* at 56,154.

The 2021 rule reemphasized that a referral for an abortion "may include providing a patient with the name, address, telephone number, and other relevant factual information" about a medical provider, but that a Title X project "may not take further affirmative action (such as negotiating a fee reduction, making an appointment, providing transportation) to secure abortion services for the patient." 86 Fed. Reg. at 56,150 (quotation marks omitted). HHS further explained that, in accordance with federal conscience statutes, individuals and entities that are covered by federal conscience laws and that have a conscience objection "will not be required to counsel or refer for abortions in the Title X program." *Id.* at 56,153.

Following the 2021 rule's promulgation, Oklahoma and several other States brought suit in district court in Ohio to challenge multiple provisions of the 2021 rule, including (as relevant here) the requirement to refer for an abortion upon a patient's

request.  *See Ohio v. Becerra*, 87 F.4th 759, 767-68 (6th Cir. 2023).  The district court denied the States' request for a preliminary injunction against the enforcement of the referral requirement, and the Sixth Circuit affirmed, reasoning that the requirement is based on a permissible construction of Title X and that HHS adequately explained its decision to restore the requirement.  *See id.* at 770-75.

### C.     HHS's Decision to Terminate Oklahoma's Title X Grant

1.  HHS's regulations afford the agency discretion to allocate congressionally appropriated Title X grant funds among competing applicants.  *See* 42 C.F.R. § 59.7. In general, Title X grants are initially made for a one-year period, and HHS may issue further continuation awards that, although funded one year at a time, allow the recipient to receive continued support beyond the initial one-year period (typically for three to five years) without having to reenter the competitive funding process.  *See id.* § 59.8(a)-(b).  Neither "the approval of any application nor the award of any grant commits or obligates the United States in any way to make any additional, supplemental, continuation, or other award with respect to any approved application or portion of an approved application."  *Id.* § 59.8(c).  Awarded Title X funds must be spent in accordance with applicable regulations, *see id.* § 59.9, and HHS may terminate a grant if the recipient fails to comply with the terms and conditions, including any incorporated regulatory requirements, *see* 45 C.F.R. §§ 75.371(c), 75.372(a)(1).

2.  The Oklahoma State Department of Health has been a longstanding recipient of Title X grants, including during the years in which HHS regulations have

required Title X projects to offer nondirective options counseling and referrals for abortion upon a patient's request. *See* App. Vol. 2 at 210 ("The State of Oklahoma, through [its Department of Health], has continuously received federal grant funds to provide family planning services across the state through Title X for more than forty years, or since 1971."). In March 2022, HHS awarded the Oklahoma State Health Department a Title X grant for the period April 1, 2022 through March 31, 2023. *See* App. Vol. 2 at 317. The award explained, consistent with HHS's grant regulations, that Title X funding is provided one year at a time based on an annual application and Oklahoma's continued compliance "with the requirements regarding the provision of family planning services that can be found in the statute . . . and the implementing regulations." *See* App. Vol. 2 at 320; *see also* App. Vol. 2 at 331-32 (reiterating federal grantee requirements, including that grantees must provide quarterly financial and annual progress reports and submit to an annual audit). Compliance with HHS's regulations—including the counseling and referral requirements challenged by Oklahoma in *Ohio*—was therefore a recited condition of Oklahoma's Title X grant.

3. In June 2022, the Supreme Court issued its decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), which overturned prior precedent recognizing a constitutional right to abortion. Following that decision, HHS reminded Title X grantees that the counseling and referral requirements remained in effect. *See* App. Vol. 3 at 456-58; *see also* App. Vol. 3 at 463 ("[A]ll Title X recipients continue to operate under the federal requirements of the 2021 Title X rule, including

8

the requirement to provide nondirective pregnancy options counseling in the event of a positive pregnancy test and client-requested referrals." (emphasis omitted)).  HHS reiterated that Title X projects are required to offer pregnant patients nondirective options counseling and a referral upon the patient's request, including for abortion. App. Vol. 3 at 456.  HHS made clear that Title X does not have geographic limitations, and thus projects may make out-of-state referrals.  App. Vol. 3 at 457.  HHS again emphasized that any referral for an abortion may include "relevant factual information" such as the name, address, and telephone number of a provider, but that Title X projects "may not take further affirmative action . . . to secure abortion services for the patient."  App. Vol. 3 at 457-58 (citing 65 Fed. Reg. at 41,281).

        4.  In August 2022, the Oklahoma State Department of Health initiated conversations with HHS to discuss proposed modifications to its counseling and referral policies in light of a state law that had recently taken effect restricting abortion in the State.  App. Vol. 2 at 311; *see* Okla. Stat. Ann. tit. 21, § 861.  HHS determined that Oklahoma's first proposal did not comply with regulatory requirements, but the agency offered Oklahoma the option of submitting an "alternate compliance proposal" with specific examples of acceptable arrangements, including that Oklahoma could satisfy the counseling and referral requirements by providing Title X patients the number for a national call-in hotline where operators would supply the requisite information.  App. Vol. 3 at 466-67; *see* All-Options, *All-Options Talkline*, https://perma.cc/GTS3-A37M.  Oklahoma agreed to comply with its counseling and

referral obligations by "providing nondirective counseling on all pregnancy options by [its] staff or through the [hotline]."  App. Vol. 2 at 312.  Oklahoma followed up with official documentation of its revised policy and program materials showing that patients were being made aware of the hotline.  *See* App. Vol. 2 at 312.  Based on Oklahoma's assurances about compliance, HHS approved a continuation award for April 1, 2023 through March 31, 2024.  App. Vol. 2 at 339-40.

Shortly after HHS had awarded continued funding, Oklahoma reversed course, notifying HHS that it had made changes to its Title X project.  App. Vol. 2 at 312. Under the new policy, Oklahoma would no longer provide for counseling through and referral to the call-in hotline.  App. Vol. 2 at 312.  In addition, Oklahoma's staff would provide nondirective counseling on "pregnancy options in Oklahoma," but not on "all pregnancy options," as stated in the prior iteration of the policy.  App. Vol. 2 at 312 (quotation marks omitted).  HHS informed Oklahoma that this policy "does not comply with the Title X regulatory requirements and, therefore, the terms and conditions of [its] grant."  App. Vol. 2 at 396.  HHS suspended Oklahoma's award but allowed it to bring its program into compliance within 30 days.  App. Vol. 2 at 397.

In follow-up discussions, Oklahoma "indicated that it would not be able to comply with the Title X regulation."  App. Vol. 2 at 313.  HHS therefore decided to terminate Oklahoma's award.  HHS noted that the applicable regulations require that Title X projects provide "information and nondirective counseling on a range of options," as well as "referrals upon client request," including for abortion.  App. Vol.

2 at 313. Because Oklahoma "had ample notification of what is required to maintain compliance with the Title X regulation," HHS concluded that termination was "in the best interest of the government" given Oklahoma's "material non-compliance with [grant] terms and conditions." App. Vol. 2 at 313-14.

Except for the Oklahoma State Department of Health and a state entity in Tennessee, all state Title X grantees have confirmed their compliance with the counseling and referral requirements. *See* Office of Population Affairs, HHS, *Fiscal Year 2023 Title X Service Grant Awards*, https://perma.cc/H2QK-P5ZX.[2]

### D. District Court Proceedings

1. Oklahoma filed this action, seeking to "reinstate" its Title X funding. App. Vol. 1 at 33. The district court denied Oklahoma's motion for a preliminary injunction for the reasons stated at a motions hearing, App. Vol. 3 at 538, concluding that Oklahoma "is unlikely to be able to prevail" on the merits and doubting that the "balancing [of] the injury and the public interest" favor relief, App. Vol. 3 at 598, 612.

The district court held that Oklahoma failed to establish a likelihood of success on its challenge to HHS's decision under the APA. Noting that Oklahoma was part

---

[2] When the Tennessee state entity refused to comply with HHS's regulations, HHS declined to issue a continuation award. Tennessee challenged that decision on similar grounds to those raised by Oklahoma here, and a district court denied Tennessee's preliminary injunction motion. *See Tennessee v. HHS*, No. 23-cv-384, 2024 WL 1053247 (E.D. Tenn. Mar. 11, 2024). Tennessee's appeal is on an expedited briefing schedule in the Sixth Circuit. *See Tennessee v. Becerra*, No. 24-5220 (6th Cir. reply brief filed May 6, 2024).

of the coalition of States seeking a preliminary injunction against the referral

requirement in *Ohio*, 87 F.4th 759, the district court explained that "there has already

been litigation between the parties on substantially the issues arising out of this same

dispute." App. Vol. 3 at 601. The court emphasized that Oklahoma largely seeks to

"reargue the same argument[s]" that the Sixth Circuit rejected about HHS's statutory

authority to issue the counseling and referral requirements. App. Vol. 3 at 602. The

court further disagreed with Oklahoma's argument that federal protections afforded

to individual providers who have "conscience or religious" objections could

"somehow eliminat[e] the need for the State to comply with" program requirements.

App. Vol. 3 at 608-09.

The district court also determined that HHS was not arbitrary and capricious in

terminating Oklahoma's grant. The court recognized that HHS's funding decision

was based on Oklahoma's noncompliance with the unambiguous terms of HHS's

counseling and referral requirements. *See* App. Vol. 3 at 610. The court highlighted

that these requirements have a long pedigree and that the agency has amply articulated

the rationales supporting them. App. Vol. 3 at 610. The court further rejected

Oklahoma's attempt to invoke an unrelated HHS regulation about "the professional

qualifications" of Title X providers to override HHS's counseling and referral

requirements. App. Vol. 3 at 611. And the court explained that Oklahoma also failed

to show any conflict between its law restricting abortions in the State and HHS's

regulations requiring projects to offer nondirective options counseling and referral for abortion upon a patient's request.  *See* App. Vol. 3 at 599-600.

The district court rejected Oklahoma's "arguments about the Spending Clause" as "thoroughly unpersua[sive]."  App. Vol. 3 at 605.  The court recognized Congress's power to set conditions on a grant of federal funds.  *See* App. Vol. 3 at 605.  In the Title X statute, Congress "specifically said" that grantees would have to comply with HHS's regulations as a condition of receiving a Title X grant, and it is common practice that regulations may put grantees "on notice of what the conditions are."  App. Vol. 3 at 605-06.  Underscoring that the counseling and referral requirements were "clearly in place at the point where the grant application process went forward," the court explained that there is "no serious argument to be made that the State of Oklahoma [did not] know what the conditions were . . . for participation in the grant program."  App. Vol. 3 at 605-06.  The court thus found no Spending Clause concern.

The district court expressed skepticism that the remaining preliminary injunction factors favor Oklahoma.  The court described "the threatened injury to the State of Oklahoma from nonissuance of the injunction" as "overblown," noting that Oklahoma claimed a loss of federal funds but failed to show any conflict between state law and "the limited referral contemplated . . . by [HHS's] regulations."  App. Vol. 3 at 598-601.  And the court questioned that Oklahoma's alleged injuries could outweigh the harm to the government's and the public's interest that would result from requiring HHS to allocate competitive grant funds to an entity that has refused

13

to comply with program requirements.  *See* App. Vol. 3 at 599-600.  The court

concluded that, if Oklahoma desired to continue to receive federal Title X funding, it

could "comply with the provisions of the grant process."  App. Vol. 3 at 600.

2.  After the district court denied a preliminary injunction, HHS agreed to

expedite appellate briefing and to voluntarily reserve Title X funding on a temporary

basis in order to permit this Court sufficient time to consider Oklahoma's appeal

while also allowing HHS sufficient time to obligate funds before the end of the fiscal

year.  The parties have requested a decision on this matter by mid-July 2024.

## SUMMARY OF ARGUMENT

The district court correctly denied Oklahoma's request for a preliminary

injunction because Oklahoma has no likelihood of success on the merits of its claims.

Oklahoma's statutory-authority argument seeks to rehash arguments that were

considered and rejected in a challenge brought by Oklahoma and other States in *Ohio*

*v. Becerra*, 87 F.4th 759 (6th Cir. 2023).  In that case, the Sixth Circuit held that HHS

may require Title X projects to offer pregnant patients the opportunity to receive

nondirective options counseling, including about abortion, followed by a referral upon

a patient's request.  *Id.* at 770-72.  HHS did not exceed its statutory authority in

applying its valid regulation by its terms to terminate Oklahoma's Title X grant where

Oklahoma refused to comply with those requirements.  Nor do federal protections

afforded to certain providers with conscience or religious objections allow Oklahoma

to pick and choose which program requirements it prefers to follow.

14

Oklahoma's arbitrary-and-capricious arguments fare no better.  In *Ohio*, the Sixth Circuit recognized the "rational reasons" that underlay HHS's decision to require Title X projects to offer neutral, factual information to pregnant patients. 87 F.4th at 775.  At bottom, Oklahoma would like HHS to revisit its counseling and referral requirements in light of the Supreme Court's decision in *Dobbs* and changing state abortion laws.  The "proper procedure" for raising such arguments, however, is not an arbitrary-and-capricious claim in this posture, but rather "a petition to the agency for rulemaking."  *Auer v. Robbins*, 519 U.S. 452, 459 (1997).  In any event, Oklahoma does not provide any basis for setting aside HHS's reasoned decision to terminate a grant of federal funds to an entity that has refused to comply with program requirements.  And Oklahoma's strained interpretations of other HHS regulations do not suggest a different result.

The district court also correctly rejected Oklahoma's reliance on the clear-statement requirement for conditions on federal funds enacted under the Spending Clause.  Congress has authorized HHS to make grants to public and nonprofit entities for the establishment of family-planning projects and has annually appropriated funds for the program.  The Title X statute makes clear that such grants are subject to HHS's regulations.  42 U.S.C. § 300a-4(a)-(b).  Oklahoma has applied for and accepted Title X grants for 50 years without suggesting any lack of clarity that compliance with HHS regulations is a condition of its grant.  Oklahoma's assertion that Spending Clause doctrine requires Congress to set out in the statute every

15

requirement of the Title X program in order for the requirement to be enforceable cannot be squared with Supreme Court precedent, including the Supreme Court's recent decision upholding agency-imposed conditions on the Medicare and Medicaid programs in *Biden v. Missouri*, 595 U.S. 87 (2022) (per curiam).

Oklahoma likewise cannot establish that the remaining equitable factors favor relief. Any harm to the Oklahoma State Department of Health from the loss of discretionary grant funds cannot outweigh the balance of the equities and the public interest, which strongly counsel against an injunction that would direct HHS to award competitive grant funds to an entity that will not comply with applicable requirements. HHS lawfully issued the counseling and referral requirements, determining that those requirements are "critical for the delivery of quality, client-centered care." *Ohio*, 87 F.4th at 772-73 (quoting 86 Fed. Reg. at 56,154). It would flout the government's and the public's interest to require HHS to continue to award Title X funds to an entity that will not offer Title X patients the neutral and factual information the regulations require, particularly given that nonprofit providers have stepped in to offer Title X services in Oklahoma's stead.

## STANDARD OF REVIEW

This Court reviews a district court's "denial of a preliminary injunction for an abuse of discretion." *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016).

16

# ARGUMENT

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20; *see also Colorado v. U.S. Envtl. Prot. Agency*, 989 F.3d 874, 883 (10th Cir. 2021) (noting that the same "four factors also determine when a court should grant a stay of agency action" under 5 U.S.C. § 705). The district court properly determined that Oklahoma failed to satisfy these requirements.

## I.    Oklahoma Has Not Demonstrated Likelihood of Success on the Merits

### A.    Oklahoma Is Unlikely to Succeed on Its APA Claims

#### 1.    HHS Acted Well Within Its Statutory Authority in Terminating Oklahoma's Title X Grant

a. The district court correctly rejected Oklahoma's argument that the counseling and referral requirements that formed the basis for HHS's termination decision exceed the agency's statutory authority. Title X establishes a competitive grant program for the establishment of family-planning projects and requires that all Title X projects comply with program requirements set forth in agency regulations. *See* 42 U.S.C. §§ 300(a), 300a-4(a). HHS promulgated a final rule in 2021 restoring requirements that had governed the Title X program for much of its history. Those

requirements specify that Title X projects must provide, upon a pregnant patient's request, "neutral, factual information and nondirective counseling" on options like foster care, adoption, and pregnancy termination, and must also provide a referral for any of those options if the patient so requests.  86 Fed. Reg. at 56,179; *see* 42 C.F.R. § 59.5(a)(5).  Referrals may consist of "relevant factual information," such as "the name, address, [and] telephone number" of an abortion provider, but the Title X program may not take "further affirmative action (such as negotiating a fee reduction, making an appointment, providing transportation) to secure abortion services for the patient."  86 Fed. Reg. at 56,150 (quoting 65 Fed. Reg. at 41,281).

Oklahoma asserts that these requirements are inconsistent with Title X's legislative history and Section 1008's prohibition on funds being "used in programs where abortion is a method of family planning," 42 U.S.C. § 300a-6.  *See* Br. 41-42. But Oklahoma simply seeks to rehash statutory interpretation arguments that have already been considered and rejected in binding Supreme Court precedent and in a Sixth Circuit case where Oklahoma was a party.  In *Rust v. Sullivan*, the Supreme Court examined Title X's text and history and explained that Congress did not "directly address the issues" of "abortion counseling" or "referral."  500 U.S. 173, 185 (1991). The Supreme Court upheld HHS's policy decision with respect to abortion counseling and referral in that case as "permissible" under "the broad directives provided by Congress in Title X in general and [Section] 1008 in particular."  *Id.* at 184.

18

The 2021 rule's counseling and referral requirements are likewise permissible under Title X, and such requirements have been in place for nearly all of Title X's history. Section 1008 has long been understood to prohibit the use of Title X funds to "promote or encourage" abortion as a method of family planning. 65 Fed. Reg. at 41,272. As HHS has explained, Section 1008 does not prohibit Title X projects from offering pregnant patients "neutral, factual information" about abortion and, if a patient requests, where an abortion can be obtained; in the agency's experience, that information is "critical for the delivery of quality, client-centered care." *See* 86 Fed. Reg. at 56,154. HHS has accordingly limited the role of Title X projects to informing pregnant patients of their various options but not going further "to secure abortion services." *See id.* at 56,150 (quotation marks omitted). Section 1008 does not include the sort of express prohibition on "abortion counseling or referral" that Congress has mandated for other federal spending programs. *See* 42 U.S.C. § 300z-10(a).

Thus, when Oklahoma and several other States challenged the 2021 rule in the Sixth Circuit and urged that the referral requirement exceeds HHS's statutory authority, the Sixth Circuit disagreed and affirmed the denial of a preliminary injunction. *See Ohio v. Becerra*, 87 F.4th 759 (6th Cir. 2023). The Sixth Circuit recognized that *Rust* compels the conclusion that it is "permissible for an administration to treat referrals either as falling inside or outside [Section] 1008's prohibition, so long as [HHS] adequately explains its choice," *id.* at 772, and determined that HHS had adequately done so in the 2021 rule, *id.* at 772-75.

19

This Court should reject Oklahoma's attempts to rely on the same arguments to achieve a different result in this Circuit. *See* Br. 41-42. Oklahoma provides no sound reason to depart from the Sixth Circuit's decision in *Ohio*, which was expressly based on the Supreme Court's controlling reasoning in *Rust*. *See* 87 F.4th at 772. Oklahoma cannot escape *Ohio*'s holding by attempting to posit a difference between an "as-applied challenge" and a "facial challenge." *See* Br. 31-32. The relevant point is that, as Oklahoma acknowledges, *see* Br. 40, HHS's funding decision in this case simply involved applying the terms of the 2021 rule upheld in *Ohio* to Oklahoma.

b. Oklahoma does not dispute that it already had an opportunity to raise its statutory-authority contentions in *Ohio*. Nor does Oklahoma claim that there has been a change to the Title X statute or the implementing regulations that has undermined the Sixth Circuit's analysis. Oklahoma nevertheless urges this Court to break from the Sixth Circuit based on an annual appropriations rider, commonly known as the Weldon Amendment, that Oklahoma did not even mention in its complaint in this case. Those arguments are no more successful.

The Weldon Amendment is one of several federal laws protecting the rights of physicians and healthcare personnel who have conscience objections to abortion-related services. *See, e.g.*, 42 U.S.C. § 300a-7(c); *id.* § 238n(a). In the Weldon Amendment, Congress provided these protections to certain "health care entit[ies]" that refuse to "provide, pay for, provide coverage of, or refer for abortions." *See* Pub. L. No. 118-47, div. D, tit. V, § 507(d)(1), 138 Stat. at 703. The term "health care

entity" includes "an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan." *Id.* § 507(d)(2), 138 Stat. at 703.

There is no conflict between these federal conscience protections and the 2021 rule. Federal conscience laws, including the Weldon Amendment, "have existed side by side" with HHS's counseling and referral requirements "for decades" without issue. 86 Fed. Reg. at 56,153. As HHS has explained, individuals and healthcare entities covered by these federal statutes that have a conscience objection "will not be required to counsel or refer for abortions in the Title X program in accordance with applicable federal law." *Id.*; *see Ohio*, 87 F.4th at 774 (noting that HHS established "a default rule requiring referrals upon request, subject to conscience exemptions for objecting providers" (quotation marks omitted)).

Oklahoma identifies no support for its assertion that States and their health departments qualify as "health care entities" that can invoke the Weldon Amendment's conscience protections based on state policy choices about abortion. *See* Br. 39-40. Oklahoma seeks to rely on the "plain text" of the Weldon Amendment, Br. 38, but the provision's sole mention of "State[s]" is in describing the government entities that cannot discriminate *against* "health care entit[ies]," *see* Pub. L. No. 118-47, div. D, tit. V, § 507(d)(1), 138 Stat. at 703. And Congress's explicit list of individuals and discrete entities—like physicians, healthcare facilities, and healthcare

21

organizations, *id.* § 507(d)(2), 138 Stat. at 703—who may object to making certain referrals based on their own beliefs suggests that States and arms of the State may not object to Title X providers making any referrals based on state policy views.[3]

Thus, in *Ohio*, although Oklahoma and the other States that brought suit objected to the referral requirement based on "state polic[ies]" opposed to abortion, they explicitly recognized that, as States, they are "not protected under any of [the federal conscience] statutes—while individual doctors working for the States might be, no statute would free a government grantee from complying with the referral requirement."  Brief of Appellants at 53-54, *Ohio*, 87 F.4th 759 (No. 21-4235), 2022 WL 613121, at *53-54; *see also Ohio*, 87 F.4th at 774 n.8 ("Both HHS and the States seem to agree that the States are not 'health care entities' entitled to conscience protection.").  In accord with that view, Oklahoma at no point raised a purported conscience objection to HHS when it applied for and accepted its Title X grant subject to the counseling and referral requirements, nor did it do so when it engaged with HHS about its compliance with those requirements.

_____

[3] Oklahoma also invokes a regulation that extended the types of conscience objections that could be raised and the entities that could raise such objections under the Weldon Amendment.  *See* Br. 40.  That regulation was vacated by multiple courts and later rescinded by the agency.  *See* 89 Fed. Reg. 2078, 2095 (Jan. 11, 2024).  And in any event, the regulation stated only that, "[a]s applicable, components of State or local governments may be health care entities under the Weldon Amendment," 45 C.F.R. § 88.2 (2019), and did not purport to address whether States or their agencies could claim the benefit of federal conscience protections by invoking state policy preferences to excuse Title X projects from meeting program requirements.

Oklahoma likewise errs to the extent it suggests that the 2021 rule violates the Weldon Amendment by requiring *Oklahoma* as a Title X grantee to discriminate against healthcare entities that have a conscience objection to abortion. *See* Br. 39. Oklahoma points to a footnote in *Ohio*, in which the Sixth Circuit questioned—but did not analyze or decide—whether it might violate the Weldon Amendment to prohibit States as Title X grantees "from subgranting to 'health care entities' who will not refer for abortion." 87 F.4th at 774 n.8. HHS's referral requirement presents no such concern. As HHS's regulations make clear, the counseling and referral requirements are imposed on the Title X project, not on individual providers or subrecipients in the project. *See* 42 C.F.R. § 59.5(a)(5)(ii) (stating that "[a] project" must provide "information and counseling" and "referral upon request"). Thus, a State may subgrant to healthcare entities that have a conscience objection, so long as the project overall provides the requisite nondirective counseling and referral. *See* 65 Fed. Reg. at 41,274 (explaining that grantees "may not require individual employees who have [conscience] objections to provide such counseling" but "must make other arrangements to ensure that the service is available to Title X clients who desire it"). This is no different than HHS's regulation allowing Title X projects to have service sites that offer only some family-planning services, so long as "the entire project" offers the broad range of family-planning services required under the statute. 42 C.F.R. § 59.5(a)(1); *see* 42 U.S.C. § 300(a).

23

Oklahoma's reliance on the Weldon Amendment to nullify HHS's regulatory requirements is particularly misguided given that the Weldon Amendment is an annual appropriations rider that governs the use of appropriated federal funds. *See* Pub. L. No. 118-47, div. D, tit. V, § 507(d)(1), 138 Stat. at 703. At the time that Congress first included the Weldon Amendment as an appropriations rider in 2004, HHS had materially identical counseling and referral requirements in place, *see* 65 Fed. Reg. at 41,281, and those requirements have been in place nearly every year since. Despite its presumed awareness of HHS's referral requirement, Congress has reenacted the same language in the Weldon Amendment each year and has continued to annually appropriate funds for HHS to carry out the Title X program, without suggesting any intent to disturb HHS's approach. *Cf. Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 159 (2013) (finding significant that Congress amended the relevant statutory provision several times while "leaving untouched" and not "express[ing] disapproval of" the agency interpretation). Consistent with the Weldon Amendment, Oklahoma can accommodate objecting and non-objecting providers while ensuring that pregnant patients receive neutral, factual information about their options, as Oklahoma has done for decades as a Title X grantee.

## 2.    HHS's Decision Is Consistent with Its Regulations

HHS's decision rests on a straightforward application of its regulations to Oklahoma. Oklahoma's contention that HHS's decision contradicts two other regulatory provisions, *see* Br. 42-47, is premised on a plainly unreasonable

interpretation of those provisions. *See* App. Vol. 3 at 611-12. At a minimum, Oklahoma does not overcome the deference owed to HHS's interpretation of its own regulations. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2413-14 (2019).

Oklahoma misunderstands 42 C.F.R. § 59.5(b)(6), which states that Title X "family planning medical services will be performed under the direction of a clinical services provider, with services offered within their scope of practice and allowable under state law, and with special training or experience in family planning." Oklahoma seeks to rely on the phrase "allowable under state law," and suggests that Oklahoma law prohibits supplying patients with neutral information about care that is legal outside the State, and therefore that HHS cannot require Title X projects to offer such information to pregnant patients. But that argument fails for several reasons. Most fundamentally, that regulation has no application here. As the district court explained, that provision speaks to "the professional qualifications of the providers that are involved," not the types of services provided under Title X programs. App. Vol. 3 at 611. HHS specifically revised the language in that provision in 2021 to account for the fact that some states allow healthcare providers other than physicians (such as physician assistants and registered nurses) to "direct family planning programs." *See* 86 Fed. Reg. at 56,163-64. Oklahoma cannot transform HHS's targeted decision to permit those other providers to direct Title X projects where "allowable under state law" into a broad exemption from applicable regulatory requirements. *See* App. Vol. 3 at 612.

25

Regardless, Oklahoma's argument would fail even if the phrase "allowable under state law" could be read as Oklahoma desires, *see* Br. 45-46, because Oklahoma does not prohibit providers from giving patients information about and referrals for legal out-of-state abortion services.  Oklahoma law prohibits "advis[ing] or procur[ing]" women to take steps "with intent thereby to procure [a] miscarriage," Okla. Stat. Ann. tit. 21, § 861, but does not mention counseling or referrals.  In the very dictionary that Oklahoma relies on (Br. 43 & n.6), the primary definition of "advise" is "to give (someone) a recommendation about what should be done." *Advise*, Merriam-Webster Dictionary, https://perma.cc/Y8ZJ-5347.  It is difficult to fathom how providing "neutral, factual information and nondirective counseling on all pregnancy options"—plus the "name, address, [and] telephone number" of an abortion provider if the patient requests—could fall within that ambit, particularly when HHS's regulations prohibit projects from steering patients toward one option over another or from taking "affirmative action . . . to secure abortion services for the patient."  86 Fed. Reg. at 56,150, 56,154 (quotation marks omitted).

Oklahoma at least initially shared this understanding—even after its restriction took effect, Oklahoma saw no barrier to having state staff provide the requisite information or direct patients to the options hotline.  *See* App. Vol. 2 at 312.  Indeed, Oklahoma law appears to contemplate the provision of such information to pregnant patients.  *See* Okla. Stat. Ann. tit. 63, § 1-741.1(B) (making it unlawful for federal grant funds "to be used to encourage a woman to have an abortion not necessary to save

her life, except to the extent required for continued participation in a federal program" and further providing that "[n]othing in this subsection shall be construed to prohibit a physician from discussing options with a patient through nondirective counseling"). Oklahoma has not criminalized a provider's offering information to patients about *legal* out-of-state abortions. And whatever the precise scope of Oklahoma law, the district court did not abuse its discretion in finding at this preliminary stage that there is no indication from the face of Oklahoma's law that it prohibits the nondirective counseling and referral required by HHS's rule. *See* App. Vol. 3 at 599.[4]

Oklahoma also relies (Br. 46-47) on 42 C.F.R. § 59.5(b)(8), which requires that Title X projects affirm that they will "[p]rovide for coordination and use of referrals and linkages" with various healthcare providers. These "referrals and linkages" should be with providers "who are in close physical proximity to the Title X site, when feasible, in order to promote access to services and provide a seamless continuum of care." 42 C.F.R. § 59.5(b)(8). By its plain terms, the regulation requires that Title X projects refer patients to nearby healthcare providers when it is possible to do so, but permits referrals to a provider farther away where such close-in-

---

[4] For the first time on appeal, Oklahoma cites a hodgepodge of tangential state laws in an effort to conjure a conflict with the counseling and referral requirements. *See* Br. 44. Oklahoma does not demonstrate any conflict by citing state laws that excuse people from "[p]articipat[ing] in" activities "contrary to [their] religious beliefs or moral convictions," Okla. Stat. Ann. tit. 63, § 1-728e(B)(1), or that pertain to the distribution of certain informational materials, *see id.* §§ 1-738.3(A)(2)(d), 1-753(2).

proximity referrals are not possible.  *See* 86 Fed. Reg. at 56,164 (agreeing with

commenters to add language to the regulations "to state that referrals are to be to

providers in close proximity to the Title X site when feasible").  It is not plausible to

read the regulation, as Oklahoma suggests, to mean that a Title X project may

unilaterally determine that all out-of-state referrals for abortion are not "feasible,"

Br. 47, and thus effectively veto the specific regulatory requirement that projects offer

nondirective options counseling followed by a referral for any of the options the

pregnant patient requests.

### 3.    HHS's Decision Is Neither Arbitrary Nor Capricious

HHS determined to terminate Oklahoma's Title X grant when Oklahoma

refused to comply with the counseling and referral requirements that govern the

program.  HHS provided "ample" explanation and support for promulgating these

requirements in the 2021 rule.  App. Vol. 3 at 610.  HHS explained that offering

pregnant patients the opportunity to receive information and nondirective counseling

on all options is "critical for the delivery of quality, client-centered care," 86 Fed. Reg.

at 56,154, and that "the provision of a referral is the logical and appropriate outcome

of the counseling process," 65 Fed. Reg. at 41,274.  The 2019 rule, which placed

restrictions on counseling and referral, led many grantees and subgrantees to stop

providing Title X services because those regulatory restrictions "interfered with the

patient-provider relationship" and compromised the ability "to provide healthcare and

information to patients consistent with medical ethics."  86 Fed. Reg. at 56,146

(quotation marks omitted).  Restoring the counseling and referral requirements (which date back approximately 40 years) enables "healthcare providers to offer complete and medically accurate information and counseling to their clients."  *Id.* at 56,154.

As the Sixth Circuit explained in rejecting Oklahoma's arbitrary-and-capricious challenge in *Ohio*, HHS's detailed discussion of the "rational reasons" that support its decision to reinstate the referral requirement "withstand arbitrary and capricious review."  87 F.4th at 775.  The agency easily satisfied its obligation to "consider [the] important aspect[s] of the problem" and to "examine the relevant data and articulate a satisfactory explanation for its action."  *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  As Oklahoma recognizes, HHS's decision here was based on a straightforward "application of the 2021 regulation to Oklahoma."  Br. 40.  HHS did not act in an arbitrary and capricious manner in applying its valid regulation in accordance with its terms.

Oklahoma's claim that HHS failed to "grapple[] with" the effects of the counseling and referral requirements now that Oklahoma and other States restrict abortion is, at bottom, nothing more than a charge that those regulatory requirements should be revisited in light of "the decision in *Dobbs*" and changes to state law. Br. 48.  But the "proper procedure" is to direct that grievance not to the courts in the first instance, but to "the agency itself."  *Auer v. Robbins*, 519 U.S. 452, 459 (1997). Addressing a substantially similar scenario, the Supreme Court has made clear that litigants who seek to raise intervening legal or factual developments to question the

continued wisdom of applying an agency rule must use the mechanism "set forth explicitly in the APA: a petition to the agency for rulemaking, denial of which must be justified by a statement of reasons, and can be appealed to the courts." *Id.* at 458-59 (citations omitted). Here, Oklahoma does not contend that it has ever raised any of its issues in such a petition to the agency.

In all events, Oklahoma's arguments provide no basis to set aside HHS's funding decision. Contrary to Oklahoma's suggestion that HHS "entirely failed to consider" important aspects of its funding decision, *see* Br. 47-48, HHS engaged with Oklahoma about its state law and the counseling and referral requirements, *see* App. Vol. 2 at 312. The parties reached a mutually agreeable solution, and HHS's decision to grant a continuation award was informed by Oklahoma's assurances that it was following that course. *See* App. Vol. 2 at 312. But as soon as HHS had awarded the new round of funding, Oklahoma abruptly changed course and refused to comply with those requirements, leading to HHS's determination to end Oklahoma's grant. *See* App. Vol. 2 at 313.

Nor does Oklahoma's decision to limit access to abortion in its State, *see* Br. 48-49, undermine the importance of Title X projects supplying "complete and medically accurate information and counseling" to pregnant patients, *see* 86 Fed. Reg. at 56,154. HHS has never suggested that the counseling and referral requirements of the 2021 rule are limited by the procedures available within a particular State. *See id.* at 56,153-54. Thus, HHS reminded all grantees in June 2022—and reiterated to Oklahoma

before terminating its grant—that the counseling and referral requirements remain in effect and that projects may provide referrals for services that are available out of state. *See* App. Vol. 2 at 313; App. Vol. 3 at 457, 463.

Oklahoma's reliance on "federalism concerns" is misguided. Br. 48-49. For the reasons already explained, HHS has not interfered with Oklahoma's state-law decisions with respect to abortion. If Oklahoma no longer wishes to have its Title X project provide the neutral, factual information about abortion that HHS's regulations require, Oklahoma is free to "decline the funds" and not participate in the Title X program. *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013); *see also Rust*, 500 U.S. at 199 n.5 (recognizing that entities are "in no way compelled to operate a Title X project; to avoid the force of the regulations, [they] can simply decline the subsidy").

Oklahoma does not advance its case in suggesting that HHS failed to account for "the impact of [the grant] termination on Oklahoma patients." Br. 49-50. As Oklahoma acknowledges (Br. 50), it is not the only Title X grantee or provider of family-planning services in the State, and nonprofit providers have stepped in to provide Title X services now that Oklahoma has refused to comply with HHS regulations. *See* App. Vol. 3 at 404, ¶ 26; *see also* Office of Population Affairs, HHS, *Fiscal Year 2023 Title X Service Grant Awards*, https://perma.cc/H2QK-P5ZX. In short, HHS was justified in awarding the funds to other compliant projects when Oklahoma chose to stop following program requirements.

### B.  Oklahoma Is Unlikely to Succeed on Its Spending Clause Arguments

Oklahoma's invocation of Spending Clause doctrine similarly lacks merit.  The Spending Clause authorizes Congress to "lay and collect Taxes, . . . to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1.  Pursuant to that authority, Congress has "broad power" to "set the terms on which it disburses federal funds."  *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022).  Congress has long "condition[ed] receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives."  *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)).

Title X is a straightforward exercise of Congress's spending power.  Congress appropriates money every fiscal year to fund the Title X program.  *See, e.g.*, Pub. L. No. 118-47, div. D, tit. II, 138 Stat. at 652 (providing over $286 million in funding). The statute authorizes HHS to issue grants to public and nonprofit private entities for the establishment of projects that offer voluntary family-planning services.  *See* 42 U.S.C. § 300(a).  And Congress expressly provided that Title X grants shall "be made in accordance with such regulations as the Secretary may promulgate," *id.* § 300a-4(a), and that payment of the grants is "subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made," *id.* § 300a-4(b).

32

Oklahoma's insistence that "HHS has wielded legislative [spending] authority" (Br. 27) is therefore difficult to understand. Title X is just one among numerous federal grant programs requiring compliance with regulations as a condition of a grant.[5] The Supreme Court has long recognized that Congress may leave the particulars of implementing a spending program through "regulations" and "other guidelines" to the agency charged with administering the program. *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 670 (1985). As with other spending programs, state participation in Title X "is voluntary," and the States retain the option of "forgoing the benefits of federal funding" if they do not want to fulfill the program conditions. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 11 (1981); *see also Rust*, 500 U.S. at 199 n.5 (making the same point as to the Title X program).

Oklahoma misunderstands the authorities that it cites in seeking to use the Spending Clause to compel HHS to award Oklahoma a discretionary grant without having to comply with program requirements. Oklahoma primarily relies on *Pennhurst* and cases applying that decision. Those cases reflect the basic proposition that "legislation enacted pursuant to the spending power is much in the nature of a

---

[5] *See, e.g.*, 42 U.S.C. § 254b(k)(3)(N) (requiring health center grantees to "ensure the appropriate use of Federal funds in compliance with applicable Federal statutes, regulations, and the terms and conditions of the Federal award"); *id.* § 1793(f)(2) (providing grants for school breakfast program that "shall be carried out in accordance with applicable nutritional guidelines and regulations issued by the Secretary"); 49 U.S.C. § 5309(c)(4) (stating that transit grants "shall be subject to all terms, conditions, requirements, and provisions that the Secretary determines to be necessary or appropriate").

contract," where a State must "voluntarily and knowingly accept[] the terms" attached to federal funding for those terms to be enforceable. *Pennhurst*, 451 U.S. at 17. The cases thus articulate a clear-statement rule of statutory interpretation, which courts apply by declining to enforce against grant recipients conditions that were not sufficiently apparent when the recipient accepted the funding. *See id.* at 25 (explaining that Congress may not "surpris[e] participating States with post acceptance or 'retroactive' conditions"). In *Pennhurst*, for example, the question was whether a federal statutory provision stated a "mandatory" and enforceable condition at all, and the Court determined as a matter of statutory construction that it did not. *See id.* at 15-27; *see also, e.g.*, *Cummings*, 596 U.S. at 219 (construing anti-discrimination statute not to authorize an award of emotional-distress damages); *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (construing fee-shifting provision of the Individuals with Disabilities Education Act not to apply to expert fees).

Those cases do not aid Oklahoma for several reasons. As an initial matter, Oklahoma does not confront the sort of predicament that animated *Pennhurst* and its progeny: the need to construe supposedly ambiguous conditions to determine what obligations it incurred by accepting a prior grant. *Arlington Cent.*, 548 U.S. at 294-95; *Pennhurst*, 451 U.S. at 7-8, 17. Oklahoma is not facing an effort to recoup previously awarded grant funds, nor is it seeking to avoid liability on the basis of prior grant conditions. Rather, Oklahoma claims entitlement to continue receiving money from the limited pool of Title X funds that Congress authorized HHS to apportion, and it

34

seeks to compel HHS to issue such an award. *Pennhurst* has no application in this circumstance and provides no basis to override HHS's decision not to issue a discretionary award to Oklahoma based on its stated refusal to comply with the regulatory requirements governing the program.

Even if *Pennhurst*'s standard were relevant here, it is satisfied. Congress "provid[ed] clear notice to the States that," "by accepting funds" under Title X, they would "be obligated to comply with" HHS regulations governing the program. *Pennhurst*, 451 U.S. at 25. As explained above, the statute is explicit that Title X "[g]rants and contracts" are subject to HHS's "regulations" and "conditions." 42 U.S.C. § 300a-4(a)-(b). Like all other Title X recipients, States are aware that once they accept Title X funding, they must comply with the regulatory requirements set forth by HHS, such as those in the 2021 rule. *See* App. Vol. 3 at 605 ("[T]here's no serious argument to be made that the State of Oklahoma didn't know what the conditions were . . . for participation in the grant program."). Oklahoma has applied for and accepted Title X funds for 50 years without suggesting any lack of clarity that compliance with HHS regulations is a condition of its grant.

Oklahoma points to (Br. 21-22) Section 1008's prohibition on grant funds being "used in programs where abortion is a method of family planning," 42 U.S.C. § 300a-6, but that provision is irrelevant to the Spending Clause analysis. HHS has not sought to deny funding to Oklahoma based on that prohibition, that prohibition is not the basis for HHS's rulemaking authority, and the existence of that prohibition

does not detract from Title X's unambiguous requirement that grantees abide by HHS regulations. *See* App. Vol. 3 at 605-07. Oklahoma's assertions that Section 1008 precludes HHS from requiring projects to offer nondirective options counseling and referrals for abortion, *see* Br. 26, merely repackage Oklahoma's erroneous statutory-authority arguments.

Oklahoma thus resorts to arguing that the Spending Clause requires that Congress itself articulate every condition of the Title X program. *See* Br. 22-25. That argument cannot be squared with Supreme Court precedent, including the Supreme Court's recent decision in *Biden v. Missouri*, 595 U.S. 87 (2022) (per curiam). There, as here, the operative statute authorized a federal agency to adopt conditions on participation in a federal spending program—in that case, "such 'requirements as [HHS] finds necessary in the interest of the health and safety of individuals who are furnished services in the institution'" at hospitals and other providers participating in the Medicare and Medicaid programs. *Id.* at 90 (quoting 42 U.S.C. § 1395x(e)(9)). And there, as here, States objected that they could not be subjected to a spending condition that was not articulated in the statute. *See* Response to Application for a Stay at 23-24, *Missouri*, 595 U.S. 87 (No. 21A240), 2021 WL 8946189, at *23-24; Response to Application for a Stay Pending Appeal at 26-28, *Missouri*, 595 U.S. 87 (No. 21A240), 2021 WL 8939385, at *26-28. The Supreme Court disagreed, explaining that the agency has properly "established long lists of detailed conditions with which facilities must comply to be eligible to receive Medicare and Medicaid

36

funds" and is not limited to issuing "bureaucratic rules regarding the technical administration of" the programs. *Missouri*, 595 U.S. at 90, 94.

None of the court of appeals decisions on which Oklahoma relies is to the contrary. For example, the Sixth and Eleventh Circuits concluded that a statutory funding condition placed on state expenditures of COVID-19 stimulus funds was not "ascertain[able]." *See West Virginia ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1140 (11th Cir. 2023); *Kentucky v. Yellen*, 54 F.4th 325, 354 (6th Cir. 2022). That holding has no application here, where, as in *Missouri*, the statutory condition is perfectly clear. *See* 595 U.S. at 92-96. Even the cases that Oklahoma invokes recognize that where Congress has articulated an ascertainable condition, agencies can permissibly elaborate its content. *See West Virginia*, 59 F.4th at 1148 ("[W]e do not question an agency's authority to fill in gaps that may exist in a spending condition."); *Kentucky*, 54 F.4th at 353-54 (discussing prior cases approving this practice). And as discussed above, there can be no serious doubt that HHS acted within its statutory authority in promulgating the challenged requirements. *See Ohio*, 87 F.4th at 770-72.

Oklahoma wrongly suggests that the counseling and referral requirements implicate "the federal-state balance." Br. 28. Those requirements are conditions on entities participating in the federal Title X program, and States have no power to set conditions on federal activities. *See Sabri v. United States*, 541 U.S. 600, 608 n.* (2004) (explaining that the spending power applies with equal force when Congress legislates "in an area historically of state concern"). Because conditions on federal spending

37

programs are in no sense "the particular domain of state law," *Alabama Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam), Oklahoma's federalism concerns are misplaced.

The conditions at issue here, moreover, are not akin to funding conditions that "arguably threatened a significant intrusion upon state taxing authority." *Kentucky*, 54 F.4th at 329; *see West Virginia*, 59 F.4th at 1145 (expressing concern that "[t]he States face[d] billions of dollars in potential recoupment actions" because the funding condition at issue was aimed "at each state's *entire* budget and every single one of its taxes"). HHS's counseling and referral requirements present no comparable risk of invading state sovereignty. The requirements apply only to the family-planning projects that are established by public and nonprofit entities with Title X funds; Oklahoma has applied for and accepted Title X funds for decades while those requirements have been in place; and the requirements do not interfere with Oklahoma's decision to restrict abortion in its State. *See Rust*, 500 U.S. at 196 ("The regulations govern the scope of the Title X *project's* activities, and leave the grantee unfettered in its other activities.").

## II. The Remaining Preliminary Injunction Factors Counsel Against Relief

Because Oklahoma has not demonstrated a likelihood of success on the merits, this Court need not consider the remaining preliminary injunction factors. *See Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1285 (10th Cir. 2016). The

district court correctly concluded, however, that Oklahoma likewise failed to establish that the remaining factors favor relief.

Oklahoma has not shown that its alleged harms are "both certain and great," rather than "merely serious or substantial." *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008) (quotation marks omitted). While Oklahoma notes that HHS's decision denies approximately $4.5 million in Title X grant funds, Br. 50, Oklahoma never even attempts to show the impact on its overall funding. Nor is a preliminary injunction warranted merely because Oklahoma cannot recover lost Title X funds "as monetary damages due to sovereign immunity." Br. 51. Such a categorical rule ignores that grantees have no legally cognizable interest in the continued receipt of Title X funding, 42 C.F.R. § 59.8(b)-(c), and undermines the notion that equitable relief is "an extraordinary remedy," *Winter*, 555 U.S. at 22. Oklahoma also speculates about harm to its goodwill and reputation if it ceases to provide "medical services" and related "translation and language services," *see* Br. 51-52, but makes no effort to explain why those harms will result given that the Oklahoma legislature has continued funding, *see* App. Vol. 2 at 214, ¶ 23, and that other entities are ready and able to offer services to Oklahoma's citizens.

In all events, any claimed loss of federal funding cannot outweigh the balance of the equities and the public interest, which strongly counsel against the issuance of a preliminary injunction that would compel HHS to issue a discretionary funding award to a grantee that has refused to comply with program requirements. HHS lawfully

issued the counseling and referral requirements, explaining that those requirements are "critical for the delivery of quality, client-centered care."  86 Fed. Reg. at 56,154. It would undermine the government's and the public's interest to require HHS to continue to award Title X funds to an entity that will not offer Title X patients the "neutral, factual" information the regulations require.  *See id.*  Oklahoma concedes (Br. 50) that it is not the only recipient of Title X funds in the State, and nonprofit providers have stepped in to provide services to clients now that Oklahoma has refused to comply with HHS regulations.  *See* App. Vol. 3 at 404, ¶ 26.

Oklahoma gestures to its sovereign interests but offers no explanation of how HHS is impairing Oklahoma's ability to regulate abortions.  Br. 53.  Oklahoma willingly applied for and received Title X funding, and for the reasons explained above, Oklahoma has not shown any conflict between HHS's counseling and referral requirements and Oklahoma state law.  To the extent that Oklahoma no longer wants to offer Title X clients the nondirective options counseling and referrals that it has provided for decades without complaint, it is free to make that decision and forgo the benefit of Title X funding.  *See Agency for Int'l Dev.*, 570 U.S. at 214.

**CONCLUSION**

For the foregoing reasons, the order of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

MICHAEL S. RAAB
COURTNEY L. DIXON

*s/ Brian J. Springer*
BRIAN J. SPRINGER
*Attorneys, Appellate Staff*
*Civil Division, Room 7537*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5446*
*brian.j.springer@usdoj.gov*

May 2024

## REQUEST FOR ORAL ARGUMENT

This Court has scheduled oral argument for May 31, 2024.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,395 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brian J. Springer*
Brian J. Springer

## CERTIFICATE OF SERVICE

I hereby certify that on May 10, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Brian J. Springer*
Brian J. Springer