**CASE NO. 24-6063**
IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

STATE OF OKLAHOMA,

     *Plaintiff-Appellant*,

v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;

XAVIER BECERRA, in his official
capacity as the Secretary of the U.S.
Department of Health and Human Services;

JESSICA S. MARCELLA, in her official
capacity as Deputy Assistant Secretary for
Population Affairs; and

OFFICE OF POPULATION AFFAIRS,

     *Defendants-Appellees*.

On Appeal from the United States District Court
For the Western District of Oklahoma
The Honorable Judge Joe Heaton
Case No. 23-CV-01052-HE

---

### APPELLANT'S REPLY BRIEF

---

May 20, 2024

Respectfully submitted,

Garry M. Gaskins, II, OBA # 20212
*Solicitor General*
Zach West, OBA # 30768
*Director of Special Litigation*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st St.
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

R. Tom Hillis, OBA # 12338
Barry G. Reynolds, OBA # 13202
J. Miles McFadden, OBA # 30166
TITUS HILLIS REYNOLDS LOVE, P.C.
15 E. 5th St., Suite 3700
Tulsa, OK 74103
(918) 587-6800  Fax: (918) 587-6822
thillis@titushillis.com
reynolds@titushillis.com
jmcfadden@titushillis.com

Anthony J. (A.J.) Ferate, OBA # 21171
SPENCER FANE
9400 North Broadway Extension,
Suite 600
Oklahoma City, OK 73114
(405) 844-9900 Fax: (405) 844-9958
AJFerate@spencerfane.com

*ATTORNEYS FOR PLAINTIFF / APPELLANT,*
*THE STATE OF OKLAHOMA*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................iv

INTRODUCTION ................................................................................................1

    I.     DEFENDANTS IGNORE CRITICAL POINTS AND MAKE KEY ADMISSIONS.....1

    II.    ISSUE 1: DEFENDANTS HAVE VIOLATED THE SPENDING CLAUSE. ...........5

    III.   ISSUE 2: OSDH IS A LEGITIMATE OBJECTOR UNDER WELDON. ............11

    IV.   ISSUE 3: DEFENDANTS ARE ACTING ARBITRARILY AND CAPRICIOUSLY..17

    V.    DEFENDANTS FAIL TO SHOW OTHER INJUNCTION FACTORS
           FAVOR THEM...........................................................................................25

CONCLUSION ..................................................................................................27

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT .................29

CERTIFICATE OF DIGITAL SUBMISSION AND EXACT COPIES ...............29

CERTIFICATE OF SERVICE ..............................................................................30

# TABLE OF AUTHORITIES

## CASES

*Auer v. Robbins,* 519 U.S. 452 (1997) ........................................................ 18, 24, 25

*Biden v. Missouri*, 595 U.S. 87 (2022) ................................................................5, 8

*City & Cnty. of S.F. v. Azar*, 411 F. Supp. 3d 1001
  (N.D. Cal. 2019)....................................................................................................15

*City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579 (E.D. Pa. 2017)...................2

*City of Sand Springs v. Dep't of Pub. Welfare*, 1980 OK 36, 608 P.2d 1139 ........23

*Colorado v. U.S. Dep't of Justice,* 455 F. Supp. 3d 1034 (D. Colo. 2020) ...............2

*Crowe & Dunlevy v. Stidham*, 640 F.3d 1140 (10th Cir. 2011) .............................26

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022)........................................................ 1, 3, 4, 10, 17, 18, 22, 25

*Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020)........................................................12

*Jackson v. Birmingham Board of Education,* 544 U.S. 167 (2005) .........................9

*Kentucky v. Yellen*, 54 F.4th 325 (6th Cir. 2022) .................................................8, 10

*Kisor v. Wilkie*, 588 U.S. 558 (2019)......................................................................18

*Ohio v. Becerra,* 87 F.4th 759 (6th Cir. 2023)...................... 3, 4, 6, 7, 16, 17, 18, 25

*Pennhurst State School & Hospital v. Halderman*,
  451 U.S. 1 (1981)............................................................................. 1, 5, 7, 10, 11

*Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186 (10th Cir. 2008) .............26

*UMC Physicians' Bargaining Unit of Nev. Serv. Emps. Union v. Nev. Serv. Emps.*
  *Union/SEIU Loc. 1107, AFLCIO,* 178 P.3d 709 (Nev. 2008).............................14

*Walker v. BOKF, Nat'l Ass'n*, 30 F.4th 994 (10th Cir. 2022) .................................19

*West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124
  (11th Cir. 2023)...............................................................................8, 9

*Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43 (D.C. Cir. 1999)............20

*Zokari v. Gates*, 561 F.3d 1076 (10th Cir. 2009)....................................12

## STATUTES

42 U.S.C. § 300(a)-4 ...................................................................6
42 U.S.C. § 300a-4(b) .................................................................7
42 U.S.C. § 300a-6......................................................................6
OKLA. STAT. TIT. 21, § 691 ........................................................22
OKLA. STAT. TIT. 21, § 861 ........................................................21
OKLA. STAT. TIT. 63, § 1-741.1 ............................................. 22, 23
OKLA. STAT. TIT. 63, § 3101.2(C) ...............................................22

## REGULATIONS

42 C.F.R. § 59.5(b)(1).................................................................20
42 C.F.R. § 59.5(b)(6)............................................................ 19, 20
53 Fed. Reg. 2922 ...................................................................4, 21
53 Fed. Reg. 2923 .......................................................................4
53 Fed. Reg. 2933 .....................................................................21
53 Fed. Reg. 2934 .......................................................................4
86 Fed. Reg. 56,153 ..................................................................2, 3
86 Fed. Reg. 56,163 ...................................................................19
89 Fed. Reg. 2078 .....................................................................15

## OTHER AUTHORITY

BLACK'S LAW DICTIONARY (11th ed. 2019) ........................................14

**INTRODUCTION**

Defendants' attempt to strip Oklahoma of millions in funding over abortion referrals conflicts with Supreme Court caselaw, Title X, and Defendants' own regulations and assurances. All are set aside, for the flimsiest of reasons, so Defendants can "protect access to abortion care."

The Spending Clause and *Pennhurst*, per Defendants, are a nullity because Congress (allegedly) said HHS can set limitless conditions on Title X. Conscience protections are irrelevant, we are told, because a State *Health* Department (somehow) does not qualify as "*any other kind* of health care … organization." And Defendants' 2021 promise to protect objecting grantees? Ignored. Defendants also see no need, under the APA, to analyze or apply a landmark Supreme Court decision (*Dobbs*) that held abortion is now regulated by the people's State representatives. Nor do they view themselves bound by their own regulations, which expressly require respect for state law. Defendants appear to believe in a bureaucracy without limits.

This Court should enjoin Defendants' effort to subvert the rule of law, and order Defendants to provide Oklahoma's 2024 Title X funding.

## I. DEFENDANTS IGNORE CRITICAL POINTS AND MAKE KEY ADMISSIONS.

To begin, it is worth highlighting important points Oklahoma made that Defendants avoid. For instance, Defendants ignore the 2020 opinion where a district court ruled for Colorado under the Spending Clause, enjoining the federal

government's anti-sanctuary city efforts. *See Colorado v. U.S. Dep't of Justice,* 455 F. Supp. 3d 1034 (D. Colo. 2020). Oklahoma cited that opinion, most prominently for the proposition that "agency-imposed grant conditions, even if they themselves are unambiguous, cannot be constitutional under the Spending Clause unless the statute from which they originate is also unambiguous." *Id.* at 1056 (citing *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 645–46 (E.D. Pa. 2017)). District court decisions are not binding here, of course, but that opinion demonstrates that Oklahoma's Spending Clause views are not esoteric. Put differently, Defendants fail to explain why Colorado should be able to rely on the Spending Clause to challenge the government and Oklahoma should not.

Remarkably, Defendants also decline to discuss their promise in promulgating the 2021 Rule that objecting "***grantees will not be required to counsel or refer for abortions in the Title X program***." Opening Br. 37 (quoting 86 Fed. Reg. 56,153 (Oct. 7, 2021)) (emphasis added); *see also* App. Vol. 2 at 264 ("Grantee Name: Oklahoma State Department of Health"). Indeed, they said this ***twice***. *See also* 86 Fed. Reg. 56,153 ("objecting providers or Title X ***grantees*** are not required to counsel or refer for abortions" (emphasis added)).  In opening, Oklahoma wrote in response to this language: "So why doesn't the 2021 Rule require Defendants to

defer to the Health Department's objection? Neither the district court nor Defendants ever addressed this." Opening Br. 37. The question remains unanswered.[1]

Defendants also claimed in 2021 that they were "unaware" of any objectors; "[f]rom 1993 to 2017, Title X received no reports of grantees or individuals objecting to the regulatory requirement to counsel or refer for abortions …." 86 Fed. Reg. 56,153. So when the question is "more of a hypothetical," *id.* (citation omitted), Defendants talk a friendly game, but when presented with an actual objector they balk, even in the face of their own assurances to objecting grantees. This is another reason why Defendants' effort to paint this lawsuit as a duplicate facial challenge to the 2021 Rule is mistaken. Here, Defendants are refusing to abide by their own express *assurances* from 2021, which is a quintessential as-applied violation.

Tellingly, Defendants also decline to address Defendant Becerra's labeling of *Dobbs* as "unconscionable" and his simultaneous insistence that Defendants would "double down and use every lever we have to protect access to abortion care." Opening Br. 4. The obvious conclusion to be drawn from this language is that Becerra's orders were taken seriously at HHS, such that all obstacles to promoting abortion—including *Dobbs* and Defendants' own 2021 promises—have been ignored. By remaining silent, Defendants do nothing to dispel this perception.

---

[1] To be sure, Defendants quote a *portion* of their 2021 assurance, but they conspicuously leave out the word "grantee." *See* Resp. 6, 21.

Finally, Defendants do not defend the district court's reliance on preclusion, which was a substantial portion of its analysis. *See, e.g.*, App. Vol. 3 at 601–02. Defendants hide behind the *Ohio* decision, to be sure. *See, e.g.*, Resp. 20. (Although even there they fail to address the Sixth Circuit's admonition that *Dobbs* is "important" moving forward. *Ohio v. Becerra,* 87 F.4th 759, 774 n.7 (6th Cir. 2023).) But Defendants' response is bereft of the terms "preclusion," "res judicata," "estoppel," or the like. Clear legal error, it appears, has been conceded.

Defendants also make significant concessions. For example, they repeatedly admit that Title X involves an annual contract, *see, e.g.,* Resp. 8 ("Title X funding is provided one year at a time based on an annual application"), which undermines their attempt to bootstrap in any alleged past acceptance of the relevant conditions by Oklahoma. And Defendants effectively admit they didn't analyze *Dobbs* when it was issued, but instead chose to quickly "remind[] Title X grantees that the counseling and referral requirements remained in effect." Resp. 8 (citations omitted).

One final admission is worth more discussion. Defendants claim abortion referrals and counseling have been required for "nearly all of Title X's history." Resp. 19. But they acknowledge that these requirements only "date back approximately 40 years." Resp. 29. Defendants, therefore, essentially concede that abortion counseling and referrals were *not* required for the first decade or more of Title X, which was enacted 54 years ago. *See also* 53 Fed. Reg. 2922, 2923, 2934

(Feb. 2, 1988) (explaining that referrals were deemed *permissible* at some point in the 1970s, but not *required* until the 1980s). And in 1988, just a few years after referrals were first required by mere bureaucratic "guidelines," HHS took public notice-and-comment and reversed course, prohibiting referrals because they likely "had the effect of promoting or encouraging abortion." *Id.* at 2933. Defendants claim the 1988 Rule "was never implemented on a nationwide basis," Resp. 5 (citation omitted), but it is hard to see why that matters given *Rust v. Sullivan*, 500 U.S. 173 (1991). By touting this non-implementation Defendants are saying meritless lawfare *then* means Oklahoma's merited claims *now* should be rejected. In sum, the history of this issue is more complex than Defendants portray, and Oklahoma's objection fits comfortably within the original understanding and application of Title X.

## II. ISSUE 1: DEFENDANTS HAVE VIOLATED THE SPENDING CLAUSE.

While admitting Title X is Spending Clause legislation, Resp. 32, Defendants perplexingly argue that the leading Spending Clause case "has no application in this circumstance," *id.* at 35. But *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981)*,* and its progeny are entirely on point. Instead of acknowledging *Pennhurst*'s relevance, Defendants rely instead on *Biden v. Missouri*, 595 U.S. 87 (2022), which is not a Spending Clause case. Moreover, Defendants have no answer for the holding in *Rust* that Title X is ambiguous as to abortion referrals—a finding

that forecasts a Spending Clause violation. In short, Defendants' responses on the Spending Clause are superficial and fail to analyze the most relevant caselaw.

At the outset, Defendants now say a general delegation of rulemaking authority at 42 U.S.C. § 300(a)-4 is sufficient to enact the abortion counseling and referral requirement. Resp. 32–33. That provision merely states that Title X grants "shall be made in accordance with such regulations as the [HHS] Secretary may promulgate" and that Title X grants are "subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made." *Id.* § 300a-4(a) & (b). It says nothing substantive, much less anything clear and unambiguous about abortion referrals or counseling.

But in the *Ohio* case, the issue was whether the 2021 Rule was a fair interpretation of § 1008 of Title X, which is codified at 42 U.S.C. § 300a-6 and states that no Title X funds "shall be used in programs where abortion is a method of family planning." *See Ohio*, 87 F.4th at 765 (the 2021 Rule "interpreted § 1008 of Title X" which is "[a]t the heart of this case"). Nowhere did the Sixth Circuit consider the argument Defendants now advance—that a generic delegation of rulemaking authority allows them to create a substantive condition where Congress was ambiguous. Here, Defendants argue that § 1008 (42 U.S.C. § 300a-6) is "irrelevant to the Spending Clause analysis." Resp. 35. This shift in focus (from § 1008 to

§1006) further illustrates the limited nature of the preliminary ruling in *Ohio* that did not address the Spending Clause.

More than that, though, adopting Defendants' view that a generic delegation of rulemaking authority allows agencies to impose new substantive conditions on Spending Clause legislative schemes is tantamount to granting HHS and other agencies limitless legislative power and gutting the Spending Clause *in toto*. Defendants muster no real response to this. They certainly offer no limiting principle to their theory, which cannot be squared with precedent holding that only *Congress* can speak with the specificity and clarity necessary to satisfy the Spending Clause. *Pennhurst*, 451 U.S. at 17. Contrary to Defendants' assertion, § 1008 is important to a Spending Clause analysis because, unlike § 1006, it discusses abortion and was found in *Rust* to be ambiguous on counseling and referrals. *Rust*'s holding, in turn, indicates that Defendants have violated the Spending Clause by stripping Oklahoma's funding over a substantive requirement left ambiguous by Congress.

Even if a generic delegation of rulemaking authority could allow an agency to impose new substantive conditions, Defendants ignore the limiting language in the statute. Section 1006 says HHS may only impose conditions "*appropriate* to assure that such grants will be effectively utilized *for the purposes for which made*." 42 U.S.C. § 300a-4(b) (emphases added). That language means Defendants do not have *carte blanche* authority to make substantive policy choices where congressional

intent is ambiguous. Rather, HHS must tailor regulations to the unambiguous "purposes" of Title X. This limitation is fatal to Defendants' position.

Contrary to Defendants' insinuations, Spending Clause principles are well-established and frequently applied, such as in the Colorado case mentioned above. Rather than interact with this precedent, Defendants rely on *Missouri*, 595 U.S. 87. But again, *Missouri* is not a Spending Clause case. Moreover, *Missouri* arose in a radically different context, the COVID-19 pandemic, which created unique regulatory challenges. *See id*. at 97. It is therefore difficult to imagine how *Missouri* could resolve Oklahoma's Spending Clause challenge, especially when the Supreme Court there found the government's actions were clearly allowed by statute. *See, e.g.*, *id.* at 93 ("The rule thus fits neatly within the language of the statute."). Such is not the case here, where *Rust* mandates an ambiguity finding.

Defendants' attempts to distinguish *West Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124 (11th Cir. 2023), and *Kentucky v. Yellen*, 54 F.4th 325 (6th Cir. 2022), fare no better. Defendants claim that, unlike *Morrisey* and *Kentucky*, "the statutory condition [in this matter] is perfectly clear." Resp. 37. This (yet again) disregards *Rust*, which Defendants don't cite in their Spending Clause response. But it is *Rust* that could not be clearer: "At *no time* did Congress directly address the issues of abortion counseling, referral, or advocacy." 500 U.S. at 185 (emphasis added). Certainly, Defendants argue that "[e]ven the cases that Oklahoma

invokes recognize that where Congress has articulated an ascertainable condition, agencies can permissibly elaborate its content." Resp. 37. But *Rust* holds that Congress *did not* articulate an ascertainable condition. As such, this is like *Morrisey*: "[T]he problem we confront here is not whether Congress left a gap that an agency may fill; it is the lack of an ascertainable condition in the statute." 59 F.4th at 1148.

Defendants' amicus, the Constitutional Accountability Center (CAC), cites cases unmentioned by Defendants. Those are no more helpful. For instance, *Jackson v. Birmingham Board of Education* specifically stated that "[w]e do not rely on regulations extending Title IX's protection beyond its statutory limits; indeed, we do not rely on the Department of Education's regulation at all, because the statute *itself* contains the necessary prohibition." 544 U.S. 167, 178 (2005). There is no such statutory clarity here in Section 1006 *or* Section 1008.

Defendants insist that Oklahoma's Spending Clause challenge is undermined because "Oklahoma has applied for and accepted Title X funds for 50 years without suggesting any lack of clarity that compliance with HHS regulations is a condition of its grant." Resp. 35. This is a strawman; Oklahoma is not arguing that all HHS regulations are invalid. Far from it. Here, Oklahoma is making the limited point that a substantive condition the Supreme Court has found ambiguous cannot, for that very reason, be required by an agency under the Spending Clause. As far as Oklahoma is aware, this is unique; there aren't many *Rust*-like cases out there.

Moreover, again, the history of referral and counseling requirements is more complex than Defendants portray, such that any insinuation of a unified 50-year practice is misleading. Here, Oklahoma is challenging the application of a rule *enacted in 2021* that differs from the entire first decade of Title X's existence. Finally, *Dobbs* cannot be ignored. Defendants' claim that their "counseling and referral requirements present no comparable risk of invading state sovereignty," Resp. 38, is impossible to square with an opinion that repeatedly insisted "the authority to regulate abortion must be returned to the people and their elected representatives." *Dobbs*, 597 U.S. at 292.

Defendants next suggest Oklahoma's argument lacks merit because the State was aware of the 2021 Rule when it accepted subsequent funding. Resp. 34. Even ignoring Oklahoma's clear objection to the 2021 Rule, however, the issue is not whether Oklahoma was aware of the regulatory condition, but whether Defendants had statutory authority to impose the requirement. Defendants point to nothing in *Pennhurst* or its progeny that limits Spending Clause challenges to where an agency has imposed new conditions after-the-fact, or that indicates a past acceptance binds a party forever. Reading such limitations into *Pennhurst* would render a case like this without any remedy, even in the presence of a clear violation of law. And it would essentially prohibit any prospective relief. This does not gel with Spending Clause cases. *Kentucky*, for instance, involved a pre-enforcement challenge. 54 F.4th

at 337–38.  And make no mistake: this is a pre-enforcement appeal. Oklahoma seeks an injunction preventing Defendants from denying **2024** Title X funding, which Defendants have held pending this lawsuit. Opening Br. 53. Whether Oklahoma accepted the condition for 2023 funding is irrelevant.

Even Defendants' amici Constitutional Accountability Center (CAC) has in the past seemingly agreed with Oklahoma's Spending Clause views, and explained why they are critical to our system of government:

> Because the Framers gave the Spending Clause power to Congress alone, and because they strictly limited the President's lawmaking powers, the Executive has no independent power to dictate what the federal government spends money on, or the conditions it attaches to those expenditures. Rather, it is Congress—and Congress alone—that has broad power to "fix the terms on which it shall disburse federal money to the States."

*See* Amicus Br. of CAC at 16–17, *City of Chicago v. Sessions*, No. 17-2991 (7th Cir. Jan. 4, 2018), 2018 WL 333368 (quoting *Pennhurst*, 451 U.S. at 17). It is quite difficult to reconcile this 2018 quote with CAC's current amicus brief before this Court, but that does not make it any less true.

**III.    ISSUE 2: OSDH IS A LEGITIMATE OBJECTOR UNDER WELDON.**

Defendants argue that "federal protections afforded to certain providers with conscience or religious objections" cannot apply here. Resp. 14. But Defendants' own explanation of their 2021 Rule disproves this, with their promise that objecting "*grantees* will not be required to counsel or refer for abortions in the Title X

program." *See supra* p.3. Given Defendants' refusal to address that "grantee" language, ruling for Oklahoma is easy—either because Weldon and the 2021 Rule require it, or because Defendants have arbitrarily and capriciously ignored their own written assurances. *See Grace v. Barr*, 965 F.3d 883, 900 (D.C. Cir. 2020) ("[W]hen departing from precedents or practices, an agency must 'offer a reason to distinguish them or explain its apparent rejection of their approach.'" (citation omitted)).

The rest of Defendants' arguments are just as inaccurate. To begin, Defendants complain that Oklahoma did not mention Weldon in the complaint. Resp. 20. Defendants cite nothing showing this is significant, however. Nor could they. *See, e.g.*, *Zokari v. Gates*, 561 F.3d 1076, 1084 (10th Cir. 2009) (acknowledging "general rule" in most circuits "that a complaint need not set forth the plaintiff's legal theories"). In any event, Oklahoma pled that "HHS's decision to terminate Oklahoma's Title X grant contravenes the governing statutory provisions and HHS's own Title X regulations." App. Vol. 1 at 26. This put Defendants on notice that Weldon and implementing regulations are at issue. If there were any doubt left, Oklahoma prominently argued Weldon in its first brief below, seeking an injunction. App. Vol. 2 at 195–198. As such, the district court was appropriately skeptical of Defendants' argument on this point. App. Vol. 3 at 574.

In a related vein, Defendants claim that: (1) "Oklahoma at no point raised a purported conscience objection to HHS when it applied for and accepted its Title X

grant" and (2) "nor did it do so when it engaged with HHS about its compliance." Resp. 22. This is not fully true, or significant. As to the first point, it is irrelevant for this appeal what Oklahoma raised when accepting Title X funds years ago. Again, this interlocutory appeal is about preliminarily enjoining Defendants from refusing to issue a *new* grant. Defendants acknowledge that Title X grants are one-year contractual arrangements, and Oklahoma is objecting *in advance* to the 2024 contract. As to the second point, Oklahoma *did* raise Weldon with HHS well before this lawsuit. Specifically, the State Health Department (OSDH) relied on Weldon in its July 2023 administrative appeal. *See* App. Vol. 1 at 126–29. That appeal—which Defendants *still* have not ruled on—came five months before this action was filed. Defendants' insinuation that Oklahoma has not adequately objected is groundless.

Procedure aside, Defendants contend that OSDH does not qualify for objector status. Defendants start by incorrectly claiming that Weldon merely protects "the rights of physicians and healthcare personnel," Resp. 20, although they are quickly forced to admit Weldon is broader in that it protects "health care entit[ies]," *id.* But even that phrasing does not quite get there. In relevant part, the Weldon Amendment protects "any institutional … health care entity" from discrimination by "a Federal agency or program" because the entity declines to "refer for abortions." Opening Br. 8. The plain language ("any"—"institutional"—"health care"—"entity") could hardly be broader, and it applies to Oklahoma's Health Department. "Institution,"

for instance, is defined as "[a]n established organization, *esp. one of a public character* …." *Institution*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added). That tracks with Weldon itself, which (Defendants concede) defines "health care entity" broadly, as "any other kind of health care … organization." Resp. 21.

Defendants nevertheless claim that "Oklahoma identifies no support for its assertion that States and their health departments qualify as 'health care entities.'" *Id*. On the contrary: Even ignoring Defendants' failure to make a positive textual case of their own, Oklahoma cited at least *three* bases for this assertion—only one of which Defendants bother to address. First, Oklahoma explained that OSDH is not just a pass-through entity; rather, its employees "provide on-the-ground medical services under Title X." Opening Br. 36. Defendants' 2016 review of the OSDH Title X program repeatedly acknowledged this. *See, e.g.*, App. Vol. 1 at 44 ("county health departments are OSDH administrative units"); *id.* at 52 ("OSDH operates at least one clinic in all but seven very rural counties"). Second, Oklahoma cited case law holding that "'[an] organization of any kind' is very broad language." Opening Br. 36 (quoting *UMC Physicians' Bargaining Unit of Nev. Serv. Emps. Union v. Nev. Serv. Emps. Union/SEIU Local 1107, AFLCIO,* 178 P.3d 709, 713 (Nev. 2008)). Third, Oklahoma observed that, until recently, Defendants' own regulation recognized that "components of State or local governments may be health care entities under the Weldon Amendment." Opening Br. 40 (citation omitted).

Defendants retort that this regulation was "vacated by multiple courts." Resp. 22 n.3. They do not cite these decisions, however, presumably because none of them ruled on the specific language saying Weldon protects State "components." The closest one came to doing so, as far as Oklahoma can tell, counseled in *favor* of that language. *See City & Cnty. of S.F. v. Azar*, 411 F. Supp. 3d 1001, 1015–18 (N.D. Cal. 2019) (indicating, through the use and non-use of italics, that court saw no problem with the State "components" language in Weldon and the related Coats-Snowe Amendment). Defendants, that is, offer no explanation for why that specific language was withdrawn. Thus, we are left with this: a regulatory provision favoring Oklahoma was on the books for over *three years* of this administration's tenure, only to be rescinded *after* this lawsuit was filed, in a rule that does not mention the provision. *See* 89 Fed. Reg. 2078 (Jan. 11, 2024). How this proves the Health Department is *not* a health care entity, organization, or grantee is beyond us.

Defendants next argue that "Congress's explicit list of individuals and discrete entities—like physicians, healthcare facilities, and healthcare organizations … suggests that States and arms of the State may not object …." Resp. 21–22. But this list suggests no such thing, since a State "arm" like Oklahoma's Health Department *is* a healthcare organization. Moreover, the fact that OSDH is covered by Weldon (and by Defendants' 2021 explanation) renders Defendants' discussion of Title X projects irrelevant. *See* Resp. 23. Defendants also, as predicted, point to

the States' claim in *Ohio* that federal conscience statutes do not apply to States. Resp. 22. But they don't acknowledge Oklahoma's disavowal of that statement, Opening Br. 37–38, nor do they explain why the original claim should bind here.

Defendants let the mask drop a bit when they complain that "Oklahoma's reliance on the Weldon Amendment" would "nullify HHS's regulatory requirements." Resp. 24. This has it backward. Statutes trump regulations, not the other way around. A State's reliance on statutory language for protection cannot be invalidated by an agency's refusal to give weight to that language. Put differently, embracing a statutory exemption does not nullify anything, since it is part of the very fabric of the law itself. Here, it is Defendants' position that would nullify the law of the land, as well as place HHS above Congress.

Perhaps sensing this problem, Defendants half-heartedly claim Congress has somehow embraced their position by enacting the Weldon Amendment annually, alongside HHS requiring abortion referrals and counseling. Resp. 24. But the entire question here is whether Weldon protects the Health Department. If it does, then Congress re-upping it every year counsels firmly for *Oklahoma*. Moreover, Defendants ignore that Congress continued to enact Weldon even when referrals and counseling were prohibited in 2019 through 2021, which indicates Weldon is *not* an implicit congressional approval of requiring referrals and counseling. Defendants are grasping at straws, rather than submitting to congressional authority.

Lastly, Defendants deride Oklahoma's stance on referrals as a mere "policy" choice that is undeserving of protection. Resp. 21, 22 n.3.[2] But nothing in Weldon indicates Congress is concerned with the reason behind a refusal. Rather, Congress has straightforwardly prohibited federal agencies from discriminating against Title X healthcare entities who refuse to "refer for abortions". That decision and the Health Department's refusal deserve respect.

## IV. ISSUE 3: DEFENDANTS ARE ACTING ARBITRARILY AND CAPRICIOUSLY.

Defendants' primary response to Oklahoma's APA argument is to hide behind *Ohio*, claiming that Oklahoma is relying "on the same arguments to achieve a different result in this Circuit." Resp. 20. But again, the issues and arguments presented in this as-applied challenge are different than the facial challenge in the Sixth Circuit. As Defendants are forced to recognize, *Ohio* only involved whether the 2021 Rule's abortion counseling and referral requirement was prohibited by Section 1008, and whether Defendants properly addressed feedback in the rulemaking process. Resp. 19. Further, the Sixth Circuit was limited to reviewing the 2021 Rule at the time it was promulgated, before *Dobbs*, and that court recognized that *Dobbs* would be an "'important aspect' of the question *now*"—*i.e.*, moving forward. *Ohio*, 87 F.4th at 774, n.7 (emphasis added). *Dobbs* is in effect

---

[2] Whether referrals violate Oklahoma law is irrelevant to the Weldon Amendment. Even if Oklahoma's refusal is a policy choice, it is protected.

now, it is binding, and it should impact the APA analysis. As such, Defendants are wrong that the arguments here are the same as in *Ohio*.

Although *Rust* may preclude a facial challenge, it does not prohibit this as-applied challenge. *Rust* held that Defendants could prohibit abortion referrals, since Title X was ambiguous. *See* 500 U.S. at 186–87. However, the text of § 1008 combined with Weldon—enacted post-*Rust*—means that, at minimum, Defendants may not resolve that ambiguity by *requiring* health care entities *who object* to make abortion referrals. This is actually undisputed. As discussed above, Defendants' 2021 Rule explanation recognizes such a protection for Title X "grantees," making this an as-applied challenge to Defendants' failure (among other things) to live up to their own words. *Ohio,* of course, did not rule on Weldon, further undermining Defendants' claim that the cases are the same.

It is an administrative law axiom that agencies must follow their own regulations. While Defendants claim their application of their regulations was "straightforward," and that deference is owed to them under *Kisor v. Wilkie*, 588 U.S. 558 (2019), Resp. 24–25, Defendants fail to apply the criteria for determining when agencies are entitled to deference. That criteria cuts against Defendants.

Per *Kisor*, *Auer* deference applies in limited circumstances: "Courts should defer to an agency's interpretation of its own regulations when (1) the regulation is 'genuinely ambiguous,' (2) the agency's interpretation is 'reasonable,' and (3) the

'character and context of the agency interpretation entitles it to controlling weight.'" *Walker v. BOKF, Nat'l Ass'n*, 30 F.4th 994, 1006 (10th Cir. 2022) (citations omitted). The interpretation is entitled to controlling weight "when the interpretation is the agency's 'authoritative' or 'official position,' implicates the agency's 'substantive expertise,' and reflects the 'fair and considered judgment' of the agency." *Id.* Defendants barely even try to show these criteria apply here; rather, they rely on *ipse dixit*.

The regulations in question are not genuinely ambiguous, and HHS's interpretation is not reasonable. Again, one such regulation states that every Title X project must "[p]rovide that family planning medical services will be performed under the direction of a clinical services provider, with *services* offered within their scope of practice and *allowable under state law* ...." 42 C.F.R. § 59.5(b)(6) (emphases added). Citing their own commentary on the rule, Defendants argue that this provision only addresses the types of medical providers who can provide services instead of the types of services that can be offered. Resp. 25. But that is not how the regulation is written; grammatically, "allowable under state law" is modifying "services," and more broadly, "family planning medical services" required under Title X.

The commentary seemingly reveals where HHS found the language. *See* 86 Fed. Reg. at 56,163–64 ("A final comment asked for the text to be amended to allow

services 'provided under the direction of an advanced practice clinician, if the services offered are within their scope of practice and if allowable under state law.'"). If anything, the commentary supports Oklahoma's reading. It makes clear that this language "ensure[s] consistency between 59.5(b)(1) and 59.5(b)(6)." *Id.* Section 59.5(b)(1) requires Title X projects to make "necessary referral[s] to other medical facilities when medically indicated." If HHS's intent was to ensure consistency between those sections, then services "allowable under state law" would apply to both—including any referrals.

Regardless, the plain text of a regulation controls over subjective intent Defendants had in enacting the regulation. *See, e.g.*, *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 53 (D.C. Cir. 1999) ("language in the preamble of the regulation is not controlling over the language of the regulation itself"). Here, the plain language of the regulation is not ambiguous, and HHS's interpretation is not reasonable. "[A]llowable under state law" modifies the services that are allowable under Title X. Having said that, even *if* Defendants' narrower interpretation was accepted, the language *still* requires deference to state law. Defendants offer nothing to explain why Title X regulations would expressly require compliance with state law on provider qualifications but implicitly require those same providers to violate state law on referrals. Such a holding would be irrational.

Alternatively, Defendants push back against the idea that Oklahoma law prohibits abortion referrals for "legal out-of-state abortion services." Resp. 26. Defendants did not argue this below, however, which raises questions of forfeiture or waiver. In any event, after requesting deference to their regulations, Defendants give no deference to Oklahoma's interpretation of its own laws. And their new interpretation is mistaken. Defendants argue that providing "neutral, factual information and nondirective counseling on all pregnancy options" and the name, address, and phone number of an abortion provider, is not "advising" someone to obtain an abortion. *See* OKLA. STAT. TIT. 21, § 861. But HHS's own predecessors have prohibited referrals in multiple decades because they likely "had the effect of promoting or encouraging abortion." 53 Fed. Reg. 2922, 2933 (Feb. 2, 1988). Oklahoma applying that same view to a robust State abortion ban is rational.

Practically, telling someone that an unlawful activity can be done out-of-state and then providing them specific information on where, how, and with whom to immediately partake in that activity can be construed as "advising" in favor of or promoting that activity. Consider other contexts, like murder. Forcing an Oklahoma healthcare provider to give out the name, number, and location of where a parent could immediately have a third party kill their three-year-old daughter out of state— say, in a foreign country—is not a truly "nondirective" or neutral approach. And, lest this be deemed an outlandish hypothetical, Oklahoma law expressly equates

abortion with homicide. *See* OKLA. STAT. TIT. 21, § 691 ("Homicide is the killing of one human being by another. … As used in this section, 'human being' includes an unborn child[.]"). An example closer to the medical field is assisted suicide, which *is* considered by some to be a legitimate medical option. Could Title X or a similar federal statute require Oklahoma providers to refer mental health patients for out-of-state suicides, even though it is illegal in Oklahoma? *See* OKLA. STAT. TIT. 63, § 3101.2(C). It is difficult to see, under Defendants' logic, why that wouldn't be the case. But any holding that giving a suicidal person the name, address, and phone number of a person who will help her immediately commit suicide is not "advising" her to do so is a stretch, to say the least.

Defendants' and the district court's belief that abortion referrals are not a big deal and probably not against state law can only be accepted if one presupposes that the State's interest in protecting innocent human life is unreasonable or miniscule. That contradicts *Dobbs. See* 597 U.S. at 263 (criticizing dissent for giving "no similar regard for a State's interest in protecting prenatal life").

Nevertheless, Defendants cite OKLA. STAT. TIT. 63, § 1-741.1(B), which states that no Oklahoma funds will be "used to encourage a woman to have an abortion not necessary to save her life, except to the extent required for continued participation in a federal program." But this is a *Roe*-era law (from 2007) that must be reconciled with Oklahoma's reinvigorated abortion ban, should the issue arise. *See, e.g., City*

*of Sand Springs v. Dep't of Pub. Welfare*, 1980 OK 36, ¶ 28, 608 P.2d 1139, 1151 ("Where such a conflict exists, the later modifies the earlier …."). No such analysis need occur, however, because Section 1-741.1 merely says encouragement is allowed if *required* by a federal program, and Oklahoma's entire point is that it is not lawful for Defendants to require referrals in this situation.

Oklahoma pointed to various laws indicating that Oklahoma abhors abortion and considers referrals to be advising or participating in an abortion. *See* Opening Br. 43–44. Defendants claim this is just a "hodgepodge of tangential state laws" that Oklahoma raised "for the first time on appeal." Resp. 27 n.4. The hubris is remarkable. Oklahoma only cited these laws "for the first time on appeal" because *Defendants did not contest this issue below*. And the idea that, say, an Oklahoma law requiring the Health Department to "[d]evelop and distribute education and informational materials … for the purpose of achieving an abortion-free society," OKLA. STAT. TIT. 63, § 1-753(2), is insignificant to the question of whether Oklahoma law prohibits that same Department's employees from making abortion referrals is mistaken. In about every way possible, Oklahoma law condemns abortion, and Defendants have pointed to nothing to undermine that conclusion.[3] At

---

[3] A second amicus breathlessly purports to find hypocrisy in Oklahoma's abortion guidance to law enforcement. But if anything, that guidance counsels for *Oklahoma*; understandably then, Defendants don't cite it. Relevant here, the guidance clearly states that "law enforcement may consider pursuing a case … where a person has advised or encouraged a woman to obtain an unlawful abortion in some imminent

an absolute minimum, there is uncertainty about whether and to what extent abortion counseling and referrals violate Oklahoma law, such that OSDH is fully justified in avoiding them completely.

Defendants also argue that out-of-state referrals are required in Oklahoma's case because it is not feasible to refer Title X care recipients to providers in "close proximity." Resp. 27–28. Oklahoma has acknowledged that this requirement is only "when feasible." But Defendants have no explanation how referrals out-of-state are "feasible" when those referrals are not permitted under Oklahoma law. Defendants' view wholly disregards the proximity requirement and state law in all cases, elevating the "when feasible" language over the rest of the regulation. An interpretation that lets the exception swallow the rule is not reasonable.

Despite not making this argument below, Defendants also claim that *Auer v. Robbins* requires Oklahoma to petition for rulemaking before contesting Defendants' decision to strip Oklahoma's Title X funding. Resp. 29–30. But that is not a fair reading of *Auer*, which applies to a claim "not that the regulation is substantively unlawful, or even that it violates a clear procedural prerequisite, but rather that it was 'arbitrary' and 'capricious' not to conduct amendatory

_____

way, especially if the third party has taken an overt or tangible action toward that goal." Okla. Att'y Gen. Guidance for Okla. Law Enf't (Nov. 21, 2023). Amici overly fixate on the word "unlawful," but that word was merely included to reiterate Oklahoma's exception to save a mother's life.

rulemaking." 519 U.S. 452, 459 (1997). Oklahoma's claim in this matter is not that Defendants failed to conduct amendatory rulemaking—though HHS certainly should after *Dobbs*. Oklahoma's claim is that Defendants acted arbitrarily and capriciously in terminating Oklahoma's funding by ignoring the Spending Clause, Weldon, and/or its own regulations. *Auer* did not involve an aggrieved party challenging an agency enforcement action, which is the situation here.

In any event, HHS's published guidance following *Dobbs* indicating that the abortion counseling and referral requirements would continue likely amounts to the rulemaking for which Defendants now advocate. App. Vol. 3 at 463-464. Likewise, as recognized in *Ohio*, HHS faced comments from states about the illegal abortion requirements when HHS implemented the 2021 Regulation and did not meaningfully respond. 87 F.4th at 773–74, nn.6 & 7. Thus, even under this view, Oklahoma was left with no choice but to pursue its claims in court.

## V.    DEFENDANTS FAIL TO SHOW OTHER INJUNCTION FACTORS FAVOR THEM.

Most of Defendants' arguments on harm, equities, and the public interest are restatements of their mistaken merits arguments. For example, they claim the equities and public interest cannot "compel HHS to issue a discretionary funding award to a grantee that refused to comply with program requirements." Resp. 39. This assumes that the grantee has no constitutional (Spending Clause), statutory (Weldon Amendment), or regulatory (2021 Rule) right to refuse to comply.

Defendants do claim that "Oklahoma has not shown that its alleged harms are 'both certain and great,' rather than 'merely serious or substantial.'" Resp. 39 (quoting *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008)). But Defendants acknowledge that $4.5 million dollars are at stake, *id.*, an amount that led the district court to hold that "Oklahoma's made a sufficient showing here of irreparable injury." App. Vol. 3 at 600. "[F]rankly," the court stated, "I'm reluctant to accept the government's invitation to say that $4.5 million isn't substantial enough to worry about." *Id.* Defendants do not acknowledge this holding.

The critical issue is that the $4.5 million loss is likely irretrievable, once distributed, because of sovereign immunity. Defendants pretend this doesn't matter because Oklahoma has no "legally cognizable interest in the continued receipt of Title X funding." Resp. 39. But this, again, just re-states their merits position. And Defendants' argument that finding irreparable harm here would undermine equitable relief, *id.*, contradicts precedent. As this Court held—while expressly distinguishing *Port City*—the "[i]mposition of money damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury." *Crowe & Dunlevy v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011) (citation omitted). Irreparable harm has been shown here, in various ways.

Audaciously, Defendants contend that stripping Oklahoma's funding is ameliorated by "other entities" being "ready and able to offer services to Oklahoma's

citizens." Resp. 39. Indeed, Defendants claim that "nonprofit providers *have stepped in* to provide services to clients now that Oklahoma has refused to comply with HHS regulations." Resp. 40 (emphasis added). Despite ample opportunity, however, *Defendants failed to introduce any evidence of this*. Oklahoma's affiant described in detail the harms being inflicted. App. Vol. 2 at 209–216. Defendants provided no such affidavit. Their only source for saying other "providers have stepped in" is their *Answer*, and that just says Oklahoma's funding was provided to Missouri entities. App. Vol. 3 at 404. It in no way claims that, in a short amount of time, out-of-State entities have built "the infrastructure, capacity, personnel, and institutional knowledge to implement [a] Title X program across the entire state of Oklahoma effectively, efficiently, and with integrity[,]" something that took Oklahoma "decades" to construct. App. Vol. 2 at 212.

## CONCLUSION

This Court should reverse and order Defendants to provide Oklahoma with Title X funding for 2024.

Respectfully submitted,

*s/ R. Tom Hillis*

Garry M. Gaskins, II, OBA # 20212
*Solicitor General*
Zach West, OBA # 30768
*Director of Special Litigation*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st St.
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov

R. Tom Hillis, OBA # 12338
Barry G. Reynolds, OBA # 13202
J. Miles McFadden, OBA # 30166
TITUS HILLIS REYNOLDS LOVE, P.C.
15 E. 5th St., Suite 3700
Tulsa, OK 74103
(918) 587-6800  Fax: (918) 587-6822
thillis@titushillis.com
reynolds@titushillis.com
jmcfadden@titushillis.com

Anthony J. (A.J.) Ferate, OBA # 21171
SPENCER FANE
9400 North Broadway Extension,
Suite 600
Oklahoma City, OK 73114
(405) 844-9900 Fax: (405) 844-9958
AJFerate@spencerfane.com

*ATTORNEYS FOR PLAINTIFF / APPELLANT,*
*THE STATE OF OKLAHOMA*

28

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) because this brief contains 6499 words excluding items exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in size 14 font Times New Roman.

s/ *R. Tom Hillis*
Attorney for Plaintiff / Appellant

## CERTIFICATE OF DIGITAL SUBMISSION AND EXACT COPIES

I hereby certify that all required privacy redactions have been made and any paper copies of this document submitted to the Court are exact copies of the version electronically filed.

s/ *R. Tom Hillis*
Attorney for Plaintiff / Appellant

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of May 2024, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant:

Andrew Beck: abeck@aclu.org
Ms. Miriam Becker-Cohen: miriam@theusconstitution.org
Mr. John J. Bursch: jbursch@adflegal.org
Courtney Dixon: courtney.l.dixon@usdoj.gov
Ms. Brianne J. Gorod: brianne@theusconstitution.org
Erin Morrow Hawley: ehawley@adflegal.org
Ms. Jamila Asha Johnson: jjohnson@lawyeringproject.org
Ms. Megan Lambert: mlambert@acluok.org
Mr. Ryan Mendias: rmendias@aclu.org
Ms. Rabia Muqaddam: rmuqaddam@reprorights.org
Mr. Michael Raab: michael.raab@usdoj.gov
Christopher Paul Schandevel: cschandevel@adflegal.org
Brian James Springer: brian.j.springer@usdoj.gov
Scott G. Stewart: scott.stewart@ago.ms.gov
Paige Suelzle: psuelzle@lawyeringproject.org
Mr. Alexander Wilson: awilson@reprorights.org
Ms. Elizabeth B. Wydra: elizabeth@theusconstitution.org,

s/ *R. Tom Hillis*
Attorney for Plaintiff / Appellant