**CASE NO. 24-6063**
IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

STATE OF OKLAHOMA,

*Plaintiff-Appellant*,

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;

XAVIER BECERRA, in his official capacity as the Secretary of the U.S. Department of Health and Human Services;

JESSICA S. MARCELLA, in her official capacity as Deputy Assistant Secretary for Population Affairs; and

OFFICE OF POPULATION AFFAIRS,

*Defendants-Appellees*.

---

On Appeal from the United States District Court
For the Western District of Oklahoma
The Honorable Judge Joe Heaton
Case No. 23-CV-01052-HE

---

**APPELLANT'S APPENDIX**
**VOLUME III OF III**
**Pages 400 to 617**

---

ORAL ARGUMENT IS REQUESTED.

April 19, 2024

Respectfully submitted,

Garry M. Gaskins, II, OBA # 20212
*Solicitor General*
Zach West, OBA # 30768
*Director of Special Litigation*
Audrey Weaver, OBA # 33258
*Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st St.
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Audry.Weaver@oag.ok.gov

AND

Barry G. Reynolds, OBA # 13202
R. Tom Hillis, OBA # 12338
J. Miles McFadden, OBA # 30166
TITUS HILLIS REYNOLDS LOVE, P.C.
15 E. 5th St., Suite 3700
Tulsa, OK 74103
(918) 587-6800  Fax:  (918) 587-6822
reynolds@titushillis.com
thillis@titushillis.com
jmcfadden@titushillis.com

AND

Anthony J. (A.J.) Ferate, OBA # 21171
SPENCER FANE
9400 N. Broadway Ext., Ste. 600
Oklahoma City, OK 73114
(405) 844-9900   Fax: (405) 844-9958
AJFerate@spencerfane.com

*ATTORNEYS FOR PLAINTIFF-APPELLANT,
THE STATE OF OKLAHOMA*

## INDEX TO APPELLANT'S APPENDIX

### VOLUME I

Civil Docket for U.S.D.C. for the Western District of Oklahoma, Case No. 23-CV-01052-HE ........ 001-007

Complaint filed November 17, 2023 [Dkt. 1] ........ 008-174

### VOLUME II

Plaintiff's Motion for Preliminary Injunction and Opening Brief in Support filed January 26, 2024 [Dkt. 23] ........ 175-399

### VOLUME III

Defendants' Answer to Complaint filed February 21, 2024 [Dkt. 27] ........ 400-413

Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction filed February 23, 2024 [Dkt. 28] ........ 414-470

Plaintiff's Reply Brief in Support of Its Motion for Preliminary Injunction filed March 1, 2024 [Dkt. 29] ........ 471-484

Defendants' Notice of Supplemental Authority filed March 13, 2024 [Dkt. 31] ........ 485-529

Plaintiff's Response to Defendants' Notice of Supplemental Authority filed March 15, 2024 [Dkt. 32] ........ 530-533

Plaintiff's Notice of Intent to Offer Evidence filed March 20, 2024 [Dkt. 34] ........ 534-536

Minute Sheet of Proceedings held before Judge Joe Heaton filed March 26, 2024 [Dkt. 35] ........ 537

Order Denying Plaintiff's Motion for Preliminary Injunction filed March 26, 2024 [Dkt. 36] ........ 538

Transcript of Proceedings held before the Honorable Joe Heaton on Motion for Preliminary Injunction dated March 26, 2024 at 1:30 p.m. ........ 539-614

Plaintiff's Notice of Appeal filed April 1, 2024 [Dkt. 39] ............................ 615-617

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| STATE OF OKLAHOMA,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>Defendants. | No. 5:23-cv-01052-HE |

**ANSWER**

The United States Department of Health and Human Services ("HHS"); Xavier Becerra, in his official capacity as Secretary of Health and Human Services; Jessica S. Marcella, in her official capacity as Deputy Assistant Secretary for Population Affairs; and Office of Population Affairs ("OPA") (collectively, "Defendants") hereby answer the Complaint, ECF No. 1, filed by the State of Oklahoma ("Plaintiff").

Defendants hereby respond to each numbered paragraph of Plaintiff's Complaint as follows:

1. This paragraph consists of Plaintiff's characterization of this lawsuit, to which no response is required. To the extent a response is deemed required, denied.

2. Admitted that Oklahoma is a State of the United States. The remaining allegation in this paragraph consists of Plaintiff's legal conclusions, to which no response is required.

3. Admitted that the Oklahoma State Department of Health ("OSDH") received

Title X funding from 1971 to 2023.  The remaining allegations in this paragraph consist of Plaintiff's legal conclusions, to which no response is required.  To the extent a response is deemed required, denied.

4.      Admitted.

5.      Admitted.

6.      Admitted.

7.      Admitted.

8.      This paragraph consists of Plaintiff's characterization of this lawsuit, to which no response is required.

9.      This paragraph consists of Plaintiff's legal conclusions, to which no response is required.

10.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.

11.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.

12.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.

13.     Admitted that OSDH received Title X funding from 1971 to 2023.  The remaining allegations in this paragraph consist of Plaintiff's characterization of a statute, to which no response is required.  To the extent a response is deemed required, Defendants respectfully refer the Court to the statute for a full and accurate statement of its contents.

14.     Admitted that OSDH received Title X funding from 1971 to 2023.  Defendants lack information or knowledge sufficient to form a belief about the truth of the remaining allegations in the first three sentences of this paragraph.  The allegation in the last sentence of

this paragraph is denied.

15.     Admitted that OSDH received Title X funding from 1971 to 2023.  Defendants lack information or knowledge sufficient to form a belief about the truth of the remaining allegations in the first three sentences of this paragraph.  Defendants deny the fourth sentence.

16.     Admitted that OSDH has contracted with the Oklahoma City-County Health Department and the Tulsa County Health Department, and that those two counties are the most populous areas in Oklahoma.  Defendants lack information or knowledge sufficient to form a belief about the truth of the remaining allegations in this paragraph.

17.     Defendants lack information or knowledge sufficient to form a belief about the truth of allegations in this paragraph, except that Defendants deny the final clause of the last sentence.

18.     Defendants lack information or knowledge sufficient to form a belief about the truth of the allegations in this paragraph.

19.     Defendants admit the allegations in the first sentence of this paragraph.  The second sentence in this paragraph consists of Plaintiffs' characterization of the 2016 Program Review document, to which no response is required.  To the extent a response is deemed required, Defendants respectfully refer the Court to the 2016 Program Review document for a full and accurate statement of its contents.  Defendants admit that HHS did not schedule another Program Review of OSDH until January 2024 (eight years after 2016) but deny the remaining allegations in the third sentence of this paragraph.

20.     Admitted that OSDH received Title X funding from 1971 to 2023.  Admitted that on April 1, 2022, HHS awarded FPHFPA006507-01-00 to OSDH, in the amount of $4.5 million to continue providing family planning services throughout the State of Oklahoma. The remaining allegations in this paragraph are denied.

21.     Admitted that on May 25, 2023, HHS sent a letter to OSDH regarding Award Number FPHFPA006507.  The remaining allegations in the first and third sentences of this paragraph consist of Plaintiff's characterization of that letter, to which no response is required.  To the extent a response is deemed required, Defendants respectfully refer the Court to that letter for a full and accurate statement of its contents.  With respect to the second sentence, Defendants admit that on April 1, 2022, HHS awarded FPHFPA006507-01-00 to OSDH, in the amount of $4.5 million, but deny the remaining allegations in that sentence.

22.     Defendants lack information or knowledge sufficient to form a belief about the truth of the allegations in the first sentence of this paragraph.  The remaining allegations in this paragraph consist of Plaintiff's characterization of the 2016 Program Review document, to which no response is required.  To the extent a response is deemed required, Defendants respectfully refer the Court to that document for a full and accurate statement of its contents.

23.     The allegations in the first sentence of this paragraph consist of Plaintiff's characterization of a federal regulation, to which no response is required.  To the extent a response is deemed required, Defendants respectfully refer the Court to that regulation for a full and accurate statement of its contents.  Admitted that on June 29, 2022, Deputy Assistant Secretary for Population Affairs Marcella sent a letter to Title X recipients providing notice that HHS would continue to require compliance with 42 C.F.R. § 59.5(a)(5).  The remaining allegations in the second sentence consist of Plaintiff's characterization of that letter, to which no response is required.  To the extent a response is deemed required, Defendants respectfully refer the Court to that letter for a full and accurate statement of its contents.

24.     Admitted that on or around August 29, 2022, OSDH submitted a proposal to change its procedures.  Admitted that on November 9, 2022, HHS did not approve the proposed modification.  Admitted that OSDH sought reconsideration of this determination

on November 22, 2022.  Defendants lack information or knowledge necessary to form a belief as to the truth of the remaining allegations in this paragraph.

25.      Admitted.

26.      Admitted that on September 22, 2023, HHS announced supplemental funding to support the provision of Title X services in Oklahoma.  Admitted that supplemental funding that would have been directed to OSDH had OSDH's grant not been terminated was granted to Community Health Connection, Inc., and Missouri Family Health Council, Inc. Admitted that Community Health Connection, Inc., was awarded $216,000 in Fiscal Year 2023 Authorized New Federal Funds, and Missouri Family Health Council, Inc. was awarded $3,250,000.  The last sentence in this paragraph consists of Plaintiff's legal conclusions, to which no response is required.  To the extent a response is deemed required, denied.

27.      The second sentence of this paragraph consists of Plaintiffs' characterization of an HHS press release, to which no response is required.  To the extent a response is deemed required, Defendants respectfully refer the Court to that press release for a full and accurate statement of its contents.  The remaining allegations in this paragraph are denied.

28.      The second sentence in this paragraph consists of a legal conclusion, to which no response is required.  The remaining allegations in this paragraph consist of Plaintiff's characterization of a state statute(s) and a Supreme Court decision, to which no response is required.  To the extent a response is deemed required, Defendants respectfully refer the Court to the statute(s) and decision for a full and accurate statement of their contents.

29.      The allegations in this paragraph consist of Plaintiff's characterization of state statutes, to which no response is required.  To the extent a response is deemed required, Defendants respectfully refer the Court to the statutes for a full and accurate statement of their contents.

30.     The allegations in the first sentence of this paragraph consist of Plaintiff's legal conclusions, to which no response is required.  To the extent a response is deemed required, denied.  The remaining allegations in this paragraph are denied.

31.     The allegations in this paragraph consist of Plaintiff's legal conclusions, to which no response is required.  To the extent a response is deemed required, denied.

32.     Admitted that HHS notified OSDH that it must comply with Title X regulations.  Admitted that OSDH filed an administrative appeal with HHS.  The remaining allegations in this paragraph consist of Plaintiff's legal conclusions, to which no response is required.  To the extent a response is deemed required, denied.

33.     Admitted that HHS terminated OSDH's award because OSDH's policy for providing nondirective options counseling and referral did not comply with Title X regulations.  Otherwise, denied.

34.     The third sentence of this paragraph consists of Plaintiff's characterization of an Executive Order, to which no response is required.  To the extent a response is deemed required, Defendants respectfully refer the Court to that Executive Order for a full and accurate statement of its contents.  The remaining allegations in this paragraph are denied.

35.     This paragraph consists of Plaintiff's characterization of a statement by Secretary of Health and Human Services Becerra, to which no response is required.  To the extent a response is deemed required, Defendants respectfully refer the Court to that statement for a full and accurate statement of its contents.

36.     This paragraph consists of Plaintiff's characterization of this lawsuit and legal conclusions, to which no response is required.  To the extent a response is deemed required, denied.

37.     Denied.

38.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.  To the extent a response is deemed required, denied.

39.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.  To the extent a response is deemed required, denied.

40.     Denied.

41.     Admitted that Title X grants are conditioned on compliance with relevant HHS regulations, including 42 C.F.R. § 59.5(a)(5)(i)(C).  Otherwise, denied.

42.     This paragraph consists of legal conclusions, to which no response is required.

43.     Denied.

44.     The paragraph consists of Plaintiff's characterization of the Title X statute and statements of Representative Dingell, to which no response is required.  To the extent a response is deemed required, Defendants respectfully refer the Court to the statute and statements for a full and accurate statement of their contents.

45.     The allegations in this paragraph consist of Plaintiff's characterization of rules, regulations, and guidelines implementing Title X, to which no response is required.  To the extent a response is deemed required, Defendants respectfully refer the Court to the rules, regulations, and guidelines for a full and accurate statement of their contents.

46.     The allegations in this paragraph consist of Plaintiff's characterization of a final rule, to which no response is required.  To the extent a response is deemed required, Defendants respectfully refer the Court to that rule for a full and accurate statement of its contents.   This paragraph otherwise states legal conclusions, to which no response is required.  To the extent a response is deemed required, denied.

47.     The allegations in this paragraph consist of Plaintiff's characterization of a Supreme Court decision, to which no response is required.  To the extent a response is deemed

required, Defendants respectfully refer the Court to the decision for a full and accurate statement of its contents.

48.     The allegations in this paragraph consist of Plaintiff's characterization of rules and regulations implementing Title X, to which no response is required.  To the extent a response is deemed required, Defendants respectfully refer the Court to the rules and regulations for a full and accurate statement of their contents.

49.     The allegations in this paragraph consist of Plaintiff's characterization of a final rule, to which no response is required.  To the extent a response is deemed required, Defendants respectfully refer the Court to the rule for a full and accurate statement of its contents.  This paragraph otherwise states legal conclusions, to which no response is required. To the extent a response is deemed required, denied.

50.     Admitted that in 2021, HHS promulgated a final rule implementing Title X. The allegations in this paragraph consist of Plaintiff's characterization of the final rule, to which no response is required.  To the extent a response is deemed required, Defendants respectfully refer the Court to the rule for a full and accurate statement of its contents.  This paragraph otherwise states legal conclusions, to which no response is required.  To the extent a response is deemed required, denied.

51.     The first sentence of this paragraph is denied.  The remaining allegations in this paragraph consist of Plaintiff's characterization of federal statutes and legal conclusions, to which no response is required.  To the extent a response is deemed required, Defendants respectfully refer the Court to the statutes for a full and accurate statement of their contents.

52.     The first, third, and fourth sentences of this paragraph are denied.  The second sentence states legal conclusions, to which no response is required.

53.     The allegations in this paragraph consist of Plaintiff's legal conclusions, to

which no response is required.  To the extent a response is deemed required, denied.

54.    Denied.

55.    Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in this paragraph.

56.    Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in the first sentence of this paragraph.  The second sentence states legal conclusions, to which no response is required.  To the extent a response is deemed required, denied.

57.    Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in this paragraph.

58.    Defendants lack information or knowledge sufficient to form a belief as to the truth of the allegations in this paragraph.

59.    The second sentence of this paragraph consists of Plaintiff's characterization of a federal statute, to which no response is required.  To the extent a response is required, Defendants respectfully refer the Court to the statute for a full and accurate statement of its contents.  To the extent a further response is required, Defendants admit that Title X projects are permitted to participate in a federal program that allows "covered entities" to purchase certain prescription drugs and devices at a discount.  Defendants lack information or knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph.

60.    Admitted that on May 25, 2023, the HHS Office of the Assistant Secretary for Health, Grants & Acquisitions Management sent a letter to OSDH, which stated "[a] termination under this section must be reported to the Office of Management and Budget-designated integriy and performance system, currently the Federal Awardee Performance and Integriy Information System (FAPIIS)" and that "[i]nclusion in FAPIIS may affect your ability

to obtain future Federal funding." Compl., Ex 2.  Defendants respectfully refer the Court to that letter for a full and accurate statement of its contents. Defendants lack information or knowledge sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

61.     This paragraph consists of Plaintiffs' legal conclusions, to which no response is required.  To the extent a response is deemed required, denied.

62.     Defendants hereby repeat and incorporate by reference paragraphs 1 through 61 above, as though set forth fully herein.

63.     Admitted.

64.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.  To the extent a response is deemed required, denied.

65.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.  To the extent a response is deemed required, denied.

66.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.   To the extent a response is deemed required, denied.

67.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.   To the extent a response is deemed required, denied.

68.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.   To the extent a response is deemed required, denied.

69.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.   To the extent a response is deemed required, denied.

70.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.  To the extent a response is deemed required, denied.

71.     This paragraph consists of Plaintiff's legal conclusions, to which no response is

required.   To the extent a response is deemed required, denied.

72.     Defendants hereby repeat and incorporate by reference paragraphs 1 through 71 above, as though set forth fully herein.

73.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.  To the extent a response is deemed required, denied.

74.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.   To the extent a response is deemed required, denied.

75.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.   To the extent a response is deemed required, denied.

76.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.   To the extent a response is deemed required, denied.

77.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.   To the extent a response is deemed required, denied.

78.     Defendants hereby repeat and incorporate by reference paragraphs 1 through 77 above, as though set forth fully herein.

79.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.   To the extent a response is deemed required, denied.

80.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.   To the extent a response is deemed required, denied.

81.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.   To the extent a response is deemed required, denied.

82.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.  To the extent a response is deemed required, denied.

83.     This paragraph consists of Plaintiff's legal conclusions, to which no response is

required.   To the extent a response is deemed required, denied.

84.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.   To the extent a response is deemed required, denied.

85.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.   To the extent a response is deemed required, denied.

86.     Defendants hereby repeat and incorporate by reference paragraphs 1 through 85 above, as though set forth fully herein.

87.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.  To the extent a response is deemed required, denied.

88.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.   To the extent a response is deemed required, denied.

89.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.   To the extent a response is deemed required, denied.

90.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.   To the extent a response is deemed required, denied.

91.     The second sentence of this paragraph consists of Plaintiff's characterization of a May 24, 2023 letter from OPA, to which no response is required. To the extent a response is deemed required, Defendants respectfully refer the Court to the letter for a full and accurate statement of its contents.  The remaining allegations in this paragraph consist of Plaintiff's legal conclusions, to which no response is required.  To the extent a response is deemed required, denied.

92.     This paragraph consists of Plaintiff's legal conclusions, to which no response is required.   To the extent a response is deemed required, denied.

93.     Defendants hereby repeat and incorporate by reference paragraphs 1 through

92 above, as though set forth fully herein.

94. This paragraph consists of Plaintiff's legal conclusions, to which no response is required.

95. This paragraph consists of Plaintiff's legal conclusions, to which no response is required. To the extent a response is deemed required, denied.

96. This paragraph consists of Plaintiff's legal conclusions, to which no response is required. To the extent a response is deemed required, denied.

The remaining paragraphs of the Complaint consist of Plaintiff's request for relief, to which no response is required. To the extent a response is deemed required, Defendants deny that Plaintiff is entitled to the relief requested, or to any relief whatsoever.

Defendants hereby deny each and every allegation in the Complaint not expressly admitted herein to which a response is deemed required.

## DEFENSES

1. Plaintiff's claims are barred by res judicata.

2. Plaintiff's claims are barred by collateral estoppel.

3. Plaintiff has failed to exhaust its administrative remedies.

4. Defendants' actions are fully consistent with the applicable provisions of Title X, the Weldon Amendment, the Administrative Procedure Act, and the United States Constitution.

DATED: February 21, 2024 Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

MICHELLE R. BENNETT
Assistant Branch Director

/s/ *Alexandra R. Saslaw*
MICHAEL P. CLENDENEN
ALEXANDRA R. SASLAW (D.C. Bar 1618175)
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 514-4520
E-mail: alexandra.r.saslaw@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| STATE OF OKLAHOMA,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>Defendants. | No. 5:23-cv-01052-HE |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

BACKGROUND ........................................................................................................2

I. Title X........................................................................................................ 2

II. Regulatory History and the 2021 Title X Rule ............................................ 3

III. Oklahoma's Title X Funding & HHS's Termination Decision.......................... 5

IV. This Lawsuit.............................................................................................. 7

LEGAL STANDARD ..................................................................................................7

ARGUMENT.............................................................................................................8

I. Oklahoma Is Not Likely to Succeed on the Merits........................................ 8

A. HHS's Decision Is Authorized by Title X...........................................8

B. HHS's Decision Does Not Violate the Weldon Amendment..............11

C. HHS's Decision Is Consistent with Agency Regulations. ......................13

D. HHS's Decision Is Neither Arbitrary Nor Capricious...........................15

E. Notice-and-Comment Procedures Were Not Required. ........................19

F. HHS's Decision Does Not Implicate the Spending Clause. ..................20

II. Oklahoma Has Not Demonstrated Irreparable Harm..................................... 26

III. The Public Interest Weighs Against a Preliminary Injunction. ........................ 29

CONCLUSION .........................................................................................................30

## TABLE OF AUTHORITIES

Cases

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l Inc.*, 570 U.S. 205 (2013) ........ 10, 26

*Allina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61 (D.D.C. 2010) ........ 27

*Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006) ........ 20, 23

*Auer v. Robbins*, 519 U.S. 452 (1997) ........ 13

*Becerra v. Louisiana*, Nos. 21A240, 21A241, 2021 WL 8939385 (U.S. Dec. 30, 2021) ........ 23

*Bennett v. Kentucky Department of Education*, 470 U.S. 656 (1985) ........ 23, 24

*Biden v. Missouri*, 595 U.S. 87 (2022) ........ 23

*Biden v. Missouri*, No. 21A240, 2021 WL 8946189 (U.S. Dec. 30, 2021) ........ 23

*Blanca Tel. Co. v. FCC*, 743 F.3d 860 (D.C. Cir. 2014) ........ 19

*Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219 (2d Cir. 2006) ........ 8

*Castellano v. Choinski*, No. 3:07-cv-772, 2008 WL 749857 (D. Conn. Mar. 19, 2008) ........ 11

*City & Cnty. of San Francisco v. Azar*, 411 F. Supp. 3d 1001 (N.D. Cal. 2019) ........ 13

*City of Arlington, Tex. v. FCC*, 569 U.S. 290 (2013) ........ 10

*Clay v. Okla. Dep't of Corr.*,
No. CIV-12-1106-C, 2013 WL 3058122 (W.D. Okla. June 17, 2013) ....................11

*Colorado v. EPA*,
989 F.3d 874 (10th Cir. 2021) ....................7

*Colorado v. United States Department of Justice*,
455 F. Supp. 3d 1034 (D. Colo. 2020) ....................25

*Commonwealth v. Biden*,
57 F.4th 545 (6th Cir. Jan. 12, 2023) ....................27

*Cornish v. Dudas*,
540 F. Supp. 2d 61 (D.D.C. 2008) ....................29

*CoverDyn v. Moniz*,
68 F. Supp. 3d 34 (D.D.C. 2014) ....................28

*Cummings v. Premier Rehab Keller, PLLC*,
596 U.S. 212 (2022) ....................20

*De Beers Consol. Mines Ltd. v. United States*,
325 U.S. 212 (1945) ....................11

*Dobbs v. Jackson Women's Health Organization*,
597 U.S. 215 (2022) ....................5

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
356 F.3d 1256 (10th Cir. 2004) .................... 7, 27

*FCC v. Prometheus Radio Project*,
141 S. Ct. 1150 (2021) ....................15

*Gruver v. La. Bd. of Supervisors*,
959 F.3d 178 (5th Cir. 2020) ....................22

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*,
138 S. Ct. 2448 (2018) ....................18

*Kentucky v. Yellen*,
54 F.4th 325 (6th Cir. 2022) .................... 20, 21

*Kentucky v. Yellen*,
67 F.4th 322 (6th Cir. 2023) ....................26

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019) .......... 13

*Little Sisters of Poor Saints Peter & Paul Home v. Pennsylvania*,
140 S. Ct. 2367 (2020) .......... 15

*Mayweathers v. Newland*,
314 F.3d 1062 (9th Cir. 2002) .......... 23

*Mich. Dep't of Envtl. Quality v. Browner*,
230 F.3d 181 (6th Cir. 2000) .......... 17

*Miss. Comm'n on Envtl. Quality v. EPA*,
790 F.3d 138 (D.C. Cir. 2015) .......... 22

*Montford and Co. v. SEC*,
793 F.3d 76 (D.C. Cir. 2015) .......... 10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 15

*N. Air Cargo v. U.S. Postal Serv.*,
756 F. Supp. 2d 116 (D.D.C. 2010) .......... 27

*Nat'l Fed. of Indep. Business v. Sebelius*,
567 U.S. 584 (2012) .......... 20

*New York v. HHS*,
414 F. Supp. 3d 475 (2019) .......... 13

*Nken v. Holder*,
556 U.S. 418 (2009) .......... 29

*Ohio v. Becerra*,
87 F.4th 759 (6th Cir. 2023) .......... *passim*

*Ohio v. Becerra*,
577 F. Supp. 3d 678 (S.D. Ohio 2021) .......... 27

*Otsuka Pharm. Co. v. Burwell*,
302 F. Supp. 3d 375 (D.D.C. 2016) .......... 19

*Otsuka Pharm. Co. v. Burwell*,
No. GJH-15-852, 2015 WL 1962240 (D. Md. Apr. 29, 2015) ....................27

*Pennhurst State School & Hosp. v. Halderman*,
451 U.S. 1 (1981) .................... 20, 21

*Planned Parenthood Fed'n of Am., Inc. v. Heckler*,
712 F.2d 650 (D.C. Cir. 1983) ....................10

*Planned Parenthood of Houston & Se. Tex. v. Sanchez*,
403 F.3d 324 (5th Cir. 2005) ....................10

*Port City Props. v. Union Pac. R.R. Co.*,
518 F.3d 1186 (10th Cir. 2008) ....................27

*Prairie Band of Potawaomi Indians v. Pierce*,
253 F.3d 1234 (10th Cir. 2001) ....................27

*Reuters Ltd. v. United Press Int'l, Inc.*,
903 F.2d 904 (2d Cir. 1990) ....................27

*Rust v. Sullivan*,
500 U.S. 173 (1991) ....................3

*Seaside Civic League, Inc. v. U.S. Dep't of Housing & Urb. Dev.*,
No. 14-1823-RMW, 2014 WL 2192052 (N.D. Cal. May 23, 2014) ....................29

*Sorenson Commc'ns, Inc. v. FCC*,
567 F.3d 1215 (10th Cir. 2009) ....................19

*State of Ohio ex rel. Celebrezze v. Nuclear Regul. Comm'n*,
812 F.2d 288 (6th Cir. 1987) ....................27

*Teufel v. Dep't of the Army*,
608 F. App'x 705 (10th Cir. 2015) ....................17

*Valley Family Planning v. North Dakota*,
661 F.2d 99 (8th Cir. 1981) ....................9

*W. Va. ex rel. Morrisey v. U.S. Dep't of Treasury*,
59 F.4th 1124 (11th Cir. 2023) ....................20, 21, 24, 25

*Wallace v. Dep't of Air Force*,
879 F.2d 829 (Fed. Cir. 1989) ....................17

*Washington v. Azar*,
426 F. Supp. 3d 704 (E.D. Wash. 2019) .......... 13

*Winter v. NRDC*,
555 U.S. 7 (2008) .......... 7, 26

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) .......... 27

**Statutes**

5 U.S.C. § 705 .......... 7, 8

34 U.S.C. § 10155 .......... 25

42 U.S.C. § 300 .......... 2

42 U.S.C. § 300a-4 .......... *passim*

42 U.S.C. § 300a-6 .......... 3

42 U.S.C. § 802 .......... 25

42 U.S.C. § 1395x .......... 23

Consolidated Appropriations Act, 2022,
Pub. L. No. 117-103, 136 Stat. 49 (Mar. 15, 2022) .......... 11, 13

Regulations

42 C.F.R. § 59.5 .......... *passim*

42 C.F.R. § 59.7 .......... 2

42 C.F.R. § 59.8 .......... 2, 18, 28

42 C.F.R. § 59.9 .......... 2

45 C.F.R. part 75 .......... 2

45 C.F.R. subpart F .......... 3

45 C.F.R. § 75.300 .......... 2

45 C.F.R. § 75.371 .......... 3

45 C.F.R. § 75.372 ....................................................................................................3

45 C.F.R. § 88.2 ....................................................................................................12, 13

58 Fed. Reg. 7462 (Feb. 5, 1993)....................................................................................................3

65 Fed. Reg. 41,270 (July 3, 2000)....................................................................................................3, 4, 12

84 Fed. Reg. 7714 (Mar. 4, 2019) ....................................................................................................4

86 Fed. Reg. 19,812 (Apr. 15, 2021) ....................................................................................................3

86 Fed. Reg. 56,144 (Oct. 7, 2021)....................................................................................................*passim*

89 Fed. Reg. 2078 (Jan. 11, 2024)....................................................................................................13

Other Authorities

All-Options Talkline, https://www.all-options.org/find-support/talkline/ ....................................................................................................6

HHS, Fiscal Year 2023 Title X Service Grant Awards, https://opa.hhs.gov/grant-programs/title-x-service-grants/current-title-x-service-grantees/fy2023-title-X-service-grant-awards ....................................................................................................17, 30

OPA, Title X Directory, https://opa.hhs.gov/sites/default/files/202402/Title_X_Directory_January_2024_508.pdf....................................................................................................26

States' Comment Letter....................................................................................................22

## INTRODUCTION

Through Title X of the Public Health Service Act (PHSA), Congress authorized the Department of Health and Human Services (HHS) to award discretionary grants to fund family planning services and to issue regulations defining the terms and conditions of such grants. In 2021, HHS issued a new rule (the 2021 Rule) that largely reinstated regulatory requirements that had been effective for much of the statutory program's history and that were in place without issue or legal challenge between 1993 and 2019. Thereafter, the Oklahoma State Department of Health (OSDH) accepted a Title X grant, which (like all Title X grants) was made expressly contingent on OSDH's compliance with applicable statutory and regulatory requirements, including the 2021 Rule's requirement that grantees provide nondirective options counseling to pregnant clients and a referral for any option chosen by the client, including for an abortion. When OSDH later refused to certify its compliance with these requirements and the terms of its Title X grant, HHS exercised its discretion and decided to terminate OSDH's Title X funding. This lawsuit contends that HHS's decision was unlawful, largely reflecting Oklahoma's belief that it need not follow the 2021 Rule's abortion referral provision. The Sixth Circuit, in a case brought by Oklahoma and other states, recently confirmed the permissibility of that requirement based on binding Supreme Court precedent. *See Ohio v. Becerra*, 87 F.4th 759 (6th Cir. 2023). This Court should follow the *Ohio* court's decision and deny Oklahoma's motion for preliminary injunctive relief.

Oklahoma's claims are unlikely to succeed on the merits. HHS's decision is fully consistent with Title X and its implementing regulations as well as the Weldon Amendment, and Oklahoma's contrary arguments are largely foreclosed for the reasons relied on by the court in *Ohio*. Oklahoma's arbitrary-and-capricious claims fail because HHS provided a reasoned explanation for terminating OSDH's funding. And HHS's funding decision does

not pose any issue under the Spending Clause. Finally, Oklahoma cannot demonstrate that it will suffer irreparable harm in the absence of emergency relief, and the public interest weighs against the imposition of such a drastic remedy.

## BACKGROUND

### I. Title X

Title X authorizes the HHS Secretary "to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects." 42 U.S.C. § 300(a). The statute further requires that "[g]rants and contracts made under this subchapter shall be made in accordance with such regulations as the Secretary may promulgate." *Id.* § 300a-4(a). HHS's implementing regulations afford it broad discretion to allocate congressionally-appropriated grant funds amongst competing applicants. *See generally* 42 C.F.R. §§ 59.7, 59.8. Each notice of grant award must specify "how long HHS intends to support the project without requiring the project to recompete for funds," *id.* § 59.8(a), but in general grants are initially awarded for a one-year period, *id.* § 59.8(b). HHS also issues "continuation awards" which, while funded one year at a time, allow the recipient to receive continued support beyond the initial one-year period (typically for three to five years) without having to reenter the competitive funding process. *See id.* § 59.8(a), (b).

Title X funds shall "be expended solely for the purpose for which the funds were granted in accordance with the approved application and budget" and generally applicable grant regulations. 42 C.F.R. § 59.9 (citing 45 C.F.R. part 75). Those regulations, in turn, require grantees to document and report on their receipt and use of federal funds and authorize HHS to conduct audits to ensure compliance. *See, e.g.*, 45 C.F.R. § 75.300(b) (providing that recipients are "responsible for complying with all requirements of the Federal

award"); 45 C.F.R. subpart D (setting forth post-award requirements, including controls for ensuring compliance and reporting on performance); 45 C.F.R. subpart F (setting forth audit requirements). If a recipient fails to comply with the terms and conditions of a grant—including any incorporated statutory or regulatory requirements—HHS can impose appropriate remedies, including termination. *See id.* §§ 75.371, 75.372.

## II.  Regulatory History and the 2021 Title X Rule

In accordance with its statutory mandate, *see* 42 U.S.C. § 300a-4(a), HHS has issued regulations defining requirements applicable to Title X grants. These regulations have at times offered differing interpretations of Section 1008 of the PHSA, which requires that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." *Id.* § 300a-6. But for much of the Title X program's history, the agency has required (as it does now) the provision of nondirective options counseling to pregnant clients (to include counseling on abortion if requested) and referral for abortion upon request.

The agency briefly changed course in 1988 and issued a rule that strictly "prohibited the discussion of or referral for abortion." 86 Fed. Reg. 19,812, 19,813 (Apr. 15, 2021). But while that interpretation was ultimately upheld by the Supreme Court as a permissible construction of § 1008, *Rust v. Sullivan*, 500 U.S. 173 (1991), the rule was "never implemented on a nationwide basis," 65 Fed. Reg. 41,270, 41,271 (July 3, 2000). In 1993, HHS suspended the 1988 Rule and imposed interim standards that reinstated the pre-1988 status quo. *See* 58 Fed. Reg. 7462 (Feb. 5, 1993) ("Under these compliance standards, Title X projects would be required, in the event of an unplanned pregnancy and where the patient requests such action, to provide nondirective counseling to the patient on options relating to her pregnancy, including abortion, and to refer her for abortion, if that is the option she selects."). HHS also

proposed new permanent regulations, which would ultimately be finalized in 2000. *See* 65 Fed. Reg. 41,270. The 2000 Rule adopted the 1993 interim standards that had been "used by the program for virtually its entire history." *Id.* at 41,271.

The regulatory requirements set forth in the 2000 Rule—which required nondirective pregnancy options counseling and counseling on and referral for abortion upon request—remained in effect without incident until 2019, when HHS issued a new rule similar to the 1988 version. *See* 84 Fed. Reg. 7714 (Mar. 4, 2019). The 2019 Rule significantly restricted the ability of Title X projects to provide pregnancy options counseling and prohibited Title X projects from referring for abortion. *Id.* In 2021, HHS revoked the 2019 Rule and replaced it with a new rule readopting, in substantial part, the 2000 Rule. *See* 86 Fed. Reg. 56,144 (Oct. 7, 2021). That rule again requires that Title X projects offer pregnant clients the opportunity to be provided information and counseling about available options, including "prenatal care and delivery; infant care, foster care, or adoption; and pregnancy termination." 42 C.F.R. § 59.5(a)(5). The project must provide neutral, factual information and nondirective counseling on each option and "referral upon request." *Id.*; *see also* 86 Fed. Reg. at 56,150 (explaining that an abortion referral may include "the name, address, telephone number, and other relevant factual information . . . about an abortion provider," and a Title X project cannot take "further affirmative action . . . to secure abortion services for the patient"). The Sixth Circuit, in a case brought by Oklahoma and eleven other states, recently found that the 2021 Rule's abortion referral requirement is a permissible interpretation of Title X and declined to award preliminary injunctive relief on that basis. *Ohio*, 87 F.4th at 772 ("it must be permissible for an administration to treat referrals either as falling inside or outside § 1008's prohibition").[1] The *Ohio* court determined that the Supreme Court's decision in *Rust*

---

[1] The *Ohio* litigation also involved another provision of the 2021 Rule not at issue here;

controlled and permitted the agency to adopt the abortion referral requirement. *See id.* at 770 ("*Rust* remains binding precedent and controls here.").

In June 2022, the Supreme Court issued a decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), which overturned prior precedent recognizing a constitutional right to abortion. In the wake of that decision, HHS clarified that the abortion counseling and referral provisions of the 2021 Rule remained in effect, and that nondirective pregnancy options counseling (to include counseling on the option of abortion if requested), as well as abortion referrals upon request, were still required. *See* OPA Q&A, Ex. A; June 29 OPA Letter, Ex. B.

## III. Oklahoma's Title X Funding & HHS's Termination Decision

On March 23, 2022, HHS awarded a Title X project grant to the Oklahoma State Department of Health. 2022 Notice of Award (PI. Br., Ex. 5 at 9, ECF No. 23-5). As the award explained, funding is provided one year at a time based on an annual application, the grantee's continued compliance with the grant's terms and conditions, and available appropriations. *See generally id* at 1–17. The award made clear that HHS is "not obligated to make additional Federal Funds available," *id.* at 3, and that Oklahoma "must comply with all terms and conditions outlined in the grant award," including requirements imposed by "program statutes and regulations, Executive Orders, and HHS grant administration regulations," *id.* at 4-5. It also reiterated the requirement that Oklahoma provide quarterly financial and annual progress reports and submit to an annual audit. *Id.* at 16.

A few months later, HHS's Office of Population Affairs (OPA) and OSDH began corresponding about OSDH's policy and procedure for providing nondirective options counseling and referral within its Title X project. *See* May 24 OPA Letter at 1 (PI Br., Ex. 5

---

with respect to that provision, the Sixth Circuit determined that "the preliminary injunction factors weigh in favor of granting relief." *Ohio*, 87 F.4th at 784.

at 33-34, ECF No. 23-5). Specifically, on August 29, 2022, OSDH submitted a proposal to change its policy and procedure for providing nondirective options counseling and referral. *Id.* On November 9, 2022, OPA informed OSDH that this proposal did not comply with the 2021 Rule, and therefore could not be approved. *Id.* OSDH submitted a request for reconsideration. *Id.* On January 25, 2023, OPA denied that request, but "informed OSDH that it could submit an alternate compliance proposal that included providing clients with referral to another entity, such as the All-Options Talkline." *Id.*; Jan. 25 OPA Letter to OSDH, Ex C.; Jan. 25 OPA Letter to Grantees, Ex. D; *see* All-Options Talkline, https://www.all-options.org/find-support/talkline/. Shortly thereafter, OSDH submitted an alternative proposal for compliance, which included providing nondirective counseling on all pregnancy options by OSDH staff or through the All-Options Talk Line; OSDH submitted a revised policy in March 2023 reflecting this change. May 24 OPA Letter at 1. OSDH also submitted a written assurance of compliance with the options counseling and referral requirements in the 2021 Rule. *Id.* at 24. Based on this documentation, OPA determined that OSDH's policy complied with the Title X regulations. Accordingly, on March 30, 2023, OPA approved a continuation award for Oklahoma for an additional $4.5 million in Title X funding. *See* 2023 Notice of Award at 1 (PI Br., Ex. 5 at 26-32, ECF No. 23-5).

However, on May 5, 2023, OSDH notified OPA by email that it "had a change required in our family planning program policy effective late afternoon of 4/27/2023." May 24 OPA Letter at 2. OSDH shared its changed policy, which no longer provided for counseling through and referral to the All-Options Talk Line, and provided that OSDH staff would "[p]rovide neutral, factual information and nondirective counseling on pregnancy options *in Oklahoma*" (rather than "on all pregnancy options," as stated in the prior iteration of the policy). *Id.* at 1-2. OPA determined that this new policy "d[id] not comply with the Title X

regulatory requirements and, therefore, the terms and conditions of [OSDH's] grant." *Id.* at 2. OPA referred the matter to the HHS Office of the Assistant Secretary for Health's Grants and Acquisitions ("GAM") division. *Id.*

On May 25, 2023, GAM notified OSDH that it was suspending OSDH's Title X award effective that day. *See* May 25 GAM Letter (PI Br., Ex. 5 at 36–37, ECF No. 23-5). On June 27, 2023, GAM notified OSDH that its Title X funding was terminated. *See* June 27 GAM Letter (PI Br., Ex. 5 at 1-8, ECF No. 23-5). OSDH appealed that determination administratively on July 27, 2023, *see* PI Br., Ex. 6, ECF No. 23-6, and the appeal remains pending.

## IV. This Lawsuit

Oklahoma filed its complaint on November 17, 2023, asserting four claims under the Administrative Procedure Act ("APA") and one claim pursuant to the Declaratory Judgment Act ("DJA"). ECF No. 1. Oklahoma moved for a preliminary injunction on January 26, 2024 and seeks a ruling on that motion no later than April 1, 2024. *See* Pls.' Mot. for Preliminary Injunction & Opening Brief in Support, ECF No. 23 (PI Br.).

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy," and therefore may only be awarded where the right to relief is "clear and unequivocal." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1261 (10th Cir. 2004). A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). This standard also applies to a request for a court to "postpone the effective date of an agency action" under 5 U.S.C. § 705. *Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021) (collecting cases); *see* PI Br. 9 (requesting,

in the alternative, that the Court "postpone effectiveness of Defendants' action to terminate Oklahoma's Title X award pursuant to 5 U.S.C. § 705").[2]

## ARGUMENT

### I. Oklahoma Is Not Likely to Succeed on the Merits.

#### A. HHS's Decision Is Authorized by Title X.

OPA's decision to terminate OSDH's Title X funding was based on the interpretation of § 1008 set forth in the 2021 Rule—*i.e.*, that Title X programs must provide, if requested, counseling on and referral for abortion. Oklahoma contends that OPA's decision "violates Title X," PI Br. 14, because HHS's regulation "requiring abortion counseling and referrals is not within the bounds of reasonable interpretation" of § 1008 "and is therefore in excess of statutory authority granted by Congress," *id.* at 17; *see id.* at 18. From a statutory perspective, the only relevant consideration is whether the interpretation set forth in the 2021 Rule is permissible. And *Rust* establishes that it is, as recently explained by the Sixth Circuit in a case in which Oklahoma was a plaintiff.[3]

In *Ohio*, the Sixth Circuit held that *Rust* is controlling authority that § 1008 authorizes HHS to either forbid, permit, or require Title X programs to provide nondirective options counseling and, upon request, abortion counseling and referrals. *Rust* rejected arguments that "providing counseling and referral for abortion is either necessarily treating, or not treating, 'abortion as a method of family planning,'" and thus, the *Ohio* court held, it "must be

[2] In any event, Oklahoma's request for relief in the form of postponement is moot because the termination decision is already effective, and Oklahoma alleges that, as of September 2023, "[f]unds that would previously have been directed to [OSDH] were instead apparently reallocated to" other Title X grantees. Compl. ¶ 26.

[3] The distinction between facial and as-applied challenges makes no difference in this situation. *See Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 228 (2d Cir. 2006) ("Facial and as-applied challenges differ in *the extent to which* the invalidity of a statute need be demonstrated (facial, in all applications; as-applied, in a personal application). Invariant, however, is the *substantive rule of law* to be used." (emphasis in original)).

permissible for an administration to treat referrals" for abortion—and, necessarily, nondirective options counseling about abortion—"either as falling inside or outside § 1008's prohibition." *Ohio*, 87 F.4th at 771-72. Accordingly, the Sixth Circuit concluded that "*Rust*'s holding requires us to reject the States' [including Oklahoma's] argument that the 2021 Rule's referral requirement is contrary to law." *Id.* at 771. Oklahoma does not provide any reason for this Court to reach a different conclusion regarding the legality of the counseling and referral requirement.

Oklahoma suggests that the statutory interpretation question should be analyzed anew to OPA's application of the 2021 Rule to OSDH because Oklahoma now generally prohibits "advising or procuring an abortion." PI Br. 5; *see id.* 21–22. But whatever restrictions Oklahoma law might now impose on abortion access, the statutory analysis is the same. The 2021 Rule broadly and unequivocally requires that Title X providers "[o]ffer pregnant clients the opportunity to be provided information and counseling regarding each" of their options—including "[p]regnancy termination"—and, if requested, to "provide neutral, factual information and nondirective counseling on each of the options, and referral upon request." 42 C.F.R. § 59.5(a)(5). It does not refer to or incorporate state law.[4] Nor does it limit the required counseling and referrals to procedures available within a particular state. Thus, OPA simply applied the 2021 Rule's plain text to OSDH, determining that its policy of only providing pregnant clients with information and non-directive counseling on options "in Oklahoma" placed OSDH out of compliance. *See* ECF No. 23-4, at 4. This case does not

[4] Even before *Dobbs*, states could, and did, adopt abortion policies inconsistent with Title X regulations' broad counseling and referral provisions. *See, e.g., Valley Family Planning v. North Dakota*, 661 F.2d 99, 102 (8th Cir. 1981) (finding state law prohibiting Title X grantees from making abortion referrals was preempted by the Supremacy Clause). These federal regulatory provisions were in effect for nearly the entire history of the Title X program, and yet Defendants are not aware of any example of a state entity seeking an exception from the plain text of the governing regulation on the basis of conflicting state law.

involve OPA applying any new interpretation of Title X or its regulation to OSDH; it involves OSDH adopting a contrary interpretation and attempting to force it on the agency. *Cf., e.g.*, *Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 663-64 (D.C. Cir. 1983) ("It is elementary that under the Supremacy Clause . . . states are not permitted to establish eligibility standards for federal assistance programs that conflict with the existing federal statutory or regulatory scheme."); *Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 337 (5th Cir. 2005) ("[A] state eligibility standard that altogether excludes entities that might otherwise be eligible for federal funds is invalid under the Supremacy Clause."). Under *Rust* and *Ohio*, it is the agency's interpretation which controls,[5] not OSDH's.

Title X establishes a competitive grant program that subjects all grantees to program requirements set forth in agency regulations. *Rust* and *Ohio* establish the permissibility of the abortion counseling and referral provisions relied upon by OPA in the decision challenged here. State entities that wish to receive federal Title X funds can either choose to follow those provisions or they can choose to decline the funds. *Cf. Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l Inc.*, 570 U.S. 205, 214 (2013) ("As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds."). But Congress wrote no exceptions into Title X based on state abortion laws—even at a time when most states prohibited abortions.

[5] Those cases also plainly establish that HHS's interpretation is entitled to *Chevron* deference. *See Ohio*, 87 F.4th at 770-72 (discussing *Chevron* analysis under *Rust*). HHS's application of the 2021 Rule's counseling and referral provisions to OSDH is entitled to the same *Chevron* deference. *See, e.g.*, *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 306 (2013) (*Chevron* deference applies where Congress vests the agency with "general authority to administer the [statute] through rulemaking *and adjudication*, and the agency interpretation at issue was promulgated in the exercise of that authority" (emphasis added)); *Montford and Co. v. SEC*, 793 F.3d 76, 82 (D.C. Cir. 2015).

### B. HHS's Decision Does Not Violate the Weldon Amendment.

Oklahoma also argues that the 2021 Rule, or OPA's application of it to OSDH, violates the Weldon Amendment. The Weldon Amendment is a statute meant to protect health care entities who object to *providing* abortion services or related referrals. It states that no Appropriations Act funds can be provided to "a Federal agency or program, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortion." *E.g.* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. H, title V, § 507(d)(1), 136 Stat. 49,496 (Mar. 15, 2022) (the Weldon Amendment is a rider for every HHS Appropriations Act). Oklahoma argues that the 2021 Rule requires states to discriminate against objecting providers in violation of the Weldon Amendment. PI Br. 16. This argument is meritless.

As an initial matter, nothing in Oklahoma's Complaint discusses or even mentions the Weldon Amendment. The Court cannot entertain a motion for preliminary injunction on a claim not raised in the Complaint. *See Clay v. Okla. Dep't of Corr.*, No. CIV-12-1106-C, 2013 WL 3058122, at *2 (W.D. Okla. June 17, 2013) ("When the movant seeks intermediate relief beyond the claims in the complaint, the court is powerless to enter a preliminary injunction."); *see also Castellano v. Choinski*, No. 3:07-cv-772, 2008 WL 749857, at *2 (D. Conn. Mar. 19, 2008) (citing *De Beers Consol. Mines Ltd. v. United States*, 325 U.S. 212, 220 (1945)).

In any event, Oklahoma's argument misunderstands the Weldon Amendment's application to Title X. Under Title X, the requirement to refer for abortions upon request is on the "project," not on subrecipients. *See* 42 C.F.R. § 59.5(a)(5)(ii) ("Each *project* supported under this part must . . . [n]ot provide abortion as a method of family planning. A *project* must . . . [i]f requested to provide such information and counseling, . . . referral upon request

[for pregnancy termination]." (emphasis added) (footnote omitted)). For example, just as not every service site must offer all methods of family planning as long as the "project" does, not every subrecipient must offer referral for abortions as long as the project does. *See id.* § 59.5(a)(1) ("If an organization offers only a single method of family planning, it may participate as part of a project as long as the entire project offers a broad range of acceptable and effective medically approved family planning methods and services."); *see also* 2021 Rule, 86 Fed. Reg. at 56,153 ("[O]bjecting providers or Title X grantees are not required to counsel or refer for abortions."); 42 C.F.R. § 59.5(a)(5) n.2 ("Providers may separately be covered by federal statutes protecting conscience and/or civil rights."); *Ohio*, 87 F.4th at 774. Because the 2021 Rule's referral requirement is not imposed on individual providers or subrecipients, who may claim objector status, but on the "project" (here, OSDH), OSDH can still comply with the referral requirement without discriminating against objecting providers.[6] *Contra* PI Br. 16 (incorrectly asserting that the 2021 Rule "forbids Oklahoma from sub-granting to health care entities that will not refer for abortion").

Oklahoma also claims that OSDH qualifies as a "health care entity," PI Br. 15 (citing 45 C.F.R. § 88.2), seemingly suggesting that it can be considered an objector under the Weldon Amendment. But this argument cannot be squared with the text of the Weldon Amendment. For purposes of the Weldon Amendment, the term "health care entity" "includes an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan." *E.g.* Consolidated Appropriations Act, 2022, Pub. L.

[6] The 2000 Rule, which also required abortion referrals upon request, contained a similar protection based on other conscience statutes prior to Congress adopting the Weldon Amendment in 2004. *See* 65 Fed. Reg. at 41,274 ("[G]rantees may not require individual employees who have such [conscience] objections to provide such counseling. However, in such cases the grantees must make other arrangements to ensure that the service is available to Title X clients who desire it.").

No. 117-103, div. H, title V, § 507(d)(2), 136 Stat. 49,496 (Mar. 15, 2022). OSDH is a department of state government, not a "health care facility, organization, or plan" or any of the other entities listed in the statute.[7]

### C. HHS's Decision Is Consistent with Agency Regulations.

Next, Oklahoma contends that HHS's decision to terminate OSDH's funding "unreasonably interprets its own regulations," citing other provisions that the decision allegedly contradicts. PI Br. at 19. But an agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation," *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *see also Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), and Oklahoma has identified no such deficiency here.

First, Oklahoma misunderstands 42 C.F.R. § 59.5(b)(6), which requires that each Title X project affirm that "family planning medical services will be performed under the direction of a clinical services provider, with services offered within their scope of practice and allowable under state law, and with special training or experience in family planning." By its terms, that regulatory provision does not limit the scope of pregnancy options counseling, or accompanying referrals, that must be provided pursuant to subsection 59.5(a). Rather, the language on which Oklahoma focuses was added to the 2021 Rule in response to comments advocating to expand the individuals permitted to direct Title X projects from physicians to

[7] Oklahoma's attempt to rely on the definition of "health care entity" in 45 C.F.R. § 88.2, PI Br. 15, fails. That regulation, and the broader rule of which it was a part, have been vacated by multiple courts. *See New York v. HHS*, 414 F. Supp. 3d 475, 524–25 (2019) (citing Congressional remarks of Representative Weldon and holding: "The Rule's definition of this term[, health care entity,]—which appears in the Coats-Snowe and Weldon Amendments and the ACA—extends beyond what the face of these statutes disclose."); *see also, Washington v. Azar,* 426 F. Supp. 3d 704 (E.D. Wash. 2019) (vacating rule); *City & Cnty. of San Francisco v. Azar*, 411 F. Supp. 3d 1001 (N.D. Cal. 2019) (same). HHS has also rescinded the regulation. *See* Safeguarding the Rights of Conscience as Protected by Federal Statutes, 89 Fed. Reg. 2,078 (Jan. 11, 2024).

"a broader range of healthcare providers." 86 Fed. Reg. at 56,163. The reference to state law merely incorporated state definitions of the authority of physician assistants and other similar providers to direct family planning programs. *See id.* at 56,164 (explaining that HHS was adopting a definition of "clinical services provider" that includes "physicians, physician assistants, nurse practitioners, certified nurse midwives, and registered nurses with an expanded scope of practice who are trained and *permitted by state-specific regulations to perform*" Title X services (emphasis added)). It did not give state law veto power over all other Title X regulatory requirements.

Oklahoma's second argument similarly misreads the plain language of the Title X regulation. HHS requires that each project affirm that it will "[p]rovide for coordination and use of referrals and linkages" with various health care providers. 42 C.F.R. § 59.5(b)(8). These "referrals and linkages" should be with providers "who are in close physical proximity to the Title X site, when feasible, in order to promote access to services and provide a seamless continuum of care." *Id.* The regulation simply provides that Title X projects should attempt, *where feasible*, to make referrals to nearby healthcare providers. Where such close-in-proximity referrals are not feasible, providers are not prevented from making referrals to more distant entities. There is no conflict between this regulatory provision and the challenged HHS decision, which is based on subsection 59.5(a)(5)'s broad requirement that projects provide nondirective options counseling and appropriate referrals upon request. HHS recognized that this might require projects in states with restrictive abortion laws to refer out of state, but left it to the projects to ensure compliance, including by using telehealth and hotline options. But because subsection 59.5(b)(8) does not impose any limitation on a project's ability to provide referrals to providers that are not in close proximity to the site, Oklahoma has identified no conflict between the challenged decision and HHS's broader Title X regulations.

### D. HHS's Decision Is Neither Arbitrary Nor Capricious.

Oklahoma's arbitrary-and-capricious claims fare no better. Agency action must be upheld in the face of an arbitrary-and-capricious challenge so long as the agency "articulate[s] a satisfactory explanation for the action including a rational connection between the facts found and the choice made." *Little Sisters of Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2383 (2020) (citation omitted). A court's review is "narrow" and it "is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Under this "deferential" standard, a court "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). Oklahoma raises several arguments that OPA's termination decision was arbitrary and capricious. PI Br. 20–23. None of these arguments succeed.

Oklahoma first argues that the termination decision is arbitrary and capricious because "Congress clearly intended its Title X funding *not* to go to promoting or performing abortions in any way." *Id.* at 21. This argument is duplicative of Oklahoma's statutory arguments. *See supra* Part I.A–B. The abortion referral requirement of the 2021 Rule does not violate any statute, so OPA's termination decision relying on that rule is not arbitrary and capricious.

Oklahoma next argues that OPA discontinued OSDH's grant without considering "the impact of requiring States where abortion is prohibited to comply with counseling and referral requirements." PI Br. 21; *see also id.* (arguing that "federalism concerns were overlooked"). Oklahoma is incorrect. As an initial matter, OPA's decision is a straightforward application of the valid requirements of the 2021 Rule. *See supra* Part I.A; *Ohio*, 87 F.4th at 772 (applying *Rust*). Because that rule requires grantees to provide abortion referrals upon request, OPA

declined to continue funding OSDH's grant when OSDH would not certify that it would do so. An agency does not act in an arbitrary and capricious manner merely by applying a valid regulation. Oklahoma's argument is really a backdoor attempt at challenging the referral requirement of the 2021 Rule—a challenge that was already rejected in the *Ohio* case, to which Oklahoma was a party.

In any event, the agency has provided a valid explanation for its decision that takes into account the fact that certain states have limited access to abortion. In June 2022, HHS issued guidance that clarified the requirements of the Title X program post-*Dobbs*, including in states that limited access to abortion in the immediate wake of the *Dobbs* decision. *See* OPA Q&A, Ex. A. This document states that the abortion counseling and referral provisions of the 2021 Rule remain in effect, and that nondirective pregnancy options counseling (to include counseling on the option of abortion if requested), as well as abortion referrals upon request, is still required. *Id.* at 4–5. The document also notes that "[t]here are no geographic limits for Title X recipients making referrals for their clients," and that "Title X recipients have flexibility to refer clients for services across state lines if necessary." *Id.* at 5. HHS also clarified that counseling and referrals may be made in person or via telehealth. *Id.* In deciding to terminate OSDH's funding, OPA further confirmed that Title X projects are required to "provide information and nondirective counseling on a range of options, including . . . referrals upon client request, including referrals for abortion," and that "in some circumstances, those referrals will need to be made out of state." ECF No. 23-4, at 4; *see also* May 24 OPA Letter at 1 (PI Br., Ex. 5 at 33-34, ECF No. 23-5) (noting that OPA "informed OSDH that it could submit an alternate compliance proposal that included providing clients with referral to another entity, such as the All-Options Talkline"). This explanation demonstrates that HHS considered the issue of state-law limitations on abortion access and nonetheless decided that

the still-in-force referral requirements of the 2021 Rule should be applied as written.  "As long as the agency's explanation is clear enough that its path may reasonably be discerned, we must respect its policy choice." *Ohio*, 87 F.4th at 775 (citations omitted).

Oklahoma raises several specific points that it says OPA should have considered and did not address in its decision, although notably Oklahoma does not say whether it raised any of these issues with the agency prior to this lawsuit.[8]  *See Teufel v. Dep't of the Army*, 608 F. App'x 705, 706 n.2 (10th Cir. 2015) ("Ordinarily, appellate courts refuse to consider issues not raised before an administrative agency." (quoting *Wallace v. Dep't of Air Force*, 879 F.2d 829, 832 (Fed. Cir. 1989))).  First, pointing to OPA's 2016 program review of OSDH, Oklahoma argues that family planning services in the state will be reduced if OSDH does not have a Title X grant. PI Br. 22.  But OSDH is not the only Title X grantee or the only project capable of providing family planning services in the state.  *See* HHS, Fiscal Year 2023 Title X Service Grant Awards, https://opa.hhs.gov/grant-programs/title-x-service-grants/current-title-x-service-grantees/fy2023-title-X-service-grant-awards (noting three Title X grantees, not including OSDH, operating in the State of Oklahoma). Moreover, some of Title X's 2023 funds have been redistributed to other grantees to serve Oklahoma now that OSDH has refused to comply with HHS regulations.  *See* Compl. ¶ 26 (alleging that OPA has already reallocated some funds).  In any event, the Court should not second-guess OPA's decision to terminate an award to a grantee that fails to comply with applicable regulations.  *Ohio*, 87 F.4th at 775 ("[I]t is not the role of the court to 'second guess the analysis and policy judgments that undergird the agency's regulations.'" (citation omitted)).

Oklahoma also says that it is "heavily invested in providing services described in

---

[8] Oklahoma also did not raise any of these concerns during the notice-and-comment period for the 2021 Rule. To the extent Oklahoma attempts to challenge the 2021 Rule—which OPA's decision merely applies—such arguments are waived. *See Mich. Dep't of Envtl. Quality v. Browner*, 230 F.3d 181, 183 n.1 (6th Cir. 2000).

Title X, given Oklahoma's 40-year track record of administering the Title X program," and that "Oklahoma's citizens are heavily invested in receiving those services." PI Br. 22. But Oklahoma has no legally cognizable interest in the continued receipt of Title X funding. Title X grants only obligate HHS to provide funds to the grantee for one year (while sometimes providing HHS with the option of issuing noncompetitive continuation grants for additional years), 42 C.F.R. § 59.8(b), and HHS's Title X regulations provide that "[n]either the approval of any application nor the award of any grant commits or obligates the United States in any way to make any additional, supplemental, continuation, or other award with respect to any approved application or portion of an approved application," *id.* § 59.8(c). The termination decision here concerns only discretionary funding. *Cf. Janus v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 138 S. Ct. 2448, 2484 (2018) (discounting asserted reliance interests because the relevant "contract provisions . . . will expire on their own in a few years' time"). Moreover, the referral requirement has been in effect since at least 2021, and for decades prior to the 2019 Rule, and Oklahoma abided by that requirement in accepting grants prior to 2023. Oklahoma thus cannot claim that it now has a reliance interest in receiving grants without needing to comply with the referral requirement.

Finally, Oklahoma contends that OPA unlawfully "shifted positions" by terminating OSDH's Title X grant. PI Br. 22–23. This argument misses the mark because the referral requirement has been in force since the 2021 Rule was issued and the agency has never changed its position on what the Rule requires. Instead, HHS has consistently applied that requirement. *See generally* OPA Q&A at 3, 5. The referral requirement is an outgrowth of the nondirective counseling requirement, *see* 86 Fed. Reg. at 56,149–50, and is consistent with medical ethics dictating that a pregnant client be provided with information about all options available to her; that need for neutral, accurate information does not change merely because

some states have limited access to certain services. Oklahoma argues that OPA's decision contradicts the 2021 Rule's provision that "objecting providers or Title X grantees are not required to counsel or refer for abortions." 86 Fed. Reg. at 56,153; *see* PI Br. 22. That exception is an application of conscience and religious freedom statutes. *See* 86 Fed. Reg. at 56,153. A state agency cannot claim to be an objector under those statutes.[9] HHS has not been inconsistent on this point.

**E. Notice-and-Comment Procedures Were Not Required.**

Oklahoma also briefly argues that HHS's termination decision violated the APA's procedural requirements because "HHS's termination of Oklahoma's Title X funding amounts to a legislative rule that required notice and comment." PI Br. at 23. But this argument provides no independent basis for invalidating the decision because, as explained above, *supra* Part I.A, that decision merely applies the plain language of the 2021 Rule to Oklahoma. *See, e.g.*, *Otsuka Pharm. Co. v. Burwell*, 302 F. Supp. 3d 375, 409 (D.D.C. 2016) (rejecting similar argument and holding that notice-and-comment procedures are not required so long as challenged agency adjudication is a "clarification or interpretation of the existing rules" rather than a "'de facto' amendment of a duly promulgated regulation") (citation omitted); *see also* *Blanca Tel. Co. v. FCC*, 743 F.3d 860, 867 (D.C. Cir. 2014) (holding that "adjudicatory decisions are not subject to the APA's notice-and-comment requirements"); *Sorenson Commc'ns, Inc. v. FCC*, 567 F.3d 1215, 1223 (10th Cir. 2009) (holding that the challenged agency action was "an interpretative rule, and the [agency] was not required to comply with notice and comment procedures").

[9] Providers who work for state grantees may, in some instances, qualify for objector status. *See* 42 C.F.R. § 59.5(a)(5) n.2 ("*Providers* may separately be covered by federal statutes protecting conscience and/or civil rights." (emphasis added)).

**F. HHS's Decision Does Not Implicate the Spending Clause.**

"Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 216 (2022); *see also Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Oklahoma argues that OPA's decision to terminate its Title X funding violates the Spending Clause because, in Oklahoma's view, that decision "was based on a requirement that was not congressionally mandated and that Oklahoma never knowingly and voluntarily accepted." PI Br. 12. But Oklahoma's argument incorrectly frames the issue and erroneously relies on *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1 (1981), and the Sixth and Eleventh Circuit's recent *Pennhurst* decisions (*Kentucky v. Yellen*, 54 F.4th 325 (6th Cir. 2022), and *W. Va. ex rel. Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124, 1140 (11th Cir. 2023)), none of which involved the type of challenge contemplated here.

*Pennhurst* and its progeny reflect the basic proposition that "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst*, 451 U.S. at 17. Just as with actual contractual obligations, a state must "voluntarily and knowingly accept[] the terms" attached to federal funding for those terms to be enforceable. *Id.* For that reason, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.* Congress cannot "surpris[e] participating States with post acceptance or 'retroactive' conditions." *Id.* at 25; *see also Nat'l Fed. of Indep. Business v. Sebelius*, 567 U.S. 584 (2012).

Courts have applied the *Pennhurst* rule by relieving states of the obligation to comply with statutory conditions on federal funding that were not sufficiently apparent at the time of acceptance. In *Pennhurst* itself, for example, the question was whether the "bill of rights" provision of a federal statute stated an enforceable condition at all, or whether it was merely

"hortatory." 451 U.S. at 15-27. Construing the statute, the Court found it "clear that the provision[]" was "intended to be hortatory, not mandatory," *id.* at 24, and thus foreclosed the plaintiffs' effort to enforce it against the state defendant. In *West Virginia* and *Kentucky*, likewise, the question was whether the plaintiff states could "ascertain" a condition that a federal statute placed on their expenditure of federal grant funds. *West Virginia*, 59 F.4th at 1140; *see Kentucky*, 54 F.4th at 348.

This case differs in significant respects from *Pennhurst* and its progeny. First, *Pennhurst*, *Kentucky*, and *West Virginia* all dealt with allegedly ambiguous *statutory* funding conditions. None of those cases involved the situation here—*i.e.*, where a statute creates a federal grant program and unambiguously makes such grants subject to conditions set forth in agency regulations. Oklahoma is not challenging any aspect of Title X itself but is instead challenging HHS's application of the unequivocal counseling and referral provisions in the 2021 Rule, which were just upheld by the Sixth Circuit. *See* PI Br. 11 (arguing that the referral requirement "was wholly absent from Congress's statutory regime"). None of the cases cited by Oklahoma supports the notion that the Spending Clause can be used to challenge an agency's application of such a regulation to terminate a discretionary grant.

Even if *Pennhurst* did apply, it would present no obstacle to the decision at issue in this case. Most importantly, *Pennhurst*'s notice requirement—*i.e.*, that a statute authorizing the provision of federal funds must "provid[e] clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with [the conditions]," *Pennhurst*, 451 U.S. at 24-25—is met here. Title X is clear that "[g]rants and contracts . . . shall be made in accordance with such regulations as the Secretary may promulgate," 42 U.S.C. § 300a-4(a), and "shall be . . . subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made," *id.*

§ 300a-4(b). Thus, states—as all other Title X recipients—are aware that, once they accept Title X funding, they must comply with the requirements set forth by the Secretary. Those requirements include the 2021 Rule, which requires Title X grantees to provide non-directive counseling and referrals for abortion. Oklahoma's contention that it "never knowingly and voluntarily accepted" this condition of funding, PI Br. 12, cannot be squared with the fact that the 2021 Rule was promulgated months prior to Oklahoma receiving its Title X grant in 2022, *see* 86 Fed. Reg. at 56,144. Indeed, Oklahoma both submitted a comment on the proposed rule in May 2021, *see* States' Comment Letter at 15, and filed a lawsuit challenging the 2021 Rule in October 2021, *see* Compl., *Ohio v. Becerra*, No. 1:21-cv-675 (N.D. Ohio Oct. 25, 2021), ECF No. 1, and yet still applied for and accepted Title X funding with full knowledge that the 2021 Rule was in force. Oklahoma's claim that it lacked sufficient notice of these conditions is particularly unpersuasive given that the Title X program has required non-directive counseling on all options, including abortion, for most of the program's existence, *see supra* pp. 3–4, and Oklahoma has nevertheless accepted such funding "[f]or nearly half a century," Compl. ¶ 1.[10]

Oklahoma contends that the statute's silence with respect to abortion counseling, referral, or advocacy prohibits the Secretary from imposing any conditions related to such activity, notwithstanding Congress's express assertion that Title X grants shall be "subject to such conditions as the Secretary may determine to be appropriate." PI Br. 11–12. Presumably, then, Oklahoma would argue that *any* conditions imposed by the Secretary that are not expressly addressed in detail in a statute are invalid and unenforceable. But it is not unusual

[10] *Cf. Gruver v. La. Bd. of Supervisors*, 959 F.3d 178, 184 (5th Cir. 2020) (rejecting Spending Clause claim when the challenged provision "has been on the books for over thirty years, all the while LSU has continued to accept federal funding"); *Miss. Comm'n on Envtl. Quality v. E.P.A.*, 790 F.3d 138, 179 (D.C. Cir. 2015) (noting that a state's prior acceptance of federal funding despite the challenged condition "may be an additional relevant factor . . for assessing the constitutionality of Spending Clause legislation.").

or impermissible for Congress to authorize an agency to promulgate requirements on federal funding. The Supreme Court has long established that, once Congress makes clear that a condition on the use of federal funds is mandatory and enforceable, it may leave the particulars of implementing the condition to the agency charged with administering the spending program. In *Bennett v. Kentucky Department of Education*, 470 U.S. 656 (1985), for example, the Court held that the Department of Education should evaluate a state's compliance with conditions on federal funds by looking to "the statutory provisions, regulations, and other guidelines provided by the Department at that time." *Id.* at 670. And in *Biden v. Missouri*, 595 U.S. 87 (2022) (per curiam), the Supreme Court considered whether a statute delegating broad authority for the HHS Secretary "to promulgate, as a condition of a facility's participation in the [Medicare and Medicaid] programs, such 'requirements as [he] finds necessary in the interest of health and safety of individuals who are furnished services in the institution,'" *id.* at 90 (quoting 42 U.S.C. § 1395x(e)(9)), allowed the Secretary to require Medicare and Medicaid providers to mandate COVID-19 vaccinations for their employees. The Court found that it did, recognizing the wide array of conditions and requirements imposed on Medicare and Medicaid facilities under that authority.[11] *Id.* at 92-96.

Here, as in *Missouri*, the condition articulated in the statute is perfectly clear: Title X recipients must follow conditions prescribed by the agency. As the Supreme Court has historically recognized, when operating a grant program, "the Federal Government simply [cannot] prospectively resolve every possible ambiguity concerning particular applications of the requirements of" the underlying statute. *Bennett*, 470 U.S. at 669; *see also Mayweathers v.*

[11] In *Missouri*, the states argued that they could not be subjected to the COVID-19 vaccination requirement because it was not articulated in the statute. *See* Resp. to Application for a Stay Pending Appeal, *Becerra v. Louisiana*, Nos. 21A240, 21A241, 2021 WL 8939385, at *26-27 (U.S. Dec. 30, 2021) (citing *Pennhurst*, 451 U.S. at 17); Resp. to Application for a Stay, *Biden v. Missouri*, No. 21A240, 2021 WL 8946189, at *23-24 (U.S. Dec. 30, 2021) (citing *Arlington Cent.*, 548 U.S. at 296).

*Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) ("Congress is not required to list every factual instance in which a state will fail to comply with a condition. Such specificity would prove too onerous, and perhaps, impossible").  This is particularly true where, as here, "grant recipients had an opportunity to seek clarification of the program requirements" from the agency. *Bennett*, 470 U.S. at 669.  As explained above, the 2021 Rule clearly sets out conditions that recipients must follow to receive Title X funding.  And those conditions were plainly ascertainable when Oklahoma applied for its initial grant in 2022 and when HHS terminated its funding in 2023.

Oklahoma cites to an Eleventh Circuit case, *West Virginia*, to support its argument that an agency cannot impose a condition that is not set forth unambiguously in a statute.  *See* PI Br. 11.  But even the *West Virginia* court recognized that "when a state accepts federal funds, the state necessarily agrees 'to comply with, and its liability determined by, the legal requirements in place when the grants were made,'" and that "[t]hese 'legal requirements' include existing regulations."  *W. Virginia*, 59 F.4th at 1148 (quoting *Bennett*, 470 U.S. at 670); *see also id.* ("To be clear, we do not question an agency's authority to fill in gaps that may exist in a spending condition.").

As noted above, this case does not present the type of Spending Clause issue addressed in *West Virginia*.  And, in any case, the *West Virginia* case is clearly distinguishable from this one.  In *West Virginia*, states challenged a provision in the American Rescue Plan Act ("ARPA"), which set aside $195.3 billion in stimulus funds to be distributed to states and the District of Columbia to combat the economic challenges posed by the COVID-19 pandemic, but conditioned receipt of those funds on states certifying that they would comply with ARPA's "offset provision."  59 F.4th at 1132-3.  The offset provision provided that states could not use ARPA funds to "directly or indirectly offset a reduction in [their] net tax

revenue" resulting from "a change in law that 'reduces any tax.'" *Id.* at 1132 (quoting 42 U.S.C. § 802(c)(2)(A)).

ARPA and the offset provision differ in several important respects from Title X and the referral requirement at issue here. *First*, Title X directly authorizes the Secretary to impose conditions on Title X grant funding, whereas ARPA contained no such language. *Compare* 42 U.S.C. § 300a-4(b) (providing that grants shall be "subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made"), *with* 42 U.S.C. § 802(f) (providing that "[t]he Secretary shall have the authority to issue such regulations as may be necessary or appropriate to carry out this section"). Accordingly, Title X expressly put states on notice that grants would be subject to conditions set by the Secretary, including the conditions set forth in the 2021 Rule.[12]

*Second*, the Eleventh Circuit's decision in *West Virginia* turned at least in part on ARPA's "novelty and scope," *W. Virginia*, 59 F.4th at 1145–46, neither of which are issues here. There is no "lack of historical precedent" here, where the Title X program has required nondirective counseling and referrals for approximately four decades (with two short-lived exceptions). And while ARPA "aimed [a] novel restriction at each state's *entire* budget and every single one of its taxes," the amount of funding at issue here—approximately $4.5 million, *see* 2023 Notice of Award at 1—is a much more modest sum, affecting only one specific state program.

Oklahoma's repeated references to state sovereignty cannot save its Spending Clause claim. Oklahoma's brief seems to suggest that there is some heightened version of the Spending Clause that applies where unspecified "sovereign interests" are at stake, but that is

[12] Oklahoma's reliance on *Colorado v. United States Department of Justice*, 455 F. Supp. 3d 1034 (D. Colo. 2020), is inapposite for the same reason. That case involved a formula grant program, "meaning that Congress has already 'determine[d] who the grant recipients are and how much money each shall receive.'" *Id.* at 1047 (citation omitted). The statute in question authorized the Attorney General to "issue rules to carry out this part," *see* 34 U.S.C. § 10155, which is more limited than the grant of power in Title X.

not what the Sixth Circuit meant when it said that "[a]s *Pennhurst* and other precedents recognize, more is at stake when Congressional spending legislation threatens state sovereign interests *than is at issue in a run-of-the-mill private contract dispute*." *Kentucky v. Yellen*, 67 F.4th 322, 327 (6th Cir. 2023) (emphasis added). In other words, the Sixth Circuit was merely pointing out that cases implicating the Spending Clause may also implicate state sovereign interests. But as explained above, HHS's decision does not violate the Spending Clause. Thus, it makes no difference which sovereign interests Oklahoma believes are implicated here.

Separately, Oklahoma suggests that HHS terminated the state's Title X funding "on the basis of its abortion laws," but that is simply not accurate. HHS terminated the state's Title X funding—after several attempts to reach a viable compromise—due to its noncompliance with the Title X regulations at 42 C.F.R. § 59.5(a)(5). *See* May 24 OPA Letter at 1–2.[13] Requiring Oklahoma to follow the regulations that it agreed to follow in exchange for discretionary funding is not an intrusion of state sovereignty. As the Supreme Court has explained, "if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds." *Agency for Int'l Dev.*, 570 U.S. at 214. Oklahoma also tries to attack HHS's decision to award supplemental funds to another entity, the Missouri Family Health Council, but that is of no moment here. The Spending Clause does not authorize a state to challenge the federal government's decision to grant discretionary funds to a nonprofit organization.

## II. Oklahoma Has Not Demonstrated Irreparable Harm.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Among other things, a movant must show that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Id.* at 20, 22. Oklahoma fails to

[13] HHS has not terminated grants to other states whose laws severely restrict access to abortion, where those states continue to comply with Title X regulations. *See* https://opa.hhs.gov/sites/default/files/202402/Title_X_Directory_January_2024_508.pdf.

demonstrate an injury that is "both certain and great," and not "merely serious or substantial." *See also Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008) (citation omitted); *see also Prairie Band of Potawaomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001). In examining the preliminary injunction factors, "courts have consistently noted that '[b]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.'" *Dominion Video Satellite, Inc.*, 356 F.3d at 1260–61 (alteration in original) (quoting *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)).

Oklahoma dedicates only one short paragraph to irreparable harm, and none of its arguments are persuasive. *First*, Oklahoma claims that it will be irreparably harmed by not receiving Title X funding for fiscal year 2024, which it describes as a "loss of funding." PI Br. 24. "[E]conomic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also State of Ohio ex rel. Celebrezze v. Nuclear Regul. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987). And while "[t]he federal government's sovereign immunity typically makes monetary losses . . . irreparable," *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. Jan. 12, 2023), courts have recognized that "a party asserting such a loss is not relieved of its obligation to demonstrate that its harm will be 'great,'" *Ohio v. Becerra*, 577 F. Supp. 3d 678, 699 (S.D. Ohio 2021), *aff'd in part, rev'd in part and remanded*, 87 F.4th 759 (6th Cir. 2023) (quoting *N. Air Cargo v. U.S. Postal Serv.*, 756 F. Supp. 2d 116, 125 n.6 (D.D.C. 2010)); *see also, e.g.*, *Allina Health Servs. v. Sebelius*, 756 F. Supp. 2d 61, 67–68 (D.D.C. 2010) (collecting cases); *Otsuka Pharm. Co. v. Burwell*, No. GJH-15-852, 2015 WL 1962240, at *11 (D. Md. Apr. 29, 2015) (similar). "Otherwise, a litigant seeking injunctive relief against the

government would always satisfy the irreparable injury prong, nullifying that requirement in such cases." *CoverDyn v. Moniz*, 68 F. Supp. 3d 34, 49 (D.D.C. 2014).

Although Oklahoma does not provide financial information in its brief, the annual amount OSDH receives through Title X funding likely represents a tiny fraction of the state's total annual budget. As such, Oklahoma has not met its burden of showing that even the loss of a year's funding would be so great as to constitute irreparable harm.

Oklahoma contends that not receiving Title X funding will "jeopardize[] Oklahoma's ability to continue offering services through the Health Department" and will cause the state to lose "its investment in translation and language services." PI Br. 24. Oklahoma's brief contains no other reference to or explanation of "translation and language services." *But see* Compl. ¶ 55. In any event, and as explained above, *see supra* Part I.D, Oklahoma has no legally cognizable interest in the continued receipt of Title X funding. Title X grants only obligate HHS to provide funds to the grantee for one year (while sometimes providing HHS with the option of issuing noncompetitive continuation grants for additional years), 42 C.F.R. § 59.8(b), and HHS's Title X regulations provide that "[n]either the approval of any application nor the award of any grant commits or obligates the United States in any way to make any additional, supplemental, continuation, or other award with respect to any approved application or portion of an approved application," *id.* § 59.8(c). Additionally, Oklahoma's argument that OSDH will not be able to continue offering family planning services depends on the assumption that the Oklahoma Legislature will not step in to fill the funding gap.

*Next*, Oklahoma cursorily cites its "potential loss [of] future grant funding that totals $541.2 million." PI Br. 24. But Oklahoma's argument ignores that it requests *preliminary* relief, and so the question is whether Oklahoma will be irreparably harmed during the pendency of litigation—not over the course of several years. As such, Oklahoma's focus on the funding

that it anticipated over its original project period (i.e., until 2027) is mistaken. Moreover, Oklahoma provides no evidence supporting its $541.2 million estimate; the declaration to which Oklahoma's brief cites says that "OSDH currently receives approximately $541.2 million from over 90 other federal grant programs *outside of Title X*." ECF No. 23-1, ¶ 29 (emphasis added).

*Finally*, Oklahoma cursorily states that "[a]dditional impacts include Oklahoma's ability to access the federal discount pharmacy program," PI Br. 24. Oklahoma provides no explanation of this anywhere in their brief, or in the Complaint, so Defendants have no real opportunity to respond to this point. Oklahoma's argument should be deemed waived for lack of development.

**III. The Public Interest Weighs Against a Preliminary Injunction.**

The balance of hardships and the public interest weigh against issuing an injunction here. When the government is a party, these two inquiries merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Oklahoma insists that an injunction would not harm HHS because "an injunction would only preserve the status quo in effect before HHS terminated Oklahoma's funding," PI Br. 24, but that argument ignores that "[t]here is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop," *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008); *see Seaside Civic League, Inc. v. U.S. Dep't of Housing & Urb. Dev.*, No. 14-1823-RMW, 2014 WL 2192052, at *3 (N.D. Cal. May 23, 2014). HHS had the authority to issue the 2021 Rule, *Ohio*, 87 F.4th at 772, and the agency determined that its counseling and referral provisions were in the public interest. An injunction frustrating the enforcement of the 2021 Rule would therefore harm the agency and the public interest. Moreover, an injunction would change the status quo with an impact on patients because OSDH was providing abortion referrals upon request prior to the

state's policy change that promptly led to the grant termination.  And despite Oklahoma's suggestion otherwise, *see* PI Br. 25, other Title X grantees are capable of providing family planning services within the state and filling any gaps left by the discontinuation of Oklahoma's grant,  *see*  https://opa.hhs.gov/grant-programs/title-x-service-grants/current-title-x-service-grantees/fy2023-title-X-service-grant-awards (noting three Title X grantees, not including OSDH, operating in the State of Oklahoma). Presumably whatever relief Oklahoma wants from HHS would require funding OSDH at the expense of funding another grantee, so a preliminary injunction would go beyond merely preserving the status quo.

## CONCLUSION

For the foregoing reasons, the Court should deny Oklahoma's preliminary injunction motion.


DATED: February 23, 2024                 Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Principal Deputy Assistant Attorney General

                                         MICHELLE R. BENNETT
                                         Assistant Branch Director

                                         /s/ *Michael P. Clendenen*
                                         MICHAEL P. CLENDENEN
                                         ALEXANDRA R. SASLAW
                                         Trial Attorneys
                                         Civil Division, Federal Programs Branch
                                         U.S. Department of Justice
                                         1100 L Street, NW
                                         Washington, DC 20005
                                         Phone:  (202) 305-0693
                                         E-mail:  michael.p.clendenen@usdoj.gov

                                         *Counsel for Defendants*

# Exhibit A

Aplt.App. 452



# *Dobbs v. Jackson Women's Health Organization* U.S. Supreme Court Decision: Impact on Title X Program

QUESTIONS & ANSWERS FOR TITLE X RECIPIENTS

**June 2022**

**HHS Office of Population Affairs**
Web: opa.hhs.gov | Email: opa@hhs.gov
Twitter: @HHSPopAffairs | YouTube: HHSOfficeofPopulationAffairs

The questions and answers included below aim to provide guidance and clarification from OPA for Title X recipients regarding the impact of the U.S. Supreme Court decision in *Dobbs v. Jackson Women's Health Organization* on the Title X Program.

## General Questions

1. **If a Title X recipient begins to see an influx of clients following the Supreme Court decision in Dobbs, et al. v. Jackson Women's Health Organization, is the Title X recipient allowed to reallocate funds to account for the change in client volume?**

   Title X recipients can submit a request for a budget revision via Grant Solutions at any time if a need arises to reallocate more than 10% of the total budget across approved budget categories. The request should contain documentation explaining the need for the budget revision along with a revised budget (SF-424A) and revised budget narrative. This should be submitted through the GrantSolutions amendment module to begin the review and approval process. The process may take up to 30 days. If approved the grants management officer will issue a notice of award with the budget revision. Guidance on how to submit a budget revision amendment in GrantSolutions can be found on MAX.gov. Recipients should discuss any potential reallocation of funds with their respective project officer and grants management specialist.

2. **Will OPA be providing Title X recipients with additional funding to address the potential influx in clients that may result from Supreme Court decision in *Dobbs v. Jackson Women's Health Organization*?**

   OPA is working to secure additional funding, but unfortunately does not have additional funding available at this time to provide to Title X recipients who may experience an influx in clients following the *Dobbs* Supreme Court decision. If additional funds were to become available at any point, OPA will share the information with all Title X recipients.

3. **Can Title X recipients expand services to a new community or a new state if the need for services changes?**

   The Title X program is not a state-based formula grant program, therefore individual Title X project service areas are not limited to individual states. Title X recipients interested in expanding their service area to include new communities, either within or across states, would need to request approval from OPA and GAM for a change in scope of their projects. Requests must be submitted via a change in scope amendment which may take up to 30 days for review. Approval is communicated via a notice of award issued by the grants management officer. Costs may be disallowed if a recipient begins implementing a change in scope prior to its approval.

   A change in scope occurs when the recipient proposes changes to project's objectives, aims, or purposes identified in the approved application, such as changing the service area; applying a new technology; adding or eliminating a service delivery site; or making budget changes that cause a project to change substantially from what was originally approved. The Title X Family Planning Change in Scope Worksheet helps identify elements for clinic closures, new clinics, or other programmatic changes which may require a request for a change in scope to the current

The questions and answers included below aim to provide guidance and clarification from OPA for Title X recipients regarding the impact of the U.S. Supreme Court decision in *Dobbs v. Jackson Women's Health Organization* on the Title X Program.

Title X family planning project. Recipients are not required to use the worksheet, but can include the completed worksheet with their amendment submission in Grant Solutions.

**4. Can Title X recipients begin to limit receipt of services to only residents from their state if the influx of clients from other states becomes too burdensome?**

No, Title X recipients cannot limit receipt of services to only residents from their states. Title X recipients are required to provide services without the imposition of any durational residency requirement or a requirement that the client be referred by a physician. (42 CFR § 59.5(b)(5))

**5. Can Title X recipients remove pregnancy testing and counseling from their Title X projects?**

Title X recipients are required to provide a broad range of acceptable and effective medically approved family planning methods (including natural family planning methods) and services (**including pregnancy testing and counseling**, assistance to achieve pregnancy, basic infertility services, sexually transmitted infection (STI) services, preconception health services, and adolescent-friendly health services). If an organization offers only a single method of family planning, it may participate as part of a project as long as the entire project offers a broad range of acceptable and effective medically approved family planning methods and services. (42 CFR § 59.5(a)(1))

**As a result of the requirement in § 59.5(a)(1), Title X recipients cannot completely remove pregnancy testing and counseling services from their Title X projects.** Title X service sites are expected to provide most, if not all, of acceptable and effective medically approved family planning methods and services on site and to detail the referral process for family planning methods and services that are unavailable on-site. However, as long as the entire Title X project offers a broad range of acceptable and effective medically approved family planning methods and services, including pregnancy testing and counseling, not all individual service sites participating in the project must offer the broad range of methods and services.

Furthermore, Title X recipients are required to ensure that Title X service sites that are unable to provide clients with access to a broad range of acceptable and effective medically approved family planning methods and services, must be able to provide a prescription to the client for their method of choice or referrals to another provider, as requested. (42 CFR § 59.5(a)(1))

**6. Given the Supreme Court decision in *Dobbs v. Jackson Women's Health Organization*, can Title X recipients still provide emergency contraception to clients?**

Yes, Title X recipients are required to provide a broad range of acceptable and effective medically approved family planning methods (including natural family planning methods) and services (including pregnancy testing and counseling, assistance to achieve pregnancy, basic infertility services, sexually transmitted infection (STI) services, preconception health services, and adolescent-friendly health services). (42 CFR § 59.5(a)(1))

The questions and answers included below aim to provide guidance and clarification from OPA for Title X recipients regarding the impact of the U.S. Supreme Court decision in *Dobbs v. Jackson Women's Health Organization* on the Title X Program.

Title X recipients may still consider emergency contraception as part of the required broad range of methods and services because it is a medically approved method of contraception. "Emergency contraception is a [FDA-approved] method of birth control you can use if you had sex without using birth control or if your birth control method did not work correctly. Emergency contraception pills are different from the abortion pill. If you are already pregnant, emergency contraception pills do not stop or harm your pregnancy." (womenshealth.gov) Click here for more information on emergency contraception.

7. **Who should Title X recipients contact with questions about the impact of the U.S. Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*?**

   For questions related to the impact of *Dobbs* on their Title X projects, Title X recipients should contact their respective OPA project officers; in addition, they should refer to the Title X Program Handbook for further guidance on all Title X recipient expectations. For questions about *Dobbs* outside the scope of their Title X projects, recipients should contact their private counsel.

**Counseling and Referral Questions**

8. **Given the Supreme Court decision in *Dobbs v. Jackson Women's Health Organization*, are Title X recipients still allowed to provide counseling to clients about abortion?**

   Not only are Title X recipients ***allowed***, but per the 2021 Title X rule, Title X recipients are ***required*** to offer pregnant clients the opportunity to be provided **information and counseling** regarding each of the following options: prenatal care and delivery; infant care, foster care, or adoption; and pregnancy termination. If requested to provide such information and counseling, provide neutral, factual information and nondirective counseling on each of the options, **and referral upon request**, except with respect to any option(s) about which the pregnant client indicates they do not wish to receive such information and counseling. (42 CFR § 59.5(a)(5))

9. **Given the Supreme Court decision *in Dobbs v. Jackson Women's Health Organization*, are Title X recipients still allowed to provide clients with counseling and a referral for an abortion?**

   Not only are Title X recipients ***allowed***, but per the 2021 Title X rule, Title X recipients are ***required*** to offer pregnant clients the opportunity to be provided **information and counseling** regarding each of the following options: prenatal care and delivery; infant care, foster care, or adoption; and pregnancy termination. If requested to provide such information and counseling, provide neutral, factual information and nondirective counseling on each of the options, **and referral upon request**, except with respect to any option(s) about which the pregnant client indicates they do not wish to receive such information and counseling. (42 CFR § 59.5(a)(5))

   However, there are limitations on what abortion counseling and referral is permissible under the statute. A Title X project may not provide pregnancy options counseling which promotes abortion or encourages persons to obtain abortion, although the project may provide patients with complete factual information about all medical options and the accompanying risks and

The questions and answers included below aim to provide guidance and clarification from OPA for Title X recipients regarding the impact of the U.S. Supreme Court decision in *Dobbs v. Jackson Women's Health Organization* on the Title X Program.

benefits. And, while a Title X project may provide a referral for abortion, which may include providing a patient with the name, address, telephone number, and other relevant factual information (such as whether the provider accepts Medicaid, charges, etc.) about an abortion provider, the project may not take further affirmative action (such as negotiating a fee reduction, making an appointment, providing transportation) to secure abortion services for the patient. (65 Fed. Reg. 41281 (July 3, 2000))

Where a referral to another provider who might perform an abortion is medically indicated because of the patient's condition or the condition of the fetus (such as where the woman's life would be endangered), such a referral by a Title X project is not prohibited by section 1008 and is required by 42 CFR § 59.5(b)(1). The limitations on referrals do not apply in cases in which a referral is made for medical indications. (65 Fed. Reg. 41281 (July 3, 2000)).

**10. Can Title X grantees accept referrals from clients living in a different state from where the service site is located?**

Yes, Title X recipients can provide services for clients living outside of the community and state that the service site is located in. Title X recipients are required to provide services without the imposition of any durational residency requirement. (42 CFR § 59.5(b)(5))

**11. Can Title X recipients make referrals for a client to a provider in a different state?**

There are no geographic limits for Title X recipients making referrals for their clients.

Title X recipients are required to provide for coordination and use of referrals and linkages with primary healthcare providers, other providers of healthcare services, local health and welfare departments, hospitals, voluntary agencies, and health services projects supported by other federal programs, **who are in close physical proximity to the Title X site, *when feasible*,** in order to promote access to services and provide a seamless continuum of care. (42 CFR § 59.5(b)(8))

Title X recipients have flexibility to refer clients for services across state lines if necessary.

**12. Can Title X recipients provide pregnancy counseling via telehealth?**

Yes, Title X recipients are required to provide for medical services related to family planning (including consultation by a clinical services provider, examination, prescription and continuing supervision, laboratory examination, contraceptive supplies), **in person or via telehealth**, and necessary referral to other medical facilities when medically indicated, and provide for the effective usage of contraceptive devices and practices. (42 CFR § 59.5(b)(1))

**13. When providing clients with a referral for an abortion, are Title X recipients allowed to take any further steps to help clients secure an appointment?**

While a Title X project may provide a referral for abortion, which may include providing a patient with the name, address, telephone number, and other relevant factual information (such as whether the provider accepts Medicaid, charges, etc.) about an abortion provider, the

The questions and answers included below aim to provide guidance and clarification from OPA for Title X recipients regarding the impact of the U.S. Supreme Court decision in *Dobbs v. Jackson Women's Health Organization* on the Title X Program.

project may not take further affirmative action (such as negotiating a fee reduction, making an appointment, providing transportation) to secure abortion services for the patient. (65 Fed. Reg. 41281 (July 3, 2000))

Where a referral to another provider who might perform an abortion is medically indicated because of the patient's condition or the condition of the fetus (such as where the woman's life would be endangered), such a referral by a Title X project is not prohibited by section 1008 and is required by 42 CFR § 59.5(b)(1). The limitations on referrals do not apply in cases in which a referral is made for medical indications. (65 Fed. Reg. 41281 (July 3, 2000)).

**<u>Prohibition of Abortion Questions</u>**

**14. Can Title X projects provide abortion services for clients now in need of such services?**

No, Title X recipients are not allowed to provide abortion as a method of family planning as part of the Title X project. (Section 1008, PHS Act; Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, 444 (2022); 42 CFR § 59.5(a)(5))

**15. Are Title X projects allowed to provide medication abortion pills for clients now in need of such services?**

No, Title X recipients are not allowed to provide abortion as a method of family planning as part of the Title X project. (Section 1008, PHS Act; Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, 444 (2022); 42 CFR § 59.5(a)(5))

**16. What is the Title X program's requirement on abortion as a method of family planning and abortion counseling and referral?**

Title X recipients are not allowed to provide abortion as a method of family planning as part of the Title X project. (Section 1008, PHS Act; Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, 444 (2022); 42 CFR § 59.5(a)(5))

Title X recipients are required to offer pregnant clients the opportunity to be provided information and counseling regarding each of the following options: prenatal care and delivery; infant care, foster care, or adoption; and pregnancy termination. If requested to provide such information and counseling, provide neutral, factual information and nondirective counseling on each of the options, and referral upon request, except with respect to any option(s) about which the pregnant client indicates they do not wish to receive such information and counseling. (42 CFR § 59.5(a)(5))

Furthermore, Title X recipients are prohibited from providing services that directly facilitate the use of abortion as a method of family planning, such as providing transportation for an abortion, explaining and obtaining signed abortion consent forms from clients interested in abortions, negotiating a reduction in fees for an abortion, and scheduling or arranging for the performance of an abortion, promoting or advocating abortion within Title X program activities, or failing to

The questions and answers included below aim to provide guidance and clarification from OPA for Title X recipients regarding the impact of the U.S. Supreme Court decision in *Dobbs v. Jackson Women's Health Organization* on the Title X Program.

preserve sufficient separation between Title X program activities and abortion-related activities. (65 Fed. Reg. 41281 (July 3, 2000))

**17. What is considered "sufficient separation" between Title X program activities and abortion-related activities?**

Title X recipients are required to ensure that non-Title X abortion activities are separate and distinct from Title X project activities. Where recipients conduct abortion activities that are not part of the Title X project and would not be permissible if they were, the recipient must ensure that the Title X-supported project is separate and distinguishable from those other activities.

What must be looked at is whether the abortion element in a program of family planning services is so large and so intimately related to all aspects of the program as to make it difficult or impossible to separate the eligible and non-eligible items of cost. The Title X project is the set of activities the recipient agreed to perform in the relevant grant documents as a condition of receiving Title X funds. A grant applicant may include both project and non-project activities in its grant application, and, so long as these are properly distinguished from each other and prohibited activities are not reflected in the amount of the total approved budget, no problem is created.

Separation of Title X from abortion activities does not require separate recipients or even a separate health facility, but separate bookkeeping entries alone will not satisfy the spirit of the law. Mere technical allocation of funds, attributing federal dollars to non-abortion activities, is not a legally supportable avoidance of section 1008. Certain kinds of shared facilities are permissible, so long as it is possible to distinguish between the Title X supported activities and non-Title X abortion-related activities:

a. a common waiting room is permissible, as long as the costs properly pro-rated;
b. common staff is permissible, so long as salaries are properly allocated, and all abortion related activities of the staff members are performed in a program which is entirely separate from the Title X project;
c. a hospital offering abortions for family planning purposes and also housing a Title X project is permissible, as long as the abortion activities are sufficiently separate from the Title X project; and
d. maintenance of a single file system for abortion and family planning patients is permissible, so long as costs are properly allocated. (65 Fed. Reg. 41281, 41282 (July 3, 2000)

**18. Can Title X recipients use Title X funds to fund speakers to present in opposition to the Supreme Court decision in *Dobbs v. Jackson Women's Health Organization*?**

No, Title X recipients are prohibited from promoting or encouraging the use of abortion as a method of family planning through advocacy activities such as providing speakers to debate in opposition to anti-abortion speakers, bringing legal action to liberalize statutes relating to abortion, or producing and/or showing films that encourage or promote a favorable attitude toward abortion as a method of family planning. Films that present only neutral, factual information about abortion are permissible. A Title X project may be a dues paying participant

The questions and answers included below aim to provide guidance and clarification from OPA for Title X recipients regarding the impact of the U.S. Supreme Court decision in *Dobbs v. Jackson Women's Health Organization* on the Title X Program.

in a national abortion advocacy organization, so long as there are other legitimate program-related reasons for the affiliation (such as access to certain information or data useful to the Title X project). A Title X project may also discuss abortion as an available alternative when a family planning method fails in a discussion of relative risks of various methods of contraception. (65 Fed. Reg. 41281, 41282 (July 3, 2000))

**19. How can Title X projects support clients with positive pregnancy tests and are experiencing early pregnancy symptoms such as bleeding, nausea and vomiting, or pain?**

For clients experiencing early pregnancy symptoms before the client realizes they are pregnant, and/or immediately following a positive pregnancy test, Title X providers should assess the client and provide clinical care to address their immediate needs.

Subsequently, as detailed in 42 CFR § 59.5(a)(5), providers must offer pregnant clients the opportunity to be provided information and counseling regarding the following options: prenatal care and delivery; infant care, foster care, or adoption; and pregnancy termination. If requested to provide such information and counseling, providers must provide neutral, factual information and nondirective counseling on each of the options, and referral upon request, except with respect to any option(s) about which the pregnant client indicates they do not wish to receive such information and counseling.

Title X recipients are required to provide a broad range of acceptable and effective medically approved family planning methods (including natural family planning methods) and services (including pregnancy testing and counseling, assistance to achieve pregnancy, basic infertility services, sexually transmitted infection (STI) services, preconception health services, and adolescent-friendly health services). (42 CFR § 59.5(a)(1))

Title X recipients are required to provide services in a manner that ensures equitable and quality service delivery consistent with nationally recognized standards of care. (42 CFR § 59.5(a)(3))

In addition, Title X recipients are required to provide for medical services related to family planning (including consultation by a clinical services provider, examination, prescription and continuing supervision, laboratory examination, contraceptive supplies), in person or via telehealth, and necessary referral to other medical facilities when medically indicated, and provide for the effective usage of contraceptive devices and practices. (42 CFR § 59.5(b)(1))

## <u>Confidentiality Questions</u>

**20. What is Title X's requirement on maintaining client confidentiality?**

As detailed in 42 CFR § 59.10(a), the Title X program requires that all information as to personal facts and circumstances obtained by the project staff about individuals receiving services must be held confidential and must not be disclosed without the individual's

The questions and answers included below aim to provide guidance and clarification from OPA for Title X recipients regarding the impact of the U.S. Supreme Court decision in *Dobbs v. Jackson Women's Health Organization* on the Title X Program.

documented consent, except as may be necessary to provide services to the patient or as required by law, with appropriate safeguards for confidentiality. Otherwise, information may be disclosed only in summary, statistical, or other form that does not identify particular individuals. Reasonable efforts to collect charges without jeopardizing client confidentiality must be made. Recipients must inform the client of any potential for disclosure of their confidential health information to policyholders where the policyholder is someone other than the client. (42 CFR § 59.10(a))

# Exhibit B

Aplt.App. 462



**DEPARTMENT OF HEALTH AND HUMAN SERVICES** Office of the Secretary

Assistant Secretary for Health
Office of the Assistant Secretary for Health
Office of Population Affairs
Washington, D.C. 20201

June 29, 2022

Dear Title X Colleagues,

For more than 50 years, Title X family planning clinics have delivered a broad range of family planning and preventive health services for millions of low-income or uninsured individuals and others. In light of the Supreme Court's consequential decision in *Dobbs v. Jackson Women's Health Organization*, the U.S. Department of Health and Human Services (HHS) Office of Population Affairs (OPA) reaffirms its commitment to Title X, the nation's family planning program, and the imperative to support communities' access to equitable, affordable, client-centered quality family planning and related preventive health services.

OPA is keenly aware of the impact of the Court's decision and is intent on maintaining Title X as a safe haven for robust, quality, client-centered family planning services. **For example, all Title X recipients continue to operate under the federal requirements of the 2021 Title X rule, including the requirement to provide nondirective pregnancy options counseling in the event of a positive pregnancy test and client-requested referrals.** The full text of the 2021 Title X rule is available at https://www.ecfr.gov/current/title-42/part-59/subpart-A. A few of the Title X requirements especially relevant given this recent decision are highlighted below and include:

- Providing a broad range of acceptable and effective medically approved family planning methods (including natural family planning methods) and services (including pregnancy testing and counseling, assistance to achieve pregnancy, basic infertility services, sexually transmitted infection (STI) services, preconception health services, and adolescent-friendly health services). (42 CFR § 59.5(a)(1))
- Providing services in a manner that ensures equitable and quality service delivery consistent with nationally recognized standards of care. (42 CFR § 59.5(a)(3))
- Offering pregnant clients the opportunity to be provided information and counseling regarding each of the following options: prenatal care and delivery; infant care, foster care, or adoption; and pregnancy termination. If requested to provide such information and counseling, provide neutral, factual information and nondirective counseling on each of the options, and referral upon request, except with respect to any option(s) about which the pregnant client indicates they do not wish to receive such information and counseling. (42 CFR § 59.5(a)(5))
- Ensuring that all information as to personal facts and circumstances obtained by the project staff about individuals receiving services must be held confidential and must not be disclosed without the individual's documented consent, except as may be necessary to provide services to the patient or as required by law, with appropriate safeguards for confidentiality. Information may otherwise be disclosed only in summary, statistical, or other form that does not identify the individual. Reasonable efforts to collect charges without jeopardizing client confidentiality must be made. Recipients must inform the client of any potential for disclosure of their confidential health information to policyholders where the policyholder is someone other than the client. (42 CFR § 59.10(a))

Prior to the Supreme Court decision, OPA had taken several meaningful actions to restore access to equitable, affordable, client-centered, quality family planning services, such as amending the Title X Family Planning regulations, awarding over $260 million in grant funding for Title X service delivery, and playing a vital role in the HHS Intra-agency Task Force on Reproductive Healthcare Access. Looking toward the future, we are committed to helping you bolster your efforts to maintain and expand access to equitable, affordable, client-centered, quality family planning services. OPA's charge for the field is threefold:

1. *Bolster access* - Including continuing to provide and/or expand mobile services, drive-thru services, and telehealth services; as well as thinking about how to expand access for additional subrecipients to join Title X networks by reducing burdensome paperwork and/or taking other steps to encourage new partners to join Title X networks.

2. *Advance equity* - Including engaging communities to ensure services are client-centered, using data to evaluate patterns in services provided, assessing clinic locations and hours, equity training for staff, and hiring staff specifically focused on equity work.

3. *Ensure quality* - Including updating clinical protocols, rethinking training, and providing ongoing support for clinical providers.

At OPA, we feel an immense responsibility to provide continued and timely support to assist you in providing access to equitable, affordable, client-centered, quality family planning services. To help you navigate this challenging time, OPA has prepared the attached list of Questions and Answers to provide additional guidance and clarity on the potential impact of the Supreme Court decision on the Title X program. We will continue to monitor how the Court's decision impacts the family planning field and will provide updated guidance and technical assistance as needed. We encourage you to continue openly communicating with your OPA project officer so that we can stay abreast of what is happening in your communities and states.

Your project officer is on stand-by to answer any questions you may have and to support you in any way we can. In addition, both the Reproductive Health National Training Center (RHNTC) and the National Clinical Training Center for Family Planning (NCTCFP) are available to provide Title X recipients with a wide range of intensive and individualized technical assistance (TA) tailored specifically to meet your needs. Please reach out directly to your RHNTC grantee liaison via email or through https://rhntc.org/contact-us, and reach out to the NCTCFP at ctcfp-cahs@umkc.edu to begin discussing how these two OPA-funded training centers can help you.

Thank you for your commitment to serving your communities. We are grateful to have you as a part of the Title X network.

Sincerely,

Jessica S. Marcella

Jessica Swafford Marcella, M.P.A.
Deputy Assistant Secretary for Health and Director,
Office of Adolescent Health
Office of Population Affairs

# Exhibit C

Aplt.App. 465



**DEPARTMENT OF HEALTH AND HUMAN SERVICES** Office of the Secretary

Office of the Assistant Secretary for Health
Office of Population Affairs
Washington, D.C. 20201

January 25, 2023

Joyce Marshall
Director, Maternal & Child Health Services
Grant #FPHPA006507
Oklahoma State Department of Health (OSDH)
Family Planning Services Project
123 Robert S. Kerr Avenue
Oklahoma City, OK 73102-6406

Dear Ms. Marshall,

On November 9, 2022, the Office of Population Affairs (OPA) sent a letter stating that the proposal submitted by the Oklahoma State Department of Health (OSDH) on August 29, 2022, to change its policy and procedure for providing nondirective options counseling within its Title X project was not in compliance with the Title X regulatory requirements set out in 42 CFR § 59.5(a)(5)(ii) and, therefore, could not be approved. OSDH was instructed to provide written assurance by November 28, 2022, to OPA stating that the project is in compliance with the Title X nondirective options counseling requirement at 42 CFR § 59.5(a)(5)(ii). On November 22, 2022, OSDH submitted to OPA a request for reconsideration/appeal of OPA's denial of OSDH's request to change its policy and procedure for providing nondirective options counseling within its Title X project.

OPA has reviewed your request for reconsideration/appeal and reiterates that the changes proposed to your policy and procedure for providing nondirective options counseling within your Title X project are not in compliance with the Title X regulatory requirements and, therefore, cannot be approved. Specifically, your proposal to provide clients seeking options counseling with a link to the HHS OPA website is not compliant with the 2021 Title X implementing regulations at 42 CFR § 59.5(a)(5)(ii).

You have 10 calendar days to provide written assurance to OPA as a Grant Note in GrantSolutions, stating that you are complying with the Title X nondirective options counseling requirement at 42 CFR § 59.5(a)(5)(ii), by continuing to follow the OSDH "Current Policy and Procedure" related to "Pregnancy Diagnosis and Counseling," as set out in the proposal you submitted on August 29, 2022. Your failure to provide the requested assurance and supporting documentation, and to show that you are in compliance with the 2021 Title X regulatory requirements at 42 CFR § 59.5(a)(5)(ii), will constitute material noncompliance with the terms and conditions of your award. You must also provide OPA with the OSDH current policy and procedure related to referrals as requested in OPA's November 9, 2022, letter.

As another option, you may submit an alternate compliance proposal **by February 6, 2023**. Examples of compliance with 42 CFR § 59.5(a)(5)(ii) include:

- Providing nondirective options counseling on-site by Title X providers on (A) prenatal care and delivery; (B) infant care, foster care, or adoption; and (C) pregnancy termination, and referral upon request, except with respect to any option(s) about which the pregnant client indicates they do not wish to receive such information and counseling;
- Providing nondirective options counseling, using a telehealth partnership with another entity, on (A) prenatal care and delivery; (B) infant care, foster care, or adoption; and (C) pregnancy termination, and referral upon request, except with respect to any option(s) about which the pregnant client indicates they do not wish to receive such information and counseling ; or

- Providing clients with a referral to another entity (e.g., All-Options Talkline) that provides nondirective options counseling on (A) prenatal care and delivery; (B) infant care, foster care, or adoption; and (C) pregnancy termination, and referral upon request, except with respect to any option(s) about which the pregnant client indicates they do not wish to receive such information and counseling.

Please be aware that if you do not provide a response demonstrating compliance by February 6, 2023, you will be considered out of compliance with the regulatory requirements of your grant.  In that case, your current award can be suspended or terminated pursuant to 45 CFR § 75.372(a)(1) for material noncompliance with the terms and conditions of the award. A termination under this section must be reported to the Office of Management and Budget-designated integrity and performance system, currently the Federal Awardee Performance and Integrity Information System. See 45 CFR § 75.372(b). Inclusion in FAPIIS may affect your ability to obtain future Federal funding.

Alternatively, you may voluntarily relinquish the grant if you so choose. Please contact your GAM Grants Management Specialist, Jessica Shields, for more information on relinquishment. A decision to relinquish your award is not reported to FAPIIS.

OPA will assist you with these concerns with the intent of ensuring compliance with the 2021 Title X implementing regulations.  If you have questions, please contact your OPA Project Officer, Cynda Hall.

Very respectfully,

Scott J. Moore -S
2023.01.25
16:59:50 -05'00'

Jessica Swafford Marcella
Deputy Assistant Secretary for Population Affairs
U.S. Department of Health and Human Services
Office of the Assistant Secretary for Health
Office of Population Affairs

Scott Moore
Chief Grants Management Officer
U.S. Department of Health and Human Services
Office of the Assistant Secretary for Health
Grants and Acquisitions Management

# Exhibit D

Aplt.App. 468



**DEPARTMENT OF HEALTH AND HUMAN SERVICES** Office of the Secretary

Office of the Assistant Secretary for Health
Office of Population Affairs
Washington, D.C. 20201

January 25, 2023

To all Title X Services Grantee Project Directors:

The Office of Population Affairs (OPA) is conducting a review of all Title X service grants to ensure compliance with the requirements for nondirective options counseling and referral, as stated in the 2021 Title X implementing regulations at 42 CFR § 59.5(a)(5).

In the past, OPA has exercised enforcement discretion in appropriate circumstances. OPA does not intend to bring enforcement actions against Title X recipients that are making, and continue to make, good-faith efforts to comply with the 2021 Final Rule. OPA is committed to working with grantees to assist them in coming into compliance with the requirements of the 2021 Final Rule.

As part of those good-faith efforts to demonstrate compliance with the requirements for nondirective options counseling and referral set out in the 2021 Title X implementing regulations at 42 CFR § 59.5(a)(5), all Title X services grantees must submit:

- A copy of the grantee's current policy(ies) and any other supporting documentation (e.g., procedures, subrecipient contract language) for providing nondirective options counseling and referrals within its Title X project. The policy(ies) and supporting documentation must be submitted as a Grant Note in GrantSolutions. If there are any questions or concerns about a grantee's policy(ies) and any other supporting documentation, the OPA project officer will notify the grantee within 2 weeks.

- A written statement, signed by the Project Director and Authorized Official, stating that the grant project is in compliance with the 2021 Title X Final Rule, including the requirements for providing nondirective options counseling and referrals within its Title X project, as required by the 2021 Title X implementing regulations at 42 CFR § 59.5(a)(5). The written statement must be submitted as a Grant Note in GrantSolutions.

**You have until February 6, 2023, to provide the information outlined above to OPA as a Grant Note in GrantSolutions.**

Your failure to provide the requested information and to show that you are in compliance with the 2021 Title X regulatory requirements at 42 CFR § 59.5(a)(5), may result in a determination that you are in material noncompliance with the terms and conditions of your award. If you are found to be out of compliance with the regulatory requirements of your grant, your award can be placed on cash restriction or can be suspended or terminated pursuant to 45 CFR § 75.372(a)(1). You also have the option to voluntarily relinquish your grant if you so choose.

If you have questions, please contact your OPA Project Officer or your GAM Grants Management Specialist.

Very respectfully,

Jessica Swafford Marcella
Deputy Assistant Secretary for Population Affairs
U.S. Department of Health and Human Services
Office of the Assistant Secretary for Health
Office of Population Affairs

Scott Moore
Chief Grants Management Officer
U.S. Department of Health and Human Services
Office of the Assistant Secretary for Health
Grants and Acquisitions Management

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

1. STATE OF OKLAHOMA,

*Plaintiff*,

v.

1. UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;
2. XAVIER BECERRA, in his official capacity as the Secretary of the U.S. Department of Health and Human Services;
3. JESSICA S. MARCELLA, in her official capacity as Deputy Assistant Secretary for Population Affairs; and
4. OFFICE OF POPULATION AFFAIRS,

*Defendants*.

Case No. 23-CV-01052-HE

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

**Submitted by:**

Garry M. Gaskins, II, OBA # 20212
*Solicitor General*
Zach West, OBA # 30768
*Director of Special Litigation*
Audrey Weaver, OBA # 33258
*Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st St.

March 1, 2024

Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Audrey.Weaver@oag.ok.gov

AND

Barry G. Reynolds, OBA # 13202
R. Tom Hillis, OBA # 12338
J. Miles McFadden, OBA # 30166
TITUS HILLIS REYNOLDS LOVE, P.C.
15 E. 5th St., Suite 3700
Tulsa, OK 74103
(918) 587-6800  Fax:  (918) 587-6822
reynolds@titushillis.com
thillis@titushillis.com
jmcfadden@titushillis.com

AND

Anthony J. (A.J.) Ferate, OBA # 21171
SPENCER FANE
9400 N. Broadway Ext., Ste. 600
Oklahoma City, OK 73114
(405) 844-9900  Fax: (405) 844-9958
AJFerate@spencerfane.com

*ATTORNEYS FOR PLAINTIFF,*
*THE STATE OF OKLAHOMA*

To rationalize terminating Oklahoma's Title X funding, Defendants downplay, twist, and ignore the plain text of the relevant statutes and regulations, improperly construe pertinent case law,[1] and provide virtually nothing to counter Oklahoma's evidence of harm. Displaying incredible regulatory hubris, Defendants' arguments amount to a claim that they are above Congress and the laws Congress has created.

## I. DEFENDANTS DO NOT HAVE UNLIMITED POWER TO IMPOSE TITLE X CONDITIONS UNDER THE SPENDING CLAUSE.

The argument that Defendants have violated the Spending Clause is simple: Courts have long held that to be justified under the Spending Clause, conditions must be set forth in statute *clearly*, and *Rust* (and *Ohio*) expressly held that Title X is ambiguous—not clear—on the question of abortion referrals.[2] Defendants seemingly concede both points; at minimum, they do not contest either one. *See, e.g.*, Doc. 28 at 21-23. They nevertheless attempt to avoid the straightforward conclusion that their actions were unlawful by claiming in essence that Congress wrote HHS a blank check to impose whatever conditions it likes without violating the Spending Clause. This simply cannot be the case.

Defendants rely entirely on the generic Title X provision indicating that Title X grants are "subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made." *Id.* at

---

[1] Defendants, for example, fail to acknowledge that neither *Ohio v. Becerra*, 87 F.4th 759 (6th Cir. 2023), nor *Rust v. Sullivan*, 500 U.S. 173 (1991), involved the Weldon Amendment or the Spending Clause. Instead, Defendants wrongly imply that these cases are on all fours with the present dispute. *See* Doc. 28 at 1, 8-9.

[2] Oklahoma, of course, contends the Weldon Amendment resolves ambiguity in the State's favor, but that need not be decided for Oklahoma to prevail on the Spending Clause.

21-22 (quoting 42 U.S.C. § 300a-4(b)). Defendants' argument, then, is that even if Congress has not expressly set forth a specific condition, it has clearly allowed the HHS Secretary to impose whatever "conditions" he so chooses. This is wrong on multiple levels. Most significantly, it overreads the plain text. Rather than grant Defendants broad powers to implement HHS's own policy goals on issues where Congress did not speak or was ambiguous, this provision only allows conditions that "assure that such grants will be *effectively utilized* for the *purposes for which made*." *Id.* (emphases added). This is plainly a procedural provision allowing the Secretary to require grantees to demonstrate that they are actually using the funds for the "purposes" set forth—*i.e.*, "made"—in Title X. It does *not* allow the Secretary free rein to come up with his own substantive purposes and impose them on grantees. Defendants, that is, cite nothing in the Title X text or congressional record reflecting any congressional intent to allow HHS to enact sweeping *substantive* program requirements that are not found in or conflict with the Title X statutory provisions, HHS's other regulations implementing Title X, and state laws. Substantive conditions that exceed the *express* congressional mandate (like imposing abortion counseling and referral requirements) therefore exceed Defendants' authority under the Spending Clause.

To accept Defendants' arguments is tantamount to cutting Defendants a blank check to use Title X to advance their own policy goals, *even where Congress has specifically instructed otherwise or remained silent*. After all, Defendants offer no limiting principle to their argument. Under their view, the HHS Secretary could conceivably impose abortion *performance* requirements under Title X, or any other requirements he sees fit, without violating the Spending Clause. Such a holding creates other constitutional issues, in that it

signals that Congress can subvert the Spending Clause's requirement of specificity and clarity by simply giving the agency carte blanche authority to come up with whatever conditions it deems fit. *Cf. West Virginia v. EPA*, 597 U.S. 697, 729 (2022) ("We are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)).

For similar reasons, Defendants' attempts to distinguish case law on this point miss the mark. First and foremost, Defendants openly admit that "*Pennhurst*, *Kentucky*, and *West Virginia*"—the primary cases cited in Oklahoma's brief—"all dealt with allegedly ambiguous *statutory* funding conditions." Doc. 28 at 21. They also admit that the "Supreme Court has long established" that it is *only* when "*Congress* makes *clear* that a condition on the use of federal funds is mandatory and enforceable" that it can "leave the particulars of implementing the condition to the agency …." *Id.* at 23 (emphases added). These admissions sink Defendants' entire Spending Clause rebuttal, because Congress has not made the abortion referral condition clear. Binding precedent dictates otherwise: *Rust* recognized that the Title X statute is ambiguous enough to allow HHS to ban abortion counseling and referrals. *See Rust*, 500 U.S. at 184 (Title X "does not speak directly to the issues of counseling, referral, advocacy, or program integrity."). Defendants therefore cannot avoid the inexorable conclusion here. *See West Virginia ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023) ("Allowing an executive agency to impose a condition that is not otherwise ascertainable in the law Congress enacted 'would be inconsistent with the Constitution's meticulous separation of powers.'"

(citation omitted)). Defendants' only response to this, again, is to claim that Congress clearly granted it authority to impose its own invented conditions. For reasons already addressed above, this is a complete non-starter textually and constitutionally.

The cases Defendants cite do not support their position, either. *Bennett v. Kentucky Department of Education*, 470 U.S. 656, 666 (1985), for example, found the required clarity to be provided by the *statute*—clarity that is not present here. There, the Court did not accept the government's argument that "any reasonable interpretation" of statutory requirements could determine "grant conditions." *Id.* at 670. And *Biden v. Missouri*, 595 U.S. 87 (2022), did not address the Spending Clause at all. *Gruver v. Louisiana Board of Supervisors*, 959 F.3d 178, 182–84 (5th Cir. 2020), and *Mississippi Commission on Environmental Quality v. EPA*, 790 F.3d 138, 176, 179 (D.C. Cir. 2015) did involve the Spending Clause, but they concluded that *congressionally imposed* funding conditions were not "unconstitutionally coercive" based on historical practice. The abortion referral requirement is not congressionally imposed, as binding precedent indicates, and HHS's undeniable history of regulatory flip-flopping undercuts any argument Defendants can muster based on historical practice.

Additionally, Oklahoma's historical acceptance of Title X funding, along with prior requirements, is of no importance to the Spending Clause analysis. For starters, Defendants admit that the current regulatory requirement traces back to only 2021 and that Oklahoma has challenged the 2021 Rule from the beginning. Doc. 28 at 1, 22. Thus, the issue is not whether Oklahoma was aware of the 2021 Rule, but whether Oklahoma knowingly and voluntarily accepted the 2021 Rule. Oklahoma's track record is clear: the State objected to

and challenged the 2021 Rule and Defendants' application of that Rule to terminate Oklahoma's Title X funding at every conceivable opportunity. Moreover, just because Oklahoma historically accepted funding subject to certain conditions does not mean that Oklahoma is required to accept all conditions going forward. After all, Defendants repeatedly insist that Title X awards are made on a yearly basis, Doc. 28 at 2, 28, and Spending Clause arrangements are indisputably akin to contractual arrangements, *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Annual contracts can be re-negotiated, and negotiations are subject to changed circumstances. Defendants' assertion that Oklahoma has accepted these conditions is clearly not true with respect to *future* contracts and funding, including the funding for 2024 that is the focus of the injunction request here. Likewise, Defendants ignore the impact of the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022). As should be obvious, state laws that took effect after *Dobbs* changed Oklahoma's ability to comply with requirements imposed by Defendants.

## II. DEFENDANTS ACTED ARBITRARILY AND CAPRICIOUSLY BY TERMINATING OKLAHOMA'S TITLE X FUNDING WITHOUT TAKING FEDERALISM OR ITS OWN REGULATIONS INTO ACCOUNT.

Defendants acted in an arbitrary and capricious manner here in several ways, including by ignoring the Spending Clause, *see supra*, and trampling on the Weldon Amendment, *see infra*. To give another example, Defendants offer no cogent explanation for how their actions were consistent with their own regulations. Again, an HHS regulation requires Title X family planning services to be "allowable under state law." 42 C.F.R. § 59.5(b)(6). Defendants claim this insertion was intended to allow additional providers such

as APRNs to direct Title X services. But Defendants' explanation actually addresses the change in the regulation whereby previously, only "physicians" could perform family planning medical services. Now, any "clinical services provider" may perform services. 86 Fed. Reg. at 56,163-164. The "allowable under state law" portion is not addressed in the Federal Register, and the definition of a "clinical services provider" quoted by Defendants appears in an entirely separate regulation. In any event, Defendants cannot just wave away the language indicating that only services "allowable under state law" are allowed to be performed. Plain text controls over amorphous intent.

Moreover, Defendants again fail to recognize and discuss the importance of the decision in *Dobbs*, and the federalism interests that *Dobbs* emphasized. *See Dobbs*, 597 U.S. at 292 ("[T]he authority to regulate abortion must be returned to the people and their elected representatives."). Defendants take issue with Oklahoma's charge that "federalism concerns were overlooked," Doc. 28 at 15, but they fail to follow that up with any citation to where HHS evaluated federalism concerns after *Dobbs*. The *Dobbs* Q&A they point to does not even mention state laws or federalism concerns, much less discuss them. Instead, the document repeatedly emphasized that *Dobbs* changed nothing. *See, e.g.*, Doc. 28-1, at 5 (declaring that "[n]ot only are Title X recipients ***allowed***" to provide counseling and referrals, but they are "***required***" to "per the 2021 Title X rule"). This is hardly surprising, given that it was issued just days after *Dobbs*, at the same time the HHS Secretary was busy labeling *Dobbs* "unconscionable" and promising that HHS would "double down and use every lever we have to protect access to abortion care." Doc. 1, ¶ 35. None of this indicates that HHS acted within a "zone of reasonableness" or "reasonably considered the

relevant issues and reasonably explained the decision." Doc. 28 at 15 (quoting *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021)).

Instead of giving effect to *all* of its regulations, and *Dobbs*, by stating that abortion referrals must be provided only if such referrals are allowable under state law, Defendants ignored one regulation to enforce the other, while publicly attacking a clearly relevant Supreme Court decision. It was an arbitrary decision by Defendants to give no weight whatsoever to the "allowable under state law" requirement of 42 C.F.R. § 59.5(b)(6) and instead terminate Oklahoma's Title X funding based on a competing regulation.

## III. DEFENDANTS FAIL TO EXPLAIN AWAY THE WELDON AMENDMENT, WHICH STRAIGHTFORWARDLY APPLIES HERE.

At the outset, Defendants half-heartedly assert that this Court should not consider Oklahoma's argument that terminating Oklahoma's Title X funding violates the Weldon Amendment because the Weldon Amendment was not discussed in the Complaint. But the Weldon Amendment is not a standalone claim, and Oklahoma was not required to raise every conceivable legal argument that might support its claims at the very outset. *See Zokari v. Gates*, 561 F.3d 1076, 1084 (10th Cir. 2009) (acknowledging "general rule" in most circuits "that a complaint need not set forth the plaintiff's legal theories"). And Oklahoma did plead, as Claim 1, that Defendants' termination violated the APA by taking an action "not in accordance with law and in excess of statutory authority," Doc. 1, Claim 1, and the State followed that up with the allegation that "HHS's decision to terminate Oklahoma's Title X grant contravenes the governing statutory provisions and HHS's own Title X regulations," *id.* ¶ 66. This is clearly sufficient to put Defendants on notice that the

well-known Weldon Amendment is at issue. And if there were any doubt, Oklahoma followed that up by prominently arguing the Weldon Amendment in its very first brief in the case, seeking a preliminary injunction. Defendants were fully on notice that Oklahoma intended to assert claims that the agency action at issue was not in accordance with federal law, including the Weldon Amendment.

Defendants' attempt to address the merits of this argument fare no better. Critically, Defendants admit that "[t]he Weldon Amendment is a statute meant to protect health care entities who object to *providing* abortion services or related referrals." Doc. 28 at 11. Defendants claim that Oklahoma is not a "health care entity." But the term "health care entity" is defined so broadly that Oklahoma's ***Department of Health*** simply *must* qualify. Even Defendants are forced to concede that "health care entity" is defined *in statute* as including "any other kind of health care … organization." Doc. 28 at 12. Congress could have hardly written it more clearly, and Defendants make no serious attempt to explain why a State Health Department whose own employees provide on-the-ground medical services under Title X is not an "organization" devoted to "health care"—especially not when the phrase is prefaced by "any." *See, e.g.*, *UMC Physicians' Bargaining Unit of Nev. Serv. Emps. Union v. Nev. Serv. Emps. Union/SEIU Loc. 1107*, 178 P.3d 709, 713 (Nev. 2008) (stating that "'[a]n organization of any kind' is very broad language . . . ."). Because it is clear that Oklahoma's Health Department qualifies as a health care entity, the alleged distinction between a "project" and the "provider" is rendered irrelevant.

Rather than offer any kind of explanation as to why the statutory definition does not cover what it obviously covers, Defendants instead attempt to disavow their own

regulation, *see* Doc. 28 at 13 n.7, which states that "components of State or local governments may be health care entities under the Weldon Amendment." 45 C.F.R. § 88.2. But that disavowal, even if legitimate,[3] is irrelevant given the straightforward language of the statute itself. Simply stated, Defendants cannot avoid the plain meaning of the statutory definition, and the binding nature of its instruction.

In a similar vein, except on the regulatory side, Defendants admit that the 2021 Rule provides that "[o]bjecting providers or Title X *grantees* are not required to counsel or refer for abortions." Doc. 28 at 12 (emphasis added). The Health Department is undeniably a grantee, which Defendants also admit. *See id.* at 17 (referring to OSDH as a "Title X grantee"); *see also* Doc. 23-2 ("Grantee name: Oklahoma State Department of Health"). Yet Defendants make no attempt to justify why Oklahoma's Title X funding was terminated even though this regulation states that Oklahoma as a Title X grantee is not required to counsel or refer for abortions. Without authority, Defendants' assertion that "a state agency cannot claim to be an objector[,]" Doc. 28 at 19, is simply baseless.

## IV. DEFENDANTS OFFER NOTHING TO COUNTER OKLAHOMA'S DEMONSTRATION OF IMMENSE AND IRREPARABLE HARM.

Defendants criticize Oklahoma for not expansively discussing the irreparable harm it will face if a preliminary injunction were not granted. This is untrue. Oklahoma submitted sworn testimony that details Oklahoma's substantial investment in translation and language services, as well as the potential loss of future grant funding and ability to

[3] Defendants fail to mention that none of the cases they cite in Footnote 7 found fault with the regulation on the basis of its application to State or local government entities.

access the federal discount pharmacy program. *See* Doc. 23-1. Defendants offered no declaration or evidence in response, nor did their response include citations to any relevant evidence. Instead, Defendants either ignored Oklahoma's evidence or offered stray *ipse dixit* as pushback. As such, Oklahoma's evidence on harm should be deemed unrebutted.[4]

Most tellingly, while Defendants take issue with Oklahoma's argument that "family planning services in the state will be reduced if OSDH does not have a Title X grant," Doc. 28 at 17, Defendants offer nothing to contradict the point. Defendants instead merely assert that there are other Title X grantees in Oklahoma. But Defendants provide no evidence that these other alleged grantees can *possibly* replicate the statewide scope of partnerships and operations that the Health Department has spent half a century developing, as testified to by the State's witness. Next, Defendants essentially agree that loss of funding makes Oklahoma's harm irreparable if it is "great," but then ludicrously claim that losing millions of dollars in funding is "modest" simply because it does not equal or compare the State's entire budget. Doc. 28 at 25, 28. Defendants cite nothing for this proposition, nor can one imagine them applying such preposterous logic to the federal government itself, which has an annual budget of over $6 trillion. In the end, Oklahoma has submitted adequate, unrebutted evidence demonstrating substantial irreparable harm.

[4] It should also be noted that Defendants violated LCvR 7.1(e) by going 5 pages over the page limit without seeking leave. Even with this additional space, Defendants failed to rebut Oklahoma's irreparable harm evidence with any competing facts or evidence.

Respectfully submitted,

*s/ R. Tom Hillis*
Garry M. Gaskins, II, OBA # 20212
*Solicitor General*
Zach West, OBA # 30768
*Director of Special Litigation*
Audrey Weaver, OBA # 33258
*Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st St.
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Audrey.Weaver@oag.ok.gov

AND

Barry G. Reynolds, OBA # 13202
R. Tom Hillis, OBA # 12338
J. Miles McFadden, OBA # 30166
TITUS HILLIS REYNOLDS LOVE, P.C.
15 E. 5th St., Suite 3700
Tulsa, OK 74103
Phone: (918) 587-6800
Fax: (918) 587-6822
reynolds@titushillis.com
thillis@titushillis.com
jmcfadden@titushillis.com

AND

Anthony J. (A.J.) Ferate, OBA # 21171
SPENCER FANE
9400 North Broadway Extension,
Suite 600
Oklahoma City, OK 73114
Phone: (405) 844-9900
Fax: (405) 844-9958
AJFerate@spencerfane.com

*ATTORNEYS FOR PLAINTIFF,*
*THE STATE OF OKLAHOMA*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of March 2024, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant:

Michael Patrick Clendenen
michael.p.clendenen@usdoj.gov

Robert C Merritt
robert.c.merritt@usdoj.gov

Alexandra R. Saslaw
alexandra.r.saslaw@usdoj.gov

*/s/ R. Tom Hillis*
R. Tom Hillis

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| STATE OF OKLAHOMA,<br>Plaintiff,<br>v.<br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br>Defendants. | No. 5:23-cv-01052-HE |

**NOTICE OF SUPPLEMENTAL AUTHORITY**

Pursuant to Local Rule 7.1(m), Defendants respectfully request that the Court take notice of the attached Memorandum Opinion issued on March 11, 2024 in *Tennessee v. U.S. Department of Health & Human Services*, No. 3:23-cv-384 (E.D. Tenn. Mar. 11, 2024). In that case, Tennessee refused to comply with the Department of Health and Human Services' ("HHS") regulatory requirement that Title X grantees provide nondirective options counseling to pregnant patients and referrals upon request for abortion, leading to HHS' decision not to issue a continuation award. Tennessee sought relief from this decision on various grounds, and the court denied Tennessee's motion for a preliminary injunction.

The *Tennessee* ruling is relevant to the motion for a preliminary injunction pending in this case in several ways. First, the court rejected Tennessee's argument that the requirement to provide nondirective options counseling and referrals upon request for abortion violates the Spending Clause. *See* Slip Op. at 12–18. Second, the court ruled that HHS's discontinuation of a state's grant under these circumstances does not exceed the agency's statutory authority,

nor does it conflict with HHS's regulations. *Id.* at 19–26. Third, the court rejected arguments that the discontinuation decision is arbitrary and capricious. *Id.* at 27–35. Fourth, the court ruled that the agency was not required to undergo notice-and-comment procedures to discontinue the state's Title X grant based on the state's failure to comply with the requirement to provide nondirective options counseling and referrals upon request for abortion. *Id.* at 35–37. Fifth, the court ruled that the state had not demonstrated irreparable harm justifying a preliminary injunction, and that the public interest weighed against issuing a preliminary injunction. *Id.* at 37–42.

DATED: March 13, 2024                Respectfully submitted,

                                     BRIAN M. BOYNTON
                                     Principal Deputy Assistant Attorney General

                                     MICHELLE R. BENNETT
                                     Assistant Branch Director

                                     */s/ Michael P. Clendenen*
                                     MICHAEL P. CLENDENEN
                                     ALEXANDRA R. SASLAW
                                     Trial Attorneys
                                     Civil Division, Federal Programs Branch
                                     U.S. Department of Justice
                                     1100 L Street, NW
                                     Washington, DC 20005
                                     Phone:  (202) 305-0693
                                     E-mail:  michael.p.clendenen@usdoj.gov

                                     *Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**AT KNOXVILLE**

| | | |
|---|---|---|
| STATE OF TENNESSEE,<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, XAVIER BECERRA, in his official capacity, OFFICE OF POPULATION AFFAIRS, and JESSICA S. MARCELLA, in her official capacity,<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 3:23-cv-384<br><br>Judge Travis R. McDonough<br><br>Magistrate Judge Jill E. McCook |

---

**MEMORANDUM OPINION**

---

For years, Tennessee accepted millions of dollars in federal grant funding to support its family-planning project. These funds were expressly conditioned on the project's provision of abortion counseling and referrals upon women's requests. And, for years, Tennessee willingly accepted and complied with this condition. But, following the Supreme Court's decision to overturn *Roe v. Wade*, Tennessee refused to satisfy the same condition. Tennessee still wants the federal funds, it wants them free of this condition, and it wants this Court to order a federal agency to provide that funding—all despite the disavowal of its prior agreement with the agency. For the reasons set forth below, Tennessee's motion for a preliminary injunction (Doc. 20) will be **DENIED**.

## I. BACKGROUND

### A. HHS's Abortion Counseling and Referral Regulations Before 2021

Title X of the Public Health Service Act authorizes the United States Department of Health and Human Services ("HHS") "to make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a). Grants under Title X "shall be made in accordance with such regulations as the Secretary may promulgate" and are "subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made." *Id.* § 300a-4(a)-(b). HHS typically awards these grants for a one-year period, but it may also issue "continuation awards" that allow a grantee to receive funding for a five-year period without having to reapply each year. 42 C.F.R. § 59.8(a)–(b).

Title X funds may not "be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. HHS's interpretation of this restriction has changed several times since 1980. In 1981, HHS "for the first time required nondirective 'options counseling' [sic] on pregnancy termination (abortion) . . . when a woman with an unintended pregnancy requests information on her options, followed by referral for these services if she so requests." Statutory Prohibition on Use of Appropriated Funds in Programs Where Abortion is a Method of Family Planning; Standard of Compliance for Family Planning Services Projects 53 Fed. Reg. 2922 (Feb. 2, 1988). This "Counseling and Referral Rule" was in place until 1988 when HHS promulgated new regulations, commonly known as the "Gag Rule," barring Title X grantees from providing such counseling or referrals. *Id.* at 2945; Standards of Compliance for Abortion-

Related Services in Family Planning Services Projects, 65 Fed. Reg. 41270 (July 3, 2000). HHS suspended the Gag Rule in 1993 and provisionally reinstated the Counseling and Referral Rule. Standards of Compliance for Abortion-Related Services in Family Planning Service Projects, 58 Fed. Reg. 7464 (Feb. 5, 1993). HHS officially reinstated the Counseling and Referral Rule in 2000. 65 Fed. Reg. 41270. It remained in place until 2019, when HHS reinstated the ban on abortion referrals and rescinded the requirement (but did not impose a prohibition) that grantees provide nondirective counseling when requested (the "2019 Rule"). Compliance with Statutory Program Integrity Requirements, 84 Fed. Reg. 7714, 7789 (Mar. 4, 2019).

**B. The 2021 Counseling and Referral Rule**

On October 7, 2021, HHS reimplemented the Counseling and Referral Rule via notice-and-comment rulemaking (the "2021 Rule").[1] 42 C.F.R. § 59.5; Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services, 86 Fed. Reg. 56144 (Oct. 7, 2021). The 2021 Rule largely reinstates the 2000 Rule and requires that Title X grantees provide a pregnant woman with counseling as to all her options, including "[p]renatal care and delivery; [i]nfant care, foster care, or adoption; and [p]regnancy termination." 42 C.F.R. § 59.5(a)(5)(i). "If requested to provide such information and counseling, [a grantee must] provide neutral, factual information and nondirective counseling on each of the options, and, referral upon request."[2] *Id.* § 59.5(a)(5)(ii). Such a referral is limited to "providing a patient with the name, address, telephone number, and other relevant factual information . . . about an abortion

---

[1] The Court uses the phrase "Counseling and Referral Rule" to refer to the general requirement to counsel and refer for abortions that has existed in various forms since 1981 and uses the phrase "2021 Rule" to refer to the current iteration of the Counseling and Referral Rule.

[2] Though the 2021 Rule uses the term "client" rather than "woman," the Court will use the term "woman" for the sake of consistency, as it will be discussing the Rule in the context of past regulations that use the term "woman." *See* 42 C.F.R. § 59.5.

provider." 86 Fed. Reg. at 56150 (quoting 65 Fed. Reg. at 41281). A grantee "may not take further affirmative action (such as negotiating a fee reduction, making an appointment, providing transportation) to secure abortion services for the patient." *Id.* The 2021 Rule went into effect on November 8, 2021, and, as a result, compliance with the 2021 Rule was a condition of Tennessee's receipt of a Title X grant in 2022.[3] 86 Fed. Reg. 56144; *Ohio v. Becerra*, 87 F.4th 759, 767 (6th Cir. 2023).

In promulgating the final 2021 Rule, HHS discussed at length why it was revoking the 2019 Rule and reimplementing the Counseling and Referral Rule. *See generally* 86 Fed. Reg. 56144. HHS noted that the 2019 Rule "interfered with the patient-provider relationship and compromised their ability to provide quality healthcare to all clients." *Id.* at 56146. HHS further found that, "the 2019 [R]ule appears to have . . . resulted in a significant loss of grantees, subrecipients, and service sites, and close to one million fewer clients served from 2018 to 2019." *Id.* at 56147. HHS detailed that, while nine states gained Title X service sites following the 2019 Rule, thirty-eight states lost service sites. *Id.* The agency observed that "the 2019 [R]ule shifted the Title X program away from its history of providing client-centered quality family-planning services and instead set limits on the patient-provider relationship and the information that could be provided to the patient by the provider." *Id.* at 56148. HHS expressed particular apprehension that "enforcement of the 2019 [R]ule raises the possibility of a two-tiered healthcare system in which those with insurance and full access to healthcare receive full medical information and referrals, while low-income populations [treated at a Title X site under

[3] By this point, the Counseling and Referral Rule had been in place thirty-four of the past forty-one years (and twenty-seven of the past twenty-nine years) Tennessee had received Title X funding. There is no suggestion that Tennessee refused to comply with this condition prior to 2023.

the 2019 Rule] . . . are relegated to inferior access." *Id.* HHS directly considered the concern that the Rule would "compel[] states to adopt policies that conflict with their own laws." *Id.* at 56169. It responded that "states that object to the rule requirements or believe that there is a conflict with state law priorities are free to opt out of the federal grant program."[4] *Id.*

**C. Tennessee's Agreement to the Counseling and Referral Rule**

Since 1971, the Tennessee Department of Health ("TDH") has received grants from HHS for its Title X project. (Doc. 1, at 6.) TDH provides family-planning services at Title X facilities across the state. (*Id.*) Recently, TDH's Title X grants have totaled approximately $7.1 million annually. (*Id.* at 7.) In March 2022, HHS approved TDH's Title X grant application for the budget period of April 1, 2022, to March 31, 2023. (Doc. 1-7, at 1.) This grant was a five-year continuation award, anticipated to run through March 31, 2027. (*Id.*) The notice of award specifically stated that "[a]ll recipients must comply with the requirements regarding the provision of family planning services that can be found in the statute (Title X of the Public Health Service Act, 42 U.S.C. § 300 *et seq.*) and the implementing regulations (42 C.F.R. Part 59, Subpart A)." (*Id.* at 4.) By this time, of course, these regulations included the 2021 Rule.

**D. Tennessee's Criminalization of Abortion**

Back in May 2019, Tennessee adopted a statute criminalizing all elective abortions in the event that *Roe v. Wade*, 410 U.S. 113 (1973) was overruled. *See* Human Life Protection Act,

---

[4] HHS responded to several additional concerns raised in the notice-and-comment period that are not at issue in this case. In response to the concern that the 2021 Rule violated providers' free-speech protections and conscience laws and would limit the type of providers participating in Title X, HHS noted that "objecting individuals and grantees will not be required to counsel or refer for abortions in the Title X program in accordance with applicable federal law." 86 Fed. Reg. at 56153–54. In response to the concern that the 2021 Rule would "result in a decrease in quality of care and would cost more to implement compared to the 2019 rule," HHS asserted that the 2021 Rule would "result in improved outcomes for all clients." *Id.* at 56,155.

2019 Tennessee Laws Pub. Ch. 351 (H.B. 1029, S.B. 1257); Tenn. Code Ann. § 39-15-213. On June 24, 2022, the Supreme Court of the United States issued its decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), which did just that, thereby automatically triggering Tennessee's abortion-ban statute. Tenn. Code Ann. § 39-15-213. The statute, which became effective on August 25, 2022, provides that "a person who performs or attempts to perform an abortion commits the offense of criminal abortion . . . a Class C felony." *Id.* § 39-15-213(b). The statute defines "abortion" as "the use of any instrument, medicine, drug, or any other substance or device with intent to terminate the pregnancy of a woman known to be pregnant with intent other than to increase the probability of a live birth, to preserve the life or health of the child after live birth, to terminate an ectopic or molar pregnancy, or to remove a dead fetus." *Id.* § 39-15-213(a)(1). The statute does not prohibit a doctor from discussing abortion with patients or from referring patients to an abortion provider in a state where abortion is legal. *See generally id.* § 39-15-213.

### E. HHS's Program Review and Tennessee's Abandonment of the 2021 Rule's Condition

In June 2022, immediately following the *Dobbs* decision, HHS issued a memorandum stating its position that the 2021 Rule was unaffected by the *Dobbs* decision and that "Title X recipients are required to offer [counseling and referrals]" as they were before *Dobbs*. (Doc. 1-6, at 4.) HHS further stated that "[t]here are no geographic limits for Title X recipients making referrals for their clients" but that the referrals should be made to providers "in close physical proximity to the Title X site, *when feasible*." (*Id.* at 5.)

From July 11, 2022, until July 15, 2022, HHS performed a program review of Tennessee's Title X project to ensure it was meeting HHS's expectations (the "July Review"). (Doc. 1-1.) During the July Review, HHS examined TDH's official policies, observed patient

visits, and interviewed its staff. (*See id.*) HHS concluded that TDH had established policies in line with the 2021 Rule. (Doc. 1-1, at 24, 58–60.) It found that "[n]on-directive pregnancy counseling is offered by nurse practitioners" (*id.* at 24) and that "TDH service sites are allowed to provide resource lists to clients seeking information on pregnancy termination sites" (*Id.* at 60). During the July review, HHS learned that TDH's legal staff was reviewing its current policies and that TDH "expect[s] a decision on what they are allowed to provide to or say to clients seeking pregnancy termination counseling and referral." (*Id.* at 60.) HHS also noted that "[TDH] Staff are concerned they will not be allowed to provide counseling [for pregnancy termination]." (*Id.*) Tennessee asserts that, during the review, TDH informed HHS that, going forward, staff would only be able to "offer counseling and referrals for pregnancy terminations that are legal in Tennessee." (Doc. 1-5, at 3.) This policy is laid out in TDH's July 1, 2022, "Nursing Protocol," which Tennessee states is a "standard instructive guideline for nursing staff in clinical settings." (Doc. 1-4, at 2, 4.)

On October 19, 2022, Trisha Reed, an HHS Title X Project Officer, emailed Tennessee the results of the July Review. (Doc. 1-2.) Reed stated HHS had determined that, "as of the date of the Program Review [July 11 – July 15, 2022]," Tennessee was in compliance with its Title X grant requirements. (*Id.* at 1.) However, Reed noted that HHS had raised concerns during the July Review about the potential effects of Tennessee's impending abortion ban on TDH's ability to comply with the nondirective options counseling requirement. (*Id.* at 1.) Reed asked that Tennessee "update [HHS] on the policy changes in response to enactment of [Tennessee's

abortion ban]." (*Id.*)  The record does not suggest that Tennessee ever provided HHS with the requested update.

On January 25, 2023, HHS sent a letter to Tennessee and all other Title X service grantees to inform them that HHS was reviewing all Title X grants "to ensure compliance with the requirements for nondirective options counseling and referral, as stated in the 2021 Title X [Rule]." (Doc. 1-8, at 1.)  HHS informed grantees that they must submit their current policy "for providing nondirective options counseling and referrals within its Title X project," as well as a written statement confirming that they were in compliance with the 2021 Rule. (*Id.*)  HHS further noted that it could terminate grants of out-of-compliance grantees. (*Id.* (citing 45 C.F.R. § 75.372(a)(1)).)  Tennessee responded on February 13, 2023, stating only that "[w]e believe we are in compliance with regulatory requirements *for the scope of allowable practice under Tennessee law*." (Doc. 1-3, at 1 (emphasis added).)  It also attached a copy of its Nursing Protocol, which noted that "[p]atients with positive pregnancy test must be offered the opportunity to be provided information and counseling *regarding all options that are legal in the State of Tennessee*." (*Id.* at 2–4 (emphasis added).)  Tennessee offered no further rationale to suggest it was in compliance.

On March 1, 2023, HHS sent a follow-up letter to Tennessee pointing to its noncompliance with the 2021 Rule. (Doc. 1-9.)  Specifically, HHS stated that "[t]he inclusion of 'legal in the state of Tennessee' is not an acceptable addition to your policy as Title X recipients must still follow all Federal regulatory requirements regarding nondirective options counseling and referrals." (*Id.* at 1.)  HHS specifically noted that, to comply with the 2021 Rule, "projects are required to provide referrals upon client request, including referrals for abortion." (*Id.* at 2.) HHS gave Tennessee until March 13, 2023, to submit an alternate protocol that complied with

the 2021 Rule. (*Id.*) HHS warned Tennessee that, if it failed to do so, its noncompliance with the terms of its Title X grant could lead to suspension or termination of the grant. (*Id.*)

Tennessee responded on March 13, 2023. (Doc. 1-10.) It noted that the 2021 Rule required counseling and referral for "pregnancy termination." (*Id.* (quoting 42 C.F.R. § 59.5(a)(5)).) Tennessee claimed that its abortion ban exempts pregnancy terminations that are done with the intent "to increase the probability of a live birth, to preserve the life or health of the child after live birth, or to remove a dead fetus" from its definition of abortion. (*Id.* (quoting Tenn. Code Ann. § 39-15-213(a)(1)).) It concluded that it therefore "[does] not construe the phrase 'pregnancy termination' to include every possible method of 'pregnancy termination,' such as abortion." (*Id.*) In sum, Tennessee's position was that, because it was still telling patients about the narrow circumstances in which Tennessee allows pregnancy termination, it was in compliance with the 2021 Rule. (*Id.*) It made no attempt to explain how its policies satisfied the 2021 Rule's requirement to offer counseling and referrals for abortions, as that requirement had been applied for a total of nearly three and one-half decades. (*See generally id.*)

On March 20, 2023, HHS replied to Tennessee. (Doc. 1-11.) HHS stated that it "ha[d] reviewed your [March 13, 2023] statement and determined that Tennessee's policy for providing nondirective options counseling and referral within your Title X project remains not in compliance with the Title X regulatory requirements and, therefore, the terms and conditions of your grant." (*Id.* at 3.) As a result, HHS determined that "Tennessee is unable to comply with the terms and conditions of the award" (*id.* at 1) and that HHS would "not [be] providing Fiscal

Year (FY) 2023 continuation funding for the Tennessee Department of Health noncompeting continuation application" (*id.* at 3).

**F. Tennessee's Lawsuit**

Tennessee filed this action on October 24, 2023 (Doc. 1) and moved for a preliminary injunction against the United States Department of Health and Human Services; Xavier Becerra, the United States Secretary of Health and Human Services; the Office of Population Affairs; and Jessica Marcella, the Deputy Assistant Secretary for Population Affairs (collectively "Defendants") on December 1, 2023 (Doc. 20). Tennessee argues that Defendants' decision not to fund its Title X grant violates both the Spending Clause of the United States Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 500 et seq. (*Id.* at 3.) Tennessee's motion is ripe for the Court's review.

## II. STANDARD OF REVIEW

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). The Court considers the following factors when evaluating a motion for preliminary injunction:

> (1) whether the movant has a strong likelihood of success on the merits;
> (2) whether the movant would suffer irreparable injury without the injunction;
> (3) whether issuance of the injunction would cause substantial harm to others; and
> (4) whether the public interest would be served by the issuance of the injunction.

*Id.* at 542 (citations omitted).

The Sixth Circuit has noted that "when a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th

Cir. 2014) (citations omitted). Furthermore, the Court need not "make specific findings concerning each of the four factors . . . if fewer factors are dispositive of the issue." *Id.* (citations omitted). However, "it is generally useful for the district court to analyze all four of the preliminary injunction factors." *Id.* (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 n.3 (6th Cir. 2000)). Rather than function as "rigid and unbending requirements[,]" the factors "simply guide the discretion of the court." *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992) (citation omitted).

"The party seeking a preliminary injunction bears the burden of justifying such relief." *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021) (citations omitted). While a party seeking a preliminary injunction need not "prove [its] case in full at a preliminary injunction hearing," *Tenke*, 511 F.3d at 542 (citations omitted), a preliminary injunction is an "extraordinary and drastic remedy." *Fowler v. Benson*, 924 F.3d 247, 256 (6th Cir. 2019) (quoting *Munaf v. Geren*, 553 U.S. 674, 689 (2008)). A preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)), and "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary*, 228 F.3d at 739.

## III. ANALYSIS

Tennessee attempts to frame HHS's decision to terminate its Title X grant as an unexpected and unprecedented attack on its sovereignty. The truth is far less dramatic. Tennessee, a longtime Title X grantee, decided to apply for a Title X grant. At the time it accepted the grant, Tennessee knew that it would be required to abide by all HHS regulations, just as it had for decades. One of those regulations required Title X grantees to provide neutral,

medically accurate counseling and referrals for abortion if women so requested. The Supreme Court's issuance of the *Dobbs* decision after Tennessee agreed to that condition triggered a Tennessee law banning abortions. Although that newly effective statute did not prohibit doctors from discussing abortions or referring their patients to abortion providers located where the procedure is legal, Tennessee nevertheless decided that TDH would not comply with the 2021 Rule; it would only allow medical providers to discuss pregnancy terminations that remained legal in Tennessee, and it would not allow counseling about, or referrals for, abortion services.

In receiving a grant from the federal government, a state commonly enters into a simple bargain. The state receives money in return for its agreement to comply with conditions. If a state does not like the conditions, it does not take the money, and the matter ends there. But Tennessee wants to have its cake and eat it too; it wants the federal money but does not want to comply with the federal conditions it knowingly assumed. The law does not support such a result.

**A. Likelihood of Success on the Merits**

Tennessee asserts that Defendants' decision not to fund its Title X grant is unlawful because it violates the Spending Clause of the United States Constitution and the APA. (Doc. 21, at 16.) Tennessee has failed to demonstrate that it has a strong likelihood of success on either of these grounds.

***i. Spending Clause***

Tennessee first argues that the 2021 Rule violates the Spending Clause because Congress did not provide clear notice of the conditions of accepting a Title X grant. (*Id.* at 17.) The facts demonstrate otherwise.

The Spending Clause allows Congress to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. In using this power to spend, "Congress may attach conditions on the receipt of federal funds and has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *S. Dakota v. Dole*, 483 U.S. 203, 206–07 (1987) (citations and internal quotation omitted). The Supreme Court has noted that this spending power functions "in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

"Congress has broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022). However, "[t]he spending power is of course not unlimited." *Dole*, 483 U.S. at 207 (internal citation omitted). When a state accepts a federal grant, it must do so "voluntarily and knowingly," just like a party agreeing to the terms of a contract. *Pennhurst*, 451 U.S. at 17 (citation omitted). As such, the Supreme Court has held that "if Congress desires to condition the States' receipt of federal funds, it must do so unambiguously . . . , enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (cleaned up). To determine whether a state has notice of a condition, a court must view the relevant statute "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [grant] funds and the obligations that go with those funds." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

Title X is a grant program that exists to promote family-planning services. *See generally* 42 U.S.C. § 300a. The operative language of Title X provides that "[t]he Secretary is authorized to make grants . . . to State health authorities to assist in planning, establishing, maintaining, coordinating, and evaluating family planning services." *Id.* § 300a(a). The statute provides that "[g]rants and contracts made under this subchapter shall be made in accordance with such regulations as the Secretary may promulgate." *Id.* § 300a-4(a). Additionally, Title X grants are "subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made." *Id.* § 300a-4(b). By adding this clause, Congress made compliance with HHS regulations a clear and unambiguous condition of receiving a Title X grant. Tennessee does not dispute this fact. (*See generally* Docs. 21, 27.)

That the statute itself does not set out in detail every condition for receiving a grant is immaterial because the conditions are readily discernable from HHS regulations. The Supreme Court has found that notice of spending conditions can be provided by agency regulations. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) (finding that a grantee had adequate notice that by accepting federal funding, a school may be liable for retaliation when "[t]he regulations implementing Title IX clearly prohibit retaliation and have been on the books for nearly 30 years") (citation omitted); *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 630 (1999) (finding a Title IX funding recipient was on notice of condition when "the regulatory scheme surrounding Title IX has long provided funding recipients with notice that they may be liable for their failure to respond the discriminatory acts of certain nonagents"). This makes sense, as any state official seeking to identify the conditions of accepting a grant can easily find them in HHS regulations. *See Arlington*, 548 U.S. at 295–96; 42 C.F.R. § 59.5. Such

transparency allows states to "exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (citation omitted).

The undisputed facts expose as a figment Tennessee's argument that the Counseling and Referral Rule is a "newly derived Title X condition" of which it had no notice. (Doc. 21, at 18.) Tennessee knew it was required to comply with HHS regulations, and the 2021 Rule was in place at the time Tennessee applied for and accepted Title X funding in March 2022. *See generally* 86 Fed. Reg. 56144. Tennessee's claim of unfair surprise is further undercut by the fact that the Counseling and Referral Rule had, as of March 2022, been in place twenty-seven of the last twenty-nine years and had always required counseling and referrals for abortions.[5] *See Ohio*, 87 F.4th at 765–67 (laying out the history of the Counseling and Referral Rule). During this entire period, HHS never suggested that a state's obligation to counsel and refer for abortions could be limited by a state's laws. *See generally id.* And there is no evidence that Tennessee did either. HHS did not suggest that its regulatory requirements would change if *Roe* were to be overturned. *Id.* It is Tennessee, not HHS, that has unilaterally abandoned its obligations while seeking to retain the benefits received in exchange for agreeing to those very obligations.

[5] As Tennessee notes, it has been a Title X grantee for this entire period. (Doc. 21, at 10.) Analyzed within the contract-law framework, this long course of dealing between Tennessee and HHS is worth considering to determine whether Tennessee had notice of the requirement that it counsel and refer for abortions. *See Miss. Comm'n on Env't Quality v. E.P.A.*, 790 F.3d 138, 179 (D.C. Cir. 2015) ("[T]he fact that the State has long accepted billions of dollars notwithstanding the challenged conditions may be an additional relevant factor in the contract-like analysis the Court has in mind for assessing the constitutionality of Spending Clause legislation."); *Jackson*, 544 U.S. at 183 (finding that a grantee had adequate notice when "[t]he regulations implementing Title IX clearly prohibit retaliation and have been on the books for nearly 30 years") (citation omitted).

Tennessee does not argue that the statutory requirement that a state comply with HHS regulations is unclear.[6]  (*See* Doc. 21, at 17–21.)  Tennessee instead argues that "Congress [cannot] use a general rulemaking delegation to funnel its constitutionally vested spending-conditions power to agencies."  (*Id.* at 19.)  In other words, Congress cannot make compliance with agency regulations a condition of receiving a federal grant, because those regulations are not a part of the statutory text.  Despite Tennessee's claims to the contrary (*id.* at 22), this is nothing less than a facial challenge to the Title X program, and indeed to *any* statute that conditions receiving a grant on compliance with agency regulations not fully described by the authorizing statute.[7]  (*Id.* at 19–21.)  Tennessee cites no caselaw to support this proposition, for good reason.  In *Dole*, the Supreme Court noted that it is commonplace for Congress to make compliance with agency regulations a condition for receiving a federal grant.  483 U.S. at 206 ("Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and *administrative directives*.") (emphasis added) (citations and internal quotation omitted).

---

[6] Tennessee argues that Title X's prohibition on abortion being used as a method of family planning is ambiguous and therefore it could not have had notice that it would have to counsel and refer for abortions. (Doc. 21, at 17–19.)  However, the statutory provision at issue in this case is not Title X's prohibition on abortion being used as a method of family planning but rather its unambiguous requirement that grantees abide by HHS regulations.

[7] Tennessee seems to acknowledge this fact in its briefing while suggesting it meant nothing so drastic.  (Doc. 27, at 9.)  It states that it "does not dispute agencies' power to help carry out clear congressional conditions" but that an agency may not set "an entirely new and controversial funding condition."  (*Id.*)  Tennessee does not bother to explain this distinction.  Congress clearly directed HHS to make grants to promote family planning services and to promulgate regulations ensuring that grants are "effectively utilized for the purposes for which made."  42 U.S.C. § 300a-4(b).  It is necessary for HHS to create regulations, *i.e.*, funding conditions, to carry out the mandate given to it by Congress.

Title X is just one of many federal grant programs requiring compliance with regulations as a condition of a grant. *See, e.g.*, 42 U.S.C. § 254b(k)(3)(N) (health center grant program requiring grantees to "ensure the appropriate use of Federal funds in compliance with applicable Federal statutes, regulations, and the terms and conditions of the Federal award"); 42 U.S.C. § 1793(f)(2) (grant program providing funds for state educational agencies to serve free school breakfasts on the condition that the breakfast program "shall be carried out in accordance with applicable nutritional guidelines and regulations issued by the Secretary"); 49 U.S.C. § 5309(c)(4) (providing that grants for new and expanded rail, bus rapid transit, and ferry systems "shall be subject to all terms, conditions, requirements, and provisions that the Secretary determines to be necessary or appropriate"). If Tennessee were correct, significant parts of the federal grant system would vanish. The fact that Tennessee urges such a radical outcome weighs heavily against the Court finding a strong likelihood of success on this point.[8] [9]

[8] Tennessee primarily relies on *Kentucky v. Yellen*, 54 F.4th 325 (6th Cir. 2022) and *W. Virginia ex rel. Morrisey v. U.S. Dep't of Treasury*, 59 F.4th 1124 (11th Cir. 2023) to support its argument that an agency cannot make an unclear statutory funding condition clear via its own interpretation. (Doc. 21, at 18–20.) However, both cases concern an unclear statutory provision that an agency tried to clarify with its own rulemaking. *See generally id.* Here, HHS is not interpreting an unclear statutory provision. Title X contains a clear requirement that grantees comply with agency regulations and a clear directive from Congress for HHS to promulgate those regulations. 42 U.S.C. § 300a-4(b). *Yellen* did not hold, nor did it even discuss, whether Congress could condition funding on compliance with agency regulations. *See generally* 54 F.4th 325. *Morrisey* is equally unhelpful to Tennessee. In *Morrisey*, the Eleventh Circuit explicitly acknowledged that Congress may require grantees to abide by "'the legal requirements in place when the grants were made' [and] [t]hese 'legal requirements' include existing regulations." 59 F.4th at 1148 (quoting *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 670 (1985)). That is the situation facing Tennessee here.

[9] Tennessee claims that Congress allowing HHS to promulgate regulations that a grantee must abide by runs afoul of the nondelegation doctrine. (Doc. 27, at 8.) "[A] statutory delegation is constitutional as long as Congress 'lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform.'" *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019) (alteration in original) (quoting *Mistretta v. United States*, 488 U.S. 361, 372 (1989)). "[T]he answer requires

Because applying the 2021 Rule to Tennessee does not violate the Spending Clause, Tennessee has not made a strong showing of likelihood of success on the merits on this ground.

***ii. APA***

Tennessee next argues that HHS's decision not to continue funding its grant violates the APA. (Doc. 21, at 21–22.) Specifically, Tennessee asserts that HHS's interpretation of the 2021 Rule: (1) exceeds HHS's regulatory authority under Title X; (2) is unreasonable; (3) is arbitrary

---

construing the challenged statute to figure out what task it delegates and what instructions it provides." *Id.* (citations omitted). Additionally, pursuant to the "major questions doctrine" courts "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021) (citations and internal quotation omitted). In such "extraordinary cases," "the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *W. Virginia v. EPA*, 142 S. Ct. 2587, 2608 (2022) (alteration in original) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159–60 (2000)).

Title X does not run afoul of the nondelegation doctrine. Title X provides that the secretary shall "make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a). This directive to make grants in support of voluntary family-planning programs that offer a range of acceptable and effective family-planning methods is a satisfactorily intelligible principle to support Congress's delegation. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001) (collecting cases in which less-than-precise standards constitute an intelligible principle, including statutes "authorizing regulation in the 'public interest'") (citations omitted).

HHS also does not "exercise powers of vast economic and political significance." *See Ala. Ass'n of Realtors*, 141 S. Ct. at 2489. In 2023, HHS awarded Title X grants to only eighty-six Title X grantees nationwide. Office of Population Affairs, *Fiscal Year 2023 Title X Service Grant Awards*, https://opa.hhs.gov/grant-programs/title-x-service-grants/current-title-x-service-grantees/fy2023-title-X-service-grant-awards (last accessed Mar. 11, 2024). Each grant had an average value of $3 million. *Id.* This relatively modest grant-making power is far from the type of administrative power that the Supreme Court has held to violate the nondelegation doctrine. *See Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 322 (2014) (finding a nondelegation issue when "newly [regulated] sources would face permitting costs of $147 billion"); *Brown & Williamson*, 529 U.S. at 159 (finding a nondelegation issue when "the FDA has now asserted jurisdiction to regulate an industry constituting a significant portion of the American economy.").

and capricious; and (4) represents a new legislative rule which may only be promulgated via notice-and-comment rulemaking. (*Id.* at 22–30.)

a. Statutory Authority

A court must "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2). As noted above, Title X is a grant program which exists to promote family-planning services. *See generally* 42 U.S.C. § 300a. Title X provides that "[t]he Secretary is authorized to make grants . . . to State health authorities to assist in planning, establishing, maintaining, coordinating, and evaluating family planning services." *Id.* § 300a(a). Title X also states that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." *Id.* § 300a-6. In *Rust v. Sullivan*, 500 U.S. 173 (1991), the Supreme Court, along with "every court to have addressed the issue," found that this language was ambiguous. 500 U.S. at 184. Applying the "*Chevron* Deference" framework, the court found that HHS's interpretation of the abortion provision was reasonable and therefore the agency acted within its authority in issuing the Gag Rule. *Id.* at 184–86. In 2023, the Sixth Circuit, finding that *Rust* controlled, held that HHS acted within its authority by issuing its 2021 Rule requiring Title X grantees to counsel and refer for abortions. *Ohio*, 87 F.4th at 770–771. Tennessee's argument that the agency's interpretation of Title X is not reasonable is a naked attempt to relitigate *Rust* and *Ohio*. (Doc. 21, at 22.) The fact that Tennessee resorts to relitigating binding precedent that explicitly decided the 2021 Rule is valid weighs against finding Tennessee is likely to succeed on this point.[10]

---

[10] Tennessee appears to argue that, because Tennessee has outlawed abortions, Title X no longer authorizes HHS to apply the 2021 Rule, even though there have been no changes to Title X

Because there is binding precedent holding that HHS has the authority to promulgate the 2021 Rule, Tennessee has not clearly demonstrated that it is likely to succeed on this basis.[11]

b. HHS Regulations

Tennessee argues that HHS's interpretation of the 2021 Rule as requiring all Title X grantees to counsel and refer for abortions, even if the referral must be made to an out-of-state provider, is unreasonable because it conflicts with the plain meaning of several of the Rule's provisions. (Doc. 21, at 24–25.)

The Supreme Court has instructed lower courts that in certain circumstances "a court should defer to the agency's construction of its own regulation." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2411 (2019). This is commonly referred to as "*Auer* Deference." *Id.* Under the *Auer* standard, "[t]he deference accorded to an agency's interpretation of its own ambiguous regulation is substantial and afforded even greater consideration than the *Chevron* deference accorded to an interpretation of an ambiguous statute." *Ohio Dep't of Medicaid v. Price*, 864 F.3d 469, 477 (6th Cir. 2017) (citation omitted). However, courts "need not defer to an agency's interpretation that is plainly erroneous or inconsistent with the regulation[s] or where there is any

---

itself. (Doc. 21, at 22–24.) Tennessee argues that "HHS's Rescindment—*and its underlying policy of applying the 2021 Rule to States who outlaw abortion*—uniquely opens a Pandora's Box of public-health and compliance challenges HHS has not answered for." (*Id.* at 24 (emphasis added).) Tennessee points to no caselaw that supports this proposition that a subsequent change in state law can effectively nullify a federal agency's prior interpretation of a statute and retroactively render it unenforceable. There is good reason why no precedent exists for such a proposition. *See generally* Respecting the Nullifying Laws of South Carolina, 11 Stat. 771 (1832). Tennessee is part of a supremely sovereign nation; it is not a signatory to a compact with, or in league with, other states. U.S. Const. art. VI, cl. 2.

[11] Tennessee also briefly invokes "avoidance" to support its argument that the 2021 Rule is no longer authorized by Title X, stating that "HHS's position uniquely presents constitutional problems, which further undercuts it reasonableness." (Doc. 21, at 23.) Tennessee does not develop this argument any further, and it is not the Court's job to try to do so on Tennessee's behalf.

other reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *In re AmTrust Fin. Corp.*, 694 F.3d 741, 754–55 (6th Cir. 2012) (quoting *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 209–10 (2011) (internal quotation marks omitted)). And even if the "regulation is ambiguous and deference is due . . . [the Court] must be satisfied that the agency's action minimally involved a 'rational connection between the facts found and the choice made.'" *Summit Petroleum Corp. v. E.P.A*, 690 F.3d 733, 741 (6th Cir. 2012) (internal citations omitted).

"The possibility of [*Auer*] deference can arise only if a regulation is genuinely ambiguous." *Kisor*, 139 S. Ct. at 2414. To determine if a regulation is ambiguous, a court must apply "all the standard tools of interpretation" and "carefully consider the text, structure, history, and purpose of a regulation." *Id.* at 2414–15 (citation and internal quotation omitted). If the regulation is unambiguous, a court must simply apply the regulation's plain language. *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000) (applying the regulation's "obvious meaning" and holding that "[b]ecause the regulation is not ambiguous . . . *Auer* deference is unwarranted").

Here, *Auer* deference to HHS's interpretation of the 2021 Rule is unnecessary, as it has a plain and unambiguous meaning. *See Kisor*, 139 S. Ct. at 2414 ("[T]he possibility of [*Auer*] deference can arise only if a regulation is genuinely ambiguous."). As explained below, HHS's interpretation of the 2021 Rule as requiring all Title X grantees to counsel and refer for abortions, even if the referral must be made to an out-of-state provider, is in line with the unambiguous meaning of the regulation.

The 2021 Rule requires that Title X grantees "[o]ffer pregnant [women] the opportunity to be provided information and counseling regarding . . . (A) Prenatal care and delivery; (B)

Infant care, foster care, or adoption; and (C) Pregnancy termination." 42 C.F.R. § 59.5(a)(5)(i). The Rule further provides that grantees, "[i]f requested to provide such information and counseling, provide neutral, factual information and nondirective counseling on each of the options, and, referral upon request." *Id.* § 59.5(a)(5)(ii). "Pregnancy termination" is an unambiguous phrase which simply means the ending of a pregnancy. *See Termination*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/termination (defining "termination" as "end in time or existence") (last accessed Mar. 11, 2024). Abortion falls within that broad definition.[12] *See Abortion*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/abortion (defining "abortion" as "the termination of a pregnancy after, accompanied by, resulting in, or closely followed by the death of the embryo or fetus") (last accessed Mar. 11, 2024). Furthermore, HHS has made clear, in promulgating every iteration of the Counseling and Referral Rule and the Gag Rule, that it uses the term "pregnancy termination" to mean "abortion."[13] Finally, the Sixth Circuit did not distinguish between a "pregnancy termination" and an "abortion" in *Ohio*. *Ohio*, 87 F.4th at 767 (finding that the 2021

[12] Tennessee's abortion ban itself recognizes that abortion is encompassed by the phrase "pregnancy termination." *See* Tenn. Code Ann. § 39-15-213(a)(1) ("'Abortion' means the use of any instrument, medicine, drug, or any other substance or device with intent to terminate the pregnancy of a woman . . . .").

[13] *See* 53 Fed. Reg. at 2922–23 (noting in promulgating the Gag Rule that "[f]ew issues facing our society today are more divisive than that of abortion" and explaining that the 1981 Rule required counseling "on pregnancy termination (abortion)"); 58 Fed. Reg. at 7464 (reinstating the 1981 Rule and noting that "[u]nder these compliance standards[,] Title X projects would be required . . . to provide nondirective counseling to the patient on all options relating to her pregnancy, including abortion, and to refer her for abortion); 65 Fed. Reg. at 41270 ("Title X projects [are] required, in the event of an unplanned pregnancy and where the patient requests such action, to provide nondirective counseling to the patient on all options relating to her pregnancy, including abortion, and to refer her for abortion"); 84 Fed. Reg. at 7716–17 (noting that "[t]he 2000 regulations require Title X projects to provide abortion referral [] and nondirective counseling on abortion" and "finaliz[ing] the prohibition against using Title X funds to refer for abortion"); 86 Fed. Reg. at 56144 (noting that the agency was "readopting the 2000 regulations").

Rule "mandate[d] that Title X projects make *abortion* referrals upon request") (emphasis added). Tennessee does not dispute this, but merely points out that the 2021 Rule uses both the terms "pregnancy termination" and "abortion" and notes that "such differences in language typically convey differences in meaning."[14] (Doc. 21, at 24–25 (internal quotation and citation omitted).) While perhaps "typically" the case, it is clear in the context of decades of HHS regulation that the terms are synonymous as used here.

HHS's referral requirement is similarly unambiguous. The 2021 Rule imposes a broad requirement that "[i]f requested to provide [] information and counseling, [a grantee must] provide neutral, factual information and nondirective counseling on each of the options, and, referral upon request." 42 C.F.R. § 59.5(a)(5)(ii). The Rule also requires that referrals for health services, including abortion, be made to healthcare providers "who are in close physical proximity to the Title X site, when feasible, in order to promote access to services and provide a seamless continuum of care." *Id.* § 59.5(b)(8). In context, the phrase "when feasible" plainly means that doctors must refer patients to healthcare providers that are close to them when it is possible to do so. *See Feasible*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/feasible (defining "feasible" as "capable of being done or carried out") (last accessed Mar. 11, 2024). If it is not possible for a doctor to refer a patient to a nearby provider, perhaps because the patient lives in a remote area or because the patient lives in a state where abortion is illegal, he may refer the patient to a provider farther away. This interpretation is further supported by the explanation HHS gave for why it was including this provision in the

[14] Tennessee appears to argue that "pregnancy termination" in the 2021 Rule instead means "pregnancy terminations that are allowable under state law." (Doc. 21, at 25.) The obvious issue with Tennessee's reading is that it would require the Court to read in a limiting clause to narrow the definition of "pregnancy termination" to "types of pregnancy terminations that are legal in a given state." Tennessee has provided no basis for the Court to do so.

2021 Rule.  HHS explained that the provision was intended to *expand* access to health services, not to limit access.  *See* 86 Fed. Reg. at 56164 ("[I]t is important for Title X clinics to provide referrals and linkages to a wide range of healthcare services to help facilitate access for Title X clients . . . .").  There is no conflict between this provision and HHS's interpretation of the 2021 Rule.

Tennessee argues that this provision, which applies to all referrals and not just abortion referrals, amounts to a total ban on referring patients to healthcare providers that are not "in close physical proximity to the Title X site."  (Doc. 21, at 25.)  Tennessee's tortured reading would destroy the plain meaning of the provision:  if a doctor at a Title X site in Cheyenne, Wyoming, found that one of her patients had cancer that required treatment at the University of Colorado Cancer Center, about a ninety minutes' drive away, then Tennessee's interpretation would sanction the doctor's refusal to refer that woman for treatment, despite the provision's stated goal of expanding access to health services.  Nothing about the regulation's language supports such an understanding.  After all, the regulation is most likely to impact underserved populations and logically would aim to increase the likelihood they receive services.  Encouraging a referral to a provider more easily accessible to that population due to proximity, it stands to reason, raises the likelihood that the patient will receive the necessary care.  A referral to an unnecessarily distant provider could accomplish the opposite.  But if the most feasible referral is to a provider some distance away, the regulation plainly contemplates such a referral.

Tennessee also suggests that this provision gives Title X providers the authority to refuse to provide referrals for any type of medical service if the provider deems that doing so is not "feasible."  (Doc. 21, at 25.)  Tennessee points to no part of the administrative record, notice of proposed rulemaking, or the 2021 Rule itself that supports its reading that "when feasible"

allows providers to unilaterally veto the 2021 Rule's referral requirement. As noted, the provision requires referrals be made to healthcare providers "who are in close physical proximity to the Title X site, when feasible, in order to promote access to services and provide a seamless continuum of care." 42 C.F.R. § 59.5(b)(8). The first part of the provision, which precedes the phrase "when feasible," is concerned with the *distance* between providers, requiring referrals to providers "who are in close physical proximity to the Title X site." *Id.* The second part of the provision, following "when feasible," explains *why* nearby referrals are preferable–because they "promote access to services and provide a seamless continuum of care." *Id.* Neither of these clauses, surrounding and potentially modified by "when feasible," addresses what *kind* of referrals providers are required to make. The phrase "when feasible" modifies a preference for nearby referrals; it does not even remotely invoke the idea of whether a procedure is legal inside the state. Tennessee's interpretation of the 2021 Rule is plainly unreasonable.

Nor is it plausible to believe that HHS would draft a regulation that both requires referrals for abortions and allows providers to completely ignore that requirement if they decide, for whatever reason, it is not "feasible." If HHS sought to give providers broad discretion to refuse to refer patients for medical services, it would either do so clearly or simply eschew any mandatory conditions as to when referrals must be made. Moreover, as explained below, it is entirely "feasible" for providers to refer patients for abortions while still complying with Tennessee law.

Finally, Tennessee argues that HHS cannot require it to counsel and refer for abortions because to do so is not "allowable" under state law. (Doc. 21, at 24 (citing 42 C.F.R. § 59.5(b)(6).) The 2021 Rule requires that "family planning medical services will be performed under the direction of a clinical services provider, with services offered within their scope of

practice and allowable under state law, and with special training or experience in family planning."  42 C.F.R. § 59.5(b)(6).  In promulgating the final 2021 Rule, HHS received comments that "were specific to advanced practice registered nurses (APRNs)."  86 Fed. Reg. at 56163.  The commenters asked that the final rule specify that APRNs "be able to serve as the medical director (in states with full practice authority)."  *Id.*  HHS stated that it agreed and would add the phrase "allowable under state law" in order to "more clearly reflect the role of a broader range of *healthcare providers* in providing Title X services."  *Id.* at 56163–64 (emphasis added). This language relates to *who* specifically may serve as a clinical services provider and has no relation to whether the *services* being provided in general are allowable under state law.  HHS's interpretation of the 2021 Rule is in line with the plain meaning of this provision.

Tennessee's argument independently fails because providing counseling and referrals for abortions *is* "allowable under state law."  Tennessee's abortion ban and the 2021 Rule do not conflict.  Tennessee's statute contains no language whatsoever related to counseling or referral for abortions.  *See generally* Tenn. Code Ann. § 39-15-213.  It merely provides that "[a] person who performs or attempts to perform an abortion commits the offense of criminal abortion."  *Id.* § 39-15-213(b).  There is no basis for prosecuting a doctor who counsels or refers a woman for an abortion.  *Id.*  Abortion counseling and referral are therefore plainly "allowable under state law."  Tennessee's law in no way hinders its Title X project staff from complying with the 2021 Rule.

Because HHS's interpretation is in line with the plain meaning of the 2021 Rule, Tennessee has not clearly demonstrated that it is likely to succeed on this basis.

c. Arbitrary and Capricious

An agency action would "normally . . . be arbitrary and capricious if the agency has: [1] relied on factors which Congress has not intended it to consider, [2] entirely failed to consider an important aspect of the problem, [3] offered an explanation for its decision that runs counter to the evidence before the agency, or [4] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Ohio*, 87 F.4th at 772. "Although courts are to engage in a careful review of the facts and record, our ultimate standard of review is narrow and deferential." *Ohio*, 87 F.4th at 772 (citation and internal quotation omitted). As such, "a court is not to substitute its judgment for that of the agency," *State Farm*, 463 U.S. at 43, and the court must "respect [the agency's] policy choice." *Ohio*, 87 F.4th at 772.

Under the arbitrary-and-capricious standard of review, the core duty of the court is to "ensure that the agency 'articulate a rational connection between the facts found and the choice made and . . . provide something in the way of documentary support for its action.'" *Hosseini v. Nielsen*, 911 F.3d 366, 371 (6th Cir. 2018) (cleaned up) (quoting *GTE Midwest, Inc. v. Fed. Commc'ns Comm'n*, 233 F.3d 341, 345 (6th Cir. 2000)). Importantly, while an agency must generally explain its reasoning, a court should still "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *Ohio*, 87 F.4th at 775 ("As long as the agency's explanation is clear enough that its path may reasonably be discerned, we must respect its policy choice.") (internal quotations and citation omitted).

Tennessee argues that HHS's decision not to fund its Title X grant was arbitrary and capricious because HHS: (1) ignored important aspects of the problem; (2) changed its position

on what the 2021 Rule required without explanation; and (3) disregarded Tennessee's reliance interest in receiving Title X funding. (Doc. 21, at 25–29.)

*1. Ignoring Important Aspects of the Regulatory Problem*

An agency action may be arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. Tennessee argues that, in requiring grantees to refer for abortions, HHS failed to consider four important aspects of the regulatory problem: (1) whether post-*Dobbs* application of the 2021 Rule to states banning abortion is reasonable; (2) whether out-of-state referrals are medically appropriate; (3) whether the 2021 Rule would increase compliance costs; and (4) whether this application would lead to a reduction in the quality of care for Tennesseans. (Doc. 21, at 26–27.)

Tennessee essentially contends that, in light of the *Dobbs* decision, HHS was required to revisit and reconsider whether it should have promulgated the 2021 Rule in the first place. The Supreme Court explicitly rejected the same argument in *Auer*, 519 U.S. 452. In *Auer*, police sergeants challenged an overtime-pay regulation promulgated by the Secretary of Labor prior to a Supreme Court decision that upheld the application of the Fair Labor Standards Act to public-sector employees. *Id.* at 454–55. The challenge turned on whether it was arbitrary and capricious for the agency, in the wake of the Supreme Court decision, not "to give adequate consideration to whether it really [made] sense to apply [an agency rule] to the public sector." *Id.* at 458. The Supreme Court rejected the argument, holding that "where, as here, the claim is . . . that it was 'arbitrary' and 'capricious' not to conduct amendatory rulemaking (which might well have resulted in no change), there is no basis for the court to set aside the agency's action prior to any application for relief addressed to the agency itself." *Id.* at 458–59. The court

explained that a party desiring an agency to reconsider its rule must petition the agency to amend its rule. *Id.* (citing 5 U.S.C. § 553).

As the Sixth Circuit pointed out in *Ohio*, while "[t]he impact of *Dobbs* on the Title X program is undoubtedly an 'important aspect' of the question now, [] judicial review of agency action is limited to the grounds that the agency invoked when it took the action." *Ohio*, 87 F.4th at 774 n.7 (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020)). The only thing HHS was required to do in refusing to fund Tennessee's grant was to determine whether TDH was out compliance with the 2021 Rule and, if so, explain why it was out of compliance. *See Hosseini*, 911 F.3d at 371 (noting that under the arbitrary and capricious standard, an agency must "articulate a rational connection between the facts found and the choice made and . . . provide something in the way of documentary support for its action") (citation and internal quotations omitted). HHS did just that. It explained in both of its March 2023 letters that, as a condition of receiving a Title X grant, Tennessee was required to comply with HHS regulations. (*See* Docs. 1-9, 1-11.) HHS further explained that Tennessee's current policy to only counsel and refer for pregnancy-termination options that are "legal in the state of Tennessee" was not in compliance with the 2021 Rule's requirement that grantees counsel and refer for abortion. (*See id.*) HHS even noted how Tennessee's policy could be changed to comply with the Rule. (*See* Doc. 1-9.) When Tennessee refused to change its policy, HHS stated that it would not fund Tennessee's Title X grant, because "Tennessee is out of compliance with the Title X regulation requirements." (Doc. 1-11, at 1.) Nothing required HHS to do more.

Because HHS reasonably explained the basis for its decision, Tennessee has not demonstrated it is likely to succeed on this basis.

*2. Unlawful Position Change*

Tennessee next argues that HHS unlawfully changed its interpretation of the 2021 Rule without explanation. (Doc. 21, at 28.)

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (citations omitted). As such, "[a]n agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citation omitted). While a change in an agency position does not require a greater degree of justification, the agency still must "provide reasoned explanation for its action" and the agency must "display awareness that it *is* changing position." *Id.* "Reasoned decision making, therefore, necessarily requires the agency to acknowledge and provide an adequate explanation for its departure from established precedent." *Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089–90 (D.C. Cir. 2009) (citing *Fox*, 556 U.S. at 515).

Since its inception, HHS has interpreted the 2021 Rule as requiring counseling and referrals for abortion.[15] *See* 86 Fed. Reg. at 56144 (noting that "[t]he effect of this 2021 final rule is to revoke the requirements of the 2019 regulations, including removing restrictions on nondirective options counseling and referrals for abortion services"). HHS has never suggested that this requirement could be modified by a state's abortion laws. *See generally id.* Post-*Dobbs*, HHS issued guidance which reaffirmed that *Roe*'s overturning did not affect what the 2021 Rule required. (*See* Doc. 1-6, at 4 (noting that *post*-Dobbs, "per the 2021 Title X rule, Title X recipients are required to offer pregnant clients the opportunity to be provided information and

[15] As the Court has noted, all previous iterations of the Counseling and Referral Rule have been interpreted by both HHS and courts as concerning counseling and referrals for abortions. *See supra* Section I.A–B.

counseling regarding [pregnancy termination]" and "referral upon request"). In finding that Tennessee was not complying with the 2021 Rule's abortion counseling and referral requirements, HHS continued to apply this same interpretation. It did not "depart from a prior policy" and was therefore not required to acknowledge it was changing course or provide an explanation for why it was changing course. *Fox*, 556 U.S. at 515.

Nevertheless, Tennessee claims that HHS unlawfully changed its interpretation of the 2021 Rule without explanation, an argument which hinges on Tennessee's unsupported view of HHS's July 2022 Review of Tennessee's Title X project. (Doc. 21, at 28.) During the review, Tennessee informed HHS that its new Nursing Protocol allowed staff only to "offer counseling and referrals for pregnancy terminations that are legal in Tennessee." (Doc. 1-5, at 3, 5.) Tennessee argues that, because the Nursing Protocol was in place during the July Review (*id.* at 7) and because HHS was aware that Tennessee's abortion ban would trigger on August 25, 2022, HHS implicitly blessed Tennessee's *future* practice of not counseling and referring for abortions. (Doc. 21, at 28.) But HHS's July Review only assessed Tennessee's compliance at the time of that review, and, at that time, Tennessee's anti-abortion law had not gone into effect. *See* Doc. 1-2, at 1 (email noting that HHS had found Tennessee in compliance "as of the date of the [July] Review"); Tenn. Code Ann. § 39-15-213 (establishing August 25, 2022, as the effective date of Tennessee's anti-abortion law). This meant that Tennessee, pursuant to the July 2022 Nursing Protocol, continued at that point to provide counseling and referrals for abortion in compliance with HHS's regulation. (*See* Doc. 1-5, at 3, 5 (noting that nurses should provide counseling on options that are "legal in the State of Tennessee")); (Doc. 1-1, at 24, 58 (summarizing the July Review's findings that "non-directive pregnancy counseling [was] offered by nurse practitioners," and noting that TDH policies required "staff to offer clients with positive

pregnancy tests all options counseling and referrals upon request").)[16] After all, abortion was still legal in Tennessee at that time. The July Review did not assess whether Tennessee would be in compliance in the future and certainly did not endorse or approve Tennessee's future policy of not referring for abortions.[17]

[16] Tennessee cites to the notes HHS made in its July Review to insinuate that Tennessee had already halted abortion referrals at the time of the Review and that HHS blessed this stance. (*See* Doc 1, at 15 ("[HHS's] Program Review Report evaluated whether Tennessee's Health Department complied with the Referral Mandate and found '[t]his expectation was met.' That conclusion held, [HHS] elaborated, despite '[n]o referrals for abortion [being] made.'") (quoting July Review)); (Doc 21, at 28 ("That review addressed Tennessee's abortion policy directly, concluding that . . . Tennessee was 'in compliance' with governing HHS rules, even when '[n]o referrals for abortion are made.'") (quoting July Review)); (Doc. 27, at 13 ("Under the July 2022 policy, HHS wrote, '[n]o referrals for abortion are made,' but still the 2021 Rule's 'expectation was MET.'") (quoting July Review)).)

Tellingly, Tennessee is very careful to never once assert factually that it was not providing abortion referrals at the time of the review. If it were true, Tennessee would surely submit evidence that it had not been complying with the 2021 Rule's referral requirement. Instead, Tennessee shapes its argument to invite a presumption that it was not providing abortion referrals. The Court will make no such presumption, despite the efforts to befog the issue.

It is true that the July Review is not entirely clear as to what the line "[n]o referrals for abortion are made" means. However, the Court finds it highly doubtful that it reflects a drastic and unexplained break from agency policy. It is far more likely that this line merely embodies the expectation that Title X grantees not set up appointments for women seeking abortions. 86 Fed. Reg. at 56150 (stating that referrals for abortion are limited to "providing a patient with the name, address, telephone number, and other relevant factual information" and that a grantee "may not take further affirmative action (such as negotiating a fee reduction, making an appointment, providing transportation) to secure abortion services for the patient"). Regardless, any lack of clarity cuts against Tennessee at the preliminary-injunction phase, as Tennessee bears the burden of making a clear showing of success on the merits. *See Pub. Int. Rsch. Grp. of Mich. (Pingam) v. Brinegar*, 517 F.2d 917, 918 (6th Cir. 1975) (finding that the district court "clearly acted within the scope of a proper exercise of discretion in refusing to grant a preliminary injunction" when "the possibility that the appellants would succeed on the merits was at best uncertain and problematical").

[17] The July Review suggests that HHS did in fact inform Tennessee that it would still be required to refer women for abortion after its abortion ban went into effect. In assessing Tennessee's referral policy, an HHS "reviewer recommended that out-of-state abortion referral resources are available at the Hamilton site to clients who request this information for an unintended pregnancy, (insofar as this procedure will no longer be available in Tennessee)." (Doc. 1-1, at 31.)

Tennessee also leans heavily on an October 19, 2022 email sent by Trisha Reed, an HHS Title X Project Officer, to TDH officials. (Doc. 1-2.) Tennessee points out that in this email Reed stated that Tennessee had "a wonderful review" and "a strong Title X program." (*Id.* at 1.) Tennessee again argues that, because HHS was aware of its anticipated policy that it would not counsel and refer for abortions, the email represents tacit approval of Tennessee's policy. (Doc. 21, at 28.) It does not. This email simply provides the results of the July Review and states that HHS determined that Tennessee was in compliance with HHS regulations at the time of the review—before Tennessee's anti-abortion law went into effect. The fact that Reed asked that Tennessee "update us on the policy changes [to patient counseling] in response to enactment of [Tennessee's abortion ban]," suggests that HHS had concerns over whether Tennessee continued to meet its obligations under the 2021 Rule after the state's abortion ban took effect two months prior. (Doc. 1-2, at 1.) If HHS had truly already given approval to a policy of not counseling or referring for abortions, there would be no need for an update.[18]

Because HHS did not change its position as to what the 2021 Rule required, Tennessee has not shown that it is likely to succeed on this basis.

[18] Tennessee also briefly argues that HHS had taken the position that states would not be required to comply with the Counseling and Referral Rule if they objected to it. (Doc. 21, at 28.) This is not the case. HHS has only ever noted that individual providers, not entire states, could qualify as objectors under applicable federal conscience laws. *See* 42 C.F.R. § 59.5(a)(5) n.2 ("Providers may separately be covered by federal statutes protecting conscience and/or civil rights."); 86 Fed. Reg. at 56153–54 (noting that "objecting individuals and grantees will not be required to counsel or refer for abortions in the Title X program in accordance with applicable federal law"). In promulgating the 2021 Rule, HHS explicitly acknowledged that the Rule may conflict with the preferred policies of some states but in no way suggested that those states would qualify as objectors. 86 Fed. Reg. at 56169. HHS instead noted that "states that object to the rule requirements or believe that there is a conflict with state law priorities are free to opt out of the federal grant program." *Id.*; *see also Ohio*, 87 F.4th at 774 n.8 (noting that, "[b]oth HHS and the States seem to agree that the States are not 'health care entities' entitled to conscience protection").

*3. Reliance Interests*

The Supreme Court has noted that a change of an official agency policy or position "that does not take account of legitimate reliance on [a] prior interpretation . . . may be arbitrary, capricious [or] an abuse of discretion." *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) (citations and quotations omitted). When the agency's official prior position has created this "reliance interest," an agency must provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox*, 556 U.S. at 516. Reliance interests are only created by "longstanding [agency] policies." *Encino,* 579 U.S. at 222. Agency policies that have only existed for a short period of time do not create reliance interests that the agency is bound to consider when changing course. *Compare Breeze Smoke, LLC v. FDA*, 18 F.4th 499, 507 (6th Cir. 2021) (holding that a two-year old agency guidance "does not qualify as longstanding" agency policy) *with Encino*, 579 U.S. at 222 (finding that a reliance interest was created by an agency guidance which had existed for thirty-three years).

An agency must only consider reliance interests when departing from a previous official position. *See Regents*, 140 S. Ct. at 1913 (noting that reliance interests must be considered "when an agency changes course"). As the Court has already determined, *see supra* Section III.A.ii.c.2., HHS never changed its position as to what the 2021 Rule required. HHS therefore did not need to consider any reliance interest that Tennessee may have had. *See Smiley*, 517 U.S. at 742 (finding that reliance interests were not implicated because "we do not think that anything which can accurately be described as a change of official agency position has occurred here"). Furthermore, if HHS took the position that Tennessee could comply with the 2021 Rule by counseling and referring for only pregnancy terminations that were legal in Tennessee after its abortion ban had taken effect, it did so, at the earliest, on October 19, 2022, when Tennessee

received the results of the July Review.[19] (Doc. 1-2.) Fewer than five months later on March 1, 2023, HHS notified Tennessee that it was out of compliance with the 2021 Rule. An agency position that has existed for only a few months is not "longstanding policy" that can create a reliance interest. *See Breeze Smoke*, 18 F.4th at 507.

Tennessee appears to suggest it has a fifty-year-old reliance interest in receiving Title X grants simply because it has received the funding throughout this period. (Doc. 21, at 28–29.) A reliance interest is created only by reliance on an official agency policy or position. *Encino*, 579 U.S. at 222. Tennessee would only have a reliance interest in receiving Title X grants if it had been HHS's official position or policy to always give Tennessee a grant regardless of whether it complied with HHS rules. It has never been HHS's official policy or position to simply give Tennessee money.[20]

Because Tennessee did not have a reliance interest in receiving Title X funding, Tennessee has not shown that it is likely to succeed on this basis.

***iii. Notice and Comment Rulemaking***

An agency action is a "legislative rule" if it "impose[s] new rights or duties and change[s] the legal status of regulated parties." *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1143

[19] Tennessee received this email a mere thirty-seven business days (or fifty-five calendar days) after its abortion ban went into effect. Accepting Tennessee's argument would also require the Court to ignore the fact that this same email raised concerns about the effect of the ban on the 2021 Rule and asked Tennessee to provide an update. (*See* Doc. 1-2.)

[20] The Court notes that the requirement that an agency account for reliance interests in its decision making is based largely on "the principle that agencies should provide regulated parties fair warning of the conduct a regulation prohibits or requires." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (internal quotation and citation omitted). As the Court has explained, *see supra* Section III.A.i., Tennessee has always been on notice that it must comply with agency regulations to receive Title X funding, and it was on notice that the 2021 Rule required counseling and referrals for abortions. The rationale for considering reliance interests does not apply here.

(6th Cir. 2022) (citation omitted). Generally, an agency may only impose a legislative rule via notice-and-comment rulemaking procedures. *See Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 114 (D.C. Cir. 2021) ("[L]egislative rules require notice and comment . . . .") (citation omitted). However, an agency action that merely interprets or applies an existing regulation does not require notice-and-comment rulemaking. *See id.* (noting that interpretive rules explain "pre-existing legal obligations or rights" and do not require notice and comment); *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995) ("Interpretive rules do not require notice and comment . . . ."); *R/T 182, LLC v. F.A.A.*, 519 F.3d 307, 310 (6th Cir. 2008) ("We find that this is an adjudication, and therefore not subject to the notice and comment requirements of rule-making . . . .").

Tennessee argues that HHS's position that the 2021 Rule requires counseling and referrals for abortions is a new regulation which can only be promulgated via-notice-and-comment rulemaking.[21] (Doc. 21, at 29.) However, as noted above, *see supra* Section III.A.ii.c.2., the 2021 Rule has always required counseling and referrals for abortions. Simply continuing to apply the 2021 Rule does not create "new rights or duties" and cannot be considered a legislative rule requiring notice-and-comment rulemaking. *Mann*, 27 F.4th at 1143. Tennessee has the same duties it has always had under the Rule: to counsel and refer for abortions upon a woman's request. Because HHS's interpretation of the 2021 Rule did not impose new duties or obligations, Tennessee has not shown that it is likely to succeed on this basis.

[21] Tennessee's claim here is premised on its argument that HHS's interpretation of the 2021 Rule is inconsistent with the language of the Rule itself. (Doc. 21, at 22.) Because the Court has found HHS has correctly interpreted the 2021 Rule, *see supra* Section III.A.ii.b., Tennessee's argument is without merit.

In sum, the Court finds that Tennessee has no chance of success on the merits. Though the Court need not analyze any other factor, it will briefly do so. *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997) (holding that "a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed").

**B.      Irreparable Harm**

"A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (citing *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)). The party seeking the injunction bears the burden of clearly showing that its "injury [is] both certain and immediate, not speculative or theoretical." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019) (citation and internal quotations omitted).

Simply showing some degree of irreparable harm will occur is not enough to merit a preliminary injunction; a court must also determine the degree of harm. *See Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) ("[I]n our view, the peculiarity and size of a harm affects its weight in the equitable balance."); *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991) (noting that courts should consider "the substantiality of the injury alleged"). When the likelihood of success on the merits is low, a plaintiff must show a high degree of irreparable harm. *See Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982) ("[I]n general, the likelihood of success that need be shown . . . will vary inversely with the degree of injury the plaintiff will suffer absent an injunction.") (citation omitted); *Ohio ex rel. Celebrezze v. Nuclear Regul. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987) ("[A] stay may be granted with either a high probability of success and some injury or vice versa.").

Here, Tennessee asserts four forms of irreparable harm: (1) the loss of Title X funding; (2) the loss of its entire Title X project; (3) harm to its reputation; and (4) harm to its "sovereign interest in limiting abortion." (Doc. 21, at 30–31.)

Tennessee first states that without an injunction it will not receive the roughly $7 million it otherwise would receive on April 1, 2024. (Doc. 21, at 30; Doc. 21-1, at 2–3.) This represents a degree of imminent and irreparable harm. *See Ohio*, 87 F.4th at 783 (finding that the loss of $1.8 million of Title X funding constituted an irreparable harm to the State of Ohio). However, in light of the Court's finding that Tennessee has very little chance of success on the merits, Tennessee must show a high degree of irreparable harm. *See Friendship Materials*, 679 F.2d at 105. This $7 million represents a very small fraction of the Federal funding that TDH receives, as Tennessee itself notes. (*See* Doc. 21, at 31 (noting that TDH currently receives Federal grants "totaling $1.4 billion").) As such, this relatively minor loss does not represent a great enough degree of irreparable harm to justify granting injunctive relief.[22] [23] *See Kentucky*, 57 F.4th at

[22] Tennessee argues that, because the Sixth Circuit found in *Ohio* that a loss of $1.8 million represented irreparable harm, its $7.1 million loss "alone suffice[s] to support relief." (Doc. 21, at 30); (Doc. 27, at 14); *Ohio*, 87 F.4th at 783. While Tennessee is correct that this loss represents a degree of irreparable harm, that is not where the analysis ends. The Court must still assess the degree of any harm and weigh it against the other preliminary-injunction factors. Unlike in *Ohio*, Tennessee has not established that it is likely to succeed on the merits of its claims. *See id* at 780. As the Sixth Circuit has explained, the degree of irreparable harm is crucial when a plaintiff has not shown a high likelihood of success on the merits. *See Celebrezze,* 812 F.2d at 290 ("[A] stay may be granted with either a high probability of success and some injury or vice versa."). Furthermore, though the court in *Ohio* did not grapple with the size of the monetary harm, it also did not purport to overrule any of its binding precedent requiring courts to weigh the degree of irreparable harm. *See Ohio*, 87 F.4th at 780–83.

[23] Tennessee also notes that it will lose "sizable discounts under the 340B drug-purchase program," which are only available to Title X grantees. (Doc. 21, at 30; Doc. 21-1, at 4.) While Tennessee has established that this harm is likely to occur, Tennessee bears the burden of establishing the size of this monetary harm. *See Hargett*, 2 F.4th at 554 ("The party seeking a preliminary injunction bears the burden of justifying such relief."). Tennessee could surely assess how valuable these discounts have been in recent years, but it has not provided this

556. This damage, on its own or in conjunction with the other harms Tennessee asserts, is not enough to justify a preliminary injunction.

Tennessee next claims that without a preliminary injunction it may lose "[its] Title X program entirely."[24] (Doc. 21, at 30.) This speculative loss does not establish irreparable injury. *See D.T.*, 942 F.3d at 327 (requiring that an irreparable harm not be speculative); *Griepentrog*, 945 F.2d at 154 ("[T]he harm alleged must be both certain and immediate, rather than speculative or theoretical."). The Tennessee General Assembly is providing Tennessee's Title X project with the $7 million it would have otherwise received from HHS. (Doc. 21-1, at 3.) While Tennessee claims that "[c]ontinued state funding for the program is not guaranteed," it presents no evidence that the legislature is considering cutting funding for the Title X project. (Doc. 21, at 31.) To the contrary, the legislature has designated its appropriation as "recurring." (Doc. 21-1, at 3.)

Tennessee next claims that it will suffer reputational harm if HHS reports Tennessee's violation of the terms of its grant to the Federal Awardee Performance and Integrity Information System ("FAPIIS"). (Doc. 21, at 31.) Tennessee argues that being reported could in turn affect its ability to obtain future federal grants. (*Id.*) Tennessee again fails to provide any evidence suggesting this harm is likely to occur, or the extent of the harm if it were to occur. For one, it is

---

information to the Court. The Court therefore cannot meaningfully weigh this harm in favor of Tennessee, even crediting Tennessee's unsupported claim that these discounts are "sizable." *See Ohio*, 87 F.4th at 783 (limiting injunctive relief to the State of Ohio because "Ohio is the only plaintiff-State that provided the requisite facts and affidavits supporting the States' assertion that the 2021 Rule would cause them to suffer the competition-based harm").

[24] Tennessee's Title X project received approximately $18.6 million in funding from April 1, 2022 to March 31, 2023. (Doc. 1-1, at 3.) The HHS grant represented $7.1 million of that funding. While a loss of this funding would be significant, Tennessee has not provided evidence that the entire program will collapse if the federal portion of funding is lost.

not entirely clear that HHS intends to report Tennessee.[25]  More importantly, however,

Tennessee has provided no evidence as to how being reported would affect the grants it currently

receives or will receive in the future.  While Tennessee cites the monetary value of all the federal

grants TDH receives, it provides no evidence as to what extent these grants could be affected, if

at all.  (*Id.*)  Because Tennessee has failed to provide any such evidence, Tennessee's theory of

reputational injury is too speculative. *See Ohio*, 87 F.4th at 784 (finding that the plaintiffs'

inability to provide the "requisite facts and affidavits" supporting their theory of [reputational]

harm rendered their injury too speculative).

Finally, Tennessee claims that "HHS's interference in Tennessee's sovereign interest in

limiting abortion to promote fetal life constitutes a form of irreparable injury."  (Doc. 21, at 31

(citation and quotations omitted).)  Tennessee does not cite binding precedent that supports its

claim that impairing a state's generalized "sovereign interest" constitutes a form of irreparable

harm.[26]  The Sixth Circuit opinion that Tennessee primarily relies upon, *Priorities USA v. Nessel*,

---

[25] The parties dispute how likely it is that Tennessee will be reported.  Defendants argue that there is good reason to believe that Tennessee will not be reported.  (Doc. 26, at 30.)  Nearly a year has passed since HHS found Tennessee to be out of compliance, and HHS has still not reported Tennessee.  (*Id.*)  Furthermore, HHS's Chief Grants Management Officer informed Tennessee in May 2023 that "[a]t this time, [HHS] do[es] not intend to report any concerns regarding the award to [FAPIIS]."  (Doc. 1-17, at 1.)  There is no evidence that HHS's position has changed.  However, HHS regulations state that "[w]hen an HHS awarding agency terminates a Federal award prior to the end of the period of performance due to the non-Federal entity's material failure to comply with the Federal award terms and conditions, the HHS awarding agency *must* report the termination to . . . [FAPIIS]."  45 C.F.R. § 75.372(b) (emphasis added).  HHS's position appears to be in conflict with its own regulations.

[26] Tennessee does point to *Tennessee v. United States Department of Education*, 615 F. Supp. 3d 807 (E.D. Tenn. 2022) to support its argument.  (Doc. 27, at 15.)  However, the court in *Tennessee* found "Plaintiffs suffered an immediate injury to their sovereign interests . . . [because] Defendants' guidance and several of Plaintiffs' statutes conflict."  *Tennessee*, 615 F. Supp. 3d at 841.  This begs the fundamental question whether, in general, a state that has subjected itself to the U.S. Constitution's Supremacy Clause can be irreparably harmed, for the purposes of Federal Rule of Civil Procedure 65, by the federal government's insistence that the

860 F. App'x 419, 423 (6th Cir. 2021), simply holds that preventing a state from "passing and enforcing its laws" represents a form of irreparable harm but says nothing about "sovereign interests" or a state's policy preferences more generally. *See Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020) ("Any time a State is enjoined by a court from *effectuating statutes* enacted by representatives of its people, it suffers a form of irreparable injury.") (emphasis added) (citation and internal quotations omitted). Tennessee does not argue that HHS has prevented it from passing and enforcing its own laws (Doc. 21, at 31; Doc. 27, at 14), and it is clear that Tennessee's abortion ban and the 2021 Rule are not in conflict. *See supra* Section III.A.ii.b. It is not impossible for Tennessee to enforce its statute banning abortion while also following the 2021 Rule. It merely prefers not to.[27] Furthermore, even if a generalized harm to state sovereignty represented a form of irreparable injury, the Supreme Court has noted that "[r]equiring States to honor the obligations voluntarily assumed as a condition of federal funding before recognizing their ownership of funds simply does not intrude on their sovereignty." *Bell v. New Jersey*, 461 U.S. 773, 790 (1983). Even if HHS regulations and Tennessee law were in conflict, there would therefore be no irreparable harm.

Tennessee has established it will suffer only a small degree of irreparable harm. This is not enough to justify granting an injunction without a strong showing of likelihood of success on

---

state abide by otherwise valid federal law. Even assuming that a conflict between a federal regulation and a state statute represents an irreparable injury to a state's "sovereign interest," there is no existent conflict here between Tennessee's abortion ban and the 2021 Rule. Therefore, the Court need not decide whether Tennessee's assertion of irreparable harm must necessarily rise and fall with the likelihood of success on the merits.

[27] Tennessee asserts that it directed TDH to stop counseling and referring for abortions in order to "adhere to the State's changed abortion landscape." (Doc. 21, at 13.) Tennessee does not explain what this vague phrase means. And Tennessee never explains why it is impossible for a doctor to comply with Tennessee's abortion ban and the 2021 Rule. Tennessee instead suggests that the state now seeks to limit women's access to abortion, even outside the state.

the merits. Tennessee has not made this showing. *See Griepentrog*, 945 F.2d at 153–54 ("[E]ven if a movant demonstrates irreparable harm that decidedly outweighs any potential harm to the defendant if a stay is granted, he is still required to show, at a minimum, serious questions going to the merits.") (citation and internal quotations omitted).

**C. Harm to Others and Public Interest**

The third and fourth factors of the preliminary-injunction analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). It is in the public interest to enforce legitimate laws and regulations that implicate a matter of public importance. *See Priorities USA*, 860 F. App'x at 423 ("[T]he public interest necessarily weighs against enjoining a duly enacted statute, and our assessment that the appellants will likely prevail on the merits tips the public-interest factor further in their favor."); *Kentucky v. Biden*, 23 F.4th 585, 612 (6th Cir. 2022) ("[T]he public's true interest lies in the correct application of the law.") (citation omitted).

Both parties agree that the public interest lies in the correct application of Title X and its regulations. (*See* Doc. 21, at 32; Doc. 26, at 31.) Because the Court has determined that HHS's actions were lawful, this factor favors Defendants. [28]

[28] Tennessee argues that HHS's actions are not in the public interest, because its refusal to fund Tennessee's Title X grant will "strip[] untold thousands of needy Tennesseans of their access to vital family planning services." (Doc. 21, at 32.) As noted above, this harm is highly speculative. Moreover, HHS has determined that it is in the public interest that Title X patients receive medically accurate information from their doctor and has further determined that this information leads to better health outcomes. *See generally* 86 Fed. Reg. 56144. Unlike Tennessee, HHS has presented evidence indicating that a Gag Rule, such as the one Tennessee is attempting to impose on a state level, has negative health consequences. *Id.* This too weighs in favor of Defendants' position.

## IV. CONCLUSION

Tennessee had two options: comply with the 2021 Rule and receive the Title X grant money or choose not to comply and forego the money. It made its choice, knowingly and voluntarily. It has no basis to force funding from HHS without meeting the obligations upon which the funding is conditioned. For the reasons stated above, Tennessee's motion for a preliminary injunction (Doc. 20) is **DENIED**.

**SO ORDERED.**

/s/ ***Travis R. McDonough***
**TRAVIS R. MCDONOUGH**
**UNITED STATES DISTRICT JUDGE**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

1. STATE OF OKLAHOMA,

*Plaintiff*,

v.

1. UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;
2. XAVIER BECERRA, in his official capacity as the Secretary of the U.S. Department of Health and Human Services;
3. JESSICA S. MARCELLA, in her official capacity as Deputy Assistant Secretary for Population Affairs; and
4. OFFICE OF POPULATION AFFAIRS,

*Defendants*.

Case No. 23-CV-01052-HE

**PLAINTIFF'S RESPONSE TO DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY**

On March 13, 2024, Defendants in this matter filed a Notice of Supplemental Authority (Doc. 31). At the outset, the Tennessee Court's Memorandum is not binding authority, nor is it persuasive. To begin, the similarity in these actions is confined to Defendants' wrongful actions of suspending and terminating Title X funding from Oklahoma and Tennessee. Oklahoma's motion for a preliminary injunction presents

arguments not presented to the Tennessee Court and relies on aspects of Oklahoma law that differ from Tennessee state law. For instance, the Tennessee Court repeatedly belabors its conclusion that Tennessee law does not prohibit abortion counseling and referrals. *E.g.*, Doc. 31-1 at 6, 26. Even assuming this is a correct interpretation of Tennessee law, this is not the case in Oklahoma. *See* Doc. 23 at 5, 13.

Defendants assert that the Tennessee Court's Memorandum is relevant for five reasons. Oklahoma briefly addresses each in turn, although much more could be said. First, on the Spending Clause, the Tennessee Court focused much on its finding that Tennessee was on notice of the abortion requirements imposed by Defendants in 2021. It did not account for Oklahoma's point that, by Defendants' own admission, Title X funding is an annual contract subject to renegotiation. Doc. 29 at 5. And the rest of the Tennessee Court's analysis amounts to a plain (and plainly incorrect) holding that Congress can indeed circumvent the Spending Clause's requirement of clear conditions by delegating *carte blanche* authority to agencies to invent conditions out of whole cloth.

Second, with respect to whether Defendants violated statutory authority and their own regulations in terminating Title X funding, the Tennessee Court did not discuss the Weldon Amendment, which profoundly impacts any analysis on this issue. That alone places an enormous amount of daylight between the Tennessee case and Oklahoma's.

Third, with respect to arbitrary and capricious arguments, the Tennessee Court downplayed the plain language of Defendants' own regulations. Particularly, concerning whether the required counseling and referral is "allowable under state law," it chose to graft in limitations that are not present in the text.

Finally, with respect to irreparable harm, Oklahoma has submitted evidence detailing the irreparable harm Oklahoma faces. Moreover, the Tennessee Court acknowledged that interference with a state's ability to pass and *enforce* its own laws constitutes irreparable harm. Unlike the Court's finding about Tennessee law, Oklahoma law prohibits abortion counseling and referrals. By redirecting Oklahoma's Title X funding to out of state entities for the purpose of entering Oklahoma to offer abortion counseling and referrals, Defendants' actions affect Oklahoma's ability to *enforce* its own laws.

Respectfully submitted,

*s/ R. Tom Hillis*
Garry M. Gaskins, II, OBA # 20212
*Solicitor General*
Zach West, OBA # 30768
*Director of Special Litigation*
Audrey Weaver, OBA # 33258
*Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st St.
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Audrey.Weaver@oag.ok.gov

AND

Barry G. Reynolds, OBA # 13202
R. Tom Hillis, OBA # 12338
J. Miles McFadden, OBA # 30166
TITUS HILLIS REYNOLDS LOVE, P.C.
15 E. 5th St., Suite 3700
Tulsa, OK 74103
Phone: (918) 587-6800
Fax: (918) 587-6822

reynolds@titushillis.com
thillis@titushillis.com
jmcfadden@titushillis.com

AND

Anthony J. (A.J.) Ferate, OBA # 21171
SPENCER FANE
9400 North Broadway Extension,
Suite 600
Oklahoma City, OK 73114
Phone: (405) 844-9900
Fax: (405) 844-9958
AJFerate@spencerfane.com

*ATTORNEYS FOR PLAINTIFF,*
*THE STATE OF OKLAHOMA*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of March 2024, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant:

Michael Patrick Clendenen
michael.p.clendenen@usdoj.gov

Robert C Merritt
robert.c.merritt@usdoj.gov

Alexandra R. Saslaw
alexandra.r.saslaw@usdoj.gov

*/s/ R. Tom Hillis*
R. Tom Hillis

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| 1. STATE OF OKLAHOMA,<br><br>*Plaintiff,*<br><br>v.<br><br>1. UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;<br><br>2. XAVIER BECERRA, in his official capacity as the Secretary of the U.S. Department of Health and Human Services;<br><br>3. JESSICA S. MARCELLA, in her official capacity as Deputy Assistant Secretary for Population Affairs; and<br><br>4. OFFICE OF POPULATION AFFAIRS,<br><br>*Defendants*. | Case No. 23-CV-01052-HE |

**PLAINTIFF'S NOTICE OF INTENT TO OFFER EVIDENCE**

Pursuant to this Court's Order dated March 12, 2024, setting Plaintiff's Motion for Preliminary Injunction for Hearing (Doc. 30), Plaintiff, the State of Oklahoma, gives notice that it intends to offer as evidence the exhibits attached to Plaintiff's Complaint (Doc. 1) and Plaintiff's Motion for Preliminary Injunction and Opening Brief in Support (Doc. 23), including the Declaration of Tina Johnson (Doc. 23-1). Counsel for Defendants has advised that Defendants do not object to Plaintiff submitting the Declaration as evidence. Plaintiff

may also submit as evidence Title X Program Review Reports prepared by Defendants for Title X programs in other states. To streamline the hearing for the Court, Plaintiff will rely on the Declaration and does not intend to call any witnesses to testify in person at the hearing on March 26, 2024.

Respectfully submitted,

*s/ R. Tom Hillis*
Garry M. Gaskins, II, OBA # 20212
*Solicitor General*
Zach West, OBA # 30768
*Director of Special Litigation*
Audrey Weaver, OBA # 33258
*Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st St.
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Audrey.Weaver@oag.ok.gov

AND

Barry G. Reynolds, OBA # 13202
R. Tom Hillis, OBA # 12338
J. Miles McFadden, OBA # 30166
TITUS HILLIS REYNOLDS LOVE, P.C.
15 E. 5th St., Suite 3700
Tulsa, OK 74103
Phone: (918) 587-6800
Fax: (918) 587-6822
reynolds@titushillis.com
thillis@titushillis.com
jmcfadden@titushillis.com

AND

Anthony J. (A.J.) Ferate, OBA # 21171
SPENCER FANE
9400 North Broadway Extension,
Suite 600
Oklahoma City, OK 73114
Phone: (405) 844-9900
Fax: (405) 844-9958
AJFerate@spencerfane.com

*ATTORNEYS FOR PLAINTIFF,*
*THE STATE OF OKLAHOMA*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of March 2024, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant:

Michael Patrick Clendenen
michael.p.clendenen@usdoj.gov

Robert C Merritt
robert.c.merritt@usdoj.gov

Alexandra R. Saslaw
alexandra.r.saslaw@usdoj.gov

*/s/ R. Tom Hillis*
R. Tom Hillis

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

**MINUTE SHEET OF PROCEEDINGS HELD IN A CIVIL PROCEEDING**

STATE OF OKLAHOMA, )
)
Plaintiff, )
vs. ) NO. CIV-23-1052-HE
)
UNITED STATES DEPARTMENT OF )
HEALTH AND HUMAN SERVICES, )
ET AL., )
)
Defendants. )

**CIVIL MOTION DOCKET**

| **Judge Joe Heaton, Presiding** | Date and Time: **03/26/2023 @ 1:30 p.m. to 3:45 p.m.**<br>Total Time: **2.45 hours** |
|---|---|
| Lisa Minter, Deputy Clerk | Susan Fenimore, Court Reporter |

| **Appearances of Counsel for plaintiff:** | **Appearances of Counsel for defendants:** |
|---|---|
| R. Tom Hillis, Esq.<br>J. Miles McFadden, Esq.<br>Garry Gaskins, Esq.<br>Barry Reynolds, Esq.<br>Anthony Ferate, Esq.<br>Audrey Weaver, AG<br>Zachary West, AG | Michael Clendenen, DOJ |

**PROCEEDINGS**: **Non-Evidentiary** Hearing held on plaintiff's motion for preliminary injunction [Doc. #23] filed 01/26/2024.

**Hearing Type**: ☒**Oral Arguments only**.
☐ Other: ____________________________.

**Proceedings**: Counsel for the parties present. The court hears oral arguments from counsel for the State of Oklahoma and counsel for defendants. For the reasons stated from the bench plaintiff's motion for preliminary injunction [Doc. #23] is **DENIED.** Parties to file a joint status report as to how the parties anticipate going forward in light of the court's denial of plaintiff's motion within 3 weeks. Written order to follow.

**Court Adjourned**.

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| STATE OF OKLAHOMA,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>Defendants. | ) | NO. CIV-23-1052-HE |

**ORDER**

For the reasons stated on the record at the hearing on March 26, 2024, plaintiff's Motion for Preliminary Injunction [Doc. #23] is **DENIED.**

**IT IS SO ORDERED.**

Dated this 26th day of March, 2024.

JOE HEATON
UNITED STATES DISTRICT JUDGE

1

IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

STATE OF OKLAHOMA, )
)
Plaintiff, )
)
vs. ) Case No. CIV-23-1052-HE
)
UNITED STATES DEPARTMENT OF )
HEALTH AND HUMAN SERVICES, )
et al., )
)
Defendants. )

* * * * * * *

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE JOE HEATON

UNITED STATES DISTRICT JUDGE

MARCH 26, 2024

AT 1:30 P.M.

MOTION FOR PRELIMINARY INJUNCTION

* * * * * * *

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145
Aplt.App. 539

2

A P P E A R A N C E S

For the Plaintiff:

Mr. R. Tom Hillis
Mr. Barry G. Reynolds
Mr. J. Miles McFadden
Titus Hillis Reynolds Love
15 East Fifth Street, Suite 3700
Tulsa, Oklahoma 74103

Mr. Anthony J. Ferate
Spencer Fane
9400 N. Broadway Extension, Suite 600
Oklahoma City, Oklahoma 73114

Ms. Audrey A. Weaver
Oklahoma Office of the Attorney General
313 NE 21st Street
Oklahoma City, Oklahoma 73105

For the Defendants:

Mr. Michael Patrick Clendenen
United States Department of Justice
1100 L Street, NW
Washington, DC 20530

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145
Aplt.App. 540

(Proceedings held on March 26, 2024.)

THE COURT: I seem to have some imbalance of counsel here. Do you guys want to spread out?

Well, good afternoon, everyone. We're here on Oklahoma vs. U.S. Department of Health and Human Services.

Let me have appearances by counsel, please.

MR. HILLIS: Tom Hillis for the State of Oklahoma, and with me is Barry Reynolds, my partner Miles McFadden, my partner A.J. Ferate, and Audrey Weaver with the attorney general's office.

I would also like to introduce Ellen Carr, intern with the A.G.'s office, Your Honor.

THE COURT: Let's have her just present this, why don't we?

MR. HILLIS: She would do better than me, Judge.

THE COURT: All right. Mr. Hillis, are you going to be the lead counsel here on this?

MR. HILLIS: Yes, Your Honor.

THE COURT: All right. And who's here on behalf of the defendant?

MR. CLENDENEN: Good afternoon, Your Honor. Michael Clendenen from the Department of Justice.

THE COURT: It's Clendenen?

MR. CLENDENEN: Yes. Yes, Your Honor.

THE COURT: All right. This is in connection with the

State's request for preliminary injunction. Let me ask just as a threshold matter: I think I had mentioned in the order setting the hearing that I wanted everyone to let me know if there was going to be evidence to be offered, and as I understand it from I think the State's submission, the plan is no testimonial evidence, but essentially the various exhibits that have been presented are coming in by agreement; is that essentially what the agreement is?

MR. HILLIS: Yes, Your Honor.

MR. CLENDENEN: Yes, Your Honor.

THE COURT: All right. Okay. Then we'll proceed with the case here just as -- on the basis that it's essentially oral argument.

I have spent a fair amount of time in the briefs in this case. It's got some thorny, many-facetted issues to it, but it did seem to me that it was involved enough and involving enough substantial theories that don't come before me in your average employment discrimination case or felon in possession case that it would be helpful to have some argument from counsel to assist me in making a determination.

So Mr. Hillis, why don't you step to the podium and let's hear from you first and we can start working through this.

I guess at the very outset, I just -- to be very clear on it, in terms of the specific injunction that the State's asking for here, as I understand it, the circumstances are there was a

grant made, and then based on later developments, the grant was terminated.

So is the State's request essentially a mandatory injunction asking me to restore a funding flow or what?

MR. HILLIS: It's not necessarily restore -- I'm sorry, maybe a little loud.

But what we have, Your Honor, we have yearly grants that are made under Title X. And it's my understanding that those grants are documented on April 1st of every year, with the funds flowing in, I believe, July or August of each year.

So that's the need for the preliminary injunction, is to prohibit the HHS from denying Oklahoma a grant solely on the basis that Oklahoma will not require referrals for abortion under Title X.

THE COURT: Maybe I'm splitting hairs here, and it may not make any difference, but I gather, though, that the -- based on the termination letter from the federal department, that the grant has been terminated, so in effect, this would be a declaration or something to reinstate the grant?

MR. HILLIS: To reinstate the grant and to allow us to apply this fiscal year without requiring us to have the program require abortion referrals.

THE COURT: Now, the -- some of the submissions here, I don't recall whose they were, talked in terms of a five-year funding cycle that happens on this Title X program.

I assume we're -- based on what you're saying, that we're now, what, one year into that five-year cycle, but it's just a question of making the further request for the --

MR. HILLIS: Yeah. And it's a little odd. I don't know if it's for accounting reasons, but the grants are for a five-year period, but then there are yearly renewals of that grant.

And so they've taken away the four and a half million already, but what we're here today is to say that the federal government cannot deny us a future grant solely on the basis that we will not refer for abortions.

So in this April -- it's my understanding the grants are announced on April 1. And what we're saying is that the federal government cannot deny Oklahoma a grant solely on the basis that Oklahoma will not refer for abortions.

THE COURT: But the urgency of the April 1 deadline is the State's view that if you're not on the list that's announced April 1, you can't ever get it back later?

MR. HILLIS: That's my understanding, Your Honor. I'm not here as a government grants expert, but we have had detailed communications with the Department of Justice, and that's the understanding that I have, Your Honor.

So the critical deadline is April 1st to be awarded a grant that will be funded in July or August of this year.

THE COURT: Well, in that connection, let me ask, I

think there's -- there was an indication in the -- in your papers that after the termination letter was received from the feds -- I frankly have debated about how to refer to the parties here. You know, we've got enough HHSs on both ends that it gets -- so I may refer to the State and the feds. That may seem less respectful than might be the case otherwise, but --

MR. HILLIS: And in my mind, I do State and then HHS, I'm meaning --

THE COURT: All right. State and HHS is probably a better way to do it.

But at any rate, the suggestion was that after HHS sent the termination letter, there was an appeal --

MR. HILLIS: Yes.

THE COURT: -- that was filed by the State that I gather is still pending.

MR. HILLIS: My understanding, Your Honor, yes.

THE COURT: Does that preserve something in terms of potential entitlement to being funded, if the decision here should ultimately be in the State's favor?

MR. HILLIS: I don't know that we can recoup the funds that have been paid to the Missouri outfit, but that's not what we're seeking now.

What we're seeking now is just a declaration to HHS that says you cannot mandate that Oklahoma have an abortion referral

in its Title VII -- or Title X, I'm sorry -- Title X application. And that would put us in line to get another grant on the next grant cycle.

THE COURT: All right. All right. Go ahead.

MR. HILLIS: Okay.

May it please the Court. Appreciate the Court's attention to this very serious matter for the people of the state of Oklahoma.

I do want to commend the Department of Justice for their collegiality in this case. With the cooperation of the Department of Justice, we have a very finite issue for Your Honor.

And literally, that finite issue is: Is it lawful for health and human services to require Title X grantees to refer patients who request to abortion providers. That's the issue in front of Your Honor.

And that's a crystallized issue that we think is very clearly decided in Oklahoma's favor.

You'll see, just a brief history, Oklahoma has been a Title X grantee for at least four decades. With that, the State of Oklahoma funds very vital family planning services through a network established through the Oklahoma Department of Health.

The State of Oklahoma funds 68 separate county health departments to provide crucial and necessary funding for the

people of the state of Oklahoma.

THE COURT: What are the ones that don't -- that aren't in the 68? Is it like the city-county health departments in the major metro areas that are not part of the mix?

MR. HILLIS: My guess is some of the health departments cover multiple counties, because we've got 68 of the 77 counties, so -- but I can't say that I'm conversational on that. But there are 68 separate health departments that are funded with Title X funds.

With that, Oklahoma is able to provide very valuable family planning services to people largely who would not get access to that.

Oklahoma is largely a rural state. We have two major metropolitan areas: Tulsa and Oklahoma City, obviously. But then the rest of the state -- and I'm from Lawton, so that's not a major metropolitan area, but is a metropolitan area -- but you have large swaths of Oklahoma that are rural without access to quality care.

While that -- those gaps in those, particularly in the rural counties are funded by the State of Oklahoma Department of Health, and literally you have people with no access to medical care, but their county health department. So this issue is critical for the state of Oklahoma.

Oklahoma has adopted this program. It was last reviewed

in 2016. We have that as -- I believe our review is attached. Yeah, it's Exhibit 2 to our preliminary injunction.

You will see that Oklahoma was commended for its Title X program in Exhibit 2. Matter fact, it was so good, that review, that the next review was not even granted or was not even required until 2024.

So Oklahoma has a well-developed, long-standing Title X program that was very, very effective for the people of the state of Oklahoma.

Obviously, the tension in this case comes in 2022. And that's when the United States Supreme Court overruled decades of precedent in the *Dobbs* decision.

All of a sudden, *Dobbs* returned legislation with respect to abortion to the states, where for decades, it had been purely a federal issue. And so that triggered a whole series of events that gets us here today.

And that requirement, it goes back to vacillating HHS regulations on abortion referrals.

Title X is very clear in 1008 that Title X funds cannot be used in a program where abortion is a method of family planning. Crystal clear, no one's arguing that.

HHS has taken, again, a vacillating position, and I think both the U.S. Government and the state government agree on that vacillation.

HHS went from requiring referrals to prohibiting referrals

to requiring referrals. Again, solely on the backdrop of 1008, which says that abortion can't -- funds can't be used in a program where abortion is a method of family planning.

The issue in front of Your Honor was never ripe before *Dobbs*. Because prior to *Dobbs*, Oklahoma could not make illegal referrals for abortion. Again, that changed completely with the *Dobbs* decision.

With the *Dobbs* decision, all of a sudden Oklahoma could, in fact, regulate abortion. Oklahoma's elected leaders have elected -- made the policy decision that not only we're going to outlaw abortion, we're going to outlaw counseling for abortion.

THE COURT: What are you basing that on?

MR. HILLIS: The statute, 861 is the -- 21 O.S. 861, Your Honor.

THE COURT: Well, all right. Go ahead.

MR. HILLIS: Okay. So that creates a tension that didn't exist in this case. So the State Department of Health then looked at the regulations that now have ping-ponged back to having abortion referrals being mandated.

And the State looked at the regulation, which is 42 CFR 59.5, and I'm in A, that requires a Title X program to refer for abortion, if requested.

But what 59(b)(6) provides, contradictory to that mandate, 59(b)(6) provides that "Provide that family planning medical

services will be performed under the direction of a clinical service provider, with services offered within their scope and practice and allowable under state law."

So in Oklahoma's mind, those are contradictory. That there's a thou shalt require abortion referrals, but then there's also a carve out that the services have to be allowable under state law.

So Oklahoma, in their -- they've already been approved for the grant, but now they're doing their yearly approval, they then modify that Oklahoma will comply with the abortion referral, if it's allowable under state law.

THE COURT: Let me ask just I guess partly as a matter of being clear on the timeline, but I think it relates potentially to maybe help focus on where the conflict ultimately came from.

This version of the rule, this 42 CFR 59.5 was adopted in October of 2021 --

MR. HILLIS: Yes, sir.

THE COURT: -- right? And then the grant from -- or the application from the State of Oklahoma under Title X got approved in March of 2022?

MR. HILLIS: Yes.

THE COURT: And then I'm saying this based on what was, I think, in some of the letters back and forth and that were describing the history, but at least it said that in

August of 2022, this would be after the award had been approved, that Oklahoma proposed changes in how the nondirective options counseling was to be provided and wanted to shift to just providing clients with a link to the HHS website.

And, apparently, HHS rejected that, which triggered some kind of an appeal, but at any rate, they rejected that and asked for maybe an alternative proposal.

I mean, is all that accurate as you understand it up to that point?

MR. HILLIS: Well, I think Oklahoma vacillated a little bit here because we initially thought we could lawfully do the link --

THE COURT: Well, that's what I'm getting to.

MR. HILLIS: Yeah.

THE COURT: The -- they talk about wanting some alternative proposals which, apparently, in February of 2023, Oklahoma did make an alternative proposal that proposed that counseling on all pregnancy options, which I assume would include abortion, could come either through the department of health staff or from this All Options Talk Line. That was Oklahoma's proposal.

MR. HILLIS: Tertiary proposal, yes.

THE COURT: I thought tertiary had to do with oil wells.

MR. HILLIS: Well, the first one. I shouldn't use 75-cent words. I'm sorry.

THE COURT: Anyway, but apparently, then, as I understand it, HHS concluded that that was okay, that that --

MR. HILLIS: Initially.

THE COURT: That that alternative proposal would meet the requirements for the grant.

And then there's an indication that it's -- that in May of 2023, Oklahoma advised that it had a change required in our family planning program policy effective late afternoon of 4-27-23.

MR. HILLIS: Yes, you have the chronology correct, Your Honor.

THE COURT: So I guess my question is what happened on the afternoon of 4-27-23?

MR. HILLIS: I'm reading tea leaves here, but what happened, I think, is that *Dobbs* was a complete sea change for the State of Oklahoma. Well, all 50 states. And so it just took some time to work through that.

And so the 4-27 is the ultimate position of the State that we believe it's unlawful to refer for abortion. So I think that was --

THE COURT: I guess the thing that strikes me as odd about that is, I'm quoting this directly when it says that this thing happened late afternoon of 4-27-23. I mean, maybe that's

when the lightbulb went off, I don't know.

But it would seem to me like there must have been something more specific than that that was being alluded to with that level of specificity.

MR. HILLIS: I think that that is, you know, decisions are events, but they're preceded by processes. And I think the 4-27 was the culmination of a process that the State went through in deciding the impact of the *Dobbs* decision, looking at the extant state law and that that was the culmination, that we don't think that referrals for abortions are lawful under the State of Oklahoma law.

THE COURT: And that's based on the 21 O.S. 861 you're talking about?

MR. HILLIS: Yes, Your Honor.

THE COURT: Well, let me ask you about that.

That's what I was looking for previously when I was trying to get it, but the language of that statute makes it criminal to advise a woman to take medication or employ some other means to terminate a pregnancy or to procure the abortion, obviously, but I guess the thing that -- or at least the question that comes to my mind is when it says -- or what is criminalized is advising the woman to go do something.

MR. HILLIS: Right. Or counsel, I believe is in -- I don't have the statute.

THE COURT: There isn't any reference to counseling,

but I guess that's my point. It doesn't say you can't bring up the subject. It just says you can't advise them to take a particular course of action.

So I guess my question would be, as I understand it in terms of what this referral requirement is, it keeps talking in terms of -- what is it -- a nondirective provision of basic information, that if it's nondirective, why would you interpret -- if the nondirective provision of information is what they're talking about, that's what's a referral, then I'm having trouble seeing how that violates the statute.

I mean, statute seems to contemplate somebody advising the woman to do something.

MR. HILLIS: Right. And that's the position of the attorney general of the State of Oklahoma, that the referral would run afoul of 21 O.S., Section 861.

THE COURT: Well, you mean -- is it the attorney general's position that, let's just say you've got a pregnant woman sitting in the -- you know, the local health department office in Lawton and she says, "I'm pregnant, what are my options?" If the health department personnel -- if the health department person sitting there says, "Well, abortion's not legal in Oklahoma unless your life's in danger, but you can call this number to get some other information."

MR. HILLIS: I believe the attorney general takes the position that that's unlawful.

THE COURT: Seriously?

MR. HILLIS: Yes, Your Honor.

THE COURT: Really?

MR. HILLIS: Yes.

THE COURT: Well, okay.

MR. HILLIS: So ...

THE COURT: Does he think it's unlawful to mention the word "abortion"?

MR. HILLIS: I don't think mention, but I think that goes into would that be considered advising or counseling an abortion.

THE COURT: You think -- would it be a crime for someone to say abortion's legal in Colorado? Is that a crime?

MR. HILLIS: I'm not a criminal lawyer, but no, I would not think that would be -- run afoul of 861, to make a factual -- if that's a factual statement.

THE COURT: So if that's not a crime, why would it be a crime to refer somebody to a phone number that might tell them that it was legal in Colorado?

MR. HILLIS: Because that's the purpose, is to promote abortions. And that's what the State of Oklahoma, through its elected legislatures, don't want to do.

THE COURT: But it's Oklahoma's position that anything that mentions the possibility of abortion is thereby promoting it?

MR. HILLIS: I don't think it goes that far, but to give someone abortion providers would at least potentially run afoul of advising someone to get an abortion. And that's the part that is problematic for the State of Oklahoma.

THE COURT: But as I understand it, the referral requirement only applies if the client or the patient, whatever the right word would be, requests it.

MR. HILLIS: That's the way the reg is written. You're right.

THE COURT: And that would suggest that the impetus for the idea of thinking about it is not coming from HHS, it's coming from the client.

MR. HILLIS: The initial one, but then the genesis could always be beyond the person advising it.

The genesis doesn't matter. It's the fact of saying, "Here are abortion providers that you can lawfully get an abortion from." That's the problem that potentially runs afoul of 861.

THE COURT: It would seem to me the question is whether at what point you're advising somebody to do something.

MR. HILLIS: Right. If you're a state official or in a state program and you're handing out something that says, you know, Dr. Smith in Grand Island, Colorado, performs abortion, to me, I can see why the State of Oklahoma, with its policy against abortion, would not want people using state-directed

funds to do that. I think that's a legitimate regulatory ask post *Dobbs*.

THE COURT: Well, may well be a legitimate regulatory ask. I'm not sure that's the same thing as saying it's criminal.

MR. HILLIS: But there's at least litigious uncertainty over that. And that's the part where, you know, we're entitled to construe our state statutes and to direct our county officials on what's lawful and what's not lawful.

And at least there's litigious uncertainty, and, you know, I can't cite you, you know, State v. Smith, the Court of Criminal Appeals said yea or nay, but there's at least litigious uncertainty over there. And discretion being the better a part of valor, I can understand why the department of health said, no, we can't comply with that.

Particularly, in light of -- if you read the rest of the regulation, Your Honor, I think it becomes clear, because as the government noted in their brief, one part of the regulation says -- and this is on page 12 of their brief. This is 59 -- 42 CFR 59.5(a)(5), "Objecting providers or Title X grantees are not required to counsel or refer for abortions." That's their own regulation. That's their own quote right out of their statute or right out of their brief.

THE COURT: Is that the regulation they say's been vacated?

MR. HILLIS: I don't believe so.

THE COURT: Somewhere in a brief there's a footnote --

MR. HILLIS: There was one. I don't believe it's 59.5(a), because that's the one they're trying to tie us up with.

And so I'm fast forwarding. My argument would have proceeded differently, but here, their regulation first of all says, thou shall refer for abortion referrals. But then that same regulation says, "Objecting providers or Title X grantees are not required to counsel or refer for abortions." And I'm quoting right now out of their own brief.

And so those are conflicting right there. And that obviates one of their arguments about the necessary clarity that is needed for a funding requirement.

So the real issue here is: Is the requirement that Title X grantees -- and Oklahoma is a Title X grantee. The grant that we submitted in our paper denominates the State of Oklahoma as a grantee.

Can Title X grantees be denied funding based on a funding condition that is not in the statute? That's the issue in front of Your Honor.

THE COURT: Well, if that's the statute, that sounds like a facial challenge to the regulation to me.

MR. HILLIS: Well, right now what we have is not a facial challenge to the regulation. We've had $4.5 million

yanked away from us.

THE COURT: I understand it has actual consequences, but it does seem to me that if -- to the extent that you're just saying, you know, they didn't have the authority to promulgate the regulation they came up with, that's already been resolved, hadn't it?

MR. HILLIS: No.

THE COURT: What significance --

MR. HILLIS: If you're referring to the *State of Ohio*.

THE COURT: Yes, I am.

MR. HILLIS: Okay. And the *State of Ohio* case, Sixth Circuit --

THE COURT: Right.

MR. HILLIS: That was a facial challenge to the regulation. We're a vastly different area right now because we are --

THE COURT: Well, I assume you would agree, though, that to the extent anything you're doing now is a facial challenge, it's barred by the *Ohio* decision.

MR. HILLIS: It's contrary to the *Ohio* decision. The government has not taken the position that that's collateral estoppel in this case.

THE COURT: Why doesn't that obviously flow here?

MR. HILLIS: Because it was an as-applied or it was a facial challenge and this is an as-applied challenge.

Because --

THE COURT: No, but my question is to the extent that it is a facial challenge in substance, isn't it precluded by the *Ohio* decision?

MR. HILLIS: It's contrary to the *Ohio* decision. I have not been faced with the government arguing that the *Ohio* court or the Sixth Circuit is binding on Your Honor or binding on the State of Oklahoma.

But you are right, the State of Oklahoma was a party in the Sixth Circuit litigation.

THE COURT: Well, I mean, it does seem to me that, you know, ordinarily if I was having to consider a Sixth Circuit case, I would give it whatever weight I thought it deserved based on how persuasive it was. I mean, it doesn't bind me like something out of the Tenth Circuit would.

MR. HILLIS: Out of Denver, right.

THE COURT: But it does seem to me that it's a pertinent distinction here that Oklahoma was a party to that case.

MR. HILLIS: Yes. I agree. I have to distinguish *Ohio*. I will agree with that.

But we can readily distinguish *Ohio*, because *Ohio*, again, as you noted, was a facial challenge. There's a vast difference between a facial challenge and an as-applied challenge in this case.

Because the as-applied challenge, the government, the federal government does not get the benefit of *Chevron* deference. That's crucial in this case.

Because if you read the *Ohio* opinion, its premise is *Chevron* deference. If you took away *Chevron* deference, I'll submit the *Ohio* justices would have reached a different decision, and they should have.

Because in this case, we've had four and a half million dollars taken away from the State of Oklahoma. So we have an as-applied challenge.

As-applied challenges --

THE COURT: Well, what is the difference in terms of -- well, go ahead and finish your sentence.

MR. HILLIS: In a facial challenge, the skin -- the cat hadn't been skinned. In applied challenges, the cat's been skinned. The money is gone from the State of Oklahoma. So we can challenge: Is that funding condition, is it statutorily based?

You have to apply the law without giving deference to the government in this case.

That is absolutely crucial, because if you look at *Pennhurst*, *Pennhurst* is a Judge -- Justice Rehnquist opinion that sets up what Your Honor should do when facing a funding decision by the government.

And *Pennhurst* is absolutely clear that funding conditions

must come from the text of the statute.

THE COURT: This is your Spending Clause argument?

MR. HILLIS: Spending Clause. Article I, Section 8. *Pennhurst* is crystal clear that that clarity must come from the statute. That differentiates the *Ohio* case entirely, because the *Ohio* case, if you'll read it, they spend a lot of pages, a lot of ink and paper on the *Chevron* deference.

But here, the answer, I think, for Your Honor is decided in an as-applied challenge by the *Rust* decision. Because *Rust* clearly holds on all fours that Title X does not either maintain or proscribe abortion referrals. It's just completely agnostic, so there's nothing in that regulation.

THE COURT: Well, it says as a matter of *Chevron* deference that you have to, at least as to that statute, accord deference to the agency's interpretation, which can change over the years. And it has changed.

MR. HILLIS: In an as-applied challenge under *Rust*. But remember, the holding of *Rust* is impactful.

The holding of *Rust* is that the Secretary could, because of the language of 1008, prohibit abortion referrals. That is very consistent with the language of 1008 that says that projects cannot use abortion as a method of family planning.

And so that's just a logical outreach in a facial challenge that the Secretary was okay to ban entirely abortion referrals. That's consistent with the text of 1008.

*Rust* did apply *Chevron* deference to get to that point, but what *Rust* does not stand for is that if a statute is silent as to a funding requirement, can the agency make it up.

THE COURT: Well, but what do you do in a situation like we've got here where the statutes that are part of Title X explicitly says the Secretary can prescribe conditions.

MR. HILLIS: Right. And so you look at that and see, does that give the Secretary carte blanche to come up with whatever rules or regulations that they want.

And if you look at the case law, and this -- we've got to get down into the weeds here, and I apologize for that. But if you look at the case law, the case law is clear --

THE COURT: Well, you don't have to look --

MR. HILLIS: -- that that general delegation does not give the Secretary carte blanche to come up with funding conditions that are not in the statute.

And very clearly, abortion referrals are not in the statute. That's crystal clear --

THE COURT: So you're saying you think the law is that we don't even have to get to the point of worrying about the presence or absence of *Chevron* deference, because it doesn't count anyway?

MR. HILLIS: Yeah, you don't get there because the Secretary was not empowered to exercise legislative function when Congress chose not to do it.

Cases are clear, they can't fill in that legislative gap. And I can walk you through the cases to get you there.

THE COURT: Well, they've been filling in that gap for 30 years.

MR. HILLIS: Well, but remember, for 30 years, there was no tension. The tension shows up in 2022 with the *Dobbs* decision.

THE COURT: The *Dobbs* decision didn't invent the Spending Clause at that point. The Spending Clause --

MR. HILLIS: Right. But there were no challenges to it because it was lawful in every state. Now we at least have serious concern that abortion referrals are unlawful in the State of Oklahoma.

THE COURT: But if that was the case, wouldn't that have come up in the *Ohio* decision?

MR. HILLIS: Not in a facial challenge, because you have *Chevron* deference. The crucial part of -- and I hope you -- I'm making myself clear.

The *Ohio* case was entirely dependent on *Chevron* deference. We don't have *Chevron* deference in an as-applied challenge.

THE COURT: My point is the *Ohio* case said, based on what they viewed as having been determined in *Rust* and the nature of -- what is it -- 1008, that *Chevron* deference did apply and that that included not only the result in *Rust* where they said it's within the permissible zone of regulatory

regulation-making to ban referrals, but it's also within the permissible zone to require them.

MR. HILLIS: Right.

THE COURT: So if that's all the case, I mean --

MR. HILLIS: But that's not all the case, because it only gets to that point based on *Chevron* deference.

You take that *Chevron* deference away and apply the as-applied Article I, Section 8 challenge cases, that's when you see the Secretary does not have the authority to exercise legislative functions. That's crystal clear under every case, and I'm going to unfortunately have to walk you through a relatively tedious exposé, because it is necessary.

The cases that we rely on crystal clear, *Pennhurst* says that the funding conditions must be unmistakably clear. If you look at the *Morrisey* case out of --

THE COURT: Well, let me ask you about one that I was looking at, because I think it's maybe cited in your brief or somebody's brief, but it's the *Arlington Central School District* case that was talking about an attorney's fee statute, as I remember.

MR. HILLIS: Yes. That was in my hit list here.

THE COURT: And the statute, whatever the federal statute was, said you could recover attorney's fees. And --

MR. HILLIS: Expert fees weren't costs, yeah.

THE COURT: And it wasn't a situation, though, of

where, you know, there were suddenly new regulations that came out. It didn't involve regulations. So I guess I'm having trouble seeing how this whole argument fits.

If there is statutory authority for the Secretary to do something and they've done something, I mean, you know, these cases that you've cited on the Spending Clause thing are, basically, it seems to me, saying, you know, you can't enter into what amounts to a contract with the State and then later come in and superimpose requirements on them after the fact. Isn't that the essence of it?

MR. HILLIS: That's part of it.

But I don't know if you're referring to the *Bennett* case, but if you look at each of these cases, and the government cited four principal cases for what I call a general delegation to the administrator. Can -- under a general delegation, can the agency head exercise legislative functions. And the cases are all crystal clear: You absolutely cannot.

The first case they cite is the *Bennett v. Kentucky Department of Education* case, which is a Justice O'Connor opinion under I believe it was Title I of the Elementary Education Act.

And in that case, the federal government provided educational funds to developmentally disabled individuals.

The agency head then came up with a regulation that prohibited, it's called "supplanting," that the State couldn't

use the federal funds and then just yank away the extant State funds that were spent for developmentally disabled, so they had to spend their money and then the federal money was an add-on.

But in *Bennett*, what happened, Congress amended Title I to adopt the supplanting language.

And Justice O'Connor said, "In order to assure that federal funds would be used to support additional services that would not otherwise be available, the Title I program from the outset prohibited the use of federal grants to replace state funds. This prohibition initially was contained in regulations and explained in the program. Congress responded by amending Title I in 1970 to add a provision that specifically prohibited supplanting."

So Congress came in and adopted that as the law of the land. That's what made that appropriate.

And if you look at the text of Justice O'Connor's opinion, she says at page -- I believe it's 47 U.S. 666, "The requisite clarity in this case is provided by Title I." Not the regulation. Title I.

So in that case, Justice O'Connor did not look at the general delegation, she looked at the text of the statute.

If you look at the federal government cites *Biden v. Missouri*, a case wholly not on point. It was a delegation doctrine case using COVID funds.

The final two cases they rely on are *Gruver* and

*Mississippi Commission*. Those two cases are coercion cases. They're not requirements cases. So they're not on point.

So none of the cases stand for the proposition the government cites them for you, that a general delegation to the agency allows it to exercise funds.

The fallacy of their argument should be readily apparent because the only case law that's out there that a general delegation is sufficient to allow the agency to exercise legislative functions is the Tennessee case, Justice McDonough, about ten days ago.

But the important thing -- so you have to look at the -- what undergirds Justice -- Judge McDonough's opinion to see if it's worth following or not.

He cites three primary cases; none of the cases that the government cited here. So Judge McDonough didn't even think they were authoritative. He first of all cites to *Jackson v. Board of Education*. Again, a Justice O'Connor opinion.

In that case, we were dealing with Title IX of funding and whether you could imply a cause of action based on the statute's language.

The language Justice O'Connor uses is -- and this is, I believe, at page 179 or 178. "We reach this result based on the statute's text. In step with Sandoval, we hold that Title IX's private right of action encompasses suits for retaliation because retaliation falls within the statutes

prohibited prohibition of intentional discrimination on the basis of sex."

So Justice O'Connor is saying the authority does not come from the regulator, it comes directly from the statute.

And what the ultimate opinion was, that Congress prohibited discrimination. The Court's construed discrimination to include unlawful retaliation. So that's just putting meaning to the words that Congress used.

THE COURT: But when we're dealing with a situation like what we have here, where Congress has essentially enacted a grant program --

MR. HILLIS: Yes.

THE COURT: -- and it's for the purpose of promoting family planning projects or whatever, is it your position that any requirement that might relate to that simply is unenforceable, unless it's in the statute?

MR. HILLIS: There has to be a statutory -- a nongeneral delegation to the regulator. And that's what the cases say.

THE COURT: Well, I assume you've looked at 59.5 that has a whole bunch of requirements that these plans or projects have to have. You're saying they're all invalid?

MR. HILLIS: The only one we're here on is the abortion referral. I've not studied the other ones, Judge.

THE COURT: But isn't that the logical consequence of

what you're saying, since none of them are in the statute?

MR. HILLIS: No, the one that's crystal clear is that *Rust* tells us abortion referrals are not in Title X. That's binding on every court. And *Rust* says it's not in Title X, and so that's what's binding. And if it's not in Title X, HHS cannot maintain it. And if you look at the cases, that's what it says.

The other case that they rely on is *Davis v. Monroe*. Again, a Justice O'Connor opinion.

She says, "The language of Title IX itself, particularly when viewed in conjunction with the requirement -- prohibition of Title IX's prohibition to be liable in damages, also cabins the range of misconduct."

So throughout *Jackson* and *Monroe*, Justice O'Connor is citing not to regulations, she's citing to the text of Title IX.

They also cite to, curiously -- or Justice McDonough curiously cites the case of -- it was a Judge Alito case, I'm sorry. I've lost it here in my book. *Arlington Central v. Murphy*, where Justice Alito doesn't discuss regulations at all in the majority opinion.

But what's telling is the dissent, Justice Breyer's dissent. And he tells us why, when you're looking at implication of private rights of action, that that does not have the same scrutiny as funding conditions under *Pennhurst*.

Justice Breyer says, "To the contrary, we have held that *Pennhurst* requirement that Congress unambiguously set out a condition on the grant of federal money does not necessarily apply to legislating setting forth the remedies available against a noncomplying state."

So that makes sense when you look at the difference between Article I, Section 1 and Article I, Section 8.

Article I, Section 1 is the delegation doctrine. And you can have under an Article I, Section 1 delegation, you can have a general delegation of authority to the executive branch. That makes sense because the executive branch enforces the laws.

The analogy the Courts use is Article I, Section 1 is basically the sword. And the sword is utilized by the executive branch. Article I, Section 8 challenges, however, are the purse. And the purse is quintessentially exercised by the legislature. That's the problem that we have here.

And if you look at the cases that are on point, that being *Pennhurst*, *Morrisey* and the District Court of Colorado case that is slipping my mind right now, and you've got *Yellen*.

If you look at -- particularly instructive is the *Morrisey* case. Because *Morrisey* dealt with specifically an as-applied funding condition challenge.

It says, "The Supreme Court's leading authority on the limits of Spending Clause is *Pennhurst*," obviously. And it

says, "And Congress must speak unambiguously and with a clear voice when it imposes conditions on federal funds. We explain that Congress must spell out a condition clearly enough for the states to make an informed choice."

And here is the part that I think is instructive, and why a general delegation of authority -- and that's all we have here, we have a general delegation. That general delegation cannot include legislative functions. And this is right out of the *Morrisey* case, second -- "An agency cannot exercise legislative power or otherwise operate independently of the statute that authorized it."

I'm going to skip a cite. "The Constitution gives Congress, not the executive branch, the power to tax and spend through the exercise of its legislative powers. It follows, therefore, that Congress, not an executive agency, must exercise that power constitutionally."

Congress cannot delegate under Article I, Section 8 its legislative powers to tax and spend. That's a killer for the government's argument in this case because it's clearly a funding condition that is sans the statute. Under *Rust*, that's crystal clear.

*Morrisey* goes on to state, "Allowing an executive agency to impose a condition that is not otherwise ascertainable in the law Congress enacted would be inconsistent with the Constitution's meticulous separation of powers, therefore, the

needed clarity under the Spending Clause must come directly from the statute."

You don't get there with a general delegation of authority. The Colorado case, it's *Colorado v. Department of Justice*, exact same thing. And that's a District Court of Colorado case from 2020.

It says, "However, agency-imposed grant conditions, even if they, themselves, are unambiguous, cannot be constitutional under the Spending Clause unless the statute from which they originate is also unambiguous," citing *City of Philadelphia* case.

"Spending Clause ambiguity cases generally involve statutory construction, not interpretations of conditions imposed by the agency."

So the binding authority here, they have zero authority in this case, Your Honor, for the proposition that a general grant of regulatory functions can serve to allow them to exercise legislative functions. That's a violation of the separation of powers.

And here what you've got to look at, the government made it easy on you and on page 21 of their brief, they cite to a regulation, a delegation of authority, one which did not grant legislative authority and one that they claim does grant legislative authority. I'll read those to you because, there's no meaningful difference.

THE COURT: Well, we've been going for a little better than an hour here. Why don't you kind of wrap up your end of this in the next few minutes and I would like to hear from the government.

MR. HILLIS: Yeah, let me then transition.

The other thing that's impactful under why *Ohio* does not apply is *Ohio* expressly did not consider the Weldon Amendment.

THE COURT: They say your complaint doesn't, either. What's the consequence of that?

MR. HILLIS: It's none. We don't have to specifically mention the Weldon Amendment. The Weldon Amendment is law.

We said their actions are unlawful, but if the only thing we're doing is forcing me to amend my petition and coming right back here, when they've been on notice the whole time, because it was in our appeal as well. So I didn't catch the government flatfooted. And so but I think that's --

THE COURT: I suspect you're right about that. Get to the merits.

MR. HILLIS: The Weldon Amendment, every dollar that has been spent, including the dollars that were taken away from us, pass through the Weldon Amendment.

And the Weldon Amendment is clear that you can't discriminate against grantees who refuse to refer for abortion. That's the congressional intent that you can look at under *Pennhurst* to see does that comply or does it not comply.

And I think the Weldon Amendment is specifically pertinent here in the application of the *Ohio* case, because *Ohio* specifically -- the *Ohio* case, the Sixth Circuit said, We wonder why the Weldon Amendment wasn't raised? I do too.

But here, we have raised it. It's impactful. It tells you what the legislative intent was and it is very contrary to the abortion mandate.

And I do appreciate you letting me go long, Your Honor. I do have some arbitrary and capricious argument that I want to add, but I'm mindful of the Court's schedule.

THE COURT: Take a couple minutes and tell me. I've read the briefs.

MR. HILLIS: You have read the briefs. But here, what you have is the application -- here is what we consider the government is doing, it is looking at one regulation and ignoring two others. It is ignoring the regulation in the same regulation that says that Title X grantees don't have to refer for abortion.

How do you square that with they yanked our funding, so for the singular reason that we will not refer for abortion.

So that's arbitrary and capricious, because they're applying one regulation and they're ignoring another one.

It's also arbitrary and capricious because that same regulation likewise says that the services have to be allowable under state law.

The agency told you they did not consider the impact of *Dobbs* in the '21 rule or when they redid it.

We think there's litigious uncertainty, at a minimum, on if abortion referrals are lawful under state law. And if we're right, then they've run afoul of that regulation as well.

So we think the application is unlawful because they're applying one regulation that overrides all the other regulations, and they're ignoring -- and they also ignored the Weldon Amendment.

So the Weldon Amendment is crucial, both for is *Ohio* impactful to Your Honor, and the Weldon Amendment's crucial in light of the as-applied to Oklahoma.

THE COURT: Insofar as you're saying essentially that their regulations are internally inconsistent, I recall the briefs talking about some other kind of deference that, frankly, I hadn't heard referred to before. But as I understand it, it's essentially saying, look, if the question is how they're interpreting their own regulations, then there's deference entitled -- that they're entitled to deference on that. I mean, after all, it's their regulations.

MR. HILLIS: But they can't just ignore one and they're ignoring one. Because we are a Title X grantee and we are being required to refer for abortion. That's contrary to their regulation.

And it's also contrary to services allowable under state

law. You've got -- you can't just ignore that. You can't put blinders on and say, We're going to do the bidding of the executive here, and the bidding of the executive wants to expand abortion. That's not an appropriate exercise of agency discretion, particularly in light of 1008, which at best, is hostile to abortion.

THE COURT: Well, doesn't it make some difference here, though, that we're dealing with a grant program? I mean, you know, it would seem to me that if the federal government came in and tried to, I don't know, impose some rule that said we're going to just flat require you, whether you like it or not, to go do an abortion referral. It seems to me that's different than saying if you don't want to do it, that's up to you, but if you want this grant, you have to do it.

MR. HILLIS: It may seem contradictory, but the most exacting review is when an agency spends money. That's the Article I, Section 8 review that the requirements have to be unmistakably clear. That's the standard.

And if they're trying to say that the regulations can make that be unmistakably clear, well, they're not, because you've got two diametrically opposed regulations. They're not unmistakably clear.

Even if they could get across that huge gulf of them exercising legislative functions, which is just prohibited under *Morrisey*, *Kentucky v. Yellen*, every Supreme Court case

that's out there, so ...

I know I've been long-winded. I appreciate Your Honor's attention. This is a very crucial matter for the people of the state of Oklahoma. We desperately need these funds and it's just categorically unfair to withhold funds --

THE COURT: Let me ask you about that, just to be certain that I understand the circumstances.

I recall at some point in the briefs there were, you know, some kind of suggestion that if this grant doesn't come through, that all these 68 counties are going to be deprived of services and people are going to, you know, not get what they need.

I mean, as I understand it from the affidavit from your deputy director, the legislature has appropriated supplemental money to backstop this if you don't get the grant, right?

MR. HILLIS: They have, but, Your Honor, that goes right into -- and I should have addressed this.

That goes right into irreparable harm. Because Oklahoma has a constitutional balance budget requirement.

So necessarily implicit or empirically, if we're spending four and a half million dollars that should come from the federal government, we're not spending that four and a half million dollars somewhere else. We're robbing Peter to pay Paul. That's irreparable harm.

The other thing is, you know, you need --

THE COURT: I don't understand what you just said about the balanced budget. I don't understand how that --

MR. HILLIS: Oklahoma can only spend as much money -- Oklahoma has to balance its budget, unlike the federal government. We can't borrow money to fund obligations.

So if we're going to spend four and a half million dollars, we've got to take it from somewhere. So it may come from the highway fund that we can't -- program that we can't fund --

THE COURT: Well, my point is the family planning services that are being delivered through the local departments of health are going to continue to be delivered, correct?

MR. HILLIS: For at least this year, but whether Oklahoma can afford to fund that going forward, we don't know.

THE COURT: And so the question, when we're -- I mean, to the extent we're trying to balance harms here or whatever, the harm is not that there are going to be services not provided, it's just a matter of the State not being able to be reimbursed for up to the extent of the grant.

MR. HILLIS: Right. But read all of *Ohio*. There's part of *Ohio* that you may not have read. *Ohio* was a facial challenge to the funding requirement. That's what we've talked about here.

It was also a challenge to -- you've got to separate abortion clinics from Title X clinics.

         THE COURT: The integrity part.

MR. HILLIS: Yeah.

THE COURT: I read that.

MR. HILLIS: Okay. And so they granted the injunction on that, but they granted the injunction because the State of Ohio lost $1.7 million. State of Ohio is much bigger than the state of Oklahoma.

But more importantly -- and I don't mean to point at you. But more importantly, they still had 80 percent of their funding. And that was irreparable harm, according to the Sixth Circuit.

Well, if 10 percent or 20 percent, I'm sorry, of a state's funding that amounts to $1.7 million is irreparable harm, taking away all of Oklahoma's funding necessarily has to be irreparable harm. But I don't think that's --

THE COURT: And we're talking here about -- what is it -- four and a half million? Is that --

MR. HILLIS: Yeah, we lost four and a half million, Ohio lost 1.7 million. But Ohio still got -- I can't do math in my head like that, but Ohio still got eight million or so, maybe seven.

But what the Sixth Circuit said is that that deprivation of 20 percent of your Title X funds is irreparable harm.

THE COURT: But I assume what makes it irreparable is that there isn't a mechanism as against sovereign immunity to

recover it from the feds?

MR. HILLIS: Yes.

THE COURT: Is that it? All right.

MR. HILLIS: I do appreciate Your Honor. Thank you for your time.

THE COURT: All right. Mr. Clendenen.

MR. CLENDENEN: Good afternoon. May it please the Court. Michael Clendenen for the defendants.

For years, Oklahoma has accepted millions of dollars in federal grant funding to support its family planning project. These funds were expressly conditioned on the project's provision of abortion counseling and referrals upon a patient's request. And for years, Oklahoma willingly accepted and complied with this condition.

But starting in 2023, Oklahoma refused to satisfy the same condition. Oklahoma still wants the federal funds, it wants them free of the condition and wants this Court to order the federal agency to provide that funding, all despite the State's disavowal of its prior agreement with the agency.

This Court should deny that request, just as the Tennessee court denied a motion for preliminary injunction on similar claims earlier this month.

I would start with some of the threshold questions that Your Honor asked of the plaintiffs about what sort of relief they're seeking, the State is seeking.

First, I would just note that I didn't see any proposed order anywhere. The plaintiffs haven't, you know, submitted -- they basically haven't shown what they're asking for, just they say they want a preliminary injunction.

And it is their burden to, you know, submit a proposed injunction that makes sense for the Court to order, if it finds that they have met the requirements for a preliminary injunction.

But as far as what an order could look like, if the plaintiffs were successful, in the defendants' view, the only thing that would really make sense is an order that says the agency has to set aside funds for Oklahoma if they are -- if they prevail on a final judgment.

This is just a preliminary injunction motion that we're dealing with, so it doesn't make sense to have a declaration that says the federal agency has to provide the funds now to Oklahoma.

I would also just clear up a couple things. There was questions about a five-year funding cycle. I think that's referring to the continuation grants.

So all of the Title X are for one year at a time. Funding is always given to all grantees one year at a time, but some grantees are given a continuation grant, which means basically that their application is approved for up to five years, assuming they -- you know, they still meet the requirements of

the program, they don't have to reapply each year for those five years. And that's what Oklahoma had here, except for the termination.

THE COURT: So the five-year cycle means every five years, somebody comes in and does a big analysis of the details of everything and if that's okay, then each of the succeeding years is a more truncated procedure, I guess?

MR. CLENDENEN: No, Your Honor, I don't think that's quite correct. It's really a matter of when the grantee has to apply.

So in this case, Oklahoma applied I think in 2022, and HHS, the federal agency, approved their grant application for a continuation grant for five years, meaning that unless they did something that made them not in compliance, they would continue to get that grant funding for each of the next five years.

The funding still only goes out one year at a time, but they would not have to reapply until five years down the road.

Also, I do want to address the April 1st deadline.

I think plaintiffs are correct when they say just as a general matter that HHS usually obligates these funds on April 1st and that they go out generally in July or August, but by statute, the agency does have until the end of the fiscal year to provide the funding.

So the only statutory requirement is that the funding go out by September 30th. The April 1st deadline and the

July-August time frame is not set in stone. It can be adjusted.

THE COURT: Well, does the pendency of the appeal have any impact on this? I mean, have they somehow preserved their rights to do something later?

MR. CLENDENEN: Your Honor, I'm not 100 percent sure, but I don't think that the agency interprets the pendency of an appeal to preserve funding, necessarily. The funding could still go out, notwithstanding the fact that there's an administrative appeal.

THE COURT: As I understand Mr. Hillis' argument, he says part of the urgency or the magic on April 1 is that it's not a matter of HHS potentially holding it, but it potentially turning around and giving the money out to other grantees.

MR. CLENDENEN: Yes, Your Honor. And as a general matter, that is usually the time frame that HHS would do that, but it's not required by statute. It's not required by any regulation either.

THE COURT: Are you telling me that HHS is committed not to do it here?

MR. CLENDENEN: Your Honor, no, HHS isn't committed to not -- not doing anything on April 1st. But --

THE COURT: Well, you're not doing much to allay their panic, if you're not in a position to do that.

MR. CLENDENEN: Understood, Your Honor. I just wanted

to make the point that it's not necessarily going to happen.

THE COURT: All right.

MR. CLENDENEN: So first I'll address their statutory claims.

The Court correctly adduced that -- that their arguments, at least with respect to Section 1008, are just a rehash of their arguments from the *Ohio* case, to which Oklahoma was a plaintiff.

That was a facial challenge, but they haven't raised any sort of factual distinction that would take this case out of the ordinary case that *Ohio* dealt with.

So as a matter of legal analysis, there's nothing in their statutory arguments that wasn't addressed in *Ohio* or at least that they couldn't have raised in the *Ohio* case.

The only sort of twist that they had is the Weldon Amendment, which wasn't specifically raised in the *Ohio* case, but they could have raised it.

Weldon has been around since I believe 2004. It hasn't been changed, so there's no reason why Oklahoma couldn't have raised it in that case. It's just another facial challenge based on the statute. There's nothing about the as-applied facts here that make it particular to the Weldon Amendment arguments.

As the Court noted, they didn't raise it in their complaint. They raised it only in their preliminary injunction

motion, which was filed after the *Ohio* decision came out. The complaint was filed before the *Ohio* decision.

One note on the Weldon Amendment: Oklahoma and the plaintiffs in the *Ohio* case did at one point in their briefing say that they didn't think that states were covered by these conscientious statutes and that states couldn't be healthcare providers.

So the docket for the *Ohio* Sixth Circuit appeal is Case Number 21-4235. And on Document Number 47, which I believe is the brief of the appellants, they said that, "The district court in that case doubted this constituted any irreparable injury, noting that federal statutes protecting conscientious and/or civil rights may exempt some, quote/unquote, providers, from complying with the referral requirements," and they quote the order. And then they say, "But the states are not protected under any of those statutes. While individual doctors working for the states might be, no statute would free a government grantee from complying with the federal requirement." So that -- they've already --

THE COURT: What about this regulation that Mr. Hillis has referred to that I gather does refer to grantees?

MR. CLENDENEN: So, Your Honor, that's a different regulation. That's part of the 2021 Rule. It's not part of the Weldon Amendment, if I'm understanding what you're referring to.

They talk about --

THE COURT: Well, I think he's talking about the part he says is inconsistent with the other provisions of the rule, but it's the --

MR. CLENDENEN: Yeah, where they say, "Objecting providers or Title X grantees are not required to counsel or refer for abortions," is that the part that?

So that comes from the 2021 Rule, 86 Fed. Reg. at 56,153.

So that sentence is a reference to objecting providers and grantees, but as we just -- I just said, states can't be objecting providers or grantees. They are not healthcare entities that are protected by the Weldon Amendment.

The healthcare M.D.s are basically, you know, institutions or individual providers. They can't be a government agency.

THE COURT: Let me ask: I was talking to -- at the beginning of Mr. Hillis' presentation, I was walking him through a timeline to try to get a sense of exactly when the -- you know, when the decision was made and what the decision was to -- that became the basis for the termination.

And I guess it has to do with this -- the hotline or whatever that was called, that at one point Oklahoma had said we'll do the hotline, and then changed its mind and wouldn't.

Is the -- in terms of complying with the rule's requirement that there be a referral on request, does HHS view providing that link to the hotline as complying with that?

MR. CLENDENEN: Yes, Your Honor.

THE COURT: In other words, if you've done that, you've done the referral?

MR. CLENDENEN: Yes, Your Honor.

And I would just add that it's at least unclear that doing so, just providing the phone number, is a violation of Oklahoma law. So it's, at the very least, not clear that providers in the state couldn't comply with the requirements of the regulation and with Oklahoma state law.

THE COURT: All right.

MR. CLENDENEN: I do also want to address the argument about the regulation that the services be allowable under state law. We addressed this on Page 13 of our brief. It's also thoroughly discussed in the Tennessee opinion.

But the language of the part they're quoting under 42 CFR Section 59.5(b)(6) says that each Title X project must affirm that, "family planning medical services will be performed under the direction of a clinical services provider, comma, with services offered within their scope of practice and allowable under state law, comma, and with special training or experience in family planning."

So this is a change of language that also took place in the 2021 rule, the same rule that's being challenged here.

Where it says "clinical services provider," that had previously said "physician." And the change to add -- to

change it to "clinical services provider" and then add the phrase "allowable under state law" was meant to be an expansion to allow for providers to be a physician -- sorry -- a physician's assistant or a nurse practitioner or anyone along those lines, if they're allowed to practice medicine under state law.

It's not meant to be an expansion of the program that services always has to be allowed under state law. It just refers to whether or not the provider is, you know, basically medically certified to provide these services under state law.

And the Tennessee court addressed this and it found that the regulation unambiguously means what HHS is saying it means, but even if the Court thought it was ambiguous, it would be subject to a *Kisor* deference, which also referred to as *Auer* deference.

THE COURT: That's the deference -- *Auer* deference, that's the one I had not at least seen it described that way before.

MR. CLENDENEN: Yes, Your Honor. *Auer* deference has been around for a few decades, I'm not sure exactly what year it was, and then in 2019, the Supreme Court reaffirmed it in *Kisor v. Wilkie*, which we cite in our brief.

Also for the Spending Clause analysis, I'm happy to answer any questions the Court has about that. But I do think the Tennessee court got it 100 percent correct in that case and it

would be the exact same analysis here.

Again, it's just a facial challenge. Oklahoma could have raised it in the Sixth Circuit case in -- or sorry, in *Ohio*. They didn't do so. It's a facial challenge. There's no difference between this argument and what Tennessee addressed.

But if there's any questions on that, I'm happy to.

And then just a couple of other points on that.

At one point the plaintiffs, I think they said there's no *Chevron* deference in an as-applied challenge. I didn't see that raised anywhere in a brief and I don't believe there's any citation to that argument. I don't believe that's correct. *Chevron* deference is the framework, whether it's an as-applied challenge or a facial challenge.

The *Ohio* decision already applies *Rust*, which is a *Chevron* case, and it would be the same here as it is in *Ohio*.

Also, it seemed as though the plaintiffs were trying to raise a nondelegation challenge, basically saying that a statute is unconstitutional if it delegates legislative power from Congress to an agency. That's not raised in the complaint or any of their briefing.

So if that's -- the Court shouldn't entertain the claim, since it wasn't raised, but to the extent that the Court is interested in the merits, the Tennessee opinion does address this in a footnote also.

I'm happy to address any other points the Court has, but

otherwise, I would rest my time.

THE COURT: Well, I do have, I guess, one further question, and that has to do with the hotline thing.

If somebody calls the hotline --

MR. CLENDENEN: Yes, Your Honor.

THE COURT: -- who is on the other end of it and what do they learn?

MR. CLENDENEN: Your Honor, I'm not entirely sure who is answering the phone. I do know it's out of state. It's not located in Oklahoma.

They are given nondirective counseling on all options, which is exactly what the HHS regulation says.

So if a patient calls and says, I'm pregnant, what are my options? They will give nondirective counseling about prenatal care, adoption, foster care, that sort of option, and also pregnancy termination.

It's nondirective, meaning they're not pushing one option or another. They're just giving neutral, factual information.

If the patient is interested in, you know, abortion, any questions, the person on the phone would very likely say, Well, there's no providers in the state of Oklahoma because it's not legal there, but Kansas and Colorado have providers.

And then if the patient requests for a referral, then the person on the hotline would give a referral. Again, it's not directive. They're just basically providing address and phone

number. They're not setting up transportation or anything like that. They're just giving the address and phone number for a provider that would give those services.

THE COURT: This is your chance.

MR. CLENDENEN: Your Honor, I think I covered everything.

Again, the Tennessee opinion goes through basically all the same arguments and there's no reason why the Court should reach a different result.

THE COURT: All right.

Anything else you want to add, Mr. Hillis?

MR. HILLIS: I do. That may not surprise you.

THE COURT: I'll give you 45 seconds to wrap it up.

MR. HILLIS: I'll confine myself to two points. I won't get it done in 45 seconds, though.

The issue in front of Your Honor is weighty and unique, because what you're being asked to do is to do something that only one court to date that we've been able to determine has done. And that is to hold that a general delegation to an agency includes legislative powers.

Approximately nine days ago, there were zero authority for that, and I'm guessing when Judge McDonough issued his opinion.

But before his, the government couldn't cite you a case that says that a general delegation suffices under the law to allow them to attach funding conditions that are clearly sans

the statute.

So that's the issue that they're asking you is to follow Judge McDonough.

THE COURT: But how do you say here that it's clearly sans the statute, when the --

MR. HILLIS: *Rust*.

THE COURT: -- when the statute that applies to Title X says we're going to do a grant program designed to enhance family planning services, and you're saying unless every single element of what constitutes a family planning service is not spelled out in the statute, it's not valid?

MR. HILLIS: No. What I'm saying is when the Supreme Court has said explicitly that 1008 Title X does not have a referral mandate, that that is insufficient to allow an as-applied challenge under Article I, Section 8 of the United States Constitution.

And just so you'll know, on page 25 is the -- one of these delegations was found by Morrisey to be not sufficient and then one is in Title X.

(Reading:) Providing that grants shall be subject to conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made, that's Title X.

And the one that was not found appropriate, (reading:) The Secretary shall have the authority to issue such regulations as

may be necessary or appropriate to carry out this section.

There's no difference between those two. There's no -- no. No material difference between those two.

And very clearly, the law before Tennessee was that a general delegation to the agency does not allow it to deny funding under Article I, Section 8 under the power of the purse because that is quintessentially a legislative function.

The other issue -- so if you'll just look at those two and recognize that there's no published authority. And I'm assuming Judge McDonough has not published his case, but if it is, he's the only one.

And that ought to give you great pause when the referral requirement -- I don't want to demean it, so I'm trying to choose -- is picayune compared to all the services that Oklahoma offers with Title X funds.

And literally, it is score keeping by the federal government. It's, State of Oklahoma, you're going to bow to our wishes. Not that that materially helps anybody, because anyone with Google and an iPhone can just Google abortion providers.

And so that's what we're talking about. They're denying $4.5 million in funding to Oklahoma just because we won't hand out a card to give the authority of the State to say, here's your abortion referral.

Doesn't matter all the other great things that we can do

with this money to the people of the state of Oklahoma. That's the singular reason.

And so that's why you need to pay really attention -- close attention and determine does the Secretary have the authority for that picayune of an issue to deny Oklahoma its Title X funds.

The other issue I want to hit just real quickly, and I know I'm going a little long, but I like Mike and he does a good job and I do want to say it's been a pleasure working with the DOJ. I had my fears, but they've been nothing but collegial and cooperative and I appreciate that.

But he made a comment that I think ought to be impactful to you --

THE COURT: He didn't say you had been nice to him.

MR. CLENDENEN: They have been nice, Your Honor, yes.

MR. HILLIS: It depends on your ruling, Judge.

THE COURT: He's not standing up, even now.

MR. HILLIS: There was a joke I'm glad I didn't tell. This table knows it.

When he candidly admits to say it's not clear that Oklahoma law prohibits referrals, that's telling. Because that impacts allowable under state law.

And surely, an agency should not be allowed to force a Title X requirement that even potentially is not allowable under state law. There's, at a minimum, litigious uncertainty

whether a referral is authorized under Oklahoma law. And with that, the agency was duty-bound to exempt Oklahoma because of that litigious uncertainty.

THE COURT: Do you think the federal government is obliged to not impose any condition that might even relate to an area where there is litigious uncertainty?

MR. HILLIS: When their regulation that they're foisting on us says services have to be allowable under state law, that's the tension. It's not just a general Oklahoma is bigger than the feds, because we're clearly not.

But when their very regulation that they're trying to foist on Oklahoma says services must be allowable under state law, that if there's litigious uncertainty there, then they should say there's litigious uncertainty there, then you have to go back to is the funding requirement unambiguously clear.

It's not unambiguously clear, because he said it was not clear whether referrals are prohibited by Oklahoma law.

So that right there, even if they had the legislative mantle that they could use the power of the purse, that uncertainty in and of itself mandates that they cannot require Oklahoma to refer for abortions lawfully.

And we would request the Court enter a preliminary injunction in this case that says that HHS is prohibited from using the abortion referral as a requirement that denies Oklahoma participation in Title X funding.

So I do appreciate the time and attention of the Court and thank you, Your Honor.

THE COURT: Well, this is certainly an involved set of issues that we're dealing with here, and offhand, I don't know of any set of public policy questions that's any more contentious probably than ones involving the abortion issue that's played out in multiple ways over the last, what, 30 or 40 years.

I saw in the paper that I think the Supreme Court was today entertaining oral argument on some other aspect of the same general topic, so it continues to be a very contentious matter. And it's been helpful to me to have the comments of the parties, in addition to the extensive written work product that you've submitted.

I debated whether to, you know, attempt to generate a lengthy written order or simply to tell you what I'm inclined to do. I think I am in a position basically to tell you here what -- the way I see the issue. I do that partly because we're getting up here very close to the end of March.

There does appear to be some urgency from the State's standpoint to have either a favorable determination from me or, presumably, an opportunity to seek relief from the appellate courts before the April 1st deadline runs.

And so I think it makes sense for me to go ahead and essentially rule now as to the pending motion.

The pending motion, of course, is one for preliminary injunction that requires Oklahoma to establish the elements that we are, I think, all familiar with in general.

One's the likelihood of success on the merits that there's irreparable injury if the injunction is not issued, a judgment, that the threatened injury to, and this state, the State, would outweigh any injury to the federal government if the injunction was not issued, and then finally, the requirement that it be not contrary to the public interest to issue the injunction.

There is, I think, some of the cases indicate that when we're dealing with a situation like this one where the injunction is sought against the federal government, the elements relating to balancing the injury and the public interest essentially merge. And I do think that ultimately what we're talking about here is the interest of both the federal government and the State in getting, you know, a proper application of the law.

So I don't know that the -- either of those factors cut significantly in either direction, although I would say that were I evaluating or to the extent that I'm evaluating the threatened injury to the State of Oklahoma from nonissuance of the injunction, that among the things that jumps out at me is that the State's position here is ultimately premised on what it says Oklahoma law requires. That is, apparently, the basis for the change of position that Oklahoma took in the course of

the grant administration process. And, frankly, it is my view that that is simply overblown.

I have an extraordinarily difficult time seeing how the implementation of the referral process as contemplated by the regulation here could translate into a violation of Oklahoma law.

Essentially, it seems to me what that says, if that is true, that means that it would violate the Oklahoma statute which bans, essentially, urging someone to get an abortion. For a department of health worker to say to the client sitting across the table, once they request information on abortion and they say, Well, it's not legal in Oklahoma, but if you want to look at other options, call this number. I cannot believe that any serious prosecutor would think that warranted prosecution under the statute.

And it seems to me the consequence of that is that this is not a situation where Oklahoma's position is driven by what the law compels it to do, but it's rather the policy basis for why Oklahoma would rather not do it.

And wanting to not do it is not to me quite the same thing as saying that it would be conduct that would violate the law if they did.

So I do think that it seems to me that the posture that Oklahoma finds itself in here is at least, in part, a matter of -- it's a circumstance of its own choosing. Because it

would appear to me that there is a path that was always available to Oklahoma whereby it could comply with the provisions of the grant process and do so without requiring anybody to violate Oklahoma law.

So as I say, that, I suppose, impacts my assessment of the relative harms here and to some degree it impacts, I suppose, some of the likelihood of success arguments.

But as I say, it does seem to me that to the extent it's premised on the assumption that the limited referral contemplated here by the regulations would violate Oklahoma law, let's just say that's less than obvious to me and that impacts some of the rest of this as well.

The element of the -- whether irreparable injury has been shown or not, I think to the extent that is the basis for it, that I think Oklahoma's made a sufficient showing here of irreparable injury.

As Mr. Hillis points out, the *Ohio* case concluded that, involving less money than is involved here. And, frankly, I'm reluctant to accept the federal government's invitation to say that $4.5 million isn't substantial enough to worry about.

I'm reminded of the comment of some senator a few years ago, he said, you know, you start talking about this budget stuff, you got a billion here and a billion there and pretty quick, you're talking about real money.

Well, you know, this isn't billions, but it seems to me,

for purposes of sufficient showing of irreparable injury, that 4.5 million is enough.

But, of course, as is often the case in these sorts of circumstances, the challenge, it seems to me here, ultimately turns on or disposition of the motion turns on the question of the likelihood of success on the part of the State.

It strikes me that in making that determination, I mean, there's been reference made to things that are unique about this litigation. It seems to me that there are at least a couple of things that are unique about it that are not involved in your average, you know, fighting over who's got the authority to do what between units of government.

One is the fact that there has already been litigation between the parties on substantially the issues arising out of this same dispute. And, of course, I'm talking about the litigation that resulted in what we've referred to as the *Ohio* case, *Ohio v. Becerra*, the Sixth Circuit case.

Ordinarily, a Sixth Circuit opinion wouldn't be binding on me. It isn't binding here, I suppose, in the sense that a Tenth Circuit decision would be, but it seems to me that it does implicate, because Oklahoma was a party there, that it limits what they're in a position to come here in a second court and re-litigate.

Whether it's -- you refer to it as res judicata or claim preclusion or whatever, it seems to me the rule rather clearly

is that to the extent that the particular claim was litigated in a prior forum, that the State is precluded by the doctrine from re-litigating it here, which is to say that they're not in a position to either, you know, reargue the same argument that was made there or to raise other theories that might ultimately support the same claim.

So it seems to me that res judicata claim preclusion does preclude at least part of the arguments that the State is relying on here, particularly those where there are, you know, comments like the statute doesn't even authorize this kind of a regulation or something.

It seems to me that those are the kinds of arguments that are essentially precluded by the litigation that has already occurred between the parties.

Now, I do recognize that the *Ohio* case involved a facial challenge to the regulation. And that the focus there was on the 1008 language, but it does seem to me that in terms of how the doctrine of res judicata claim preclusion applies, that to the extent we're talking about a facial challenge to the regulation, that the *Ohio* decision would preclude re-litigation on any theory that was advanced or that might have been advanced, at least to the extent that it's the basis for a facial challenge.

And as I say, I think some of the arguments that have been made here today essentially are that. They're a facial

challenge that's barred by the litigation that has already occurred, like, for example, whether they have exceeded their authority by issuing this regulation at all or whether the counseling requirement's outside the scope of Title X.

I mean, those are, in my view, facial-type arguments and I don't think you can avoid the impact of just -- just by saying, well, we're doing it as-applied.

You know, certainly, the application of any rule has consequences, but if it, at a fundamental level, is going to facial attack, then I think it's precluded for that reason.

The other thing that strikes me as being unique about the circumstances here is that we're not dealing with a regulation that just got thought up in 2021 or 2022, whenever the current version of the rule was adopted.

We're dealing with an area of the law that has obviously reflected the substantial pulling and hauling that's been going on for 30 years over this difficult issue of abortion. And the question of the kinds of requirements that are to be imposed in connection with this grant program have changed over time.

The *Ohio* court, of course, describes in some detail that history. I won't repeat it here, other than to acknowledge what I think we're all aware of. And that is that depending on which administration was in the power, the regulatory -- or the regulations pursuant to Title X have varied in their treatment of the counseling requirement and the provision of information

that would potentially be the basis for referral. Sometimes it's been required, sometimes it's been prohibited.

And I think what is clear from *Rust* is that at least to the extent that we're tying it to the language of 1008, we're dealing with an ambiguous area where *Chevron* deference applies.

But I do think that the fact that we have this lengthy history of prior incarnations of substantially the same requirements, as are now at issue in this case, translates into making it a very difficult lift for the State to come in and show arbitrary and capricious regulations when it has that history.

I understand there are a couple of aspects that have been mentioned here this morning that maybe differ from it, but at least in terms of the fundamental underlying requirement for the -- imposing a condition on the Title X grant that the grantee has to be providing this nondirective information and potentially referral information on request, that's not new. It's not something that is, it strikes me as being, you know, something new and exotic.

So I think, as I say, the fact that we have that history makes the whole lift that Oklahoma's attempting here a very difficult one.

But that said, I think ultimately evaluating the individual arguments that Oklahoma's offered here on balance, I simply am not persuaded that Oklahoma has a reasonable prospect

of prevailing on these arguments.

The arguments about the Spending Clause that Mr. Hillis has referenced, I confess I am thoroughly unpersuaded by.

We're dealing here not with simply a matter of random delegation of legislative authority, but we're dealing with a grant program. We're dealing with a grant program in a particular context and for a particular purpose where Congress has specifically said that we expect the agency to promulgate rules to flesh it out.

I don't think, as I read the cases, that in those circumstances, that the -- whether it's the Spending Clause or, frankly, I'm not sure we're talking about the same thing when we're talking about the Spending Clause versus a nondelegation doctrine. I suspect those may be different.

But, in any event, I'm unpersuaded by that argument. I mean, the cases that talk about the Spending Clause issues recognize that the notice to the -- essentially they say, look, if they're going to be conditions imposed on a grant, or on federal spending, that the State is entitled to know what those conditions are. You can't mousetrap the State or another grantee by imposing them after the fact.

Here, it seems to me, there's no serious argument to be made that the State of Oklahoma didn't know what the conditions were that the HHS folks were going to insist on as a basis for participation in the grant program.

The State, of course, had, as I understand it, commented on the regulations. They had at some point got involved in the *Ohio* litigation to challenge it. And the regulations themselves, in terms of the particular requirement that's at issue here, the counseling and referral part, was clearly in place at the point where the grant application process went forward.

The cases, as I read them, say that in terms of putting the State on notice of what the conditions are, those can come, not only from the statute, but from the regulations pursuant to the statute.

And so it seems to me that the -- that this is simply not a circumstance where the State can plausibly say, Well, gee, we've been subjected to these conditions when we didn't know what the deal was.

What the deal was has been obvious, it seems to me. The State doesn't agree with those conditions, and certainly that's -- they're certainly entitled to take a different view. But that, it seems to me, is something different than saying, Well, we were sufficiently mousetrapped by the conditions, that we ought to be relieved from them now, even though we don't comply with them.

So it seems to me that the Spending Clause argument doesn't hunt -- and I frankly think that is probably one that we don't even need to get into the weeds on it, because to the

extent that the argument is that regulations on these kinds of things go beyond the -- what's permitted by the Spending Clause or what's permitted by the delegation -- the nondelegation doctrine, it seems to me that's facial in nature. That goes to whether the regulations can properly approach it at all.

And as I said earlier, if it is essentially a facial challenge, it seems to me that's precluded by *Ohio* and the particular litigation context that we've got here.

I think to the extent that the State is relying here on an argument that it violates Title X itself, I assume that's essentially an argument about 1008 and that, of course, is exactly what *Ohio* addressed and resolved.

And I don't see anything about the circumstances here that in terms of it being -- the fact that it's been applied here, if the underlying objection to it is facial in nature, I don't think you create an opportunity to re-litigate it based on that.

So at any rate, it seems to me that the *Ohio* litigation has already concluded that the particular regulation that we're dealing with here is within the scope of what's permissible as against the language of Title X itself.

With respect to the termination being based -- or being contrary to the provision of the Weldon Amendment, that is maybe a closer question, just because some of this is not as clear, I think, as some of the other provisions. But I am

frankly not persuaded that the State can establish that one, either.

The question I think is essentially one of whether or not the various provisions of -- well, whether the language in the appropriation bill saying that there can't be discrimination against a healthcare entity that refuses to refer for abortion, I think the question there is a threshold matter as what constitutes a healthcare entity.

Mr. Clendenen says, well, that means the provider of the services. I frankly think that is probably the more plausible interpretation of that than to say that the State can object.

It strikes me as a very substantial step to say essentially that a state can get the benefit of what's essentially a conscience-protecting kind of amendment just because the particular regulatory requirement is contrary to state policy.

I -- from what I have seen of the history of that regulation, it does appear to be focused essentially on assuring that providers are not required to perform some -- either perform an abortion or refer -- do something related to abortions contrary to their own conscience or religious beliefs or whatever.

And it does seem to me that that's something different than what we've got here, which is essentially the State saying, look, we see -- we prefer a different policy and we

don't want to follow it because it conflicts with state policy.

So I am skeptical whether the State can ultimately establish that as a basis for showing the Weldon Amendment is somehow eliminating the need for the State to comply with or making it improper for HHS to insist on compliance with the referral portion of that.

Again, with the Weldon Amendment, I can't help thinking that, frankly, at least in part, that's in the nature of a facial challenge, more than it is in substance an as-applied challenge.

But to the extent that it is as-applied, in the sense that the feds are applying requirement to require the State to at least give a potential -- to give the pregnant woman information via a hotline, it seems to me that, if anything, that as-applied approach to the regulation is a more forgiving standard in terms of what it's requiring from the State than might arguably be required by the regulation.

I mean, to be sure the regulation itself says nondirective information, suggesting that it can't be, you know, somebody campaigning for an abortion or trying to urge somebody to do it. But it does seem to me that, you know, the feds might plausibly seek more than just giving out a phone number.

But, ultimately, it appears that the circumstances here are simply by supplying a phone number, the State could meet its referral obligations, as contemplated by the grant terms.

And so it seems to me that even to the extent that we try to apply the Weldon Amendment beyond that to in some as-applied circumstance, that you have a hard time translating that into a violation here.

That leaves, finally, the issue of whether or not this regulation is -- and particularly its application to Oklahoma through the termination for failure to do referrals, is arbitrary and capricious under the APA.

It seems to me that, as I said at the outset, that in terms of the explanation for the particular requirement that the rule's explanation of it is ample. It's more or less the same rationale that was in place for, what was it, '81 to '89 or whatever the time period was, where essentially the same rule was in place.

I certainly recognize that there are respectable different views as to what the best regulation should be or what a good regulation would be as it applies to this issue, and it's obviously changed over the years, but to suggest that the present regulation is arbitrary and capricious I think simply falls short.

The explanation has been given in the order continuing the rules as to the basis for it. It seems to me that is plainly within the scope of the agency's discretion to make that.

I don't think it -- that to say, well, that there's litigious uncertainty about it; that's not the test for whether

it's arbitrary and capricious. There's plenty of litigious uncertainty about everything.

It does not translate into a basis for concluding here that the particular regulation was arbitrary and capricious.

The Tennessee case that the parties have referred to, I think goes into more detail in terms of the history of the rule and so on and I'm -- I am in substantial agreement with that case's treatment of the arbitrary and capricious issue.

To the extent that the State here is relying on the language in the rule that talks about the allowable under state law provision, it does seem to me that it most plausibly makes sense to understand that as relating to the professional qualifications of the providers that are involved, simply because that's a construction of it or an interpretation of it that avoids the conflict that arguably would otherwise exist with the other provisions.

I think under the various deference standards that apply to particularly an agency's interpretations of its own regulations, as opposed to interpretation of a statute, *Chevron* is -- *Chevron* is interpreting regulations based on a statutory command.

We're talking here about whether a -- the HHS's interpretation of the regulations, of their own regulations is entitled to deference and it seems to me that it is. Which is to say that the language that appears in -- that's been

referred to about allowable under state law doesn't have the meaning that the State would prefer to attach to it here, so as to suggest some general requirement that state law is going to generally trump all other regulatory provisions that might apply.

So, in any event, it does seem to me that on multiple grounds, that the State is unlikely to be able to prevail here, and as a result, I'm going to deny the request for a preliminary injunction.

What I would ask is that -- I don't know precisely how the parties will go forward in light of this determination. I assume the State will seek some kind of relief from the circuit. If you do, then, obviously, that will govern the direction in which the case goes forward, consistent with what the circuit decides.

If you decide not to do that or the circuit denies relief, then I would like the parties to think through where that leaves us. If there is magic to this April 1st deadline and it isn't met, for whatever reason, does that make the case moot or not? I don't know. It simply potentially impacts how we go forward as a scheduling matter with the balance of the case.

So what I would ask is that the parties file something within the next let's say three weeks to give me your respective positions as to how we go forward, if at all here, in light of whatever you may seek from the circuit or whatever

75

they may do in the meantime.

Questions from the parties or anything further that we need to address while we're here today?

MR. HILLIS: I take it there is going to be some sort of written order, but --

THE COURT: What I anticipate doing is simply an order that says it's denied for the reasons that I've said here today.

MR. HILLIS: Okay. Can I order the transcript then now or do I --

THE COURT: Now or when, I think you're entitled to a transcript, so we'll see that you get one.

MR. HILLIS: I do appreciate it.

THE COURT: Anything else?

MR. HILLIS: I think we can be can beat the three-week deadline, Your Honor.

THE COURT: All right.

Anything else? All right.

Court's in recess.

(Adjourned.)

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145
Aplt.App. 613

76

CERTIFICATE OF OFFICIAL REPORTER

I, Susan J. Fenimore, Federal Official Realtime Court Reporter, in and for the United States District Court for the Western District of Oklahoma, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 29th day of March, 2024

/s/SUSAN J. FENIMORE

Susan J. Fenimore, CSR, RPR, FCRR
Federal Official Court Reporter

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145
Aplt.App. 614

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| 1. STATE OF OKLAHOMA,<br><br>*Plaintiff*,<br><br>v.<br><br>1. UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;<br><br>2. XAVIER BECERRA, in his official capacity as the Secretary of the U.S. Department of Health and Human Services;<br><br>3. JESSICA S. MARCELLA, in her official capacity as Deputy Assistant Secretary for Population Affairs; and<br><br>4. OFFICE OF POPULATION AFFAIRS,<br><br>*Defendants*. | Case No. 23-CV-01052-HE |

**NOTICE OF APPEAL**

Notice is hereby given that the State of Oklahoma, Plaintiff in the above-named case hereby appeals to the United States Court of Appeals for the Tenth Circuit this Court's Order denying Plaintiff's Motion for Preliminary Injunction entered in this action on March 26, 2024 (Doc. 36).

Dated this 1st day of April 2024.

Respectfully submitted,

*s/ R. Tom Hillis*

Garry M. Gaskins, II, OBA # 20212
*Solicitor General*
Zach West, OBA # 30768
*Director of Special Litigation*
Audrey Weaver, OBA # 33258
*Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st St.
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Audrey.Weaver@oag.ok.gov

AND

Barry G. Reynolds, OBA # 13202
R. Tom Hillis, OBA # 12338
J. Miles McFadden, OBA # 30166
TITUS HILLIS REYNOLDS LOVE, P.C.
15 E. 5th St., Suite 3700
Tulsa, OK 74103
Phone: (918) 587-6800
Fax: (918) 587-6822
reynolds@titushillis.com
thillis@titushillis.com
jmcfadden@titushillis.com

AND

Anthony J. (A.J.) Ferate, OBA # 21171
SPENCER FANE
9400 North Broadway Extension,
Suite 600
Oklahoma City, OK 73114
Phone: (405) 844-9900
Fax: (405) 844-9958
AJFerate@spencerfane.com

*ATTORNEYS FOR PLAINTIFF,*
*THE STATE OF OKLAHOMA*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of April 2024, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant:

Michael Patrick Clendenen
michael.p.clendenen@usdoj.gov

Robert C Merritt
robert.c.merritt@usdoj.gov

Alexandra R. Saslaw
alexandra.r.saslaw@usdoj.gov

Allyson Scher
Allyson.r.scher@usdoj.gov

*/s/ R. Tom Hillis*
R. Tom Hillis