**CASE NO. 24-6063**
IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

STATE OF OKLAHOMA,

       *Plaintiff-Appellant*,

v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;

XAVIER BECERRA, in his official
capacity as the Secretary of the U.S.
Department of Health and Human Services;

JESSICA S. MARCELLA, in her official
capacity as Deputy Assistant Secretary for
Population Affairs; and

OFFICE OF POPULATION AFFAIRS,

       *Defendants-Appellees*.

On Appeal from the United States District Court
For the Western District of Oklahoma
The Honorable Judge Joe Heaton
Case No. 23-CV-01052-HE

---

**APPELLANT'S OPENING BRIEF**

---

ORAL ARGUMENT IS REQUESTED

April 19, 2024

Respectfully submitted,

Garry M. Gaskins, II, OBA # 20212
*Solicitor General*
Zach West, OBA # 30768
*Director of Special Litigation*
Audrey Weaver, OBA # 33258
*Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st St.
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Audrey.Weaver@oag.ok.gov

Barry G. Reynolds, OBA # 13202
R. Tom Hillis, OBA # 12338
J. Miles McFadden, OBA # 30166
TITUS HILLIS REYNOLDS LOVE, P.C.
15 E. 5th St., Suite 3700
Tulsa, OK 74103
(918) 587-6800  Fax:  (918) 587-6822
reynolds@titushillis.com
thillis@titushillis.com
jmcfadden@titushillis.com

Anthony J. (A.J.) Ferate, OBA # 21171
SPENCER FANE
9400 N. Broadway Ext., Ste. 600
Oklahoma City, OK 73114
(405) 844-9900   Fax: (405) 844-9958
AJFerate@spencerfane.com

*ATTORNEYS FOR PLAINTIFF-APPELLANT,*
*THE STATE OF OKLAHOMA*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................vi

GLOSSARY..........................................................................................1

PRIOR OR RELATED APPEALS...........................................................1

STATEMENT OF JURISDICTION.........................................................2

STATEMENT OF THE ISSUES..............................................................3

INTRODUCTION ..................................................................................4

STATEMENT OF THE FACTS AND PROCEDURAL HISTORY .......................5

    I.    OKLAHOMA HAS SUCCESSFULLY MANAGED TITLE X FUNDING FOR DECADES, AND THE SERVICES PROVIDED ARE VITAL TO THE STATE'S CITIZENS. ...........................................................5

    II.   HISTORICALLY, HHS HAS PROMULGATED CONTRADICTORY TITLE X REGULATIONS..........................................................7

    III.  *DOBBS* ALLOWS OKLAHOMA'S LONGSTANDING ABORTION BAN TO AGAIN TAKE EFFECT. ..................................................10

    IV. HHS TERMINATES OKLAHOMA'S TITLE X FUNDING OVER ABORTION REFERRALS..........................................................11

    V.   OKLAHOMA BRINGS AN AS-APPLIED CHALLENGE TO THE TITLE X TERMINATION. ....................................................13

SUMMARY OF THE ARGUMENT ....................................................15

STANDARD OF REVIEW ..................................................................18

ARGUMENTS AND AUTHORITIES ..................................................19

    I.    THIS MATTER IS APPROPRIATE FOR THE COURT TO REVIEW. .19

II.   ISSUE NO. 1: OKLAHOMA IS LIKELY TO SUCCEED ON THE MERITS UNDER THE SPENDING CLAUSE. ......................................20

    A.   *Title X does not clearly require abortion referrals, ergo Defendants cannot take a hostile action against a State for declining to provide referrals.* ............................................................20

    B.   *The Spending Clause requires more respect for State sovereignty than what Defendants have provided.* ...........................................27

    C.   *Oklahoma brings an as-applied challenge and is not precluded here by a preliminary injunction decision on a facial challenge in Ohio.* ......31

III.  ISSUE NO. 2: OKLAHOMA IS LIKELY TO SUCCEED ON THE MERTIS UNDER THE WELDON AMENDMENT...............................35

IV.   ISSUE NO. 3: OKLAHOMA IS LIKELY TO SUCCEED IN SHOWING THAT DEFENDANTS VIOLATED THE APA. .....................................40

    A.   *Defendants' Termination of Oklahoma's Title X Funding Overstepped the Agency's Authority and is Not a Reasonable Interpretation of Title X.* ..............................................................41

    B.   *Defendants' Termination Decision Was Arbitrary and Capricious.* .47

V.    THE OTHER INJUNCTION FACTORS FAVOR OKLAHOMA AS WELL, SUCH AS IRREPARABLE HARM. ..........................................50

CONCLUSION.....................................................................................53

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................................54

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT .................56

CERTIFICATE OF DIGITAL SUBMISSION AND EXACT COPIES ................56

CERTIFICATE OF SERVICE ...............................................................57

ATTACHMENTS:

1. District Court Order filed March 26, 2024

2. Excerpts from Transcript of Proceedings held before the Honorable Joe Heaton on Motion for Preliminary Injunction dated March 26, 2024, at 1:30 p.m. App. Vol. 3 at 539 and 597-614.

## CASES

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
   594 U.S. 758 (2021) .......................................................................... 28, 51

*Arbogast v. Kansas, Dep't of Lab.*, 789 F.3d 1174 (10th Cir. 2015) .....................20

*Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006)...........21

*Autoskill, Inc. v. Nat'l Educ. Support Sys., Inc.,* 994 F.2d 1476 (10th Cir. 1993)...52

*Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012).....................................................18

*Bond v. U.S.*, 572 U.S. 844 (2014)..........................................................................48

*Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ...................................31

*Colorado ex rel. Watrous v. Dist. Ct. of U.S. for Dist. of Colo.*,
   207 F.2d 50 (10th Cir. 1953) ...............................................................................34

*Colorado v. U.S. Dep't of Justice*, 455 F. Supp. 3d 1034 (D. Colo. 2020)....... 22,25

*Darby v. Cisneros*, 509 U.S. 137 (1993) .................................................................19

*Deer Creek Water Corp. v. Oklahoma City,* 82 F.4th 972 (10th Cir. 2023) ...........21

*Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)...................................
   ...............................3, 4, 10, 11, 13, 15, 17, 25, 27, 28, 29, 31-33, 39, 46, 48, 49, 53

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
   356 F.3d 1256 (10th Cir. 2004) ...........................................................................51

*FEC v. Cruz*, 596 U.S. 289 (2022)..........................................................................24

*Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222 (10th Cir. 2007) .........18

*Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250 (10th Cir. 2003) ...............51

*Heideman v. South Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003) ............... 18, 34

*Highway J Citizens Grp., U.A. v. U.S. Dep't of Transp.,*
   656 F. Supp. 2d 868 (E.D. Wis. 2009).................................................................34

*Kentucky v. Yellen*, 67 F.4th 322 (6th Cir. 2023) ....................................................27

*Missouri v. Bowen*, 813 F.2d 864 (8th Cir. 1987) ....................................................19

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ..................................21

*OCRJ v. Drummond,* 2023 OK 24, 526 P.3d 1123 (Okla. 2023)............................10

*Ohio v. Becerra,*
   87 F.4th 759 (6th Cir. 2023) .................. 1, 13-15, 25, 26, 31, 33-35, 37-39, 50, 51

*Olenhouse v. Commodity Credit Corp*., 42 F.3d 1560 (10th Cir. 1994) .......... 47, 48

*Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1 (1981) ... 21, 23, 27

*Planned Parenthood of Kansas & Mid-Missouri v. Moser,*
   747 F.3d 814 (10th Cir. 2014) ...........................................................................27

*Reuters Ltd. v. United Press Intern., Inc*., 903 F.2d 904 (2d Cir. 1990) ................52

*Rust v. Sullivan*, 500 U.S. 173 (1991)................. 8, 15, 21, 25, 26, 31, 32, 39, 41, 42

*Sackett v. EPA*, 566 U.S. 120 (2012) ......................................................................19

*Safe Streets All. v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017) ...........................28

*Scherer v. U.S. Forest Serv*., 653 F.3d 1241 (10th Cir. 2011) ......................... 13, 32

*Sinclair Wyo. Ref. Co. v. EPA*, 887 F.3d 986 (10th Cir. 2017) ...............................41

*South Dakota v. Dole*, 483 U.S. 203 (1987) ...................................................... 20, 23

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27 (2d Cir. 1995) ...... 51, 52

*UMC Physicians' Bargaining Unit of Nev. Serv. Emps. Union v. Nev. Serv. Emps. Union/SEIU Loc. 1107, AFL-CIO*, 178 P.3d 709 (Nev. 2008) ............................36

*United States v. Bass*, 404 U.S. 336 (1971) ............................................28

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981) ..................................34

7*West Virginia ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124 (11th Cir. 2023) ........................................ 22-26

*West Virginia v. EPA*, 597 U.S. 697 (2022) .........................................30

*Winkler v. Andrus*, 614 F.2d 707 (10th Cir. 1980) ...............................18

*Wyandotte Nation v. Sebelius*, 443 F.3d 1247 (10th Cir. 2006) ..............18

## CONSTITUTIONAL PROVISIONS

U.S. CONST. art. I, § 8, cl. 1 .........................................................20

## STATUTES

5 U.S.C. § 702 ..............................................................................2
5 U.S.C. § 705 .................................................................. 18, 19, 53
5 U.S.C. § 706 ...............................................................................20
28 U.S.C. § 1292(a)(1) ....................................................................2
28 U.S.C. § 1331 .............................................................................2
28 U.S.C. § 1346 .............................................................................2
42 U.S.C. § 300(a) ..........................................................................5
42 U.S.C. §§ 300-300a-6 ................................................................1
42 U.S.C. § 300a-4(a) ....................................................................25
42 U.S.C. § 300a-6 ........................................................ 1, 7, 15, 41
42 U.S.C. §§ 3505a-3505b ...............................................................1
OKLA. STAT. tit. 21, § 861 .......................................... 10, 14, 28, 43
OKLA. STAT. tit. 63, § 1-728b(4) .....................................................44
OKLA. STAT. tit 63, § 1-728e(B) .....................................................44
OKLA. STAT. tit. 63 § 1-738.3(A)(2)(d) ....................................... 10, 44
OKLA. STAT. tit. 63, § 1-753(2) .......................................................44

# REGULATIONS

42 C.F.R. § 59.5 ...............................................................................17

42 C.F.R. § 59.5(a) ...........................................................................42

42 C.F.R. § 59.5(a)(5) ................................................ 9, 11, 20, 21, 30, 31

42 C.F.R. § 59.5(a)(5)(i)(c) ................................................ 11, 12, 43

42 C.F.R. § 59.5(b)(6) ........................................................ 42, 45, 46

45 C.F.R. § 88.2 ................................................................................40

53 Fed. Reg. 2922 ..............................................................................7

53 Fed. Reg. 2923 ..............................................................................7

65 Fed. Reg. 41,270 ..........................................................................8

84 Fed. Reg. 7714 ..............................................................................8

84 Fed. Reg. 23,264 ..........................................................................40

86 Fed. Reg. 56,144 ................................................................ 1, 9, 49

86 Fed. Reg. 56,149 ..........................................................................26

86 Fed. Reg. 56,153 ..........................................................................37

86 Fed. Reg. 56,168 ..........................................................................49

# OTHER AUTHORITIES

116 Cong. Rec. 37,375 (Nov. 16, 1970) ..................................41

Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. H, title V, § 507(d)(1), 136 Stat. 49,496 (Mar. 15, 2022) ......................... 1, 8, 35, 38

Fed. R. App. P. 4(a)(1)(B) ..........................................................2

## GLOSSARY

APA                       Administrative Procedures Act

HHS                       U.S. Department of Health and Human Services

OSDH                      Oklahoma State Department of Health

Title X                   Family Planning Services and Population Research Act of
                          1970 (enacted as Title X of the Public Health Services Act,
                          42 U.S.C. §§ 300-300a-6, 3505a-3505b)

2021 Rule                 Ensuring Access to Equitable, Affordable, Client-
                          Centered, Quality Family Planning Services, 86 Fed. Reg.
                          56,144 (Oct. 7, 2021), including the abortion counseling
                          and referral requirement found at 42 C.F.R. § 59.5(a)(5)

Weldon Amendment          An annual appropriations rider for every HHS
                          appropriations bill. *See, e.g.,* Consolidated Appropriations
                          Act, 2022, Pub. L. No. 117-103, div. H, title V, § 507(d)(1),
                          136 Stat. 49,496 (Mar. 15, 2022)


## PRIOR OR RELATED APPEALS

In a lawsuit led by Ohio in 2021, Oklahoma joined ten other States in a facial

challenge, arguing that Defendants violated the Administrative Procedures Act

(APA) with their 2021 Rule interpreting Title X. On appeal, the Sixth Circuit granted

in part and denied in part the States' motion for a preliminary injunction. *See Ohio v.

Becerra*, 87 F.4th 759 (6th Cir. 2023). The *Ohio* case has since been remanded, and

summary judgment briefing has not yet been filed at the district court. There has

been no final adjudication on the merits in that action.

# STATEMENT OF JURISDICTION

The Western District of Oklahoma had jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1346, and 5 U.S.C. § 702. After a hearing on Plaintiff's motion for a preliminary injunction, the district court's order denying the motion was entered on the docket on March 26, 2024. App. Vol. 3 at 538; *Attachment 1 & 2.*[1] Oklahoma's notice of appeal was timely filed in accordance with Fed. R. App. P. 4(a)(1)(B) on April 1, 2024. This Court's jurisdiction derives from 28 U.S.C. § 1292(a)(1).

---

[1] All references to the Appendix refer to Appellant's Appendix and include pinpoint cites where appropriate in the following format: App. Vol. [#] at [page].

## STATEMENT OF THE ISSUES

1. Whether Defendants are likely violating the Constitution's Spending Clause by imposing a funding condition—abortion referrals—that Supreme Court precedent holds is not unambiguously required by Title X, and by stripping Oklahoma of millions of dollars solely for declining to comply with that non-statutory condition.

2. Whether Defendants are likely violating Title X by punishing Oklahoma for declining to provide abortion referrals when federal law expressly protects from discrimination—through the Weldon Amendment, most prominently—organizations and grantees who decline to provide abortion referrals.

3. Whether Defendants' decision to strip millions in funding from Oklahoma over abortion referrals was likely arbitrary and capricious when, among other things, Defendants' actions conflicted with their own regulations, and they ignored Oklahoma's compelling interest in protecting fetal life and federalism concerns in the wake of *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).

**INTRODUCTION**

This case is both simple and urgent. Last year, Defendants informed the State of Oklahoma, through the Oklahoma State Department of Health ("Oklahoma," "Health Department," "OSDH," or "State"), that HHS would strip all Title X funds from the Oklahoma Health Department's longstanding and successful Title X program. The sole reason for this is undisputed: The Health Department determined it could not make abortion referrals after Oklahoma's longstanding abortion prohibition was revitalized in the wake of *Dobbs*.

Neither *Dobbs* nor this revitalized law mattered to Defendants, however, despite Defendants' own Title X regulations requiring respect for State law. Nor did it matter to Defendants that Title X rejects abortion and says nothing about referrals, and it did not matter to them that Congress has carved out robust exemptions for those who wish to avoid abortion referrals. All those binding factors were ignored so that Defendants could, in the HHS Secretary's words after the "unconscionable" *Dobbs*, "double down and use every lever we have to protect access to abortion care." HHS Secretary Becerra's Statement on Supreme Court Ruling in *Dobbs v. Jackson Women's Health Organization* (June 24, 2022), https://www.hhs.gov/about/news/2022/06/24/hhs-secretary-becerras-statement-on-supreme-court-ruling-in-dobbs-v-jackson-women-health-organization.html.

Contrary to what the district court held, Oklahoma is likely to show that Defendants violated the Spending Clause, which requires *congressional* clarity on federal spending conditions; violated federal conscience protections, which exempt Title X grantees from making referrals upon objection; and violated the APA, which requires Defendants to act in ways that are not so blatantly arbitrary and capricious. Very soon, Defendants will distribute another year's worth of Title X funds. This Court should enjoin them from doing so in violation of the law.

## STATEMENT OF THE FACTS AND PROCEDURAL HISTORY

### I. OKLAHOMA HAS SUCCESSFULLY MANAGED TITLE X FUNDING FOR DECADES, AND THE SERVICES PROVIDED ARE VITAL TO THE STATE'S CITIZENS.

The Health Department has successfully participated in Title X's family planning projects for over fifty years, offering the State's most vulnerable citizens "a broad range of acceptable and effective family planning methods" that includes family planning, infertility, and services for adolescents. 42 U.S.C. § 300(a). At no point prior to the stripping decision that forms the basis of this action had Oklahoma's Title X funding received adverse treatment, dating back to when Oklahoma began participating in the Title X program in 1971. Decl. of Tina Johnson, App. Vol. 2 at 210, ¶ 8.

These Title X funds are vital to Oklahoma's provision of family planning services. The Health Department uses the Title X grant to disperse funds to 68 county

health departments that provide critical public health services to rural and urban Oklahoma communities. *Id.* at 211, ¶ 12. These county health departments are part of the front-line of women's healthcare in Oklahoma, and they aim to provide comprehensive, connected care to numerous patients. *Id.* at 211–12, ¶¶ 12, 15. OSDH has also contracted with the Oklahoma City-County Health Department and the Tulsa County Health Department to ensure family planning services are available in Oklahoma's most heavily populated counties. *Id.* at 211–12, ¶ 13.

Depriving those communities and populations of Title X services would be devastating. In many instances, particularly in rural Oklahoma communities, the county health department is one of the only access points for critical preventative services for tens or even hundreds of miles. *Id.* at 213, ¶ 18. Some of these same rural communities lack the presence of a full-time health provider or women's healthcare provider. *Id*. Many patients OSDH sees already have difficulty accessing the health care they need because of location, work schedules, or transportation issues. *Id.* Language barriers can also create difficulties in providing services. *Id.* at 212–13, ¶ 17. Thus, Oklahoma's Title X program has access to translators for 30-plus different dialects and languages to assist with language barriers to care. *Id*.

In May 2016, HHS reviewed Oklahoma's Title X program in person, concluding that it "supports excellent projects and activities." App. Vol. 2 at 260. In fact, HHS "applaud[ed]" Oklahoma's "efforts to increase services and qualities

throughout the system," and its reviewers were "impressed with the dedication and commitment to family planning in both the central office staff as well as in the field." *Id*. After making several recommended changes, Oklahoma's program was approved, and HHS advised that it did not need to schedule a return visit until 2024—eight years later. App. Vol. 2 at 211, ¶ 11. On April 1, 2022, HHS awarded Oklahoma a Title X grant (FPHPA 006507), as it had done virtually every grant cycle since 1971. App. Vol. 2 at 303.

## II. HISTORICALLY, HHS HAS PROMULGATED CONTRADICTORY TITLE X REGULATIONS.

From the outset, Title X has expressly prohibited grant funds from "be[ing] used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. Despite this mandate, HHS has historically implemented contradictory abortion rules and regulations for Title X, depending on the presidential administration. From the mid-1970s to the late-1980s, HHS permitted—and in 1981 adopted guidelines requiring—Title X recipients to offer pregnant women "nondirective 'options counseling' on pregnancy termination (abortion) . . . followed by referral for these services if she so requests." 53 Fed. Reg. 2922, 2923 (Feb. 2, 1988).

In 1988, HHS changed course and issued a rule *prohibiting* Title X providers from making referrals for or counseling women regarding abortion. *Id.* at 2945. HHS determined that these requirements were "more consistent with" the Title X provision prohibiting abortion funding. *Id.* at 2932. The validity of this regulation

was challenged in *Rust v. Sullivan*, 500 U.S. 173 (1991). There, the Supreme Court upheld HHS's 1988 regulation. *Rust* held that HHS had permissibly justified its new rule prohibiting abortion counseling and referrals, which HHS had defended as "more in keeping with the original intent of the statute[.]" 500 U.S. at 186–87.

However, in 1993, HHS suspended the 1988 Rule, and in 2000, it again reinstated the requirement that Title X recipients make abortion referrals upon request. 65 Fed. Reg. 41,270.

Importantly, in 2004, Congress began including the so-called "Weldon Amendment" as an annual appropriations rider for every HHS appropriations bill. *See, e.g.,* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. H, title V, § 507(d)(1), 136 Stat. 49,496 (Mar. 15, 2022). Per the Weldon Amendment, no HHS funds, which includes Title X funds:

> may be made available to a Federal agency or program, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, *or refer for* abortions.

*Id*. (emphasis added).

In 2019, in line with the Weldon Amendment, HHS promulgated *Compliance with Statutory Program Integrity Requirements*, 84 Fed. Reg. 7714 (Mar. 4, 2019) ("2019 Rule"). The 2019 Rule adopted much of the 1988 Rule that was upheld in *Rust*, including the prohibition on Title X grantees "perform[ing], promot[ing],

refer[ring] for, or support[ing] abortion as a method of family planning . . . ." *Id.* at 7788–90. As in 1988, HHS concluded that this version of the regulation reflects "the best reading of" Section 1008, "which was intended to ensure that Title X funds are also not used to encourage or promote abortion." *Id.* at 7777. HHS determined that prior regulations "are inconsistent" with section 1008 "insofar as they require referral for abortion as a method of family planning." *Id.* at 7723.

Finally, in 2021, HHS reversed course yet again, promulgating a regulation that it now claims requires abortion counseling and referrals. *See* 86 Fed. Reg. 56,144 (Oct. 7, 2021). Although 42 C.F.R. § 59.5(a)(5) states that "[e]ach" Title X project should "[n]ot provide abortion as a method of family planning," HHS re-added in 2021 that each project must nevertheless "[o]ffer pregnant clients the opportunity to be provided information and counseling regarding … [p]regnancy termination." *Id.* § 59.5(a)(5)(i). The 2021 Rule went into effect on November 8, 2021. Although contrary to Title X's text and the Weldon Amendment, HHS's 2021 Rule remains in effect today, and, pursuant to HHS's interpretation, generally purports to require grantees to make abortion counseling and referrals available upon patients' requests. As will be discussed below, Oklahoma joined a facial challenge against the 2021 Rule and its requirement of abortion referrals—*i.e.*, the State has never accepted the Rule's legitimacy.

## III. *DOBBS* ALLOWS OKLAHOMA'S LONGSTANDING ABORTION BAN TO AGAIN TAKE EFFECT.

On June 24, 2022, the Supreme Court issued *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022). Reversing *Roe v. Wade* and five decades of abortion jurisprudence in the federal courts, *Dobbs* emphasized *repeatedly* that authority to regulate abortion must be returned to the people and their elected representatives. *Id.* at 232, 256, 259, 292, 302.

Exercising that right, the people's elected representatives in Oklahoma have prohibited abortion except to preserve a woman's life, and they have made it illegal to advise a woman to obtain an abortion. *See* OKLA. STAT. tit. 21 § 861. This statute, which has been on the books in Oklahoma since Statehood in 1907, took effect immediately following *Dobbs*, owing in part to a trigger law Oklahoma enacted in case *Roe* should ever be overturned. *See OCRJ v. Drummond,* 2023 OK 24, ¶ 7, 526 P.3d 1123, 1130. As a result, in Oklahoma, advising or procuring an abortion for any woman is punishable as a felony. *Id*. Moreover, Section 861 has been upheld by the Oklahoma Supreme Court. *Id.* at ¶ 16.

And it isn't just Section 861. Rather, Oklahoma has repeatedly sought to protect the "unborn person" or "unborn child," in a variety of ways. Indeed, the State's official, published position is that abortion "terminate[s] the life of a whole, separate, unique, living human being." OKLA. STAT. tit. 63 § 1-738.3(A)(2)(d). And the Health Department has been expressly tasked by the Oklahoma Legislature to

"[d]evelop and distribute education and informational materials … for the purpose of achieving an abortion-free society." OKLA. STAT. tit. 63, § 1-753(2). And so on.

Nevertheless, immediately after *Dobbs*, HHS advised by letter to Title X grant recipients (on June 29, 2022) that it would require compliance with 42 C.F.R. § 59.5(a)(5)'s abortion counseling and referral requirement—added in 2021— regardless of any state law or policy that conflicted with this requirement. App. Vol. 3 at 403.

## IV. HHS TERMINATES OKLAHOMA'S TITLE X FUNDING OVER ABORTION REFERRALS.

For its part, after *Dobbs* the Health Department correctly concluded that it could not comply with 42 C.F.R. § 59.5(a)(5)(i)(c) if it required abortion counseling and referrals, because Oklahoma law makes it a crime for any person to advise or procure an abortion for any woman. Health Department Appeal Letter, App. Vol. 2 at 348–49. Nevertheless, the Health Department took several actions to find an agreeable solution that would allow the Health Department to continue receiving Title X funds while complying with Oklahoma law prohibiting abortions. HHS Termination Notice, App. Vol. 2 at 311–313. On August 29, 2022, the Health Department sought to modify its programmatic procedures to ensure compliance with Oklahoma abortion law, a modification that was denied by HHS on November 9, 2022. *Id.* The Health Department sought reconsideration of this determination on November 22, 2022. *Id.* The Health Department undertook extensive internal

processes to determine how to comply with this HHS regulation and Oklahoma law through early 2023, but it was unable to find a solution. App. Vol. 2 at 213, ¶ 21.

On May 25, 2023, HHS sent a letter to the Health Department claiming the Department was in violation of Title X and out of compliance with the terms and conditions of award FPHPA 006507, the "Oklahoma State Department of Health Family Planning Services Project" (the "Award"). HHS Suspension Letter, App Vol. 2 at 305–06. The Award totals $4.5 million in funding—money that is relied on by the Department to provide critical health care services to Oklahomans. App. Vol. 2 at 210, ¶ 9. Specifically, HHS determined that the Health Department was in violation of Section 59.5(a)(5)(i)(c) because the Department would not offer pregnant clients abortion counseling and referrals. App. Vol. 3 at 405, ¶ 33.

The Health Department received notice that the Award would be terminated on June 27, 2023. App. Vol. 2 at 309–345. One month later, OSDH administratively appealed that ruling. App. Vol. 2 at 346–399. On September 22, 2023, while the administrative appeal was still pending, HHS announced supplemental funding, supposedly to support the provision of Title X services in Oklahoma. App. Vol. 3 at 404, ¶ 26. Funds that would previously have been directed to the Health Department were instead reallocated to Community Health Connection, Inc. and Missouri Family Health Council, Inc., a Missouri entity. *Id.* Community Health Connection,

Inc. was awarded $216,000 in newly authorized federal funds, while Missouri Family Health Council, Inc. was awarded $3,250,000 in supplemental funds. *Id.*

## V. OKLAHOMA BRINGS AN AS-APPLIED CHALLENGE TO THE TITLE X TERMINATION.

On November 23, 2023, Oklahoma filed this as-applied challenge to HHS's termination of Oklahoma's Title X funding. App. Vol. 1 at 189; *see also Scherer v. U.S. Forest Serv.*, 653 F.3d 1241, 1243 (10th Cir. 2011). Although the district court below relied on the Sixth Circuit's preliminary injunction decision in *Ohio v. Becerra*, 87 F.4th 759 (6th Cir. 2023), to find that the referral issue had already been decided, *Ohio* was a *facial* APA challenge to the 2021 rule. The present as-applied challenge raises factual and legal issues that were not present in *Ohio*, such as the effect of *Dobbs*, the Spending Clause, and the Weldon Amendment. Several of these issues were even flagged by the Sixth Circuit as "important" for consideration in future cases. *See, e.g., Ohio*, 87 F.4th at 774 n.7 (indicating that "[t]he impact of *Dobbs* on the Title X program is undoubtedly an 'important aspect'" of cases challenging HHS actions taken *after Dobbs*, which was not the situation with a facial challenge to the 2021 Rule). Moreover, *Ohio* was a preliminary injunction decision, not a final judgment. *Ohio*, in short, does not foreclose relief.

Because Oklahoma faced the potential loss of another $4.5 million in funding in April 2024, Oklahoma moved for a preliminary injunction on January 26, 2024. App. Vol. 2 at 175–399. Oklahoma sought an injunction prohibiting HHS from

excluding Oklahoma from receiving a Title X grant on the basis that Oklahoma is not compliant with the abortion counseling and referral requirement. After briefing was completed on the injunction, App. Vol. 3 at 414–484, the court below held a hearing on March 26, 2024. PI Hr'g Tr., App. Vol. 3 at 539–614.

At the end of the hearing, the court denied Oklahoma's motion with an oral ruling and issued an order to that effect the same day. App. Vol. 3 at 538. Although the district court found that Oklahoma had shown irreparable harm, it concluded erroneously that the State was unlikely to succeed on the merits. App. Vol. 3 at 612. In doing so, the district court relied on several arguments that Defendants did *not* raise in their brief. That is, a substantial portion of the district court's ruling was based on arguments Oklahoma never had a chance to respond to in writing. For example, the district court repeatedly insisted—contrary to a plain reading of OKLA. STAT. tit. 21, § 861—that Oklahoma law does not actually prohibit abortion referrals. App. Vol. 3 at 598–600. And the court indicated that it believed Oklahoma was precluded in some way from making many of its arguments by the *Ohio* litigation, App. Vol. 3 at 601–02, even though the Defendants—represented by perhaps the largest and most sophisticated law firm on the planet—didn't raise preclusion in their brief. The district court also failed to acknowledge that the *Ohio* case has only produced a Sixth Circuit ruling on a *preliminary* injunction; *i.e.*, no final judgment has issued, and the case is still in the process of being litigated.

This appeal ensued. This Court should reverse and grant an injunction.

## SUMMARY OF THE ARGUMENT

From its inception, Title X has prohibited Title X funds from "be[ing] used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6 (Title X, § 1008). And, beginning in 2004, the Weldon Amendment has protected health care entities who refuse to refer women for abortions. Finally, in 2022, the Supreme Court returned the right to regulate abortion to the people and their elected representatives, which revived an Oklahoma law prohibiting anyone from administering, prescribing, advising, or procuring an abortion for any woman. After *Dobbs*, Oklahoma's Health Department determined it could not comply with the 2021 regulation given this reinvigorated Oklahoma statute, and HHS terminated Oklahoma's Title X funding as a result.

This was unlawful, and the district court's denial of a preliminary injunction was an abuse of discretion. The district court improperly found (*sua sponte*) that some form of preclusion prohibited Oklahoma from litigating any issue that was or even could have been presented in *Ohio*, the multistate facial challenge to the 2021 Rule. In short, in an as-applied action, the court improperly assigned preclusive effect to a preliminary injunction ruling in a facial challenge that holds no preclusive power.

On the merits, the district court wrongly discounted Oklahoma's argument that the 2021 Rule violates the Spending Clause. *Rust* establishes that Title X is

ambiguous with respect to abortion counseling and referrals. That, in turn, triggers the Supreme Court's Spending Clause precedent, which holds that agencies cannot exercise legislative authority to create a spending condition that was not clearly authorized by Congress. The district court focused improperly on whether Oklahoma was aware of the funding condition and requirement imposed by the HHS regulation, without acknowledging that Oklahoma has never acceded to the 2021 condition. The court also wrongly found that the Spending Clause is only implicated when a condition is sprung on a State after-the-fact, and the district court incorrectly indicated that a generic statutory grant of authority to HHS to impose conditions obviates the Spending Clause. This latter holding cannot possibly be true, or else Congress could evade the Spending Clause by simply delegating its condition-setting power to bureaucracies.

In any event, the Weldon Amendment prohibits HHS from enforcing the abortion counseling and referral requirement by terminating Oklahoma's Title X funding. The district court erred in finding—without citing anything—that the Weldon Amendment is not applicable to a State. Simply put, the State Department of Health qualifies, textually, as a "health care entity" protected by the Weldon Amendment, and it also qualifies as a "grantee" protected by HHS's own 2021 Rule.

This leads to the final issue, which is that HHS acted in an arbitrary and capricious manner by disregarding some of its regulations to give effect to the only

regulation it wants to enforce—the requirement that Title X grantees make abortion counseling and referrals. For example, HHS regulations require that Title X services be "allowable under state law." In responding to this point, the district court erred in finding that abortion referrals *are* permitted in Oklahoma. To the contrary, a plain reading of Oklahoma law precludes the Health Department, and its city and county health department partners, from complying with 42 C.F.R. § 59.5. Indeed, Defendants did not even argue otherwise in their briefing below, which constitutes waiver. In addition, HHS ignored the impact and importance of the *Dobbs* decision when HHS decided to terminate Oklahoma's grant funding, particularly with respect to federalism concerns and the State's compelling interest in protecting the unborn. The result is a federal agency that seeks to push its own policy goals onto states, when the Supreme Court has articulated that authority to regulate abortion must be returned to the people and their elected representatives. These issues all demonstrate that Oklahoma was and is likely to succeed on the merits in its challenge against the decision by HHS to terminate Oklahoma's Title X funding.

The district court did properly conclude that Oklahoma demonstrated irreparable harm. If an injunction is not issued, Oklahoma looks to lose $4.5 million in Title X funding, as well as reputation and other federal benefits. Likewise, Oklahoma's irreparable harm exceeds any harm that can be claimed by HHS, and a preliminary injunction would advance the public interest. For these reasons, the

district court should have issued a preliminary injunction prohibiting HHS from excluding Oklahoma from Title X grants on the basis that Oklahoma cannot comply with the abortion counseling and referral requirement in HHS's regulations.

## STANDARD OF REVIEW

This Court reviews the denial of a preliminary injunction for an abuse of discretion. *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007) (citing *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1252 (10th Cir. 2006)). An abuse of discretion occurs when the district court "commits an error of law or makes clearly erroneous factual findings." *Id.*; *see also Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). To obtain a preliminary injunction, Oklahoma must show that: (1) it is likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3) the threatened injury outweighs any injury to the opposing party; and (4) the injunction is not against the public interest. *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012).

A stay of Defendants' termination of Oklahoma's Title X grant is also appropriate under 5 U.S.C. § 705, which states that "the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." Thus, a stay under § 705 is a provisional remedy in the nature of a preliminary injunction. *See Winkler v. Andrus*, 614 F.2d 707, 709 (10th Cir. 1980).

## ARGUMENTS AND AUTHORITIES

Oklahoma met all four requirements for a preliminary injunction, thus the district court improperly denied Oklahoma's motion. Most significantly, Oklahoma demonstrated a likelihood of success on the merits on: (1) the Spending Clause; (2) the Weldon Amendment; and (3) the APA's arbitrary and capricious standard. In its disagreement, the district court committed several errors of law, including its holding that Oklahoma law does not actually prohibit abortion referrals. Alternatively, the district court should have postponed effectiveness of Defendants' action to terminate Oklahoma's Title X award pursuant to 5 U.S.C. § 705.

## I.    THIS MATTER IS APPROPRIATE FOR THE COURT TO REVIEW.

As a threshold matter, HHS's decision to terminate Oklahoma's Title X funding is a final agency action subject to judicial review. *Sackett v. EPA*, 566 U.S. 120, 127 (2012). While Oklahoma pursued an agency appeal prior to filing this action, and allowed HHS ample time to resolve that appeal, that appeal was not mandatory. *See Darby v. Cisneros*, 509 U.S. 137, 147 (1993); *Missouri v. Bowen*, 813 F.2d 864, 871 (8th Cir. 1987). And HHS did not contend below that the decision to terminate Oklahoma's funding was unreviewable.

Moreover, under the APA, courts are entitled to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning

or applicability of the terms of an agency action." 5 U.S.C. § 706. Courts may

compel an agency action "unlawfully withheld" and:

> hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law."

*Id.* at 706(1), (2)(A)-(D). Here, Oklahoma appropriately sought a preliminary

injunction prohibiting HHS from excluding Oklahoma from receiving Title X

funding on the basis that Oklahoma would not comply with 42 C.F.R. § 59.5(a)(5)'s

abortion counseling and referral requirement.

## II.    ISSUE NO. 1: OKLAHOMA IS LIKELY TO SUCCEED ON THE MERITS UNDER THE SPENDING CLAUSE.

> A.    *Title X does not clearly require abortion referrals, ergo Defendants cannot take a hostile action against a State for declining to provide referrals.*

Title X is authorized under the Spending Clause, which provides that

"Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises,

to … provide for the … general Welfare of the United States ...." U.S. CONST. art. I,

§ 8, cl. 1. The Supreme Court has recognized four restrictions on the ability of

Congress to utilize the Spending Clause, the second of which matters most in this

case: if Congress wants to place conditions on a state's receipt of federal funds, it

must do so ***unambiguously***. *See Arbogast v. Kan., Dep't of Lab.*, 789 F.3d 1174,

1186 (10th Cir. 2015) (citing *South Dakota v. Dole*, 483 U.S. 203, 207 (1987)).

Put differently, "[t]he legitimacy of Spending Clause legislation" "depends on whether a state voluntarily and knowingly accepts the terms of such programs." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 522 (2012); *see also Deer Creek Water Corp. v. Okla. City,* 82 F.4th 972, 987–88 (10th Cir. 2023). Thus, while Congress may exert influence on states by conditioning funding on certain requirements, Congress must provide *clear notice* of the obligations imposed. *Arlington Cent. School Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). "'[L]egislation enacted pursuant to the spending power is much in the nature of a contract,'" and therefore, to be bound by "'federally imposed conditions,'" recipients of federal funds must accept them "'voluntarily and knowingly.'" *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17 (1981).

It is undisputed here that Title X does *not* clearly or expressly require abortion referrals. Indeed, that holding is required by binding precedent, *Rust*, which held that Title X "does not speak directly to the issues of counseling, referral, advocacy, or program integrity" and is therefore ambiguous. 500 U.S. 173, 184 (1991). This would seem to compel a ruling for the State under the Spending Clause. Nevertheless, in denying the injunction, the district court primarily focused on whether Oklahoma was merely aware of the bureaucratic condition imposed by 42 C.F.R. § 59.5(a)(5). *See* App. Vol. 3 at 605 ("Here, it seems to me, there's no serious argument to be made that the State of Oklahoma didn't know what the conditions

were that the HHS folks were going to insist on as a basis for participation in the grant program."). [2] The district court also concluded that notice of spending conditions "can come, not only from the statute, but from the regulations pursuant to the statute." App. Vol. 3 at 606.

But "agency-imposed grant conditions, even if they themselves are unambiguous, cannot be constitutional under the Spending Clause unless the statute from which they originate is also unambiguous." *Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1056 (D. Colo. 2020). Conditions imposed by an agency on grant funding cannot have been unambiguously authorized by Congress when the conditions were never statutorily authorized to start. *Id.* at 1056–57; *see also West Virginia ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1147 (11th Cir. 2023) (citation omitted) (stating that "the ability to place conditions on federal grants ultimately comes from the Spending Clause, which empowers Congress, not the Executive, to spend for the general welfare").

Therefore, the proper focus of the Spending Clause analysis is not on whether Oklahoma was merely *aware of* the spending condition but is instead on whether the spending condition imposed on Oklahoma is *unambiguously prescribed by statute*.

---

[2] *See also* App. Vol. 3 at 606 (finding that "[w]hat the deal was has been obvious, it seems to me" and "that this is simply not a circumstance where the State can plausibly say, Well, gee, we've been subjected to these conditions when we didn't know what the deal was.").

The Supreme Court's case law on the Spending Clause makes this point clear, and the district court improperly disregarded this part of the analysis to focus on whether Oklahoma was aware of the condition.

The leading Supreme Court case setting forth Spending Clause principles is *Pennhurst*. There, the Supreme Court wrote that "our cases have long recognized that *Congress* may fix the terms on which it shall disburse federal money to the States." *Pennhurst*, 451 U.S. at 17 (emphasis added) (citations omitted). "[I]f Congress intends to impose a condition on the grant of federal moneys," the Court held, "it must do so unambiguously." *Id.* It is difficult to imagine language more straightforward and applicable.

In *West Virginia,* the Eleventh Circuit recently recognized and applied *Pennhurst* as the leading case on the Spending Clause. 59 F.4th at 1140. Like the present case, *Morrisey* dealt with an as-applied funding condition challenge. The *Morrisey* court, building upon *Pennhurst* and *Dole*, reiterated the five elements:

> that conditional funding grants must satisfy to pass constitutional muster under the Spending Clause: (1) the expenditure must "advance the general welfare"; (2) any condition attached must be "unambiguous[]"; (3) conditions must relate "to the federal interest in particular national projects or programs"; (4) conditions cannot violate another constitutional provision; and (5) conditions cannot "be so coercive ... [that] pressure turns into compulsion."

*Id.* at 1141 (quoting *Dole*, 483 U.S. at 207–11). Although an "expenditure or condition" that "does not satisfy these elements … is unconstitutional," *id.*, the

district court did not focus its analysis on *any* of these elements in its oral ruling, even though several of them were raised by Oklahoma.

*Morrisey* illustrates the flaw in the district court's analysis. "A state's knowledge that strings attach to federal funds is necessary, *but not sufficient*, for the conditions to comport with the Spending Clause." *Id.* at 1143 (emphasis added). Here, even ignoring that Oklahoma's awareness of the 2021 Rule was always accompanied by the State's legal objections and opposition, the district court's conclusion that Oklahoma was aware of the regulatory requirement is not sufficient to satisfy Spending Clause scrutiny. Rather, "[a] law must 'unambiguously' link 'its conditions to the receipt of federal funds and define those conditions clearly enough for the states to make an informed choice." *Id.* (citation omitted).

Simply put, agencies cannot make a spending condition unambiguous when Congress has failed to do so. "[A]n agency cannot exercise legislative power or otherwise 'operate independently of the statute that authorized it.'" *Id.* at 1147 (quoting *FEC v. Cruz*, 596 U.S. 289, 301 (2022)). "The Constitution gives Congress, not the executive branch, the power to tax and spend through the exercise of its legislative power. It follows therefore that Congress, *not an executive agency*, must exercise that power constitutionally." *Id.* (emphasis added). Indeed, "[a]llowing an executive agency to impose a condition that is not otherwise ascertainable in the law Congress enacted 'would be inconsistent with the Constitution's meticulous

separation of powers.'" *Id.* (citations omitted). "Therefore, the 'needed clarity' under the Spending Clause 'must come directly from the statute[,]'" not from Defendants' after-the-fact regulations. *Id.* (citations omitted); *see also Colorado*, 455 F. Supp. 3d at 1056.

*Morrisey* addresses the district court's other concern, as well. Defendants argued below, and the district court seemingly accepted, that a generic delegation of rulemaking authority to an agency allows that agency to impose spending conditions that are not present in the statute. *See* 42 U.S.C. § 300a-4(a). This is wrong for multiple reasons. To begin, the district court's observation that HHS has "been filling in [the legislative] gap for 30 years," App. Vol. 3 at 564, is of no consequence. Here, the challenged actions began in 2023, and involve enforcing a regulation that was enacted in 2021 and did not take into account a landmark Supreme Court decision issued in 2022. Relying on what happened 30 years prior to these developments is inappropriate. Indeed, *Dobbs* itself overturned nearly *50* years of precedent, which makes relying on abortion-related actions or inactions during those 50 years questionable, at best. In any event, in that alleged 30 years no court actually addressed the Spending Clause question raised here. *Rust* did not involve a Spending Clause challenge to the Title X regulatory scheme, nor did *Ohio*. Questions not analyzed or answered cannot possibly dictate the outcome here. Further, *Morrisey* recognizes that while courts do not question an agency's ability to fill in gaps that

may exist within a spending condition, a problem arises when there is a lack of an ascertainable condition in the first place. 59 F.4th at 1147. That is HHS's problem in this case. There is no ascertainable condition in the Title X statute requiring abortion counseling and referrals.

Again, the Supreme Court in *Rust* specifically found that Title X is *ambiguous* as to any abortion counseling and referral requirement. 500 U.S. at 184. There, the Supreme Court considered a challenge to an HHS regulation that prohibited Title X grantees from offering abortion referrals. *Id.* at 179. Rather succinctly, the Supreme Court found that Title X's statutory provisions are *ambiguous* on the issues of abortion counseling and referrals. *Id.* at 184 (stating that § 1008 "does not speak directly to the issues of counseling, referral, advocacy, or program integrity"); *see also Ohio*, 874 F.4th at 771 (reiterating *Rust*'s finding that the statute is ambiguous).[3]

Indeed, HHS itself has acknowledged *Rust*'s holding Title X statute is silent and therefore ambiguous about abortion counseling and referrals. *See* 86 Fed. Reg. at 56,149. Because the statute is admittedly ambiguous, HHS's regulation imposing conditions on the receipt of a Title X grant cannot be constitutional under the Spending Clause. *See, e.g.*, *Morrisey*, 59 F.4th at 1146.

---

[3] Further, *Rust* came before Congress enacted the Weldon Amendment, which, if anything, clarified the Title X ambiguity in Oklahoma's favor.

In this case, HHS effectively asks this Court to approve of HHS exercising the power of all three branches of government: HHS has wielded legislative authority to impose a spending condition requiring Title X grantees to offer abortion counseling and referrals, HHS has exercised executive authority by stripping a State of funding for not meeting this condition, and HHS has exercised judicial authority by (thus far) declining to rule on Oklahoma's administrative appeal and urging the courts to defer to Defendants' interpretations of the law. This goes too far. Without *clear notice* from Congress itself, Oklahoma could not *voluntarily* and *knowingly* agree to the abortion counseling and referral requirement as a condition to accepting Title X funding. Nor did Oklahoma ever *actually* agree to this condition in the 2021 Rule, and especially not after the *Dobbs* decision was issued. After all, Spending Clause arrangements are indisputably akin to contractual arrangements, *Pennhurst*, 451 U.S. at 17. Annual contracts can be re-negotiated, and negotiations are subject to changed circumstances. Defendants' assertion that Oklahoma has accepted these conditions is clearly not true with respect to *future* contracts and funding, including the funding for 2024 that is the focus of the injunction request here.

B. *The Spending Clause requires more respect for State sovereignty than what Defendants have provided.*

As courts have recognized, "more is at stake when Congressional spending legislation threatens state sovereign interests ...." *Kentucky v. Yellen*, 67 F.4th 322, 327 (6th Cir. 2023); *see also Planned Parenthood of Kan. & Mid-Missouri v. Moser,*

747 F.3d 814, 824 (10th Cir. 2014) (describing the "special nature of Spending Clause legislation" and explaining that "[i]n the federal-grant context, the State is more a partner than a subordinate of the federal government"), *abrogated in part on other grounds by Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 905 n.16 (10th Cir. 2017). "In traditionally sensitive areas, such as legislation affecting the federal balance, the requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *United States v. Bass*, 404 U.S. 336, 349 (1971). The Supreme Court has articulated that it expects "Congress to speak clearly when authorizing an agency to exercise powers of "vast 'economic and political significance.'" *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.,* 594 U.S. 758, 764 (2021) (citations omitted). This matter involves considerable economic significance, through $4.5 million in federal Title X funding, and it is hard to imagine an issue bearing more political significance than a State's ability to enact its own abortion regulations, protect unborn life, and decline to refer women for abortions that the State has deemed criminal.

Here, the federal-state balance is at issue. Following *Dobbs*, Oklahoma law made it a felony to administer, advise, or procure an abortion for any woman except when necessary to preserve the woman's life. OKLA. STAT. tit. 21, § 861. Defendants' application of its regulation foists upon Oklahoma a requirement

invented by federal bureaucrats concerning an issue that has been recognized as specifically reserved to the people. And it was done with the clear intent to *subvert* Supreme Court precedent. Specifically, in 2022 Defendant Becerra announced that the *Dobbs* decision was "unconscionable" and that Defendants would "double down and use every lever we have to protect access to abortion care." HHS Secretary Becerra's Statement on Supreme Court Ruling in *Dobbs v. Jackson Women's Health Organization*, June 24, 2022, https://www.hhs.gov/about/news/2022/06/24/hhs-secretary-becerras-statement-on-supreme-court-ruling-in-dobbs-v-jackson-women-health-organization.html. That is, HHS deliberately sought to circumvent a Supreme Court decision and impose the executive's abortion policy preferences on the states, including Oklahoma. Yet the district court took no notice of this, despite it being presented in Oklahoma's Complaint and preliminary injunction brief.

By terminating Oklahoma's grant funds because of its abortion laws and refusal to countenance referrals without clear congressional authorization, Defendants have intruded upon Oklahoma's sovereignty. Moreover, by awarding Oklahoma's funds to an entity in Missouri, HHS has willfully encouraged an entity to disregard Oklahoma law. After awarding the Missouri Family Health Council funds to provide services in Oklahoma, Defendants admit that this entity will provide services in Oklahoma. HHS will also presumably condition Missouri Family Health Council's receipt of such funds on compliance with all of HHS's regulations,

including 42 C.F.R. § 59.5(a)(5). To the extent that Missouri Family Health Council provides services in Oklahoma and provides pregnancy termination referrals, Missouri Family Health Council risks violating Oklahoma law.

Therefore, Oklahoma's sovereign interests are directly in play, and the lack of *clear notice* by *Congress* of any requirement to offer abortion counseling and referrals renders HHS's termination of Oklahoma's Title X funding violative of the Spending Clause. Ultimately, binding precedent holds that Title X is ambiguous on the issue of abortion counseling and referrals, and as such, the Spending Clause prohibits HHS from relying on the regulation to terminate Oklahoma's Title X funding. The district court improperly denied Oklahoma a preliminary injunction. Accepting Defendants' position and the district court's analysis is tantamount to cutting Defendants a blank check to use Title X to advance their own policy goals, even where Congress has specifically instructed otherwise or remained silent. After all, Defendants offer no limiting principle to their argument. Under their view, the HHS Secretary could conceivably impose abortion performance requirements under Title X, or any other requirements he sees fit, without violating the Spending Clause. Such a holding creates other constitutional issues, in that it signals that Congress can subvert the Spending Clause's requirement of specificity and clarity by simply giving the agency carte blanche authority to come up with whatever conditions it deems fit. *Cf. West Virginia v. EPA*, 597 U.S. 697, 729 (2022) ("We are confident

that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." (quoting *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000)).

C. *Oklahoma brings an as-applied challenge and is not precluded here by a preliminary injunction decision on a facial challenge in Ohio.*

The district court improperly concluded that much, if not all, of Oklahoma's challenge in this matter was really a facial challenge to the regulatory requirement at 42 C.F.R. § 59.5(a)(5). *See, e.g.,* App. Vol. 3 at 558–59, 602–03, 607. Moreover, the district court concluded that Oklahoma was precluded from raising many, if not all, of its arguments because of its participation in the *Ohio* case. *See, e.g.,* App. Vol 3 at 601–02. The court's analysis on these points was plainly incorrect.

Again, Oklahoma is one plaintiff among many in a case currently pending in the Southern District of Ohio, *Ohio v. Becerra,* No. 1:21-cv-675 (S.D. Ohio, filed Oct. 25, 2021). That matter is a facial challenge under the APA to the validity, among other things, of 42 C.F.R. § 59.5(a)(5), and it predated *Dobbs* and any action by HHS to terminate Oklahoma's Title X funding. Late last year, the Sixth Circuit declined to preliminarily enjoin the implementation of the abortion referral regulation, finding that it was unable to do so under the APA because of *Rust*'s ambiguity finding and *Chevron* deference. *See Ohio*, 87 F.4th at 765. But the Sixth Circuit did not analyze the Spending Clause, which, unlike *Chevron*, resolves ambiguity in favor of the regulated, not the regulator. And the Sixth Circuit did not take *Dobbs* into account

because the 2021 Rule predated *Dobbs*. Nor was its ruling anything more than a preliminary (injunction) decision. There was no final judgment, and the parties there have now returned to the district court to continue the litigation.

This case, on the other hand, is an as-applied challenge brought with respect to HHS's specific action of terminating Oklahoma's Title X funding based on the post-*Dobbs* application of HHS's 2021 regulation. *See Scherer*, 653 F.3d at 1243 (describing an as-applied challenge as "limited to review of how the regulation or statute has been 'applied in a particular instance'" (citation omitted)). In the facial challenge, Oklahoma proactively attacked the regulation on the basis that it violates the rights of the public and sought to strike down the 2021 Rule for the benefit of all. Here, Oklahoma is in a defensive role. Facial challenges are the most difficult challenges to mount successfully because the challenger must generally establish that no set of circumstances exists under which the regulation might be valid. *See Rust*, 500 U.S. at 183. Not so for an as-applied challenge, which focuses on whether the regulation is invalid applied to a particular party at a particular time.

To be sure, a party's as-applied challenge could end up relying on broader facially tinged arguments about a rule's legitimacy. But that concern is particularly inapplicable here. Perhaps most prominently, Oklahoma's facial challenge predated the paradigm shift on abortion jurisprudence in *Dobbs*, whereas this as-applied challenge leans *into* that shift. The Sixth Circuit expressly recognized this

distinction, observing that the "impact of *Dobbs* on the Title X program is undoubtedly an 'important aspect' of the question *now*, but 'judicial review of agency action is limited to the grounds that the agency invoked when it took the action.'" *Ohio*, 87 F.4th at 774 n.7 (citation omitted) (emphasis added). Thus, even if Oklahoma could be viewed as making broad arguments here as it did in *Ohio*, that should in no way prevent this Court from analyzing the merits of those arguments. The Sixth Circuit's opinion is neither binding nor on all fours, given the changed circumstances.[4]

Nevertheless, the district court concluded that "res judicata or claim preclusion or whatever" "rather clearly" applies here. App. Vol. 3 at 601–02. "[T]o the extent that the particular claim was litigated in a prior forum," the court below held, "the State is precluded by the doctrine from re-litigating it here, which is to say that they're not in a position to either, you know, reargue the same argument that was made there or to raise other theories that might ultimately support the same claim." App. Vol. 3 at 602. In the end, the district court appears to have held that

---

[4] More changes are likely. *Ohio* relied extensively on *Chevron* for its abortion referral analysis. *See Ohio*, 87 F.4th at 768–70. But by the end of June, the Supreme Court will issue decisions presumably explaining the continued vitality and scope of *Chevron* in *Loper Bright Enters. v. Raimondo*, No. 22-451 (U.S. filed Nov. 10, 2022) and *Relentless, Inc. v. U.S. Dep't of Com.*, No. 22-1219 (U.S. filed June 14, 2023). Oklahoma reserves the right to incorporate those rulings. In any event, *Chevron* does not apply to as-applied challenges under the Spending Clause, because any funding condition must be unambiguously clear from statute.

Oklahoma cannot bring Spending Clause (or Weldon Amendment) arguments here, because they should have been raised in *Ohio*. But this makes no sense, which is presumably why Defendants—the United States Government—didn't even bother to raise preclusion in their injunction response brief below.

It is undisputed that the *Ohio* litigation is not complete, nor has there been a final adjudication on the merits. Rather, the Sixth Circuit decision was limited to reviewing the district court's denial of a *preliminary* injunction. *See Ohio*, 87 F.4th at 768. And longstanding authority from this Court holds that "[t]he denial of [a] preliminary injunction was not an adjudication of the ultimate rights in controversy. It will not be conclusive on the court or the rights of the plaintiffs at a subsequent hearing." *Colorado ex rel. Watrous v. Dist. Ct. of U.S. for Dist. of Colo.*, 207 F.2d 50, 58 (10th Cir. 1953). This is straightforward, and it makes sense given the "less formal" and "less complete" nature of preliminary injunction proceedings, which are "often conducted under pressured time constraints, on limited evidence and expedited briefing schedules." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). Simply stated, a party "is not required to prove his case in full at a preliminary-injunction hearing." *Camenisch*, 451 U.S. at 395; *see also Highway J Citizens Grp., U.A. v. U.S. Dep't of Transp.,* 656 F. Supp. 2d 868, 883 (E.D. Wis. 2009) ("[F]ailing to raise an argument at the preliminary injunction stage is not

inconsistent with an intent to pursue the argument during later stages of a case."). Thus, Oklahoma is not precluded by the facial *Ohio* litigation from raising the Spending Clause or Weldon Amendment in this as-applied challenge.

The district court never acknowledged the preliminary nature of the *Ohio* case, nor did it receive any briefing on preclusion. By relying on preclusion to deny a preliminary injunction here, it erred as a matter of law.

## III. ISSUE NO. 2: OKLAHOMA IS LIKELY TO SUCCEED ON THE MERITS UNDER THE WELDON AMENDMENT.

Although the district court considered it a "closer question," App. Vol. 3 at 607, it ultimately erred in finding that the Weldon Amendment does not apply here. Since 2004, the Weldon Amendment has expressly *prohibited* Title X funds from flowing to a federal agency (including HHS) that discriminates against a "health care entity" that refuses to refer women for abortions. *See supra* p.9. And a "health care entity" is defined to include "an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or *any other kind* of health care facility, *organization*, or plan." Pub. L. No. 117-103, 136 Stat. 496, div. H, title V, § 507(d)(2) (2022) (emphases added).

Contrary to the district court's finding, the Weldon Amendment's restrictions *must* apply to the Health Department, given the plain text and the scope of the Department's operations in the State. To recap, OSDH administers the Title X family

planning program in Oklahoma by dispersing funds through 68 county health departments that provide critical public health services to rural and urban Oklahoma communities. App. Vol. 2 at 211, ¶ 12. These county health departments *easily* meet the broad definition of "health care entity" set forth above. The Health Department is also a health care entity because it partners with and funds county health departments, and its own medically trained employees provide Title X health services to Oklahomans out of the country health departments.

Neither Defendants nor the district court made any serious attempt to explain why a state health agency whose own employees provide on-the-ground medical services under Title X is not an "organization" devoted to "health care"—especially not when the phrase is prefaced by "any." *See, e.g., UMC Physicians' Bargaining Unit of Nev. Serv. Emps. Union v. Nev. Serv. Emps. Union/SEIU Loc. 1107, AFL-CIO*, 178 P.3d 709, 713 (Nev. 2008) (stating that "'[an] organization of any kind' is very broad language . . . ."). Despite this, the district court stated that the Weldon Amendment "means the provider of the services[,]" App. Vol. 3 at 608, implying incorrectly that the Health Department doesn't provide services itself. Because Oklahoma's Department qualifies as a health care entity, the alleged distinction between a "project" and the "provider" raised by Defendants below is irrelevant.

If there were any question about this, it was put to rest by, ironically, Defendants' highly touted 2021 Rule. Incredibly, when enacting the 2021 Rule

supposedly requiring abortion referrals, HHS expressly *declined* to consider the impact of the Weldon Amendment. The relevant rulemaking stated as follows:

> While the [conscience] statutes may at times interact with the requirements of Title X, <u>interpreting these laws is beyond the scope of this rule</u> and the HHS Office for Civil Rights (OCR) has been delegated authority to receive complaints under these provisions.

86 Fed. Reg. 56,153 (Oct. 7, 2021) (emphases added). Putting that dereliction aside, however, HHS added that:

> Irrespective of the points made above … objecting individuals and ***grantees will not be required to counsel or refer for abortions*** in the Title X program in accordance with applicable federal law.

*Id.* (emphasis added). The Health Department is undeniably a Title X grantee. *See* App. Vol. 2 at 264 ("Grantee Name: Oklahoma State Department of Health"). So why doesn't the 2021 Rule require Defendants to defer to the Health Department's objection? Neither the district court nor Defendants ever addressed this. Despite having expressly promised that "grantees will not be required to counsel or refer for abortions in the Title X program," HHS has now discontinued the Health Department's funding because it declines to refer women for abortion. This is unlawful.

Sans authority, Defendants asserted below that "[a] state agency cannot claim to be an objector . . . ." App. Vol. 3 at 440. On appeal, Defendants are likely to point out that, in the *Ohio* litigation, the multistate coalition led by Ohio told the Sixth Circuit that States are not protected under federal statutes protecting conscience in

the context of abortion referrals. *See* Brief of Appellants at 53–54, *Ohio v. Becerra*, No. 21-4235 (6th Cir. Feb. 22, 2022). But much like Defendants here, the multistate coalition cited nothing for this proposition. Because it conflicts with the law's plain text, Oklahoma now disavows that language. Given this disavowal, that language should not be considered binding on Oklahoma because, again, it was made in the context of a *preliminary* injunction. Oklahoma has already informed Ohio that it will not support any such statement being made going forward, as that case makes its way to summary judgment. In any event, it would be the height of irony if Oklahoma was prohibited from changing positions on this point in the midst of a case where Defendants have changed positions on the relevant issues multiple times, including in the last five years.

To summarize, to comply with Defendants' regulation, Oklahoma would be required to "discriminat[e] on the basis that the health care entity does not . . . refer for abortions," which is directly prohibited by the Weldon Amendment. Pub. L. No. 117-103, 136 Stat. 49,496 (2022). As such, Defendants' decision to suspend and terminate Oklahoma's Title X funding is based on HHS's requirement that Oklahoma comply with a regulation that violates federal law. Thus, HHS's termination decision should be set aside because it is premised on requiring a violation of federal law.

As noted above, the Sixth Circuit in *Ohio* did not rule on any argument that the 2021 regulation violates the Weldon Amendment, because it was not raised by the parties in that preliminary briefing. *See* 87 F.4th at 774 n.8. The Sixth Circuit correctly observed, however, that:

> the 2021 Rule would seem to forbid states from subgranting to "health care entities" who will not refer for abortion; that, in turn seems to force the States to "discriminat[e] on the basis that the health care entity does not . . . refer for abortions," the very thing the Weldon Amendment forbids.

*Id.* (citation omitted). The Sixth Circuit indicated, in other words, that the Weldon Amendment could change its analysis of *Rust, Chevron*, and Title X. Although it also mentioned that "[b]oth HHS and the States seem to agree that the States are not 'health care entities[,]'" (*id.*) (citation omitted), that was presumably based on the language Oklahoma has already disavowed above.

Contrary to the district court's ruminations, the application of the Weldon Amendment just makes sense here. Why, after all, would Congress carve out protections for the conscience of private individuals and organizations, but not do the same for public individuals and organizations? What possible reason could justify that distinction, especially after *Dobbs*? Defendants have not proffered any such reason, nor did the district court. Certainly, the district court stated that "[i]t strikes me as a very substantial step to say essentially that a state can get the benefit of what's essentially a conscience-protecting kind of amendment just because the

particular regulatory requirement is contrary to state policy." App. Vol. 3 at 608. But the court offered little explanation for *why* it didn't believe States or their health departments should not be allowed to embrace conscience protections that private organizations are permitted to utilize. And in the end, it is not the district court's decision to make—it is Congress's call.

Finally, it is worth noting that Oklahoma is not the first to make this connection. Indeed, up until March 2024, 45 C.F.R. § 88.2 stated that "[a]s applicable, components of State or local governments may be health care entities under the Weldon Amendment ...." 84 Fed. Reg. 23,264 (2019). Defendants have very recently rescinded this regulation, but there isn't any comparable regulation in its place saying that States *cannot* be health care entities. In the end, a straightforward reading of the Weldon Amendment and Defendants' promises to grantees relating to the 2021 Rule indicate that Oklahoma is likely to succeed on the merits here. The district court erred in ruling otherwise.

## IV.    ISSUE NO. 3: OKLAHOMA IS LIKELY TO SUCCEED IN SHOWING THAT DEFENDANTS VIOLATED THE APA.

In addition to the Spending Clause and the Weldon Amendment, Oklahoma challenged Defendants' application of the 2021 regulation to Oklahoma as arbitrary and capricious under the APA. In finding that HHS's decision was not arbitrary and capricious, the district court incorrectly opined about what Oklahoma law requires and failed to give effect to the plain meaning of HHS's own regulations.

40

*A. Defendants' Termination of Oklahoma's Title X Funding Overstepped the Agency's Authority and is Not a Reasonable Interpretation of Title X.*

Agencies are required to follow governing statutes and regulations. In reviewing an agency's legal determinations, federal courts generally apply a two-step test. *Sinclair Wyo. Refin. Co. v. EPA*, 887 F.3d 986, 990 (10th Cir. 2017). At step one, courts consider "whether Congress has directly spoken to the precise question at issue." *Id.* (quotation omitted). At step two, if Congress has not directly spoken, courts ask whether an agency's interpretation "is based on a permissible construction of the statute." *Id.* (citation omitted).

Whether Title X funding provisions "include abortion as a method of family planning" was a point of debate while Congress considered Title X. 116 Cong. Rec. 37,375 (Nov. 16, 1970) (statement of Rep. Dingell). It was later clarified that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. Through this language, "committee members clearly intend[ed] that abortion is not to be *encouraged or promoted in any way* through" Title X. 116 Cong. Rec. 37,375 (Nov. 16, 1970) (statement of Rep. Dingell) (emphasis added). "Programs which include abortion as a method of family planning are not eligible for funds allocated through this act." *Id.*

As described above, in *Rust* the Supreme Court held that HHS could permissibly prohibit abortion referrals. 500 U.S. at 186–87. However, the regulation

considered by *Rust* was essentially the *opposite* of the regulation HHS has applied against Oklahoma to strip Oklahoma's Title X funding here. Thus, while *Rust* recognizes that HHS can prohibit counseling and referrals for abortion services under Title X, or could conceivably be agnostic or neutral with respect to requiring abortion counseling and referrals, HHS's application of 42 C.F.R. § 59.5(a) here goes too far—especially in light of the Weldon Amendment.

Put differently, although *Rust* recognized Title X was ambiguous on abortion referrals, HHS may not resolve that ambiguity in the statute by *requiring* Title X grantees who object to nevertheless make abortion counseling and referrals. The Weldon Amendment simply cannot be squared with such an approach. Using the current regulation to terminate Oklahoma's funding is inconsistent with federal law.

Furthermore, Defendants' decision to terminate Oklahoma's Title X funding unreasonably interprets HHS's own regulations. Specifically, HHS's interpretation contradicts its other regulations requiring grantees to ensure that they will provide "family planning medical services" that are "allowable under *state* law." 42 C.F.R. § 59.5(b)(6) (emphasis added). HHS describes this as a requirement that must be met by a family planning project. *Id.*

On this point, the district court erred in its *sua sponte* conclusion that Oklahoma law does not prohibit abortion referrals. Defendants' regulation requires a project to "offer pregnant clients the opportunity *to be provided information and*

*counseling* regarding . . . pregnancy termination." 42 C.F.R. § 59.5(a)(5)(i)(c) (emphasis added). The definition of "counsel" is to "advise."[5] Thus, this regulation conflicts with Oklahoma's primary abortion prohibition, which provides that:

> Every person who administers to any woman, or who prescribes for any woman, or *advises or procures* any woman to take any medicine, drug or substance, or uses or employs any instrument, or other means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life shall be guilty of a felony punishable by imprisonment in the State Penitentiary for not less than two (2) years nor more than five (5) years.

OKLA. STAT. tit. 21, § 861 (emphasis added). At the preliminary injunction hearing, the district court repeatedly scoffed at the idea that merely providing a woman with information on where to obtain an out-of-state abortion would violate this law. But "Advise" means, among other things, "to give information or notice to,"[6] which is presumably one reason Defendants did not raise this argument below.

Of course, even if there were debate about whether Oklahoma's abortion prohibition covers abortion referrals, that does not end the matter. The Health Department is entitled to err on the side of caution, given the abundance of evidence that Oklahoma abhors abortion. Oklahoma's firm policy, as enacted through its elected legislators and reflected in Okla Stat. tit. 21, § 861, is to not promote

---

[5]      MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/counsel#dictionary-entry-2.

[6]      MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/advise.

abortions in any way. App. Vol. 3 at 555–56. And a different provision of Oklahoma law explicitly defines "[p]articipate in" as meaning "to perform, practice, engage in, assist in, recommend, counsel in favor of, *make referrals for*, prescribe, dispense, or administer drugs or devices or otherwise promote or encourage." OKLA. STAT. tit. 63, § 1-728b(4) (emphasis added); *see also id.* § 1-728e(B) (directing that "[n]o person shall be required to … [p]articipate in an activity specified in Section 3 of this act …."). That is to say, contrary to the district court's finding, making referrals for abortions is expressly recognized as a form of participation that promotes or encourages abortion under Oklahoma law.

Moreover, as mentioned above, Oklahoma has repeatedly sought to protect the "unborn person" or "unborn child" from abortion, which "terminate[s] the life of a whole, separate, unique, living human being." OKLA. STAT. tit. 63, § 1-738.3(A)(2)(d). And the Health Department has been tasked by the Oklahoma Legislature to "[d]evelop and distribute education and informational materials … for the purpose of achieving an abortion-free society." *Id.* § 1-753(2). All these things should have influenced the district court's analysis of Oklahoma law.

Instead, the district court suggested that Oklahoma has "overblown" its interpretation of what state law requires, App. Vol. 3 at 599, and it wrongly concluded that Oklahoma's predicament is a problem of its own choosing because all Oklahoma would need to do, in the Court's opinion, is tell a pregnant woman

that, "Well, [abortion]'s not legal in Oklahoma, but if you want to look at other options, call this number to get some other information." App. Vol. 3 at 599. This formulation severely underplays Oklahoma's compelling interest in protecting the unborn by ignoring what "some other information" *actually means*. Here, it means advising a woman precisely how and where to get an abortion, which, against all of Oklahoma law and policy, terminates an innocent human life.

Importantly, there is a major contradiction between the district court's stated belief that a referral essentially does not mean anything of significance and therefore does not violate Oklahoma law, and Congress's insistence that there be conscience protections for referrals (through Weldon). Why has Congress mandated conscience protections for referrals if referrals are "just a phone call" with "some information"? Congress obviously doesn't agree with the district court's blasé view of referrals, and Congress's view is what is supposed to control here.

Likewise, the district court's conclusion about the meaning of "allowable under state law" fails to comport with the plain language of the regulation. The requirement in question requires projects to "[p]rovide that family planning medical services will be performed under the direction of a clinical services provider, with services offered within their scope of practice and allowable under state law, and with special training or experience in family planning." 42 C.F.R. § 59.5(b)(6). The term "allowable under state law" modifies the noun "services" in the same clause.

That is the only meaning that makes sense grammatically and meets with common sense. The services offered by "clinical services providers" must be allowable under state law.

On top of that, the same regulation requires grantees to:

> [p]rovide for coordination and use of referrals and linkages with primary healthcare providers, other providers of healthcare services, local health and welfare departments, hospitals, voluntary agencies, and health services projects supported by other federal programs, *who are in close proximity to the Title X site*, when feasible, in order to promote access to services and provide a seamless continuum of care.

*Id.* § 59.5(b)(8) (emphasis added). Out-of-state referrals are almost by definition not in close proximity to the Title X site.

There is no indication that Congress intended to preempt state healthcare laws in enacting Title X. But *Dobbs* introduced a tension that did not exist before. After "authority to regulate abortion [was] returned to the people and their elected representatives" in *Dobbs*, 597 U.S. at 292, states could restrict abortion counseling and referrals, and Oklahoma did so. Instead of giving effect to both regulations by stating that abortion counseling and referrals must be provided only if such referrals are allowable under state law, HHS ignored one regulation to enforce the other. It was an arbitrary decision by HHS to give no meaning whatsoever to the "allowable under state law" requirement of 42 C.F.R. § 59.5(b)(6) and instead terminate Oklahoma's Title X funding on the basis of a competing regulation.

Even if the Health Department could require subgrantees to make abortion referrals out of state under Oklahoma law, to do so would violate the requirement that referrals be given in close proximity to the Title X site. To be sure, the proximity requirement is only a requirement "when feasible." But it is not feasible to make referrals that are not permitted under Oklahoma law and that completely disregard the physical proximity requirement. Out of state travel is not something that is economically feasible for many recipients of Title X services, and the physical proximity requirement reflects this important reality. Simply disregarding the proximity requirement in all cases is not a viable option. The district court should have found that HHS's actions were arbitrary and capricious because the decision exceeded the agency's authority and was not consistent with HHS's own regulations.

B. *Defendants' Termination Decision Was Arbitrary and Capricious.*

Defendants' termination of Oklahoma's Title X funding was arbitrary and capricious. *See Olenhouse v. Commodity Credit Corp*., 42 F.3d 1560, 1574 (10th Cir. 1994). As part of this analysis, courts must "ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made" to determine "whether there [was] a clear error of judgment." *Id.* (citation omitted) "[I]f the agency relied on factors which Congress has not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise" then an agency's action must be set aside. *Id*. (citation omitted).

Here, for reasons detailed above, Congress clearly intended its Title X funding *not* to go to promoting or performing abortions in any way, and it has provided conscience protections through the Weldon Amendment, so HHS's reliance on the lack of abortion referrals to strip Oklahoma of funding was arbitrary and capricious. Further, Defendants failed to address important aspects of the problem. HHS did not consider the impact of requiring States where abortion is prohibited to comply with abortion counseling and referral requirements. Defendants cannot point to any material in its administrative record where HHS has grappled with the important issue at the heart of this case.

Put differently, Defendants' application of its rule here was arbitrary and capricious because federalism concerns were overlooked. "[I]t is incumbent upon the federal courts to be certain of Congress' intent before finding that a federal law overrides the usual constitutional balance of federal and state powers." *Bond v. United States*, 572 U.S. 844, 858 (2014) (citations omitted). In particular, Defendants failed to recognize and discuss the importance of the decision in *Dobbs*. Since the 2021 Rule was introduced, the Supreme Court has determined that abortion is not a constitutionally protected right and that issues concerning abortion must be

returned to the people and their elected representatives. *Dobbs*, 597 U.S. at 231. While HHS may have found that there were no federalism implications at the time it implemented the 2021 regulation, *see* 86 Fed. Reg. 56,144, 56,168, there has been a paradigm shift on this issue. HHS's failure to consider this shift and the resultant federalism concerns at the time HHS suspended and terminated Oklahoma's Title X grant demonstrates that the decision was arbitrary and capricious. Oklahoma has exercised its sovereign right to refuse to make referrals for abortions. HHS either failed to think through these concerns prior to suspending and terminating Oklahoma's Title X grant, or it did think through them and capriciously decided to punish Oklahoma for its lawful exercise of sovereignty that is perfectly in accord with the language of Title X.

Defendants also failed to adequately consider the impact of their termination on Oklahoma patients. For decades, Defendants have consistently approved Oklahoma's Title X program, which was last reviewed by HHS in 2016. At that time, HHS was "[o]verall ... impressed with the dedication and commitment to family planning in both the central office staff as well as in the field." App. Vol. 2 at 260. The result of the Health Department's site visit by HHS was so positive that HHS did not schedule a return visit until January 2024—eight years later. Further, Oklahoma is heavily invested in providing services described in Title X, given Oklahoma's 40-year track record of administering the Title X program. And

Oklahoma's citizens are heavily invested in receiving those services. HHS did not consider these important aspects before terminating Oklahoma's Title X funding.

For these reasons, Oklahoma demonstrated it is likely to succeed on the merits of this action, and the district court improperly denied Oklahoma's request for a preliminary injunction.

## V.   THE OTHER INJUNCTION FACTORS FAVOR OKLAHOMA AS WELL, SUCH AS IRREPARABLE HARM.

The district court properly found that Oklahoma faces irreparable harm without a preliminary injunction. App. Vol. 3 at 600. On or about September 22, 2023, while the Health Department administrative appeal was still pending, HHS announced supplemental funding, supposedly to support the provision of Title X services in Oklahoma. Funds that would previously have been directed to the Health Department were instead apparently reallocated to Community Health Connection, Inc. and Missouri Family Health Council, Inc.—a Missouri entity. Community Health Connection, Inc. was awarded $216,000 in newly authorized federal funds, while Missouri Family Health Council, Inc. was awarded $3,250,000 in supplemental funds. App. Vol. 3 at 404, ¶ 26. The grant funding for this cycle will be sent by the close of the fiscal year in September 2024, and Oklahoma will lose another $4.5 million in funding if an injunction does not issue. In *Ohio*, the Sixth Circuit found that Ohio's loss of one-fifth of its Title X funding constituted irreparable harm. *Ohio*, 87 F.4th at 782-83.

Once this funding is distributed, Oklahoma will not likely be able to recoup the funds as monetary damages due to sovereign immunity. "An 'irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'" *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003). Further, once funding is distributed, there is no way for Oklahoma or the federal government to claw back distributions from entities that received funding. *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs*, 594 U.S. 758, 765 (2021) (stating that risk of significant financial harm with no guarantee of eventual recovery constitutes irreparable harm); *Ohio*, 87 F.4th at 783 (recognizing that loss of Title X funding was irreparable harm since economic injuries caused by federal agency action are unrecoverable since the APA does not waiver sovereign immunity for damages claims). Oklahoma's loss of funding alone constitutes irreparable harm, sufficient for a preliminary injunction to issue.

Oklahoma will also suffer reputational harm and harm to its goodwill. The Health Department has created significant goodwill in providing necessary medical services to citizens, which will be damaged if it can no longer provide those services. *Dominion Video Satellite, Inc. v. Echostar Satellite Corp*., 356 F.3d 1256, 1264 (10th Cir. 2004) (citing *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 37–39 (2d Cir. 1995) (loss of prospective goodwill through inability to market

unique product constituted irreparable harm); *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907–09 (2d Cir. 1990) (loss of unique product and goodwill supports finding of irreparable harm when customers indicate a strong preference for the product and threaten discontinuation of business relationship); *Autoskill, Inc. v. Nat'l Educ. Support Sys., Inc.,* 994 F.2d 1476, 1498 (10th Cir. 1993) (loss of uniqueness in marketplace satisfied irreparable harm factor where plaintiff established harm to goodwill and difficulty in calculating damages). Further, Oklahoma's investment in translation and language services is threatened by stripping Oklahoma's funding. If lost, the lack of translation and language services will result in barriers to providing adequate healthcare. The loss of goodwill is another irreparable harm factor that favors issuance of a temporary injunction.

In addition, the threatened injury to Oklahoma greatly exceeds any possible injury that Defendants could face. Virtually no cognizable harm to HHS can be imagined, as an injunction would only preserve the status quo in effect before HHS terminated Oklahoma's funding in an arbitrary and capricious attack. And HHS cannot rely on a lack of referrals for abortion as harm since, again, Title X expressly prohibits funding going to abortion. Further, no harm can result from issuing an injunction since HHS previously found that Oklahoma complied with program requirements and in good standing to receive and administer federal Title X funds

during the current grant period. The very real injuries that Oklahoma has and will continue to sustain are greatly disproportionate to any harm that HHS might allege.

Finally, a temporary injunction should have been issued in this matter since the requested injunction is in the public interest. Reinstating Oklahoma's ability to receive Title X funding *advances* the public interest in Oklahoma by allowing the Health Department to continue to offer services as it historically has done. The public interest would also be advanced since, as recognized in *Dobbs*, regulation of "abortion must be returned to the people and their elected representatives." 597 U.S. at 292. Oklahoma has exercised its right to determine policy on this issue. As such, the public interest will only be undercut by HHS's decision to suspend and terminate funding based on abortion concerns under a statute that expressly prohibits funding from going to programs promoting abortion.

## CONCLUSION

For the foregoing reasons, the State of Oklahoma respectfully requests that this Court reverse the district court's order denying Oklahoma's Motion for a Preliminary Injunction and stay under 5 U.S.C. § 705. Oklahoma respectfully requests this Court's resolution of the instant appeal no later than July 15, 2024, to preserve Oklahoma's ability to benefit from a favorable decision prior to HHS's disbursement of Title X funds for 2024.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Oklahoma requests oral argument in this matter and respectfully requests that this Court specially set oral argument in order to resolve this appeal prior to July 15, 2024. Oklahoma requests oral argument on the basis that this appeal concerns novel legal arguments, issues that are of significant import to the people and the State of Oklahoma, and a targeted attempt by a federal agency to encroach on the rights reserved by the States and the people. For these reasons, oral argument will aid the Court in resolving this appeal.

Respectfully submitted,

*/s/ R. Tom Hillis*
Garry M. Gaskins, II, OBA # 20212
*Solicitor General*
Zach West, OBA # 30768
*Director of Special Litigation*
Audrey Weaver, OBA # 33258
*Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st St.
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
Zach.West@oag.ok.gov
Audrey.Weaver@oag.ok.gov

Barry G. Reynolds, OBA # 13202
R. Tom Hillis, OBA # 12338
J. Miles McFadden, OBA # 30166
TITUS HILLIS REYNOLDS LOVE, P.C.
15 E. 5th St., Suite 3700
Tulsa, OK 74103

Phone: (918) 587-6800
Fax:   (918) 587-6822
reynolds@titushillis.com
thillis@titushillis.com
jmcfadden@titushillis.com

Anthony J. (A.J.) Ferate, OBA # 21171
SPENCER FANE
9400 North Broadway Extension,
Suite 600
Oklahoma City, OK 73114
Phone: (405) 844-9900
Fax:   (405) 844-9958
AJFerate@spencerfane.com

*ATTORNEYS FOR PLAINTIFF / APPELLANT,
THE STATE OF OKLAHOMA*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,619 words excluding items exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in size 14 font Times New Roman.


*/s/ R. Tom Hillis*
Attorney for Plaintiff / Appellant


## CERTIFICATE OF DIGITAL SUBMISSION AND EXACT COPIES

I hereby certify that all required privacy redactions have been made and any paper copies of this document submitted to the Court are exact copies of the version electronically filed.


*/s/ R. Tom Hillis*
R. Tom Hillis

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of April 2024, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant:

Courtney Dixon: courtney.l.dixon@usdoj.gov
Brian James Springer: brian.j.springer@usdoj.gov


*/s/ R. Tom Hillis*
R. Tom Hillis

# ATTACHMENT 1

## Order [Dkt. 36]
## Filed March 26, 2024

**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| STATE OF OKLAHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CIV-23-1052-HE |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| HEALTH AND HUMAN SERVICES, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**<u>ORDER</u>**

For the reasons stated on the record at the hearing on March 26, 2024, plaintiff's

Motion for Preliminary Injunction [Doc. #23] is **DENIED.**

**IT IS SO ORDERED.**

Dated this 26th day of March, 2024.

_____
JOE HEATON
UNITED STATES DISTRICT JUDGE

# ATTACHMENT 2

**Excerpts of Transcript of Proceedings held before the Honorable Joe Heaton on Motion for Preliminary Injunction dated March 26, 2024 at 1:30 p.m. [App. Vol. 3 at 539 and 597-614]**

1    IN THE UNITED STATES DISTRICT COURT FOR THE

2    WESTERN DISTRICT OF OKLAHOMA

3

STATE OF OKLAHOMA,            )
4                             )
      Plaintiff,              )
5                             )
vs.                           )  Case No. CIV-23-1052-HE
6                             )
UNITED STATES DEPARTMENT OF   )
7  HEALTH AND HUMAN SERVICES, )
   et al.,                    )
8                             )
      Defendants.             )
9

10                    * * * * * * *

11              TRANSCRIPT OF PROCEEDINGS

12         BEFORE THE HONORABLE JOE HEATON

13            UNITED STATES DISTRICT JUDGE

14                 MARCH 26, 2024

15                  AT 1:30 P.M.

16         MOTION FOR PRELIMINARY INJUNCTION

17                    * * * * * * *

18

19

20

21

22

23

24  Proceedings recorded by mechanical stenography; transcript
    produced by computer-aided transcription.
25

Aplt.App. 539

1    So I do appreciate the time and attention of the Court and

2  thank you, Your Honor.

3    THE COURT:  Well, this is certainly an involved set of

4  issues that we're dealing with here, and offhand, I don't know

5  of any set of public policy questions that's any more

6  contentious probably than ones involving the abortion issue

7  that's played out in multiple ways over the last, what, 30 or

8  40 years.

9    I saw in the paper that I think the Supreme Court was

10  today entertaining oral argument on some other aspect of the

11  same general topic, so it continues to be a very contentious

12  matter.  And it's been helpful to me to have the comments of

13  the parties, in addition to the extensive written work product

14  that you've submitted.

15    I debated whether to, you know, attempt to generate a

16  lengthy written order or simply to tell you what I'm inclined

17  to do.  I think I am in a position basically to tell you here

18  what — the way I see the issue.  I do that partly because

19  we're getting up here very close to the end of March.

20    There does appear to be some urgency from the State's

21  standpoint to have either a favorable determination from me or,

22  presumably, an opportunity to seek relief from the appellate

23  courts before the April 1st deadline runs.

24    And so I think it makes sense for me to go ahead and

25  essentially rule now as to the pending motion.

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145

Aplt.App. 597

1     The pending motion, of course, is one for preliminary

2     injunction that requires Oklahoma to establish the elements

3     that we are, I think, all familiar with in general.

4         One's the likelihood of success on the merits that there's

5     irreparable injury if the injunction is not issued, a judgment,

6     that the threatened injury to, and this state, the State, would

7     outweigh any injury to the federal government if the injunction

8     was not issued, and then finally, the requirement that it be

9     not contrary to the public interest to issue the injunction.

10        There is, I think, some of the cases indicate that when

11    we're dealing with a situation like this one where the

12    injunction is sought against the federal government, the

13    elements relating to balancing the injury and the public

14    interest essentially merge.  And I do think that ultimately

15    what we're talking about here is the interest of both the

16    federal government and the State in getting, you know, a proper

17    application of the law.

18        So I don't know that the — either of those factors cut

19    significantly in either direction, although I would say that

20    were I evaluating or to the extent that I'm evaluating the

21    threatened injury to the State of Oklahoma from nonissuance of

22    the injunction, that among the things that jumps out at me is

23    that the State's position here is ultimately premised on what

24    it says Oklahoma law requires.  That is, apparently, the basis

25    for the change of position that Oklahoma took in the course of

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145

Aplt.App. 598

the grant administration process.  And, frankly, it is my view
that that is simply overblown.

I have an extraordinarily difficult time seeing how the
implementation of the referral process as contemplated by the
regulation here could translate into a violation of Oklahoma
law.

Essentially, it seems to me what that says, if that is
true, that means that it would violate the Oklahoma statute
which bans, essentially, urging someone to get an abortion.
For a department of health worker to say to the client sitting
across the table, once they request information on abortion and
they say, Well, it's not legal in Oklahoma, but if you want to
look at other options, call this number.  I cannot believe that
any serious prosecutor would think that warranted prosecution
under the statute.

And it seems to me the consequence of that is that this is
not a situation where Oklahoma's position is driven by what the
law compels it to do, but it's rather the policy basis for why
Oklahoma would rather not do it.

And wanting to not do it is not to me quite the same thing
as saying that it would be conduct that would violate the law
if they did.

So I do think that it seems to me that the posture that
Oklahoma finds itself in here is at least, in part, a matter
of — it's a circumstance of its own choosing.  Because it

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145

Aplt.App. 599

1  would appear to me that there is a path that was always

2  available to Oklahoma whereby it could comply with the

3  provisions of the grant process and do so without requiring

4  anybody to violate Oklahoma law.

5      So as I say, that, I suppose, impacts my assessment of the

6  relative harms here and to some degree it impacts, I suppose,

7  some of the likelihood of success arguments.

8      But as I say, it does seem to me that to the extent it's

9  premised on the assumption that the limited referral

10  contemplated here by the regulations would violate Oklahoma

11  law, let's just say that's less than obvious to me and that

12  impacts some of the rest of this as well.

13      The element of the — whether irreparable injury has been

14  shown or not, I think to the extent that is the basis for it,

15  that I think Oklahoma's made a sufficient showing here of

16  irreparable injury.

17      As Mr. Hillis points out, the *Ohio* case concluded that,

18  involving less money than is involved here.  And, frankly, I'm

19  reluctant to accept the federal government's invitation to say

20  that $4.5 million isn't substantial enough to worry about.

21      I'm reminded of the comment of some senator a few years

22  ago, he said, you know, you start talking about this budget

23  stuff, you got a billion here and a billion there and pretty

24  quick, you're talking about real money.

25      Well, you know, this isn't billions, but it seems to me,

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145

Aplt.App. 600

1    for purposes of sufficient showing of irreparable injury, that

2    4.5 million is enough.

3        But, of course, as is often the case in these sorts of

4    circumstances, the challenge, it seems to me here, ultimately

5    turns on or disposition of the motion turns on the question of

6    the likelihood of success on the part of the State.

7        It strikes me that in making that determination, I mean,

8    there's been reference made to things that are unique about

9    this litigation.  It seems to me that there are at least a

10   couple of things that are unique about it that are not involved

11   in your average, you know, fighting over who's got the

12   authority to do what between units of government.

13       One is the fact that there has already been litigation

14   between the parties on substantially the issues arising out of

15   this same dispute.  And, of course, I'm talking about the

16   litigation that resulted in what we've referred to as the *Ohio*

17   case, *Ohio v. Becerra*, the Sixth Circuit case.

18       Ordinarily, a Sixth Circuit opinion wouldn't be binding on

19   me.  It isn't binding here, I suppose, in the sense that a

20   Tenth Circuit decision would be, but it seems to me that it

21   does implicate, because Oklahoma was a party there, that it

22   limits what they're in a position to come here in a second

23   court and re-litigate.

24       Whether it's — you refer to it as res judicata or claim

25   preclusion or whatever, it seems to me the rule rather clearly

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145

Aplt.App. 601

1    is that to the extent that the particular claim was litigated

2    in a prior forum, that the State is precluded by the doctrine

3    from re-litigating it here, which is to say that they're not in

4    a position to either, you know, reargue the same argument that

5    was made there or to raise other theories that might ultimately

6    support the same claim.

7        So it seems to me that res judicata claim preclusion does

8    preclude at least part of the arguments that the State is

9    relying on here, particularly those where there are, you know,

10   comments like the statute doesn't even authorize this kind of a

11   regulation or something.

12       It seems to me that those are the kinds of arguments that

13   are essentially precluded by the litigation that has already

14   occurred between the parties.

15       Now, I do recognize that the *Ohio* case involved a facial

16   challenge to the regulation.  And that the focus there was on

17   the 1008 language, but it does seem to me that in terms of how

18   the doctrine of res judicata claim preclusion applies, that to

19   the extent we're talking about a facial challenge to the

20   regulation, that the *Ohio* decision would preclude re-litigation

21   on any theory that was advanced or that might have been

22   advanced, at least to the extent that it's the basis for a

23   facial challenge.

24       And as I say, I think some of the arguments that have been

25   made here today essentially are that.  They're a facial

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145

**Aplt.App. 602**

1  challenge that's barred by the litigation that has already

2  occurred, like, for example, whether they have exceeded their

3  authority by issuing this regulation at all or whether the

4  counseling requirement's outside the scope of Title X.

5       I mean, those are, in my view, facial-type arguments and I

6  don't think you can avoid the impact of just — just by saying,

7  well, we're doing it as-applied.

8       You know, certainly, the application of any rule has

9  consequences, but if it, at a fundamental level, is going to

10  facial attack, then I think it's precluded for that reason.

11       The other thing that strikes me as being unique about the

12  circumstances here is that we're not dealing with a regulation

13  that just got thought up in 2021 or 2022, whenever the current

14  version of the rule was adopted.

15       We're dealing with an area of the law that has obviously

16  reflected the substantial pulling and hauling that's been going

17  on for 30 years over this difficult issue of abortion.  And the

18  question of the kinds of requirements that are to be imposed in

19  connection with this grant program have changed over time.

20       The *Ohio* court, of course, describes in some detail that

21  history.  I won't repeat it here, other than to acknowledge

22  what I think we're all aware of.  And that is that depending on

23  which administration was in the power, the regulatory — or the

24  regulations pursuant to Title X have varied in their treatment

25  of the counseling requirement and the provision of information

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145

Aplt.App. 603

1   that would potentially be the basis for referral.  Sometimes
2   it's been required, sometimes it's been prohibited.

3       And I think what is clear from *Rust* is that at least to
4   the extent that we're tying it to the language of 1008, we're
5   dealing with an ambiguous area where *Chevron* deference applies.

6       But I do think that the fact that we have this lengthy
7   history of prior incarnations of substantially the same
8   requirements, as are now at issue in this case, translates into
9   making it a very difficult lift for the State to come in and
10  show arbitrary and capricious regulations when it has that
11  history.

12      I understand there are a couple of aspects that have been
13  mentioned here this morning that maybe differ from it, but at
14  least in terms of the fundamental underlying requirement for
15  the — imposing a condition on the Title X grant that the
16  grantee has to be providing this nondirective information and
17  potentially referral information on request, that's not new.
18  It's not something that is, it strikes me as being, you know,
19  something new and exotic.

20      So I think, as I say, the fact that we have that history
21  makes the whole lift that Oklahoma's attempting here a very
22  difficult one.

23      But that said, I think ultimately evaluating the
24  individual arguments that Oklahoma's offered here on balance, I
25  simply am not persuaded that Oklahoma has a reasonable prospect

1    of prevailing on these arguments.

2         The arguments about the Spending Clause that Mr. Hillis

3    has referenced, I confess I am thoroughly unpersuaded by.

4         We're dealing here not with simply a matter of random

5    delegation of legislative authority, but we're dealing with a

6    grant program.  We're dealing with a grant program in a

7    particular context and for a particular purpose where Congress

8    has specifically said that we expect the agency to promulgate

9    rules to flesh it out.

10        I don't think, as I read the cases, that in those

11   circumstances, that the — whether it's the Spending Clause or,

12   frankly, I'm not sure we're talking about the same thing when

13   we're talking about the Spending Clause versus a nondelegation

14   doctrine.  I suspect those may be different.

15        But, in any event, I'm unpersuaded by that argument.  I

16   mean, the cases that talk about the Spending Clause issues

17   recognize that the notice to the — essentially they say, look,

18   if they're going to be conditions imposed on a grant, or on

19   federal spending, that the State is entitled to know what those

20   conditions are.  You can't mousetrap the State or another

21   grantee by imposing them after the fact.

22        Here, it seems to me, there's no serious argument to be

23   made that the State of Oklahoma didn't know what the conditions

24   were that the HHS folks were going to insist on as a basis for

25   participation in the grant program.

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145

Aplt.App. 605

1    The State, of course, had, as I understand it, commented

2  on the regulations.  They had at some point got involved in the

3  *Ohio* litigation to challenge it.  And the regulations

4  themselves, in terms of the particular requirement that's at

5  issue here, the counseling and referral part, was clearly in

6  place at the point where the grant application process went

7  forward.

8    The cases, as I read them, say that in terms of putting

9  the State on notice of what the conditions are, those can come,

10  not only from the statute, but from the regulations pursuant to

11  the statute.

12    And so it seems to me that the — that this is simply not

13  a circumstance where the State can plausibly say, Well, gee,

14  we've been subjected to these conditions when we didn't know

15  what the deal was.

16    What the deal was has been obvious, it seems to me.  The

17  State doesn't agree with those conditions, and certainly that's

18  — they're certainly entitled to take a different view.  But

19  that, it seems to me, is something different than saying, Well,

20  we were sufficiently mousetrapped by the conditions, that we

21  ought to be relieved from them now, even though we don't comply

22  with them.

23    So it seems to me that the Spending Clause argument

24  doesn't hunt — and I frankly think that is probably one that

25  we don't even need to get into the weeds on it, because to the

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145

Aplt.App. 606

1    extent that the argument is that regulations on these kinds of

2    things go beyond the — what's permitted by the Spending Clause

3    or what's permitted by the delegation — the nondelegation

4    doctrine, it seems to me that's facial in nature.  That goes to

5    whether the regulations can properly approach it at all.

6         And as I said earlier, if it is essentially a facial

7    challenge, it seems to me that's precluded by *Ohio* and the

8    particular litigation context that we've got here.

9         I think to the extent that the State is relying here on an

10   argument that it violates Title X itself, I assume that's

11   essentially an argument about 1008 and that, of course, is

12   exactly what *Ohio* addressed and resolved.

13        And I don't see anything about the circumstances here that

14   in terms of it being — the fact that it's been applied here,

15   if the underlying objection to it is facial in nature, I don't

16   think you create an opportunity to re-litigate it based on

17   that.

18        So at any rate, it seems to me that the *Ohio* litigation

19   has already concluded that the particular regulation that we're

20   dealing with here is within the scope of what's permissible as

21   against the language of Title X itself.

22        With respect to the termination being based — or being

23   contrary to the provision of the Weldon Amendment, that is

24   maybe a closer question, just because some of this is not as

25   clear, I think, as some of the other provisions.  But I am

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145

Aplt.App. 607

1  frankly not persuaded that the State can establish that one,

2  either.

3       The question I think is essentially one of whether or not

4  the various provisions of — well, whether the language in the

5  appropriation bill saying that there can't be discrimination

6  against a healthcare entity that refuses to refer for abortion,

7  I think the question there is a threshold matter as what

8  constitutes a healthcare entity.

9       Mr. Clendenen says, well, that means the provider of the

10 services.  I frankly think that is probably the more plausible

11 interpretation of that than to say that the State can object.

12      It strikes me as a very substantial step to say

13 essentially that a state can get the benefit of what's

14 essentially a conscience-protecting kind of amendment just

15 because the particular regulatory requirement is contrary to

16 state policy.

17      I — from what I have seen of the history of that

18 regulation, it does appear to be focused essentially on

19 assuring that providers are not required to perform some —

20 either perform an abortion or refer — do something related to

21 abortions contrary to their own conscience or religious beliefs

22 or whatever.

23      And it does seem to me that that's something different

24 than what we've got here, which is essentially the State

25 saying, look, we see — we prefer a different policy and we

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145

Aplt.App. 608

1    don't want to follow it because it conflicts with state policy.

2         So I am skeptical whether the State can ultimately

3    establish that as a basis for showing the Weldon Amendment is

4    somehow eliminating the need for the State to comply with or

5    making it improper for HHS to insist on compliance with the

6    referral portion of that.

7         Again, with the Weldon Amendment, I can't help thinking

8    that, frankly, at least in part, that's in the nature of a

9    facial challenge, more than it is in substance an as-applied

10   challenge.

11        But to the extent that it is as-applied, in the sense that

12   the feds are applying requirement to require the State to at

13   least give a potential -- to give the pregnant woman

14   information via a hotline, it seems to me that, if anything,

15   that as-applied approach to the regulation is a more forgiving

16   standard in terms of what it's requiring from the State than

17   might arguably be required by the regulation.

18        I mean, to be sure the regulation itself says nondirective

19   information, suggesting that it can't be, you know, somebody

20   campaigning for an abortion or trying to urge somebody to do

21   it.  But it does seem to me that, you know, the feds might

22   plausibly seek more than just giving out a phone number.

23        But, ultimately, it appears that the circumstances here

24   are simply by supplying a phone number, the State could meet

25   its referral obligations, as contemplated by the grant terms.

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145

Aplt.App. 609

1    And so it seems to me that even to the extent that we try

2  to apply the Weldon Amendment beyond that to in some as-applied

3  circumstance, that you have a hard time translating that into a

4  violation here.

5    That leaves, finally, the issue of whether or not this

6  regulation is -- and particularly its application to Oklahoma

7  through the termination for failure to do referrals, is

8  arbitrary and capricious under the APA.

9    It seems to me that, as I said at the outset, that in

10  terms of the explanation for the particular requirement that

11  the rule's explanation of it is ample.  It's more or less the

12  same rationale that was in place for, what was it, '81 to

13  '89 or whatever the time period was, where essentially the same

14  rule was in place.

15    I certainly recognize that there are respectable different

16  views as to what the best regulation should be or what a good

17  regulation would be as it applies to this issue, and it's

18  obviously changed over the years, but to suggest that the

19  present regulation is arbitrary and capricious I think simply

20  falls short.

21    The explanation has been given in the order continuing the

22  rules as to the basis for it.  It seems to me that is plainly

23  within the scope of the agency's discretion to make that.

24    I don't think it -- that to say, well, that there's

25  litigious uncertainty about it; that's not the test for whether

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145

Aplt.App. 610

1    it's arbitrary and capricious.  There's plenty of litigious
2    uncertainty about everything.
3         It does not translate into a basis for concluding here
4    that the particular regulation was arbitrary and capricious.
5         The Tennessee case that the parties have referred to, I
6    think goes into more detail in terms of the history of the rule
7    and so on and I'm — I am in substantial agreement with that
8    case's treatment of the arbitrary and capricious issue.
9         To the extent that the State here is relying on the
10   language in the rule that talks about the allowable under state
11   law provision, it does seem to me that it most plausibly makes
12   sense to understand that as relating to the professional
13   qualifications of the providers that are involved, simply
14   because that's a construction of it or an interpretation of it
15   that avoids the conflict that arguably would otherwise exist
16   with the other provisions.
17        I think under the various deference standards that apply
18   to particularly an agency's interpretations of its own
19   regulations, as opposed to interpretation of a statute, *Chevron*
20   is — *Chevron* is interpreting regulations based on a statutory
21   command.
22        We're talking here about whether a — the HHS's
23   interpretation of the regulations, of their own regulations is
24   entitled to deference and it seems to me that it is.  Which is
25   to say that the language that appears in — that's been

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145

Aplt.App. 611

1   referred to about allowable under state law doesn't have the
2   meaning that the State would prefer to attach to it here, so as
3   to suggest some general requirement that state law is going to
4   generally trump all other regulatory provisions that might
5   apply.
6        So, in any event, it does seem to me that on multiple
7   grounds, that the State is unlikely to be able to prevail here,
8   and as a result, I'm going to deny the request for a
9   preliminary injunction.
10       What I would ask is that — I don't know precisely how the
11  parties will go forward in light of this determination.  I
12  assume the State will seek some kind of relief from the
13  circuit.  If you do, then, obviously, that will govern the
14  direction in which the case goes forward, consistent with what
15  the circuit decides.
16       If you decide not to do that or the circuit denies relief,
17  then I would like the parties to think through where that
18  leaves us.  If there is magic to this April 1st deadline and it
19  isn't met, for whatever reason, does that make the case moot or
20  not?  I don't know.  It simply potentially impacts how we go
21  forward as a scheduling matter with the balance of the case.
22       So what I would ask is that the parties file something
23  within the next let's say three weeks to give me your
24  respective positions as to how we go forward, if at all here,
25  in light of whatever you may seek from the circuit or whatever

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145

Aplt.App. 612

1   they may do in the meantime.

2      Questions from the parties or anything further that we

3   need to address while we're here today?

4        MR. HILLIS:  I take it there is going to be some sort

5   of written order, but —

6        THE COURT:  What I anticipate doing is simply an order

7   that says it's denied for the reasons that I've said here

8   today.

9        MR. HILLIS:  Okay.  Can I order the transcript then

10   now or do I —

11        THE COURT:  Now or when, I think you're entitled to a

12   transcript, so we'll see that you get one.

13        MR. HILLIS:  I do appreciate it.

14        THE COURT:  Anything else?

15        MR. HILLIS:  I think we can be can beat the three-week

16   deadline, Your Honor.

17        THE COURT:  All right.

18     Anything else?  All right.

19     Court's in recess.

20     (Adjourned.)

21

22

23

24

25

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145

Aplt.App. 613

```
 1              CERTIFICATE OF OFFICIAL REPORTER

 2

 3        I, Susan J. Fenimore, Federal Official Realtime Court

 4   Reporter, in and for the United States District Court for the

 5   Western District of Oklahoma, do hereby certify that pursuant

 6   to Section 753, Title 28, United States Code that the foregoing

 7   is a true and correct transcript of the stenographically

 8   reported proceedings held in the above-entitled matter and that

 9   the transcript page format is in conformance with the

10   regulations of the Judicial Conference of the United States.

11        Dated this 29th day of March, 2024

12

13

14              /s/SUSAN J. FENIMORE

15              Susan J. Fenimore, CSR, RPR, FCRR
                Federal Official Court Reporter
16

17

18

19

20

21

22

23

24

25
```

Susan Fenimore, CSR, RPR, FCRR
United States District Court, Western District of Oklahoma
susan_fenimore@okwd.uscourts.gov - 405.609.5145

Aplt.App. 614