**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**July 15, 2024**

**FOR THE TENTH CIRCUIT**

**Christopher M. Wolpert**
**Clerk of Court**

_____

STATE OF OKLAHOMA,

     Plaintiff - Appellant,

v.

No. 24-6063

UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN
SERVICES; XAVIER BECERRA, in
his official capacity as the Secretary
of the U.S. Department of Health
and Human Services; JESSICA S.
MARCELLA, in her official
capacity as Deputy Assistant
Secretary for Population Affairs;
OFFICE OF POPULATION
AFFAIRS,

     Defendants - Appellees.

------------------------------------------

STATES OF MISSISSIPPI;
ALABAMA; ALASKA;
ARKANSAS; FLORIDA;
GEORGIA; IDAHO; INDIANA;
IOWA; KANSAS; KENTUCKY;
LOUISIANA; MISSOURI;
MONTANA; NEBRASKA; NORTH
DAKOTA; OHIO; SOUTH
CAROLINA; SOUTH DAKOTA;
TENNESSEE; TEXAS; UTAH;
WEST VIRGINIA; WYOMING;THE
AMERICAN ASSOCIATION OF
PRO-LIFE OBSTETRICIANS &
GYNECOLOGISTS; THE

CHRISTIAN MEDICAL & DENTAL
ASSOCIATIONS; THE CATHOLIC
MEDICAL ASSOCIATION; THE
NATIONAL ASSOCIATION OF
CATHOLIC NURSES, USA;
CONSTITUTIONAL
ACCOUNTABILITY CENTER;
AMERICAN CIVIL LIBERTIES
UNION; AMERICAN CIVIL
LIBERTIES UNION OF
OKLAHOMA; CENTER FOR
REPRODUCTIVE RIGHTS;
LAWYERING PROJECT,

      Amici Curiae.

_____

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA
### (D.C. No. 5:23-CV-01052-HE)

_____

Zachary Paul West, Director of Special Litigation, Office of Attorney
General, State of Oklahoma, Oklahoma City, Oklahoma (Garry M. Gaskins,
II, Solicitor General, and Audrey A. Weaver, Assistant Solicitor General,
Office of Attorney General, State of Oklahoma, Oklahoma City, Oklahoma;
Barry G. Reynolds, R. Tom Hillis, J. Miles McFadden, Titus Hillis
Reynolds Love, P.C., Tulsa, Oklahoma; and Anthony J. Ferate, Spencer
Fane, Oklahoma City, Oklahoma, with him on the briefs), for Appellant.

Brian J. Springer, Attorney, Appellate Staff, Civil Division, U.S.
Department of Justice (Brian M. Boynton, Principal Deputy Assistant
Attorney General, Michael S. Raab and Courtney L. Dixon, Attorneys,
Appellate Staff, Civil Division, with him on the briefs), Washington D.C.,
for Appellees.

Scott G. Stewart, Office of Attorney General for the State of Mississippi,
(Lynn Fitch, Attorney General for the State of Mississippi, with him on the
briefs), Jackson, Mississippi, on behalf of States of Alabama, Alaska,
Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky,
Louisiana, Mississippi, Missouri, Montana, Nebraska, North Dakota, Ohio,
South Carolina, South Dakota, Tennessee, Texas, Utah, West Virginia, and
Wyoming; John J. Bursch, Erin Morrow Hawley, Christopher Paul

2

Schandevel, Alliance Defending Freedom on behalf of American Association of Pro-Life Obstetricians and Gynecologists, The Christian Medical and Dental Associations, The Catholic Medical Association, and The National Association of Catholic Nurses, USA; Miriam Becker-Cohen, Brianne J. Gorod, and Elizabeth B. Wydra, Constitutional Accountability Center on behalf of Constitutional Accountability Center; Andrew Beck and Ryan Mendias, American Civil Liberties Union Foundation on behalf of American Civil Liberties Union; Megan Lambert, American Civil Liberties Union of Oklahoma Foundation on behalf of American Civil Liberties Union of Oklahoma; Rabia Muqaddam and Alexander Wilson, Center for Reproductive Rights, on behalf of Center for Reproductive Rights; Jamila Asha Johnson and Paige Suelzle, Lawyering Project on behalf of Lawyering Project, filed amicus curiae briefs.

_____

Before **BACHARACH**, **EBEL**, and **FEDERICO**, Circuit Judges.

_____

**BACHARACH**, Circuit Judge.

_____

This case involves a congressional program to award grants for family-planning projects. When the program was created, Congress instructed the Department of Health and Human Services to establish eligibility requirements. HHS complied, and its requirements included nondirective counseling and referrals for all family-planning options, including abortion.

The grant recipients included Oklahoma. But Oklahoma expressed concern to HHS about the eligibility requirements, insisting that new state laws prohibited counseling and referrals for abortions. HHS responded by proposing that Oklahoma supply individuals with neutral information about

family-planning options (including abortion) through a national call-in number. Oklahoma rejected this proposal, so HHS terminated the grant.

Oklahoma challenged termination of the grant and moved for a preliminary injunction. The district court denied the motion, determining that Oklahoma wasn't likely to succeed on the merits.

On appeal, Oklahoma argues that it would likely succeed for three reasons: (1) the spending power didn't allow Congress to delegate eligibility requirements to HHS, (2) HHS's eligibility requirements violated a statute known as *the Weldon Amendment*, and (3) HHS acted arbitrarily and capriciously. We reject these arguments:

1. **Spending Power**: The Constitution's spending power prohibits Congress from imposing ambiguous conditions on states in exchange for federal funds. Did the district court err in treating Title X of the Public Health Service Act as unambiguous? We answer *no*, concluding that the court didn't err when it determined that

   • Title X had likely been unambiguous in conditioning eligibility on satisfaction of HHS's requirements and

   • Oklahoma had likely acted knowingly and voluntarily in accepting HHS's requirements.

2. **The Weldon Amendment**: A federal law, known as *the Weldon Amendment*, prohibits distribution of funds to a federal or state agency that discriminates against a health-care entity for declining to provide referrals for abortions. *See* Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, div. F, § 508(d), 118 Stat. 2809, 3163 (2004). Did the district court err when it concluded that Oklahoma hadn't shown a likely violation of the Weldon Amendment? We answer *no*. HHS had proposed use of a national call-in number, which would supply neutral information about family-planning options, and

4

Oklahoma didn't show a likelihood that the sharing of this call-in number would constitute a *referral for* the purpose of an abortion.

3. **Arbitrary and Capricious Action**: Oklahoma argues that HHS acted arbitrarily and capriciously, raising three sub-issues.

The first sub-issue is whether HHS strayed from Title X in creating the eligibility requirements. We answer *no*, concluding that the district court didn't err when it concluded that the eligibility requirements had likely fallen within HHS's delegation of statutory authority.

The second sub-issue is whether Oklahoma demonstrated a likely violation of HHS's regulations. We answer *no*. In our view, the district court didn't err by rejecting Oklahoma's proof of a likely violation.

The third sub-issue is whether the district court erred by concluding that Oklahoma had failed to show a likely disregard of relevant factors. We answer *no*, concluding the district court didn't err by determining that HHS had likely considered all the relevant factors, such as recent changes in precedent on abortion and the impact on Oklahoma.

## Background

**1. Congress empowers HHS to administer the Title X grant program.**

In 1970, Congress enacted Title X of the Public Health Service Act, which created a grant program for family-planning projects. 42 U.S.C. §§ 300(a), 300a-4(c); Family Planning Services and Population Research Act, Pub. L. No. 91-572, 84 Stat. 1504, 1508 (1970). Under Title X, Congress authorized HHS to determine eligibility requirements for the funds. 42 U.S.C. § 300a-4(a)–(b).

Most Title X funds flow to state and local governmental agencies, which distribute the funds to other entities providing health-care services. *See Nat'l Family Planning & Reproductive Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 828 (D.C. Cir. 2006). The grants initially last one year, but can be continued upon HHS's approval. 42 C.F.R. § 59.8(a)–(b). HHS may terminate a grant if the recipient violates the conditions, including any regulatory requirements. *See* 45 C.F.R. §§ 75.371(c), 75.372(a)(1).

**2.    HHS terminates Oklahoma's grant.**

In 2021, HHS enacted a rule imposing conditions on the grant funds. Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services, 86 Fed. Reg. 56,144 (Oct. 7, 2021); *see* 42 C.F.R. § 59.1 *et seq*. In this rule, HHS renewed two earlier conditions[1]:

1.    **Nondirective Counseling**: Projects must "[o]ffer pregnant clients the opportunity" to receive "neutral, factual information and nondirective counseling" regarding various family-planning options, including abortion. 42 C.F.R. § 59.5(a)(5)(i)–(ii).

2.    **Referral on Request**: Projects must also provide a referral regarding all options when requested. *Id.* § 59.5(a)(5)(ii). The referral may include the provider's name, address, phone number, and other factual information. 86 Fed. Reg. 56,144, 56,150 (Oct. 7, 2021). But the project "may not take further affirmative action . . . to secure abortion services for the patient," like negotiating fees, making an appointment, or providing transportation. *Id.*

---

[1]    Through this rule, HHS readopted the regulations in place from 2000 to 2019. 86 Fed. Reg. 56,144; 56,144 (Oct. 7, 2021).

In 2022, HHS approved a grant to Oklahoma's health department for the period April 2022 to March 2023. In approving the grant, HHS reminded Oklahoma that it needed to comply with Title X and the 2021 rule.

While the grant was in place, the Supreme Court issued *Dobbs v. Jackson Women's Health Organization*, stating that there is no constitutional right to an abortion. 597 U.S. 215 (2022). Following the decision, HHS informed grant recipients that *Dobbs* didn't affect the obligation to continue offering nondirective counseling and referrals regarding all family-planning options, including abortions.

Months later, Oklahoma proposed to change its policies, citing changes in state law. HHS rejected Oklahoma's proposal, saying that the changes had violated the 2021 rule. But HHS suggested that Oklahoma could satisfy the requirement by passing along a national call-in number, which would supply neutral information regarding various family-planning options.

In March 2023, Oklahoma accepted the grant and agreed to pass along the call-in number. So HHS approved continuation of the grant until March 2024. A short time later, however, Oklahoma decided to stop sharing information about the call-in number. With this decision, HHS informed Oklahoma that it was violating the 2021 rule. When Oklahoma

refused to continue telling individuals about the call-in number, HHS terminated the grant.

**Discussion**

1. **We apply the abuse-of-discretion standard to the district court's denial of a preliminary injunction.**

Oklahoma challenged HHS's termination and sought a preliminary injunction to keep the grant in place during the litigation. To obtain the preliminary injunction, Oklahoma needed to show that

- it was likely to succeed on the merits,

- the denial of the preliminary injunction would create irreparable harm,

- the balance of equities favored a preliminary injunction, and

- the preliminary injunction would be consistent with the public interest.

*Derma Pen, LLC v. 4EverYoung Ltd.*, 773 F.3d 1117, 1119 (10th Cir. 2014). Applying these elements, the district court denied the motion for a preliminary injunction on the ground that Oklahoma hadn't shown likely success on the merits.

1.1 **We apply the abuse-of-discretion standard to the district court's conclusions on likelihood of success.**

Oklahoma sought judicial review under the Administrative Procedure Act, arguing that it was likely to succeed on the claims involving constraints involving the spending clause, violation of the Weldon Amendment, and arbitrariness and caprice in terminating Oklahoma's

8

grant. We review the district court's decision on likelihood of success under the deferential abuse-of-discretion standard. *See, e.g.*, *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2016) ("Because each of these elements [including the likelihood-of-success element] is a prerequisite for obtaining a preliminary injunction, we will not reverse the district court's denial of injunctive relief unless we are persuaded that the court abused its discretion as to all [elements]."); *Verlo v. Martinez*, 820 F.3d 1113, 1128–37 (10th Cir. 2016) (applying the abuse-of-discretion standard to review the district court's determination on likelihood of success).

We apply this standard based on the realities of decisions on preliminary injunctions, where the "district court almost always faces an abbreviated set of facts and must hypothesize the probable outcome of a case." *Resol. Tr. Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992); *see also FTC v. Weyerhaeuser Co.*, 665 F.2d 1072, 1083 (D.C. Cir. 1981) (Ginsburg, J.) (noting that rulings on motions for a preliminary injunction often involve "time pressure" and incomplete records). Given these realities, we regard likelihood of success as only a tentative conclusion. *See Homans v. City of Albuquerque*, 366 F.3d 900, 904–05 (10th Cir. 2004) ("Courts repeatedly have emphasized that a decision as to the likelihood of success is tentative in nature and not binding at a subsequent trial on the merits."). We generally leave these tentative conclusions to "the sound

discretion of the trial court." *Resol. Tr. Corp.*, 972 F.2d at 1198. For issues involving questions of law, however, we conduct de novo review. *See Derma Pen, LLC v. 4EverYoung Ltd.*, 773 F.3d 1117, 1119–20, 1120 n.2 (10th Cir. 2014) (explaining that we apply de novo review to legal determinations involved in the inquiry on likelihood of success).

Because Oklahoma is seeking judicial review of agency action under the Administrative Procedure Act, the district court had to reach a tentative conclusion based on the standard that would govern the final decision. *See Aposhian v. Barr*, 958 F.3d 969, 978–79, 989 (10th Cir. 2020) (reviewing likelihood of success in light of the standard of review that would apply for the final decision), *abrogated on other grounds by Garland v. Cargill*, 602 U.S. 406 (2024). When reaching a final decision, the district court can set aside HHS's termination of the grant only if HHS had acted in a way that was

- "procedurally defective,"

- "arbitrary or capricious in substance,"

- "manifestly contrary to [a] statute," or

- unconstitutional.

*Ukeiley v. EPA*, 896 F.3d 1158, 1164 (10th Cir. 2018); *see United States v. Mead Corp.*, 533 U.S. 218, 227 n.6 (2001) (explaining that review under the Administrative Procedure Act includes constitutional questions); *People for Ethical Treatment of Prop. Owners v. U.S. Fish & Wildlife*

10

*Serv.*, 852 F.3d 990, 999 (10th Cir. 2017) (same).[2] So in reviewing the district court's tentative conclusions on likelihood of success, we consider the standard that will apply at the final stage.

**2.      The district court didn't err in tentatively concluding that Oklahoma hadn't proven a violation of the spending power.**

Oklahoma argues that the spending power didn't allow Congress to delegate eligibility to HHS. We reject this argument.

Under the spending power, Congress can "lay and collect Taxes, . . . to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8. This language allows Congress to "fix the terms on which it shall disburse federal money to the [s]tates." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The disbursement creates a kind of contract, where states agree to federally imposed conditions in exchange for federal funds. *Id*. Given the contractual nature of the terms, two requirements exist:

1.      Congress may impose conditions on federal grants only when the conditions are unambiguous.

2.      The state must voluntarily and knowingly accept the terms of the "contract."

---

[2]      In the body of its opening brief, Oklahoma requests a stay pending appeal. Because we affirm the district court's denial of the preliminary injunction, the motion for a stay is moot. *See, e.g.*, *Walmer v. U.S. Dep't of Def.*, 52 F.3d 851, 856 (10th Cir. 1995) (concluding that a stay was dissolved upon affirmance of the district court's ruling on a preliminary injunction).

*Id.*

## 2.1    Title X likely authorizes HHS to impose the disputed condition.

Oklahoma argues that Title X is ambiguous, preventing HHS from imposing conditions related to counseling and referral. For this argument, Oklahoma relies on § 1008 of Title X, which prohibits the use of federal funds "in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6.

Oklahoma regards § 1008 as ambiguous based on the Supreme Court's opinion in *Rust v. Sullivan*, 500 U.S. 173 (1991). There the Court had to decide whether § 1008 prohibited HHS from enacting a rule banning nondirective counseling and referrals. *Id.* at 179–80. For that decision, the Court concluded that congressional silence rendered § 1008 ambiguous on counseling and referrals. *Id.* at 184. Oklahoma relies on *Rust* to argue that Congress's silence on counseling and referrals renders Title X ambiguous for purposes of the spending power.

Though § 1008 itself didn't require the availability of counseling and referrals, Congress instructed HHS to determine eligibility for Title X grants. *See* 42 U.S.C. § 300a-4(a) ("Grants and contracts . . . shall be made in accordance with such regulations as the Secretary may promulgate."); *id.* § 300a-4(b) ("Grants under this subchapter shall be . . . subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made.").

The district court didn't err in tentatively concluding that this delegation to HHS wouldn't violate the spending power.

The Supreme Court considered a similar delegation to an agency in *Bennett v. Kentucky Department of Education*, 470 U.S. 656 (1985). There the agency tried to recoup a federal grant from a state, arguing that the state had knowingly and voluntarily accepted unambiguous conditions. *Id.* at 658–59.

The Supreme Court agreed with the agency. *Id.* at 669. Under the grant program, Congress authorized the agency to set grant conditions. 20 U.S.C §§ 241e(a), 241f(a)(1), 242(b) (1976). The Supreme Court allowed this delegation to the agency, explaining that Congress couldn't "prospectively resolve every possible ambiguity concerning particular applications of the requirements." *Bennett*, 470 U.S. at 669; *see also W. Va. ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1148 (11th Cir. 2023) ("[W]e do not question an agency's authority to fill in gaps that may exist in a spending condition.").[3]

---

[3]    When the spending power was adopted, Congress had already begun delegating grant conditions to the executive branch. For example, Congress created a benefits program for the army in 1790, stating that payments would follow "regulations . . . directed by the President." Act of Apr. 30, 1790, ch. 10, § 11, 1 Stat. 119, 121; *see also* Act of Sept. 29, 1789, ch. 24, 1 Stat. 95, 95 (similarly delegating executive authority to administer a pension program for wounded Revolutionary War veterans).

Despite this authorization, the state grantee invoked the spending power, arguing that ambiguity in the law prevented deference to the agency's interpretations. Br. for the Respondent at 24–30, *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656 (1985) (No. 83-1798), 1984 WL 565692; *see also id.* at 22–27 (arguing that the recipient of the grant should not be penalized for interpreting an ambiguous statute differently than the agency).

But the Supreme Court held that the funding conditions were unambiguous based on the combination of the statute *and* the agency's authorized regulations: "We agree with the [agency] that the [state grantee] clearly violated *existing* statutory *and regulatory provisions* . . . ." *Bennett*, 470 U.S. at 670 (emphasis added); *see id.* (considering exercises of the spending power based on both the "the statutory provisions" *and* "the regulations . . . and other guidelines provided by the [the agency] at th[e] time" that funding had been accepted); *see also Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999) (holding that agencies' unambiguous regulations satisfy the notice requirements under the spending power); *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) ("Congress . . . has repeatedly employed the spending power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory *and administrative*

14

*directives*.'" (emphasis added) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980))).

*Bennett*'s reasoning applies here. Like the statute in *Bennett*, Title X unambiguously authorized the agency to impose conditions for federal grants. *See* 42 U.S.C. § 300a-4(b);[4] *see also* 86 Fed. Reg. 56,144, 56,154 (Oct. 7, 2021) (explaining the critical nature of nondirective counseling and referrals for the delivery of services under Title X). With this authorization, HHS established the conditions for Title X grants. So Oklahoma could make an informed decision based on the combination of Title X's language and HHS's conditions.

Oklahoma points to *West Virginia ex rel. Morrisey v. U.S. Department of the Treasury*, 59 F.4th 1124 (11th Cir. 2023). There the

---

[4]    In its reply brief, Oklahoma points to Congress's authorization, arguing that it limits HHS's rulemaking power. Appellant's Reply Br. at 7–8 (discussing statutory language that instructs HHS to impose conditions to assure that grants are "utilized for the purposes for which made" (quoting 42 U.S.C. § 300a-4(b))). We need not address this argument because it didn't appear in the opening brief. *United States v. Hunter*, 739 F.3d 492, 495 (10th Cir. 2013).

Even if we were to consider this argument, we would reject it. The statute explicitly allows HHS to impose conditions that it "*determine[s] to be appropriate*." 42 U.S.C. § 300a-4(b) (emphasis added). In the 2021 rule, HHS explained why it believed that the requirement for nondirective counseling and referrals would be critical to accomplish the purposes of Title X. *See* 86 Fed. Reg. 56,144, 56,154 (Oct. 7, 2021). We could disturb HHS's determination only if it had been procedurally defective, arbitrary or capricious, or manifestly contrary to a statute. *See* Discussion–Part 1.1, above.

Eleventh Circuit said that the Treasury Department had violated the spending power by interpreting an ambiguous tax offset provision in a stimulus act. *Id.* at 1146–48. We aren't bound by other circuits. *United States v. Carson*, 793 F.2d 1141, 1147 (10th Cir. 1986). But even if *Morrisey* were binding, its circumstances differed in two ways.

First, the Treasury Department created a regulatory framework for the statutory offset provision because the statute itself was confusing and ambiguous. *Morrisey*, 59 F.4th at 1133–34, 1146. But HHS's requirements didn't create a framework to apply a confusing and ambiguous statute.

Second, the Eleventh Circuit said that this generic statutory language hadn't authorized the Treasury Department to interpret a major question of the stimulus act. *Id.* at 1147. The Eleventh Circuit explained that "[t]he Constitution does not allow the [Treasury Department] to supply content without which the [o]ffset [p]rovision literally could not function." *Id.* at 1148. By contrast, HHS's requirement governs only counseling and referrals, not the fundamental application of the grant program.

\* \* \*

The district court didn't err when it tentatively concluded that Oklahoma couldn't show a violation of the spending power. Oklahoma points out that § 1008 is silent on counseling and referrals. But § 1008 rests alongside other provisions of Title X that unambiguously direct HHS to determine the eligibility requirements. So the district court didn't err by

16

tentatively determining that the spending power hadn't prevented Congress's delegation of eligibility requirements to HHS.

## 2.2    Oklahoma likely agreed voluntarily and knowingly to HHS's requirement for nondirective counseling and referrals.

The Supreme Court has explained that even when the law is unambiguous, the spending power prohibits Congress from "surpris[ing] participating States with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981). So we must consider the conditions that existed when the state accepted the federal funds. *See Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 670 (1985) (rejecting a challenge under the spending power because "the State agreed to comply with . . . the legal requirements in place when the grants were made").

In our view, the district court didn't err when it tentatively determined that Oklahoma had knowingly and voluntarily agreed to the requirements for nondirective counseling and referrals. Oklahoma accepted the grants for 2022 and 2023 after HHS had enacted the 2021 rule, including the requirements regarding nondirective counseling and referrals.[5] And Oklahoma continued complying with these requirements

---

[5]    Oklahoma points out that it objected to the conditions stated in HHS's 2021 rule. But the existence of an objection reflects awareness of HHS's conditions.

even after *Dobbs* had triggered a change in state law. When concerns emerged, HHS proposed use of a national call-in number and Oklahoma accepted the proposal. *See* Background–Part 2, above.[6]

Given these circumstances, the district court could tentatively conclude that Oklahoma had voluntarily and knowingly accepted the grant with awareness of HHS's eligibility requirements.

## 2.3    The district court didn't err in tentatively determining that HHS hadn't violated Oklahoma's sovereignty.

Finally, Oklahoma suggests that HHS's 2021 rule violates the spending power by encroaching on state sovereignty.[7] For this suggestion, Oklahoma assumes that HHS's requirements force Oklahoma to violate state criminal law. But Oklahoma likely couldn't use its state criminal law to dictate eligibility requirements for the grants. *See Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 663 (D.C. Cir. 1983)

---

[6]    Oklahoma argues that acceptance of the 2022 and 2023 grants doesn't matter because it would have been impossible to agree to the conditions for the 2024 grant period. Even if we were to credit this argument, Oklahoma's challenge would fail. If we were to focus on the upcoming period, Oklahoma could simply decline the grant rather than accept HHS's conditions. *See Rust v. Sullivan*, 500 U.S. 173, 199 n.5 (1991) ("The recipient is in no way compelled to operate a Title X project; to avoid the force of the regulations, it can simply decline the subsidy.").

[7]    Oklahoma points out that the HHS Secretary publicly disagreed with the Supreme Court's opinion in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), and surmises that HHS deliberately tried to circumvent the opinion. But Oklahoma doesn't explain how HHS tried to circumvent *Dobbs*.

("Although Congress is free to permit the states to establish eligibility requirements for recipients of Title X funds, Congress has not delegated that power to the states."); *Valley Fam. Plan. v. North Dakota*, 661 F.2d 99, 102 (8th Cir. 1981) (deferring to HHS's interpretation when state law conflicted with a regulation on referrals regarding abortions).[8] After all, if compliance with the requirements would entail a state crime, Oklahoma could simply decline the grant. *See Rust v. Sullivan*, 500 U.S. 173, 199 n.5 (1991) ("The recipient is in no way compelled to operate a Title X project; to avoid the force of the regulations, it can simply decline the subsidy.").[9]

\* \* \*

We conclude that the district court didn't err in its tentative conclusions that

- the combination of Title X and the HHS requirements doesn't violate the spending power and

- Oklahoma had acted voluntarily and knowingly when accepting HHS's conditions.

---

[8]     Oklahoma also suggests that by giving the funds to another entity, HHS encourages that entity to violate Oklahoma law. But the district court didn't err in tentatively concluding that Oklahoma had failed to substantiate that risk. *See* Appellant's Opening Br. at 29–30 (stating only that another grantee "*risks* violating Oklahoma law" (emphasis added)).

[9]     Under state law, Oklahoma generally can't use a federal grant to encourage a woman to get an abortion "except to the extent required for continued participation in a federal program." Okla. Stat. tit. 63 § 1-741.1(B). This law doesn't "prohibit a physician from discussing options with a patient through nondirective counseling." *Id.*

So we uphold the district court's rejection of Oklahoma's challenge under the spending power.

### 3. The district court didn't err when tentatively concluding that HHS hadn't violated the Weldon Amendment.

Oklahoma also relies on a statutory provision known as *the Weldon Amendment*. Since 2004, Congress has adopted the amendment every year when appropriating funds to HHS. *See Nat'l Family Planning & Reproductive Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 827 (D.C. Cir. 2006).

Oklahoma argues that HHS violated the Weldon Amendment by

- subjecting Oklahoma's health department (a health-care entity) to discrimination for declining to make referrals for abortions and

- forcing Oklahoma (a state government) to discriminate against other entities receiving funds under the statewide grant.

### 3.1 HHS's proposal for the national call-in number was unlikely to constitute a referral for the purpose of facilitating an abortion.

The Weldon Amendment provides:

> None of the funds made available in this Act may be made available to a Federal agency or program, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions.[10]

---

[10] The Weldon Amendment says that federal funds will not "be made available" to a federal agency that discriminates against a grantee. *See* text accompanying note. Given this language, a violation could arguably result in a denial of funds to HHS. This is not the remedy that Oklahoma wants;

Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, div. F, § 508(d)(1), 118 Stat. 2809, 3163 (2004); *see also* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. H, § 507(d)(1), 136 Stat. 4459, 4908 (2022) (enacting the amendment for the fiscal year ending September 30, 2023); Further Consolidated Appropriations Act, 2024, H.R. 2882, 118th Cong. div. D, § 507(d)(1) (2024) (enacting the amendment for the fiscal year ending September 30, 2024). Interpreting this language involves a legal question that we review de novo. *See, e.g.*, *Sinclair Wyo. Refin. Co. v. EPA*, 887 F.3d 986, 990 (10th Cir. 2017). In conducting de novo review, we start with the Weldon Amendment's language. *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1161 (10th Cir. 2011). We give this language its "ordinary, everyday" meaning unless the context suggests otherwise. *Navajo Nation v. Dalley*, 896 F.3d 1196, 1213 (10th Cir. 2018).

Based on the Weldon Amendment's language, Oklahoma must prove two elements for success on the merits:

1. The entity claiming discrimination (the Oklahoma health department) constitutes a health-care entity.

2. The federal government has discriminated against the Oklahoma health department for declining to *refer* pregnant women *for abortions*.

Oklahoma wants to receive the grant rather than strip HHS of funding. But HHS doesn't question Oklahoma's right to the grant upon proof of discrimination. HHS instead argues that it didn't violate the Weldon Amendment.

21

Oklahoma relies on the first element, insisting that its health department constitutes a *health-care entity*. But the district court relied on the second element, concluding that Oklahoma likely couldn't show discrimination for refusing to refer women for abortions.[11] In our view, this tentative conclusion fits the statutory language.

The Weldon Amendment would apply only if HHS had required the health department to make *referrals for abortions*. HHS recognized that Oklahoma had criminal laws prohibiting abortion. So HHS informed Oklahoma that it could inform pregnant women of a national call-in number. HHS explained that the number would provide neutral, nondirective information about family-planning options. When informed of this option, Oklahoma expressed dissatisfaction. But the district court didn't err by tentatively rejecting Oklahoma's argument that the mere act of sharing the national call-in number would constitute a referral for the purpose of facilitating an abortion.

---

[11]    On appeal, the parties don't address the meaning of the phrase *refer for abortions*. But we must independently interpret the statutory phrase irrespective of the parties' positions. *See WWC Holding Co., Inc. v. Sopkin*, 488 F.3d 1262, 1276 n.10 (10th Cir. 2007) ("[W]e are not limited to the parties' positions on what a statute means, because we review a question of statutory construction de novo."); *see also A.M. v. Holmes*, 830 F.3d 1123, 1146 n.11 (10th Cir. 2016) (stating that we can affirm based on our statutory interpretation even if the appellee had relied on a different ground to affirm).

To interpret the Weldon Amendment, we consider the use of prepositions limiting the scope of the provision. *See Kientz v. Comm'r, SSA*, 954 F.3d 1277, 1282 (10th Cir. 2020) (relying on the limiting function of the preposition *on* to interpret a statute). The amendment uses the preposition *for* to connect *abortion* with the *referral*. The preposition *for* means *because of* or *on account of*. 6 *Oxford English Dictionary* 25 (2d ed. 1989); *see also Merriam-Webster Dictionary*, http://www.merriam-webster.com/dictionary/for (last visited June 20, 2024) (defining *for* "as a function word to indicate purpose," "an intended goal," and "the object . . . of a perception, desire, or activity"). So we generally consider the preposition *for* to link conduct to a particular purpose. *See Muñoz v. Garland*, 71 F.4th 1174, 1177 (9th Cir. 2023) (interpreting the preposition *for* to indicate a purpose); *Chamber of Com. of U.S. v. U.S. Dep't of Lab.*, 885 F.3d 360, 373 (5th Cir. 2018) (same); *Murfey v. WHC Ventures, LLC*, 236 A.3d 337, 346 (Del. 2020) (stating that the preposition *for* links the conduct at issue to a particular purpose).

The combined phrase (*refer for*) thus suggests that the Weldon Amendment prohibits discrimination against entities for refusing to refer individuals *for the purpose* of getting abortions. But HHS required only that the Title X project offer pregnant women "the opportunity to be provided information and counsel *regarding* . . . [p]regnancy termination." 42 C.F.R. § 59.5(a)(5)(i)(c) (emphasis added). The term *regarding* is

23

neutral, unlike the term *for* in the Weldon Amendment. *See American Heritage College Dictionary* 1149 (3d ed. 1997) (defining the preposition *regarding* as "[i]n reference to; with respect to; concerning"). Given the neutral wording of the requirement, the district court didn't err when it tentatively determined that reference to a national call-in number wouldn't involve a *referral for* an abortion. Instead, the call-in number offered an opportunity to supply neutral information *regarding* an abortion. Oklahoma rejected the option of a national call-in number, but didn't question the neutrality of the information provided.[12]

The dissent suggests two reasons why use of the call-in number would constitute a *referral for an abortion* based on a pregnant woman's use of the information:

1.    An Oklahoma provider would reasonably assume that any pregnant woman's request for the call-in number would involve an interest in exploring the possibility of an abortion.

2.    If a pregnant woman gets an abortion after using the national call-in number, her decision to get an abortion turns the referral into one for the purpose of getting an abortion.

---

[12]    At oral argument, Oklahoma suggested that the call-in number hadn't provided neutral information, citing evidence outside the record. We decline to consider this argument because it didn't appear in Oklahoma's appellate briefs and rested on evidence beyond the record. *See United States v. Anthony*, 22 F.4th 943, 952 (10th Cir. 2022) ("We do not consider arguments raised for the first time at oral argument."); *United States v. Kennedy*, 225 F.3d 1187, 1191 (10th Cir. 2000) ("This court will not consider material outside the record before the district court.").

These arguments rest on a misunderstanding of the call-in number, speculation about a caller's purpose, and disregard of the statutory focus on the referring entity's purpose rather than the pregnant woman's.[13]

HHS proposed use of the call-in number as a way for Oklahoma to provide pregnant women with information about various family-planning options. Apart from the dissent, no one has suggested

- that individuals will contact Oklahoma to obtain information about the call-in number or

- that Oklahoma would use the call-in number only for individuals asking about abortions.

*See Verlo v. Martinez*, 820 F.3d 1113, 1125–26 (10th Cir. 2016) (stating that when reviewing a district court's preliminary-injunction ruling, we restrict our inquiry to facts in the district court's record). To the contrary, HHS provided the national call-in number as a way for Oklahoma to answer questions about *all* options available to pregnant women. For example, a woman might ask: "I'm pregnant, what are my options?" Appellant's App'x vol. 3, at 591. Given that question, HHS would require Oklahoma to provide the call-in number for nondirective counseling about

---

[13]    The dissent states that the Weldon Amendment unambiguously renders use of the national call-in number a referral *for abortion*. But the dissent doesn't identify anything in the statutory text for this interpretation. Instead, the dissent relies solely on the possibility that a pregnant woman might decide to get an abortion after learning about her options. This reliance not only rests on speculation, but also disregards the statutory focus on the referring entity's purpose rather than how the pregnant woman would use the information.

"prenatal care, adoption, foster care . . . and also pregnancy termination." *Id.*

The pregnant woman's ultimate decision doesn't show a likelihood that the court will ultimately regard use of the national call-in number as a referral for an abortion. HHS said that the call-in number provided neutral information about abortions, and Oklahoma's briefs and evidence presented no reason to question the neutrality of the information. Given the neutrality of the call-in information, the Weldon Amendment requires us to focus on the purpose of the referring entity (Oklahoma) rather than the pregnant women using the information. Otherwise, the act of sharing the call-in number would create both a referral *for* and *against* an abortion depending on the pregnant woman's decision after getting the same information.

Based on the statutory language and the record, the district court didn't err when tentatively concluding that the act of sharing the call-in number wouldn't constitute a referral for pregnant women to get abortions.[14] This interpretation is supported by the statutory sponsor of the

---

[14]    HHS points out that Congress annually reenacts the Weldon Amendment, including in the fifteen years that the amendment existed alongside HHS's requirements in 2000 for nondirective counseling and referrals. *See* 86 Fed. Reg. 56,144, 56,153 (Oct. 7, 2021) (discussing the longstanding coexistence of the amendment and the nondirective counseling-and-referral requirement). HHS theorizes that this longstanding coexistence shows that Congress didn't intend for the amendment to

Weldon Amendment. The sponsor explained that the Weldon Amendment wouldn't "affect access to abortion [or] the provision of abortion-related information or services by willing providers." 150 Cong. Rec. H10,090 (daily ed. Nov. 20, 2004) (statement of Rep. Weldon).[15] We give substantial weight to the statutory sponsor's explanation of his amendment. *Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 564 (1976); *Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*, 764 F.3d 1199, 1232 (10th Cir. 2014).

The dissent characterizes Oklahoma's objection as *sincere*. Dissent at 20. Even if Oklahoma had sincerely considered use of the national call-in

---

abrogate HHS's requirements concerning counseling and referrals. But we need not address this theory.

[15]    In addition, the statutory sponsor explained that the amendment had two other objectives:

1.    Protection of individual health-care providers like "nurses, technicians, and doctors" who don't want to "participate in an abortion, perform an abortion, or be affiliated with doing an abortion"

2.    Protection of health-care entities from being forced by the government to provide abortion services, citing examples of state governments forcing hospitals to perform elective abortions or build abortion clinics

150 Cong. Rec. H10,090. In these ways, the statutory sponsor explained that the amendment would prevent action to force participation in abortions—not to prevent the sharing of neutral information about abortions.

number as a *referral for abortion* under the Weldon Amendment, the language in the amendment doesn't entrust health-care entities with the authority to define *referral for abortion*. Given the statutory language and the sponsor's explanation, the district court didn't err by tentatively concluding that the national call-in number wasn't a referral for the purpose of facilitating an abortion.

* * *

The statutory sponsor's explanation seems to fit the statutory phrasing, which addresses *referrals for abortions*. This language suggests a bar on referrals for the purpose of facilitating abortions rather than on the sharing of neutral information regarding all family-planning options. The district court thus didn't err when tentatively concluding that the act of sharing the call-in number wouldn't constitute a referral for the purpose of facilitating an abortion.

## 3.2    HHS likely didn't force Oklahoma to discriminate against other health-care entities.

Oklahoma also argues that HHS forced the state to discriminate against other health-care entities that refuse to make referrals for abortions. But HHS clarified that Oklahoma could distribute the grant funds to other health-care entities as long as Oklahoma itself passed along the call-in number. *See* 65 Fed. Reg. 41,270, 41,274 (July 3, 2000) (specifying that while "grantees may not require individual employees who

have objections to provide such counseling . . . in such cases the grantees must make other arrangements to ensure that the service is available to Title X clients who desire it"); 86 Fed. Reg. 56,144, 56,148, 56,153 (Oct. 7, 2021) (readopting this requirement with the 2021 rule). Given HHS's clarification, the district court didn't err in tentatively concluding that Oklahoma hadn't compelled Oklahoma to discriminate against other health-care entities.

* * *

The district court didn't err when it tentatively concluded that HHS hadn't

- discriminated against Oklahoma for declining to make referrals for abortions or

- forced Oklahoma to discriminate against other health-care entities.

**4.     The district court didn't err by tentatively concluding that HHS hadn't acted arbitrarily and capriciously.**

Finally, Oklahoma argues that HHS acted arbitrarily and capriciously in terminating the grant. But the district court didn't err in tentatively rejecting Oklahoma's characterization of HHS's actions as arbitrary or capricious.

**4.1     The district court didn't err by tentatively concluding that HHS had complied with Title X.**

Oklahoma argues that HHS misinterpreted § 1008 of Title X, which prohibits use of Title X for "programs where abortion is a method of

family planning." 42 U.S.C. § 300a-6. Oklahoma and ten other states presented a similar argument in *Ohio v. Becerra*, 87 F.4th 759, 770–75 (6th Cir. 2023). But *Ohio* involved a facial challenge to HHS's requirement. *Id.* Here Oklahoma presents an as-applied challenge, focusing on termination of a grant based on the state's refusal to pass along the national call-in number.

Section 1008 is silent on the issue of counseling and referrals. *See Rust v. Sullivan*, 500 U.S. 173, 184 (1991) ("Title X does not define the term 'method of family planning,' nor does it enumerate what types of medical and counseling services are entitled to Title X funding."). Given Congress's silence, the Supreme Court held that HHS could enact requirements on counseling and referrals. *Id.* at 185.[16]

When a judgment is issued, the district court will presumably need to decide whether HHS strayed from Title X. But here our inquiry is limited, considering only whether the district court erred when tentatively concluding that HHS had complied with Title X. In our view, the district court's tentative conclusion wasn't erroneous. *See Ohio v. Becerra*, 87

---

[16]    In *Rust v. Sullivan*, the Supreme Court applied a two-part test that had been established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Roughly two weeks ago, the Court overruled *Chevron. Loper Bright Enters. v. Raimondo*, 603 U.S. __, Nos. 22-451, 22-1219, 2024 WL 3208360, at *21 (June 28, 2024). But the Court clarified that it was not "call[ing] into question prior cases that [had] relied on the *Chevron* framework." *Id.*

F.4th 759, 772 (6th Cir. 2023) (relying on *Rust* to conclude that HHS can "treat referrals as either falling inside or outside § 1008's prohibition, so long as [HHS] adequately explains its choice").

**4.2    The district court didn't err by tentatively finding compliance with HHS's regulations.**

Oklahoma also argues that HHS acted inconsistently with its own requirements, pointing to three snippets:

1.    The phrase *allowable under state law* in 42 C.F.R. § 59.5(b)(6)

2.    The phrase *in close physical proximity* in 42 C.F.R. § 59.5(b)(8)

3.    Two sentences in HHS's preamble

An agency acts arbitrarily and capriciously when it violates its own regulations. *N.M. Farm & Livestock Bureau v. U.S. Dep't of Interior*, 952 F.3d 1216, 1231 (10th Cir. 2020). We grant substantial deference to an agency's interpretation of its own regulations unless the interpretation is unreasonable, plainly erroneous, or inconsistent with the plain language. *Oxy USA Inc. v. U.S. Dep't of Interior*, 32 F.4th 1032, 1044 (10th Cir. 2022).

Oklahoma first relies on an HHS regulation that requires Title X projects to provide for performance of family-planning services "under the direction of a clinical services provider, with services offered within their scope of practice and *allowable under state law*, and with special training or experience in family planning." 42 C.F.R. § 59.5(b)(6) (emphasis

31

added). According to Oklahoma, this regulation prohibits HHS from forcing Oklahoma to violate its laws.

Even if Oklahoma were correct, its argument would turn on the meaning of HHS's phrase *allowable under state law*. HHS interpreted this phrase to ensure that non-physician health-care providers can direct family-planning programs so long as the providers are qualified under state law. HHS's explanation is supported by the commentary accompanying the 2001 rule. *See* 86 Fed. Reg. 56,144, 56,163–64 (Oct. 7, 2021) (explaining that HHS added this regulatory language, including the phrase *allowable under state law*, because "other healthcare providers . . . have authority to direct family planning programs and should be included within the regulation"). This commentary indicates that the phrase *allowable under state law* is meant to expand the categories of qualified providers. Given HHS's explanation and the commentary, the district court didn't err by tentatively concluding that HHS had correctly interpreted its regulation.

Oklahoma also points to a second HHS regulation, which requires Title X projects to "[p]rovide for coordination and use of referrals and linkages with [other health-care entities], *who are in close physical proximity to the Title X site, when feasible . . . .*" 42 C.F.R. § 59.5(b)(8) (emphasis added). According to Oklahoma, the use of a national call-in number would violate the requirement of *close physical proximity*. But the regulation requires physical proximity only *when feasible. See* Appellant's

App'x vol. 3, at 457 (HHS guidance on the 2021 rule, stating that "[t]here are no geographic limits for Title X recipients making referrals for their clients"). Oklahoma hasn't explained how it would be feasible to make referrals in close proximity to a Title X site within the state.

Oklahoma also argues that the call-in number can't be *feasible* when the requirement forces a state to violate its own criminal law. This argument likely rests on a misreading of the regulation.

The regulation appears to modify the physical-proximity requirement, which would permit referrals to distant providers when nearby referrals aren't possible; the language doesn't necessarily modify the basic requirements regarding nondirective counseling and referrals. In these circumstances, the district court didn't err by tentatively concluding that HHS's regulatory interpretations hadn't been arbitrary or capricious.

Finally, Oklahoma points to two stray sentences from the preamble to the 2021 rule:

1. "[O]bjecting providers or Title X grantees are not required to counsel or refer for abortions."

2. "[O]bjecting individuals and grantees will not be required to counsel or refer for abortions in the Title X program in accordance with applicable federal law."

86 Fed. Reg. 56,144, 56,163 (Oct. 7, 2021).

We reject arguments based on snippets of a preamble when the regulatory language is otherwise clear. *See Sierra Club v. EPA*, 964 F.3d

33

882, 893 (10th Cir. 2020) (rejecting an agency's argument relying "on snippets from the regulation's preamble"); *Peabody Twentymile Mining, LLC v. Sec'y of Lab.*, 931 F.3d 992, 998 (10th Cir. 2019) ("[T]he limitations that appear in the preamble do not appear in the language of the regulation, and we refuse to engraft those limitations onto the language.").[17]

HHS interprets its requirements to allow a Title X project to issue its own grants to objecting health-care entities as long as the project otherwise provides nondirective counseling and referrals. This interpretation is supported by the regulatory language and HHS's guidance. With that support, the district court didn't err by tentatively concluding that HHS's interpretation of its requirements hadn't been arbitrary or capricious.

**4.3    The district court didn't err by tentatively concluding that HHS had considered all important aspects of the problem.**

Finally, Oklahoma alleges various errors and omissions, suggesting that HHS ignored two important aspects of the problem.[18]

First, Oklahoma alleges that HHS ignored federalism concerns, including the importance of the Supreme Court's 2022 opinion in *Dobbs v.*

---

[17]    At oral argument, Oklahoma agreed, conceding that preamble language isn't binding.

[18]    In its appellate briefs, Oklahoma cites various other state laws, suggesting that they show a broad policy against abortions. But Oklahoma concedes that it didn't refer to these laws in district court. So we decline to

*Jackson Women's Health Organization*, 597 U.S. 215 (2022). But HHS issued extensive guidance about the effect of *Dobbs* on the requirements regarding counseling and referrals. Given that guidance, the district court didn't err by tentatively concluding that HHS had adequately considered *Dobbs*. Though *Dobbs* had addressed the constitutional right to an abortion, the opinion had not expressly addressed the power of the federal government to set conditions on federal grants. *See id.* at 231.

Even if the Supreme Court's opinion had addressed this power, the district court could tentatively conclude that HHS's requirements wouldn't prevent Oklahoma from regulating abortions. "The recipient is in no way compelled to operate a Title X project; to avoid the force of the regulations, it can simply decline the subsidy." *Rust v. Sullivan*, 500 U.S. 173, 199 n.5 (1991).

Second, Oklahoma argues that HHS failed to consider how termination of Oklahoma's grant would affect the state. But HHS considered the impact on Oklahoma patients, funding other providers who could fill the gap.

\* \* \*

---

address Oklahoma's new suggestion of a broad policy reflected in these laws. *See Bass v. Potter*, 522 F.3d 1098, 1107 n.9 (10th Cir. 2008) ("Because 'the theory in question was not presented . . . to the district court,' the issue 'is not properly before us' and we need not comment further.").

The district court didn't err in tentatively concluding that HHS had (1) correctly interpreted Title X and the regulations and (2) considered all important aspects of the problem.

## Conclusion

The district court acted within its discretion by concluding that Oklahoma hadn't shown a likelihood of succeeding on its claims involving constraints under the spending power, violation of the Weldon Amendment, or arbitrariness and caprice in HHS's application of its regulations and Title X. So we affirm the denial of a preliminary injunction.[19]

---

[19]    Given Oklahoma's failure to show a likelihood of success, we need not consider the other elements of a preliminary injunction. *Warner v. Gross*, 776 F.3d 721, 736 (10th Cir. 2015); *see* Discussion–Part 1, above.

No. 24-6063, *Oklahoma v. HHS, et al.*
**FEDERICO**, Circuit Judge, dissenting.

For more than 50 years, the Oklahoma State Department of Health ("OSDH") received federal grant money under Title X of the Public Health Service Act, 42 U.S.C. § 300 *et seq.*, to provide family planning health care for Oklahomans. This money was primarily used to ensure that low-income and rural patients had access to reproductive and family planning care. Congress appropriated the federal grant money, which was dispersed through a regulatory scheme developed by the United States Department of Health and Human Services ("HHS").

Since Title X's inception in 1970, Congress has been explicit that "[n]one of the funds appropriated under [Title X] shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. Beginning in 2004 and every year thereafter, Congress included the so-called "Weldon Amendment" as an annual appropriations rider to every HHS appropriations bill. *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, div. D, tit. V, § 507, 138 Stat. 460, 703. Relevant here, the Weldon Amendment prohibits disbursement of grant money to government agencies that discriminate against any health care entity that "does not provide, pay for, provide coverage of, or refer for abortions." Pub. L. No. 118-47, div. D, tit. V, § 507(d)(1), 138 Stat. 460, 703.

As the majority explains, this appeal arises from HHS's regulatory requirement that all Title X grantees, such as OSDH, provide referrals to patients who desire information on their full range of pregnancy options, including pregnancy termination ("referral requirement"). 42 C.F.R. § 59.5(a)(5). The Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), triggered an abortion ban under Oklahoma law, *see* Okla. Stat. Ann. tit. 21, § 861, and Oklahoma determined that OSDH providers and grantees cannot comply with the referral requirement without categorically running afoul of Oklahoma state law and policy. Because HHS disagreed with OSDH's assessment, it terminated OSDH's Title X grant.

On its face, the Weldon Amendment covers the more common situation in which funding cannot be denied to *individual* providers who raise conscience objections to the referral requirement. This case, however, presents a wholesale objection by a grantee who, under my reading of the Weldon Amendment, also qualifies as a health care entity as an *institutional* provider.

To determine whether the Weldon Amendment's discrimination prohibition applies to this case, we must define its use of the phrase "refer for abortions." Applying the natural reading of the Amendment's language to the facts of this case, Oklahoma has shown a likelihood of success in proving that HHS's termination of the Title X grant to OSDH was unlawful discrimination against its providers who cannot and will not comply with the referral

2

requirement. I would therefore reverse the district court with instructions to grant the preliminary injunction, and thus, I respectfully dissent.

## I

## A

To contextualize the motion for preliminary injunction that was before the district court, we must consider HHS's historical implementation of Title X and OSDH's history as a program grantee. In 1970, Congress enacted Title X, which authorizes HHS to "make grants to and enter into contracts with public or nonprofit private entities to assist in the establishment and operation of voluntary family planning projects which . . . offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a). Title X grants "shall be made in accordance with such regulations as the [HHS] Secretary may promulgate," *id.* § 300a-4(a), and "shall be payable . . . subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made," *id.* § 300a-4(b).

HHS has discretion under its regulations to determine the allocation of Title X grant funds among the applicants. *See* 42 C.F.R. § 59.7(a) (stating that "the Secretary *may* award grants" (emphasis added)). Title X funds must be spent in accordance with applicable regulations, *see id.* § 59.9, and HHS may terminate a grant if a recipient fails to comply with the terms and conditions,

including any incorporated regulatory requirements, *see* 45 C.F.R. §§ 75.371(c), 75.372(a)(1).

For much of the Title X program's existence, HHS has required – as it does now – that Title X projects offer pregnant patients the choice to be provided information and "nondirective 'options counseling'" about "prenatal care," "adoption and foster care," and "pregnancy termination (abortion)," "followed by referral for [any of] these services if [the patient] so requests." 53 Fed. Reg. 2922, 2923 (Feb. 2, 1988) (describing regulatory history); *see* 42 C.F.R. § 59.5(a)(5)(i)(C), (a)(5)(ii) (describing current project requirements, including "offer[ing] pregnant clients the opportunity to be provided information and counseling regarding . . . [p]regnancy termination," and "[i]f requested" to "provide neutral, factual information and nondirective counseling," as well as "referral upon request"). HHS requires that patients receive "complete factual information about all medical options and the accompanying risks and benefits." 65 Fed. Reg. 41281, 41281 (July 3, 2000).

Notably, § 1008 of Title X states that "[n]one of the funds appropriated . . . shall be used in programs where abortion is a method of family planning." 42 U.S.C. § 300a-6. Consistent with § 1008, HHS has explained that a Title X project may not "promote[] abortion or encourage[] persons to obtain [an] abortion." 65 Fed. Reg. at 41281. Any referral for an abortion may consist of "relevant factual information" such as a provider's "name, address, [and]

telephone number," but Title X projects may not take "further affirmative action (such as negotiating a fee reduction, making an appointment, [or] providing transportation) to secure abortion services for the patient." *Id.*

On two occasions, HHS has promulgated rules requiring the inverse of the current rule, by placing strict restrictions on the type of counseling and referrals that Title X grantees may provide. First, in 1988, HHS issued a rule that prohibited grantees from discussing or referring for abortions. *See* 86 Fed. Reg. 19812, 19813 (Apr. 15, 2021) (describing 1988 rule). In *Rust v. Sullivan*, 500 U.S. 173, 184–90 (1991), the Supreme Court upheld the 1988 rule as a "permissible construction" of the statute in light of the "broad directives provided by Congress in Title X," but the rule was "never implemented on a nationwide basis." 65 Fed. Reg. 41270, 41271 (July 3, 2000). HHS issued an interim rule in 1993 that suspended the 1988 prohibitive rule and returned to the pre-1988 standards. 58 Fed. Reg. 7462, 7462 (Feb. 5, 1993). It then issued a rule in 2000 that required nondirective options counseling and a referral for options the patient requested. *See* 65 Fed. Reg. at 41271. This rule remained in effect until 2019. *Id.*

In 2019, HHS "essentially revive[d]" the 1988 rule that restrained the ability of Title X projects to provide pregnancy options counseling and prohibited Title X projects from referring for abortion. *Mayor of Balt. v. Azar*, 973 F.3d 258, 271 (4th Cir. 2020) (en banc). The Ninth Circuit upheld the rule's

restrictions, *California ex rel. Becerra v. Azar*, 950 F.3d 1067, 1101–04 (9th Cir. 2020) (en banc), while the Fourth Circuit enjoined its operation in Maryland, *Mayor of Balt.*, 973 F.3d at 276–81, 283–90, 296.

In October 2021, HHS promulgated a final rule, which remains in effect today, restoring the counseling and referral requirements that have governed grantees "for much of the program's history." 86 Fed. Reg. 56144, 56150 (Oct. 7, 2021). HHS determined that the 2019 rule's restrictions on counseling and referrals had "interfered with the patient-provider relationship," *id.* at 56146; had "compromised [the] ability to provide quality healthcare to all clients," *id.*; and had "shifted the Title X program away from its history of providing client-centered quality family planning services," *id.* at 56148.

Following the 2021 rule's promulgation, Oklahoma and several other States sued and brought a facial challenge against it in federal court in the Southern District of Ohio, including the referral requirement. *See Ohio v. Becerra*, 87 F.4th 759, 767–68 (6th Cir. 2023). The district court in *Becerra* denied the States' request to enjoin the referral requirement, and the Sixth Circuit affirmed, reasoning that the requirement is based on a permissible construction of Title X and HHS adequately explained its decision to restore the requirement. *Id.* at 770–75.

**B**

OSDH has been a recipient of Title X grants for decades,[1] including during the years in which the HHS regulations required Title X projects to offer nondirective options counseling and referrals for abortion upon a patient's request. And in March 2022, HHS again awarded OSDH a Title X grant for the period of April 1, 2022, through March 31, 2023.

In June 2022, the Supreme Court issued its decision in *Dobbs,* which overturned precedent recognizing a constitutional right to abortion. 597 U.S. 215. Following that decision, HHS advised Title X grantees that the counseling and referral requirements remained in effect. Aplt. App'x III at 58–66; *see also id.* at 68 ("[A]ll Title X recipients continue to operate under the federal requirements of the 2021 Title X rule, including the requirement to provide nondirective pregnancy options counseling in the event of a positive pregnancy test and client-requested referrals." (emphasis removed)). HHS reiterated that Title X projects are required to offer pregnant patients nondirective options counseling and a referral upon the patient's request, including for abortion. HHS stated that projects may also make out-of-state referrals.

---

[1] There are 68 clinics and entities that receive Title X grant funds in Oklahoma. *See* Aplt. App'x II at 41 (Declaration of Tina Johnson, MPH, RN ¶ 12).

The same day that *Dobbs* was decided, Oklahoma's law outlawing abortion, § 861, took effect. *See* ACLU, *et al.* Am. Br. at 31 (discussing Letter from John O'Connor, Okla. Att'y Gen., to J. Kevin Stitt, Okla. Governor (June 24, 2022)). And in August 2022, OSDH sought to modify its counseling and referral policies because § 861 became state law.

HHS determined that Oklahoma's first proposed policy modification did not comply with federal regulatory requirements, but it offered Oklahoma the option of submitting an "alternate compliance proposal" with specific examples of acceptable arrangements, including by providing Title X patients the number for a national call-in hotline where operators would supply the requisite information. Aplt. App'x III at 71–72. Initially, Oklahoma agreed to comply with its counseling and referral obligations by providing nondirective counseling on all pregnancy options by its staff or through the hotline. And on March 14, 2023, Oklahoma submitted written assurance of its compliance with the 2021 rule and program materials showing that patients were being made aware of the hotline. Based on Oklahoma's assurances, HHS approved an award for April 1, 2023, through March 31, 2024.

Shortly after HHS awarded funding, on May 5, 2023, Oklahoma reversed course, notifying HHS that it had made changes to its Title X project. Under the new policy, OSDH would "[p]rovide neutral, factual information and nondirective counseling on pregnancy options in Oklahoma by OSDH staff

8

(except for options the client indicated she does not want more information on)," but would no longer provide counseling through a referral to the hotline. Aplt. App'x I at 90. In response, HHS informed Oklahoma that this policy "does not comply with the Title X regulatory requirements and, therefore," violates "the terms and conditions of [its] grant." *Id.* at 91.

HHS then suspended Oklahoma's award but allowed it 30 days to bring its program into compliance. Oklahoma, however, "indicated that it would not be able to comply with the Title X regulation[,] citing state law." *Id.* HHS was unmoved and terminated Oklahoma's grant. Because Oklahoma "had ample notification of what is required to maintain compliance with the Title X regulation," HHS concluded that termination was "in the best interest of the government" given Oklahoma's "material non-compliance with [grant] terms and conditions." *Id.* at 91–92. And in September 2023, HHS redirected Oklahoma's $4.5 million award to two entities in Missouri. Oklahoma appealed the termination action to an administrative review panel within HHS. Shortly before oral argument in this appeal, HHS denied Oklahoma's administrative appeal.

After filing a complaint against HHS, Xavier Becerra,[2] Jessica Marcella,[3] and the Office of Population Affairs ("Defendants") in the Western District of Oklahoma, Oklahoma moved for a preliminary injunction seeking to enjoin Defendants from redirecting the award to other entities. The district court held a hearing on the motion in March 2024, and, during the hearing, provided its reasoning orally for denying the motion. The district court determined that Oklahoma had not shown a likelihood of success on the merits, that it had shown irreparable injury, and that the merged remaining factors were neutral.

## II

We review the district court's denial of a preliminary injunction for abuse of discretion. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). The district court's factual findings are reviewed for clear error and its legal determinations are reviewed de novo. *Id.* Though I agree with most of the majority's opinion,[4] I take issue with its interpretation of a federal statute (the

---

[2] Becerra is the Secretary of HHS. Oklahoma sues him in his official capacity.

[3] Marcella is the Deputy Assistant Secretary for the Office of Population Affairs. Oklahoma sues her in her official capacity.

[4] I agree with the majority that the district court did not abuse its discretion by concluding that the 2021 HHS rule did not violate the Spending Clause or by concluding that HHS did not otherwise act arbitrarily and capriciously.

Weldon Amendment), so my review is best framed as whether the district court abused its discretion by committing an error of law in interpreting and applying that statute. *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 775 (10th Cir. 2009). To this end, "it is well-established that 'committing a legal error . . . is necessarily an abuse of discretion.'" *Berdiev v. Garland*, 13 F.4th 1125, 1132 (10th Cir. 2021) (quoting *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 n.9 (10th Cir. 2004)).

To obtain a preliminary injunction, Oklahoma must show:

(1) [it] is substantially likely to succeed on the merits; (2) [it] will suffer irreparable injury if the injunction is denied; (3) [the] . . . threatened injury [to it] outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction [is] not . . . adverse to the public interest.

*Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016) (internal quotation marks omitted) (quoting *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009)). When, as here, the government is the opposing party, factors three and four merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Because it concludes that Oklahoma is not likely to succeed on the merits, the majority analyzes this first factor only.

Additionally, under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, "[a] person[5] suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. And relevant here, "final agency action for which there is no other adequate remedy in a court" is subject to our review. *Id.* § 704. An agency action is "final" for purposes of § 704 when the action marks the consummation of the agency's decision-making process, *Chic. & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948), and is one by which the rights or obligations have been determined, or from which legal consequences will flow, *Port of Bos. Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970). This case presents a final agency action subject to our review because HHS terminated OSDH's Title X grant and allocated it elsewhere, despite an ongoing administrative appeal.

The scope of our review of the agency action is determined by statute. 5 U.S.C. § 706. "Informal agency action must be set aside if it fails to meet statutory, procedural or constitutional requirements or if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

---

[5] "Person" includes "an individual, partnership, corporation, association, or public or private organization other than an agency." 5 U.S.C. § 551(2).

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994) (internal quotations omitted) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971)); 5 U.S.C. § 706(2)(A)–(D).

## III

Like the majority, I now consider whether the district court abused its discretion by denying the extraordinary remedy of a preliminary injunction. Unlike the majority, however, I respectfully conclude that it did. Further, not only do I conclude Oklahoma has demonstrated it is substantially likely to succeed on the merits of its claim that the agency action was unlawful, but I also conclude that the other preliminary injunction factors weigh in Oklahoma's favor.

## A

Oklahoma has demonstrated a substantial likelihood of success on the merits. HHS's decision and action to terminate OSDH's Title X grant was not lawful because that final agency action violated the Weldon Amendment. It did so because HHS discriminated against a health care entity that programmatically determined that it could not follow the referral requirement because doing so would violate state law and policy.

This case presents a question of first impression. Indeed, no conscience-based objections were made under the Weldon Amendment until 2017 – more than a decade after its creation. So, although we are not guided by a large body

13

of case law to apply the statute to these facts and circumstances, my analysis is guided by what I believe to be the best reading of the statutory text.

1

When interpreting a statute, "we start with the statutory text." *Tanzin v. Tanvir*, 592 U.S. 43, 46 (2020). The Weldon Amendment states:

> (d)(1) None of the funds made available in this Act may be made available to a Federal agency or program, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions.

> (2) In this subsection, the term "health care entity" includes an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, a health insurance plan, or any other kind of health care facility, organization, or plan.

Pub. L. No. 118-47, div. D, tit. V, § 507, 138 Stat. 460, 703. The only defined term in the Weldon Amendment is "health care entity." But like reading any statute, "we look first to its language, giving the words used their ordinary meaning." *Artis v. D.C.*, 583 U.S. 71, 83 (2018) (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)); *Republic of Sudan v. Harrison*, 587 U.S. 1, 8 (2019) (noting that courts should strive to find "the most natural" reading of statutory text); *Maslenjak v. United States*, 582 U.S. 335, 336 (2017) (reviewing statutory text for "the most natural understanding" of its language).

14

As the majority explains, Oklahoma must prove two elements to show it will succeed on the merits: (1) OSDH is a "health care entity," and (2) HHS discriminated against OSDH for declining to refer pregnant patients for abortions. The majority skips the first element because it decides the issue on the second. However, the first element is worthy of exploration because it is a prerequisite for, and properly frames the analysis of, the second element.[6]

**2**

I first consider whether OSDH is a "health care entity" within the definition of that term in the Weldon Amendment. All parties agree that OSDH is a Title X grantee, and I conclude that the Weldon Amendment's definition of a "health care entity" also covers OSDH because it is a "health care facility, organization, or plan." Pub. L. No. 118-47, div. D, tit. V, § 507(d)(2), 138 Stat. 460, 703. As fleshed out during oral argument, OSDH qualifies as such a "facility, organization, or plan" because it engages in direct patient care at OSDH clinics. Oral Argument at 3:40–3:55, 4:45–4:55, 5:00–7:20; *see also* Aplt. App'x II at 39 (Johnson Declaration ¶ 3, describing job positions at OSDH, including public nursing at county health clinics).[7]

---

[6] The district court briefly considered the first question without drawing any specific conclusions of law, but noted it is a "threshold matter." *See* Aplt. App'x III at 213–15.

[7] The OSDH clinics can be located by county on the OSDH website.

During the back-and-forth discussions about compliance with the referral requirement, OSDH communicated to HHS that its staff provides direct patient care. In May 2023, OSDH stated its family planning policy would "[p]rovide neutral, factual information and nondirective counseling on pregnancy options in Oklahoma *by OSDH staff*." Aplt. App'x I at 90 (emphasis added). In other words, OSDH has facilities to see patients and administer health care, is an organization that provides health care, and is an institutional plan with individual medical professionals who provide health care. The district court also noted the Weldon Amendment "means the provider of the services." Aplt. App'x III at 213. I agree and conclude that such language describes OSDH.[8]

There is nothing in the statutory text of the Weldon Amendment that prohibits a grantee from also being a protected "health care entity." Indeed, HHS itself recognizes that grantees and health care entities may be one and the same in the context of making objections to the referral requirement, having noted that "objecting individuals and grantees will not be required to counsel or refer for abortions in the Title X program." 86 Fed. Reg. at 56153.

---

[8] In *Becerra*, the Sixth Circuit noted it was "somewhat puzzled about the interaction between the [2021] Rule's referral requirement and . . . the Weldon Amendment[] as applied to State grantees." 87 F.4th 759, 774 n.8. But it did not have to resolve this point because the States did not pursue it on appeal or before the district court. *Id.*

Thus, because OSDH is an institutional health care entity protected by the Weldon Amendment, it cannot be discriminated against on the basis that it does not refer patients for abortions.

**3**

I now turn to the second inquiry: whether HHS violated the Weldon Amendment by discriminating against OSDH for declining to refer pregnant patients for abortions. The key statutory phrase at issue is the meaning of "refer for abortions." That is, HHS cannot discriminate by denying funding against any health care entity (such as OSDH) that does not refer its patients for abortions. This phrase is not defined in the Weldon Amendment, so as stated above, we must consider the ordinary or most natural understanding of this language.

The majority's primary focus on this issue is the preposition "for" in the phrase "refer for abortions" within the Weldon Amendment, using dictionary definitions to conclude the language means to refer a pregnant patient *for* the *particular purpose of* getting an abortion. In my view, to best understand the phrase "refer for abortions" in this context, we must consider the provider-patient interaction where the Oklahoma patient requests a referral from OSDH or other individual provider to discuss all pregnancy options. There is only one option that is unlawful in Oklahoma – abortion. If the patient desires information about options that are not abortion, there would be no need for a

17

referral to a national hotline. On the other hand, if a patient requests a referral, an Oklahoma provider would reasonably assume it is solely to explore the option of pregnancy termination, which OSDH concluded would run afoul of Oklahoma law and policy.

From OSDH's perspective, if only one patient in Oklahoma called the "All-Options Talkline" proposed by HHS to comply with the referral requirement, and ultimately decided to obtain an abortion, this would be a referral for the purpose of obtaining an abortion under the majority's reading of the Weldon Amendment. It would require OSDH providers to anticipate whether a referral would result in an abortion, potentially violating Oklahoma law and policy. And not only would such a reading possibly violate Oklahoma law and policy, but it may also violate conscience-based objectors' rights.

The majority calls this speculative and unsupported by the record. However, when discussing the referral requirement for the Title X grant, OSDH communicated to HHS that it would "[p]rovide neutral, factual information and nondirective counseling on pregnancy options in Oklahoma by OSDH staff (except for options the client indicated she does not want more information on)," but would no longer provide counseling through a referral to the hotline. Aplt. App'x I at 90. Thus, OSDH was saying explicitly to HHS that it could not comply for the reason explained above – because the only pregnancy option not available in Oklahoma is abortion.

18

Also, the majority finds fault in this reasoning by saying it disregards the statutory focus on the referring entity's purpose rather than the pregnant patient's reason or purpose for a request for a referral. The statute says nothing, not even a hint, about the referring entity's purpose. Rather, the statute is a command to government agencies or programs that they cannot discriminate against health care entities. The statute's focus is on the agency that controls the funds, not the entity that is applying to receive them.

Although one point of contention in this litigation is whether the referral requirement violates state law, no authority has been uncovered that would require Oklahoma to prove its legal position is correct to be protected from discrimination by the Weldon Amendment. During oral argument before the district court, Oklahoma informed the court that its Attorney General had deemed the referral requirement to be unlawful in Oklahoma. Aplt. App'x III at 159–60. In this context only, why isn't that enough? The Weldon Amendment is silent as to whether a health care entity must state its basis for objecting, or why it does not refer for abortions. Rather, as an objector, the Amendment plainly protects OSDH from discrimination through funding termination.

And though "[w]hen construing statutes, we begin with the plain language of the text itself," "[p]roper interpretation of a word 'depends upon reading the whole statutory text, considering the purpose and context of the

statute.'" *United States v. Ko*, 739 F.3d 558, 560 (10th Cir. 2014) (quoting *Dolan v. U.S. Postal Service*, 546 U.S. 481, 486 (2006)). Here, the text and purpose of the Weldon Amendment align to put the focus on agency discrimination, not a detailed probe as to why an entity does not refer for abortions. The record supports that OSDH raised a sincere objection to compliance with the referral requirement, which HHS disregarded by terminating the grant.

The majority relies upon HHS's regulation that requires Title X projects to offer pregnant patients "the opportunity to be provided information and counseling regarding . . . [p]regnacy termination." 42 C.F.R. § 59.5(a)(5)(i)(C). But Oklahoma's claim here is a violation of the Weldon Amendment, not an agency regulation, so the agency regulation is of little consequence. With the passage of the Weldon Amendment, Congress did not delegate to HHS or any other agency the authority to clarify its meaning. Rather, the text of the Amendment stands on its own, making it the statutory duty of the courts to determine its meaning when conducting a review of agency action. *See* 5 U.S.C. § 706; *see also Sherley v. Sebelius*, 689 F.3d 776, 786 (D.C. Cir. 2012) (Henderson, J., concurring) (The Weldon Amendment "reveals no express delegation of authority—implicit or explicit—to any agency to administer its provisions—which is unsurprising given that the [amendment] itself confers no substantive authority on any agency to do anything; it simply—and plainly—prohibits the Departments of Labor, Health and Human Services and

20

Education, as well as [r]elated [a]gencies, from using the appropriated funds for the specifically enumerated purposes." (internal quotation marks omitted)).

In reviewing the district court's interpretation and application of the Weldon Amendment, I do not find it to be the best reading of the statute. Rather, I read the statute to conclude that HHS's termination action violated it. Indeed, in sum, I conclude the best reading of the Weldon Amendment is: (1) OSDH is a health care entity; and (2) HHS discriminated against OSDH on the basis that it does not provide, pay for, provide coverage of, or refer for abortions. OSDH's non-compliance with the referral requirement was raised as a legitimate objection to not run afoul of state law and policy. There is nothing in the Weldon Amendment, the record of this case, or the parties' arguments that requires more to trigger the anti-discrimination prohibition.

Finally, to support its conclusions, the majority gives weight to the Weldon Amendment's legislative history. But I see the legislative history as a mixed bag. Representative ("Rep.") Weldon stated the following regarding the Weldon Amendment:

> The reason I sought to include this provision in the bill is my experience as a physician, and I still see patients, is that the majority of nurses, technicians and doctors who claim to be pro-choice who claim to support *Roe v. Wade* always say to me that they would never want to participate in an abortion, perform an abortion, or be affiliated with doing an abortion. This provision is meant to protect health care entities from discrimination because they choose not to provide abortion services.

\* \* \*

> This provision is intended to protect the decisions of physicians, nurses, clinics, hospitals, medical centers, and even health insurance providers from being forced by the government to provide, refer, or pay for abortions.

150 Cong. Rec. 25044–45 (2004).

> Rep. Weldon also stated the following:

> This provision is intended to protect the decisions of physicians, nurses, clinics, hospitals, medical centers, and even health insurance providers from being forced by the government to provide, refer, or pay for abortions.

\* \* \*

> This provision only applies to health care entities that refuse to provide abortion services. Furthermore, the provision only affects instances when a government requires that a health care entity provide abortion services. Therefore, contrary to what has been said, this provision will not affect access to abortion, the provision of abortion-related information or services by willing providers or the ability of States to fulfill Federal Medicaid legislation.

*Id.*

First, this legislative history was made eighteen years before *Dobbs* extinguished the constitutional right to abortion, which had for decades been ensconced by *Roe*. Second, as pointed out in *City and County of San Francisco v. Azar*, "Representative Weldon used the term 'refer for' as separate from the provision of information, and further explicitly clarified that the Amendment was not meant to apply to the provision of abortion-related information." 411 F. Supp. 3d 1001, 1021 (N.D. Cal. 2019). But "the provision of any information

22

by a 'health care entity' that could reasonably lead to a patient obtaining the procedure at issue would be considered a 'referral.'" *Id.* In other words, the statements of the legislator who sponsored and whose name appears on this Amendment, even if given substantial weight, do not clearly resolve what was intended with the words "refer for abortions" because he drew a distinction between referrals and the provision of abortion-related information that is not in the statutory text. The legislative history should not be used here to muddy the meaning of the statutory text, especially given the muddiness of the history itself. *See Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019) (noting that legislative history may "muddy" the meaning of clear statutory language).

**B**

Having determined that Oklahoma is substantially likely to succeed on the merits of its claim regarding the Weldon Amendment, I turn now to the second preliminary injunction factor – irreparable harm. Oklahoma asserts that the district court properly found that Oklahoma faces irreparable harm because it will lose $4.5 million in Title X funding absent an injunction.

To constitute irreparable harm, an injury must be certain, great, actual "and not theoretical." *Heideman*, 348 F.3d at 1189 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Irreparable harm is more than

"merely serious or substantial" harm. *Prairie Band of Potawatomi Indians*, 253 F.3d at 1250.

To make this showing, Oklahoma must establish "a significant risk that [it] will experience harm that cannot be compensated after the fact by monetary damages." *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (quoting *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484–85 (3d Cir. 2000)). And "[w]hile not an easy burden to fulfill," "a plaintiff who can show a significant risk of irreparable harm has demonstrated that the harm is not speculative." *Id.* Finally, to be irreparable, "the injury must be 'likely to occur before the district court rules on the merits.'" *New Mexico Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1250 (10th Cir. 2017) (quoting *Yellowstone Coal*, 321 F.3d at 1260).

Oklahoma argues it "will not likely be able to recoup the funds as monetary damages due to sovereign immunity." Aplt. Br. at 60. And, indeed, Oklahoma's argument succeeded in *Becerra*, 87 F.4th at 782–83. There, the Sixth Circuit held that economic injuries caused by agency action are unrecoverable because the APA does not waive the federal government's sovereign immunity in this context. *Id.* I agree with the Sixth Circuit's take on the issue. The termination of the financial grant is actual, irreparable harm

that will occur before the district court rules on the merits of the case, warranting relief.[9]

C

Merging the third and fourth factors that are necessary to merit a preliminary injunction, I also find they favor Oklahoma. On HHS's side of the scale, the public has an interest in Title X grantees complying with agency regulations to receive public funds. The funds, however, are already appropriated by Congress in this context, so whether they go to a grantee in Oklahoma or are redirected to Missouri as occurred here, the net result monetarily is a neutral transaction.

Weighing against HHS's interest is the reality that the termination of the grant to OSDH reduces access to health care for those who need it most: patients who visit OSDH clinics for health care because, by virtue of resources or geography, that is the only option available to them. Additionally, both the Weldon Amendment and Oklahoma state law § 861 were enacted by elected representatives in the respective legislatures, federal and state, so compliance

---

[9] The parties filed a motion for expedited review of this appeal because a decision is needed to obligate funds for the next fiscal year, should an injunction be granted. The need to expedite this appeal further demonstrates irreparable harm, as what is at stake is the funding of OSDH clinics to provide health care to low-income and rural patients.

and respect for the law is an interest that commands significant weight. Oklahoma prevails on this factor as well.

## D

Finally, and for the same reasons stated above, I would grant Oklahoma a stay under 5 U.S.C. § 705. Section 705 provides:

> When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. *On such conditions as may be required and to the extent necessary to prevent irreparable injury*, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, *may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.*

*Id.* (emphases added).

Oklahoma has satisfied § 705's requirements. Not only has it demonstrated a substantial likelihood of success on the merits, but it also has demonstrated that it would suffer irreparable harm absent an injunction.

## IV

This case presents circumstances that ripened only after *Dobbs* was decided and Oklahoma's abortion ban took effect. These two events gave rise to a change in OSDH's longstanding policy, as it concluded it could no longer follow the referral requirement set forth in 42 C.F.R. § 59.5(a)(5) without running afoul of state law and policy. But rather than complying with its statutory obligations, HHS terminated OSDH's grant in violation of the

Weldon Amendment. Because I conclude that Oklahoma has met its burden, I would reverse the district court and remand with instruction to grant the preliminary injunction motion. Accordingly, I respectfully dissent.